UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA       :

                        :

     -against-               :         NOTICE OF MOTION TO

                        :         DISMISS

HALIMA SALMAN,          :

                        :         24-CR-206 (NCM)

          Defendant.     :

-----------------------------------------------------X

PLEASE TAKE NOTICE, upon the annexed memorandum of law, that the defendant

HALIMA SALMAN, by her attorneys MIA EISNER-GRYNBERG and SAMUEL JACOBSON

of the Federal Defenders of New York, Inc., will move the Court, before the Honorable Natasha

C. Merle, United States District Judge for the Eastern District of New York, for an Order:

1.      Dismissing the indictment due to violation of the non-delegation doctrine.

2.      Granting such other and further relief as the Court may deem just and proper.

DATED:     BROOKLYN, N.Y.
            April 16, 2025

                                          /s/
                              MIA EISNER-GRYNBERG
                              SAMUEL JACOBSON
                              Attorneys for Halima Salman
                              Federal Defenders of New York, Inc.
                              1 Pierrepont Plaza, 16th Floor
                              Brooklyn, N.Y. 11201
                              (718) 330-1257

TO:    JOHN J. DURHAM
       United States Attorney
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, N.Y. 11201
       By:   Assistant U.S. Attorney Amanda Shami
              Assistant U.S. Attorney Andrew Reich

CC:    Clerk of the Court (NCM) (by ECF)
       Halima Salman

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA     :
     :
  -against-     :
     :       24-CR-206 (NCM)
HALIMA SALMAN,     :
     :
     Defendant.     :
-------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS DUE TO VIOLATION OF THE NONDELEGATION
DOCTRINE**

MIA EISNER-GRYNBERG
SAMUEL JACOBSON
Attorneys for Halima Salman
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201
(718) 330-1257

TO:   JOHN J. DURHAM
     United States Attorney
     Eastern District of New York
     271 Cadman Plaza East
     Brooklyn, New York 11201
     By:   Assistant U.S. Attorney Amanda Shami
           Assistant U.S. Attorney Andrew Reich

**TABLE OF CONTENTS**

A.  Introduction…………………………………………………………………….....1

B.  Background……………………………………………………………...…...1

C.  Argument…………………………………………………………………….3

      1.  Section 2339D Impermissibly Delegates Quintessentially Legislative Powers………4

      2.  Section 2339D's Delegation to the Secretary of State Fails the Intelligible Principle Test………………………………………………………………………….4

          a.  To state an Intelligible Principle, a Statute Must Provide Sufficiently Clear Guidance on Fundamental Policy Questions……………………………….5

          b.  Section 1189(a)(1)'s Requirements Provide Little Guidance as to the Boundaries of the Delegated Authority, Granting the Executive Discretion to Criminalize Conduct through § 2339D……………………………………………….8

      3.  Compared to Permissible Delegations, the Character and Significance of the Power Conferred by Section 2339D Render it Unconstitutional……………………11

D.  Conclusion…………………………………………………………….........11

A.  <u>Introduction</u>

The power to decide if countless private citizens around the world are subject to criminal liability in the United States is an immense one. The Constitution vests that power exclusively in Congress. But under 18 U.S.C. § 2339D(a) and (c)(4), Congress tied the criminal material support statute to the definition of a foreign terrorist organization in 8 U.S.C. § 1189, which expressly delegates the authority to designate foreign terrorist organizations ("FTOs") to the Secretary of State. Under this statutory scheme, the State Department, rather than Congress, has the unguided and unchecked power to decide which organizations are or are not subject to criminal liability under Section 2339D. This is plainly unconstitutional.

B.  <u>Background</u>

The authority to legislate is entrusted solely to Congress. U.S. Const. Art. I §§ 1, 8. "Congress manifestly is not permitted to abdicate or transfer to others the legislative functions" with which it is vested. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935). This "nondelegation doctrine is rooted in the principle of separation of powers... " *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

Because of its focus on protecting individual liberty, the nondelegation doctrine is enforced most rigorously in the criminal context. Several specific constitutional provisions safeguard the separation of powers. While Congress may single out parties to a civil suit, *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1327 (2016), the Bill of Attainder Clause, U.S. Const. art. I, § 9, prevents Congress from singling out persons for criminal punishment. This protection is "an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965).

1

The Framers recognized that, with "criminal subjects," Congress should "leave as little as possible to the discretion of those who are to apply and to execute the law." James Madison, *The Report of 1800*, in 14 *The Papers of James Madison* 266, 307, 324 (Robert A. Rutland et al. eds., 1983). As a result, the Court has made clear that "defining crimes" is a "legislative" function, *United States v. Evans*, 333 U.S. 483, 486 (1948), and that Congress cannot delegate "the inherently legislative task" of determining what conduct "should be punished as crimes." *United States v. Kozminski*, 487 U.S. 931, 949 (1988); *see also United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ("It is the legislature which is to define a crime, and ordain its punishment.").

This special prohibition on congressional delegation of criminal lawmaking power is reflected in the Court's void-for-vagueness doctrine. Vague criminal statutes are prohibited both because individuals are entitled to sufficient notice as to what constitutes a crime and to prevent legislatures from "abdicat[ing] their responsibilities for setting the standards of the criminal law." *Smith v. Goguen*, 415 U.S. 566, 574-75 (1974); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (vague laws "impermissibly delegate[] basic policy matters to policemen"); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921) (invalidating vague criminal statute as delegation to define crimes). "In that sense, the [void-for-vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

The Court has not "exactly drawn" the line separating "legislative" from executive or judicial powers, *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825), but one thing is clear: the power to enact generally applicable, binding rules of private conduct is "legislative."

2

*See Yakus v. United States*, 321 U.S. 414, 424 (1944); *see also The Federalist No. 75*, at 450 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The essence of the legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of the society.").

While the nondelegation doctrine does not prevent Congress from "obtaining the assistance of its coordinate Branches," it can do so only if it provides clear guidance. *Id.* at 372-73. "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not forbidden delegation of legislative power.'" *Id.* at 372 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928)).

In both *Panama Refining Co.* and *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), the Supreme Court held that Congress had unconstitutionally authorized the Executive to make laws because "Congress had failed to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress delegated power." *Mistretta*, 488 U.S. at 374, n.7. Similarly, in Sections 1189 and 2339D, Congress failed to articulate any policy to guide the Secretary of State in exercising this delegated authority to designate FTOs. Because Section 2339D grants the Secretary of State unfettered discretion to determine who is subject to criminal liability without an "intelligible principle" to guide him, it plainly violates the nondelegation doctrine.

C. Argument

Section 2339D(a) and (c)(4) violates the Constitution under any formulation of the nondelegation doctrine. First, the delegation is invalid under an originalist understanding of the nondelegation doctrine because the statute transfers to the Secretary of State what can only be described as legislative authority. Second, the statute is unconstitutional because it fails to

3

provide a sufficiently intelligible principle to cabin and direct the Secretary of State's exercise of the delegated powers.

### 1. Section 2339D Impermissibly Delegates Quintessentially Legislative Powers

Section 2339D grants, in the context of the receipt of military-type training statute, the Secretary of State quintessentially legislative powers: it allows him to prescribe who is subject to criminal sanctions, potentially governing the conduct of hundreds of thousands of private individuals, both in the United States and abroad, including Ms. Salman. It affects the substantive liberty interests of these individuals in the most profound way.

Under an originalist interpretation of the Constitution, the legislative nature of these delegated powers ends the inquiry and requires this Court to invalidate the delegation. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1246 (2015) (Thomas, J., concurring) ("[T]he original understanding of the federal legislative power . . . require[s] that the Federal Government create generally applicable rules of private conduct only through the constitutionally prescribed legislative process."); *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825) ("It will not be contended that Congress can delegate . . . powers which are strictly and exclusively legislative. . . . [Those powers] must be entirely regulated by the legislature itself."); *Field v. Clark*, 143 U.S. 649, 692 (1892) ("That congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution.").

### 2. Section 2339D's Delegation to the Secretary of State Fails the Intelligible Principle Test

In addition to violating originalist constitutional principles governing delegations of power, Section 2339D fails the Court's prevailing "intelligible principle" test because it fails to provide sufficiently clear guidance on fundamental policy question.

a.   To state an Intelligible Principle, a Statute Must Provide Sufficiently Clear Guidance on Fundamental Policy Questions

While affirming that Congress cannot delegate its legislative powers, the Supreme Court has recognized that "separation-of-powers principle[s] . . . do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The Court's modern jurisprudence has been "driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.*

The Court developed the "intelligible principle" test to evaluate such congressional delegations of power. Under this test, if "Congress shall lay down by legislative act an intelligible principle to which the person or body [to whom power is delegated] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

When Congress lays down a sufficiently clear guiding principle, the Court has construed the powers delegated not to be "legislative," even if they involve some degree of discretion, because Congress itself has made all of the fundamental policy decisions—i.e., it has done the "legislative" work. *See J.W. Hampton, Jr., & Co.*, 276 U.S. at 407. As the Court explained in *J.W. Hampton, Jr. & Co.*, when Congress delegates pursuant to an "intelligible principle" it "is not an exact statement" to claim that the Executive is exercising "legislative power" because such "power has already been exercised legislatively by the body vested with that power." *Id.*; *accord Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 85 (1932) ("[T]he legislative power of Congress cannot be

5

delegated   But Congress may declare its will, and, after fixing a primary standard, devolve . . . the 'power to fill up the details'… ").

In addition to being clear enough to guide the Executive, this intelligible principle must enable courts to determine whether the delegate has acted within the bounds of the delegated authority and in accordance with Congress's expressed will. *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 423, 425 (1944) (courts must be able to see "in an appropriate proceeding" that there is a "substantial basis" for the executive action and that the "will of Congress has been obeyed"); *Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686 (1980) (Rehnquist, J., concurring) (intelligible principle requirement "ensures that courts . . . reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards"). The principle, even if defined under "broad general directives", must "clearly delineate[] the general policy, . . . and the boundaries of this delegated authority." *U.S. v. Bozarov*, 974 F.2d 1037, 1041 (9th Cir. 1992).

The intelligible principle requirement thus preserves "both sets of constitutional checks—judicial and political—on the exercise of coercive authority in a 'government of laws.'" Laurence H. Tribe, *American Constitutional Law* 985 (3d ed. 2000). It permits a court to police delegations to ensure the delegate does not exceed Congress's grant of authority and follows Congress's will. And by requiring Congress to provide adequate guidance in the first instance, the intelligible principle test ensures that Congress itself makes the critical legislative policy decisions.

Under the intelligible principle test, the amount of required congressional guidance depends on the "extent and character" of the power conferred. *See J.W. Hampton, Jr., & Co.*, 276 U.S. at 406; *see also Whitman*, 531 U.S. at 475 ("[T]he degree of agency discretion that is

6

acceptable varies according to the scope of the power congressionally conferred."). Congress itself must regulate certain "important subjects," but may more freely delegate to the executive in areas of "less interest." *Wayman*, 23 U.S. (10 Wheat.) at 43. For example, while Congress "must provide substantial guidance on setting air standards that affect the entire national economy," far less guidance is necessary when the Executive determines relatively minor matters, like the definition of "country elevators." *Whitman*, 531 U.S. at 475. Congress must also speak with particular clarity when it confers powers that "touch[] constitutionally sensitive areas." Tribe, *supra* at 987. "[A]ction . . . in areas of doubtful constitutionality[] requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *Greene v. McElroy*, 360 U.S. 474, 507 (1959); *see also Kent v. Dulles*, 357 U.S. 116, 129 (1958) ("If . . . 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress."); Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 317(2000) (noting that the nondelegation doctrine's "most convincing claim" is "that certain highly sensitive decisions should be made by Congress").

When transferring powers that touch upon these areas, Congress must provide sufficiently clear directives to show that it deliberated and made the required "legislative judgment." *United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring) ("The area of permissible indefiniteness [of a delegation] narrows, however, when the regulation invokes criminal sanctions and potentially affects fundamental rights"); *see also Bilski v. Kappos*, 561 U.S. 593, 649 (2010) (Stevens, J., concurring) ("[A]t the 'fringes of congressional power,' 'more is required of legislatures than a vague delegation to be filled in later[.]'") (quoting *Barenblatt v. United States*, 360 U.S. 109, 139-40 (1959) (Black, J., dissenting)). This principle is of course manifest in the requirement that Congress—not the Executive—decide the

7

scope of criminal laws. § 2339D's designation violates this principle by granting the Executive the power to decide exactly what that scope is.

> b. Section 1189(a)(1)'s Requirements Provide Little Guidance as to the Boundaries of the Delegated Authority, Granting the Executive Discretion to Criminalize Conduct through § 2339D

Section 2339D(a) and (c)(4) define the term "terrorist organization" as "an organization designated as a terrorist organization under Section 219 of the Immigration and Nationality Act." Section 219 of the INA, as amended by AEDPA, is codified at 8 U.S.C. § 1189, and provides that the Secretary of State, "in consultation with the Secretary of the Treasury and the Attorney General," may designate an organization as an FTO if he finds: (1) it is foreign; (2) it is engaged in "terrorist activity" or "terrorism," or has the "capability and intent" to do so; and (3) "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4).[1]

These three "discrete" requirements underscore the extent of power delegated to the Secretary of State by a designation under § 1189(a). Their definitions are short, broad, and provide little to no overall guidance on the implications of a designation as a terrorist organization. § 1189(a)(1) contains only a cursory requirement that the organization be "foreign," while § 1189(a)(3) defines activity related to "national security" with the broad brush of "national defense, foreign relations, or economic interests of the United States."

---

[1] Moreover, Section 1189(a)(8) specifically precludes a criminal defendant from challenging the Secretary of State's designation:

> If a designation under this subsection has become effective under paragraph (2)(B) a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing.

Even when § 1189(a)(2) refers to a definition of "terrorist activity" in another section, the requirements become more vague, not more specific. The §1189(a)(1)(B) requirement that an organization is engaged in "terrorist activity" as defined in § 1182(a)(3)(B) only requires the Secretary to have "reasonable grounds to believe that an organization has engaged in terrorist acts-assassinations, bombings, hostage-taking. . ." *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000). If all that is required is the "reasonable belief" in the potential "capability and intent" of an organization from the conjecture of the politically appointed Secretary, the intelligible principle lies within the mind of the Secretary, not Congress. Even when § 1182(a)(3)(B) gives some better guidance using traditional examples of hijacking, violence, or sabotage as "terrorist activity," it still fails to state how those specific violent and criminal acts become terrorist activity. The crucial point here is that evidence of hijackings, violence, sabotage, kidnapping, or other unlawful activity cannot stand as an intelligible principle themselves, because the definition of foreign terrorism is a subset of all hijackings, violence, sabotage, etc., and nothing is given to differentiate "terrorist" violent activity and non-terrorist violent activity. Where do the actions of US-backed militias or rebel fighters, who engage in hijackings, violence, and sabotage for more acceptable purposes lie? In recognizance of this, the FBI's definition of terrorism only includes violent or criminal actions "inspired by, or associated with, *designated foreign terrorist organizations*,"[2] exempting any activity done by an organization not on the list. Another cursory glance at the current list of designated FTOs reveals just 92 organizations, the oldest being designated so in 1997.[3] Surely an intelligible definition of

---

[2] https://www.fbi.gov/investigate/terrorism.

[3] https://www.state.gov/foreign-terrorist-organizations/.

9

"terrorist activity" did not lead to the composition of this FTO list, nor do these 92 organizations accurately reflect the amount of "terrorist activity" that occurs in foreign lands. Rather, organizations find themselves on the FTO list as a result of political decision making by the executive,[4] subject to little restraint on when and how they must designate. All this is to say; regardless of the complexities and unworkability of a "terrorism" label, for a matter that most squarely falls into *Wayman*'s "important subjects," such a circular and bare definition of terrorist activity cannot be construed as clear Congressional guidance.

We have highlighted how a lack of clarity discerning an intelligible principle poses a greater issue when referring to *personal criminal liability.* The proscription of criminal conduct is a direct result of the unrestrained and unprincipled delegation of power to the executive. If a FTO designation was only a tool for foreign economic sanctions and political messaging, this definition may suffice for the purposes of the nondelegation doctrine, but the question of "What is terrorism?" and "What isn't terrorism?" when referring to personal criminal liability is unguided and unbound.[5] The Secretary of State reaches far beyond the traditional boundaries of the executive's role in foreign affairs and into the legislative domain of prescription of criminal codes and domestic conduct, all guided by his "reasonable belief". When it "would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, Congress [has] fail[ed] to give sufficient guidance in its delegations . . ." *Mistretta v. U.S.*, 488 U.S. 361, 379

---

[4] *See* Sanford, Melissa (2020) "'This is a Game:' A History of the Foreign Terrorist Organization and State Sponsors of Terrorism Lists and their Applications," History in the Making: Vol. 13 , Article 10. (discussing the administration-by-administration foreign policy agendas that lead to politically-motivated designation and undesignation, particularly Iran).

[5] *See Whiteman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001) ("While Congress need not provide any direction to the EPA regarding the manner in which it is to define 'country elevators,' . . . it must provide substantial guidance on setting air standards that affect the entire national economy.") (citations omitted).

(1989) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). This circular Congressional language instead creates a framework in which the executive may pick and choose which groups to designate as terrorist,[6] criminalizing otherwise innocuous conduct through § 2339B.[7] Emboldened with a criminal statute in § 2339B in which Congress has already expanded the definition of "material support or resources,"[8] the power to designate under 8 U.S.C. § 1189 is not one that can be delegated with such an ill-defined principle.

> 3. Compared to Permissible Delegations, the Character and Significance of the Power Conferred by Section 2339D Render it Unconstitutional

At its heart, the Section 2339D cross-reference to Section 1189 permits the Secretary of State to designate as "foreign terrorist organizations" any foreign organizations engaged in "terrorist activity or terrorism". The circularity of this Congressional guidance falls far below what is required to pass muster under the nondelegation doctrine. The point is not that DOJ's prosecutions under the Secretary of State's historical FTO designations represent good or

---

[6] Look no further than to the most recent additions to the list of FTO designations, in which the Trump Administration named eight Mexico-affiliated drug cartels on February 20th, 2025. This is not to say that drug cartels are incapable of terrorist-adjacent behavior such as kidnapping and attacks on public officials, but the classification of a profit-seeking crime syndicate as a "terrorist" organization represents a development in the government's understanding of terrorism and a clear expansion of executive power. *See* https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/. The Cato Institute has noted that such designation stands as a politically favorable move for the Trump administration's anti-immigration and border enforcement agenda, further suggesting a lack of an effective intelligible principle. *See* https://www.cato.org/blog/trump-administration-shouldnt-designate-drug-cartels-foreign-terrorist-organizations.

[7] The Brennan Center for Justice has highlighted how the addition of drug cartels to the FTO list risks criminal liability for organizations serving domestic migrants such as food banks, churches, and synagogues under § 2339B. *See* https://www.brennancenter.org/our-work/analysis-opinion/dangerous-sweep-trumps-plan-designate-cartels-terrorist-organizations.

[8] The definition of "material support or resources" was also expanded by AEDPA. Pub. L. 108–458, §6603(e).

bad policy. The point is that the Constitution requires Congress—not the Secretary of State—to make these sorts of fundamental legislative choices and for Congress's choices to be reflected in the guidance it provides in any delegation.

The lack of guidance attending this delegation makes Section 2339D akin to the statutes the Supreme Court invalidated in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). Both cases involved laws backed by criminal sanctions, and that fact, coupled with the overall significance of the delegated authority, weighed in the Court's holdings that Congress had not sufficiently constrained Executive power in its delegations. *See Fahey v. Mallonee*, 332 U.S. 245, 249 (1947) (distinguishing *Panama Refining* and *Schechter Poultry* because they "dealt with delegation of a power to make federal crimes of acts that never had been such before").

In *Panama Refining*, 293 U.S. at 406, the Court struck down a statutory provision "authoriz[ing] [the President] to prohibit the transportation in interstate and foreign commerce of petroleum" products produced in excess of state production quotas, so called "hot oil." The Court noted that whether oil could be transported in interstate commerce was "obviously [a question] of legislative policy." *Id.* at 415. It therefore looked to the statute to see whether Congress had properly "set up a standard for the President's action; [or] . . . required any finding by the President in the exercise of the authority to enact the prohibition." *Id*.

The statute did not do so. It did not state "whether or in what circumstances or under what conditions" the President was to ban hot oil, nor provide any criteria to govern his decision. *Panama Refining*, 293 U.S. at 415. The statute instead endowed the President with "unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he

12

may see fit," unguided by any "standard or rule." *Id.* at 415, 418. Thus, "[i]nstead of performing its lawmaking function," Congress had "transfer[red] that function to the President." *Id.* at 430. Similarly, in *Schechter Poultry*, 295 U.S. at 529, the Court struck down a statute authorizing the President to adopt a code of industrial conduct that fostered "fair competition." The Court held that "[i]n view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes . . . is virtually unfettered." *Id.* at 541-42. It invalidated Congress's attempt to "abdicate or transfer to others the essential legislative functions with which it is vested." *Id.* at 529.

The dearth of guidance in Section 2339D, and in the statutes struck down in *Schecter Poultry* and *Panama Refining*, stand in marked contrast to statutes where the Court has upheld congressional delegations to the Executive in the criminal lawmaking context. In *Touby v. United States*, 500 U.S. 160, 168-69 (1991), for example, the Supreme Court ruled that Congress had provided sufficient guidance in permitting the Drug Enforcement Agency to temporarily schedule, and thereby criminalize the possession or distribution of, new drugs under the Controlled Substances Act (CSA). Before exercising this power, Congress required the DEA to find that scheduling a new drug was "necessary to avoid an imminent hazard to the public safety." *Id.* at 163 (citing 21 U.S.C. § 811(h)). In making that determination, Congress further required the DEA to consider three factors: the drug's "history and current patterns of abuse"; "[t]he scope, duration and significance of abuse"; and "[w]hat, if any, risk there is to the public health." *Id.* at 166 (citing 21 U.S.C. §§ 811(c)(4)-(6), 811(h)(3)).

The Court determined that even if "greater congressional specificity [regarding a delegation] is required in the criminal context," the detailed directives in the CSA satisfied these requirements because they "meaningfully constrain[ed]" the Secretary of State's discretion.

*Touby,* 500 U.S. at 166. Indeed, the statute at issue in *Touby* resembles some of the earliest delegations approved by the Court, which conditioned executive action on the making of specific factual findings. *See, e.g.*, *Field v. Clark,* 143 U.S. 649, 693 (1892) (holding President was not "making laws" where delegation required him to act if he found a particular fact).

*Touby*'s statutory scheme gives us an idea about what a proper intelligible principle looks like. In contrast to the unguided or hidden purposes of a FTO designation in 8 U.S.C. § 1189(a), the scheduling statute contains an intimate, structured statutory scheme that identifies specific principles that the DEA must uphold or find when managing the addition and removal of drugs from the DEA schedule; these include: the "potential for abuse"; "scientific evidence of its pharmacological effect"; "the state of current scientific knowledge regarding the drug"; "psychic or physiological dependence liability"; and "[w]hether the substance is an immediate precursor of a substance already controlled under this subchapter.". 21 U.S.C. § 811(c)). Most importantly, the *purpose* of the statutory scheme and its intelligible principles are clear; Congress requires the DEA to investigate abuse, using up-to-date scientific research, while accounting for public health, and other specific characteristics of each drug before moving, adding, or removing them from the DEA schedule. Such specificity could exist in § 1189(a), but the entire substantive basis for answering the question - "Who is to be labeled as a "foreign terrorist organization"? - is defined with such bare-bones and vague language as to deprive it of any meaning. The depth and specificity of an intelligible principle is not dispositive in determining whether it may be a proper delegation, but § 1189(a)'s lack of detail for a critically important matter of national security only suggests its unconstitutionality.

For another example of a constrained and permissible intelligible principle, the Supreme Court most recently revisited its nondelegation jurisprudence in June 2019. The case, *Gundy v.*

14

*United States*, 139 S. Ct. 2116 (2019), involved a provision of the Sex Offender Registration and Notification Act ("SORNA") that confers on the Attorney General the authority to "specify the applicability" of SORNA's registration requirement to "sex offenders convicted before" the date of SORNA's enactment. In a 5-3 decision, the Court held that construed narrowly the relevant statutory section required the Attorney General simply to apply SORNA "to all pre-Act offenders as soon as feasible." *Gundy*, 139 S. Ct. at 2123. Here, both the purpose and urgency of the intelligible principle, inherent in the AG's task, are clear. It did not empower the Attorney General to create, remove, or otherwise revise registration requirements for these offenders. Accordingly, the Court held that the delegation in *Gundy* passed muster because it directed the Attorney General to "implement" Congress' legislation, *id*. at 2130, not to itself legislate. The delegation was "distinctly small-bore." *Id*.

Unlike the statute at issue in *Gundy*, Section 2339D does far more than "implement [Congress'] programs." *See id.* at 2130. The instant statute effectively endows the Secretary of State with the power to write his own criminal code. *See id*. at 2131 (Gorsuch, J., dissenting). Section 2339D contains no goal specifically relating to the delegation; no criteria to constrain the Secretary of State's exercise of the delegated power; and no standards by which a court can evaluate any executive action.

The question before this Court is not whether a defendant can raise at trial whether the FTO designation was proper, as was the issue in *United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015) (SLT), or whether Section 1189 violates the nondelegation doctrine because designations are not subject to judicial review, as in *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157 (E.D.N.Y. 2008) (BMC). In *Taleb-Jedi*, Judge Cogan did address, briefly, the wider constitutional question, opining that FTO designation delegation is permissible because

15

"Congress has established detailed procedures to designate organizations as FTOs and it retains the power to revoke such a designation when made." *Id*. at 172. But a "detailed procedure" is not the same as the constitutionally required "substantial guidance," and the power to override agency action by statute does not save otherwise unlawful delegation of legislative authority, because agency action can always be undone by statute. The question is whether "procedure" is a constitutionally valid replacement for actual guidance when Congress seeks to give away its legislative power. It is not.

To be clear, our issue is also not with the idea that Congress can delegate the designation of FTOs to the Secretary of State for any purposes—although that might be impermissible too—but with the practice, implemented through Section 2339D, that those same agency-determined FTO designations are in turn used to support the proscription of private conduct without additional Congressional action. In other words, we are not challenging Section 1189 itself, or any of the myriad non-criminal statutes or programs that depend on Section 1189. Whereas matters relating to foreign affairs and the military are the executive branch's traditional domain, in the context of material support laws, the designation of FTOs takes on a legislative valence, because it affects not only foreign policy determinations but also the regulation and criminalization of private conduct.

Under Section 2339D which criminalizes the receipt of military-type training from an FTO, the Section 1189 delegation grants broad and plenary power on the Secretary of State without substantial guidance. It is thus unconstitutional under *Whitman*. *See* 531 U.S. at 475. The delegation involves exactly the sort of significant and constitutionally sensitive decisions that require careful legislative deliberation and especially clear legislative guidance.

16

D.  Conclusion

In enacting Section 2339D, Congress improperly transferred its legislative power to the

Secretary of State without telling her how, or even whether, to exercise it. The nondelegation

doctrine thus requires the Court to invalidate this definitional section of the material support

statute. Doing so will reaffirm basic separation-of-powers principles, thereby protecting

individual liberty, preserving democratic accountability, and vindicating the rule of law. By tying

Section 2339D to the plenary delegation authorized at 8 U.S.C. § 1189, Congress

unconstitutionally conferred unguided and unchecked power to create criminal liability upon an

executive agency. The indictment must be dismissed.


DATED:        BROOKLYN, N.Y.
              April 16, 2025

                                        _____/s/_____
                                        MIA EISNER-GRYNBERG
                                        SAMUEL JACOBSON
                                        Attorneys for Halima Salman
                                        Federal Defenders of New York, Inc.
                                        1 Pierrepont Plaza, 16th Floor
                                        Brooklyn, N.Y. 11201
                                        (718) 330-1257