UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA               :

    -against-                                    :          NOTICE OF MOTION TO
                                :          EXCLUDE EVIDENCE

HALIMA SALMAN,                            :

                               :          24-CR-206 (NCM)

          Defendant.               :
------------------------------------------------------X

PLEASE TAKE NOTICE, upon the annexed memorandum of law, that the defendant

HALIMA SALMAN, by her attorneys MIA EISNER-GRYNBERG and SAMUEL JACOBSON

of the Federal Defenders of New York, Inc., will move the Court, before the Honorable Natasha

C. Merle, United States District Judge for the Eastern District of New York, for an Order:

     1.     Excluding evidence of a photograph of a fraudulent document, pursuant to Fed. R.
           Evid. 1002, 1003, 901(a), 802, and 403; or

     2.     In the alternative, granting a pretrial evidentiary hearing pursuant to Fed. R. Evid.
           104(a) to determine the photograph's admissibility; and

     3.     Granting such other and further relief as the Court may deem just and proper.

DATED:     BROOKLYN, N.Y.
           April 16, 2025

                                            /s/
                               MIA EISNER-GRYNBERG
                               SAMUEL JACOBSON
                               Attorneys for Halima Salman
                               Federal Defenders of New York, Inc.
                               1 Pierrepont Plaza, 16th Floor
                               Brooklyn, N.Y. 11201
                               (718) 330-1257

TO:    JOHN J. DURHAM
       United States Attorney
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, N.Y. 11201
       By:   Assistant U.S. Attorney Amanda Shami
              Assistant U.S. Attorney Andrew Reich

CC:     Clerk of the Court (NCM) (by ECF)
        Halima Salman

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA   :
            :
 -against-       :
            :   24-CR-206 (NCM)
HALIMA SALMAN,     :
            :
    Defendant.   :
-------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF
## MOTION TO EXCLUDE EVIDENCE
## OF A PHOTOGRAPH OF A FRAUDULENT DOCUMENT

MIA EISNER-GRYNBERG
SAMUEL JACOBSON
Attorneys for Halima Salman
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201
(718) 330-1257

TO: JOHN J. DURHAM
   United States Attorney
   Eastern District of New York
   271 Cadman Plaza East
   Brooklyn, New York 11201
   By: Assistant U.S. Attorney Amanda Shami
      Assistant U.S. Attorney Andrew Reich

**TABLE OF CONTENTS**

A.  Introduction………………………………………………………………………….......1

B.  Background……………………………………………………………………….....…..1

C.  Legal Standards……………………………………………………………………………6

    i.   Best Evidence Rule………………………………………………………………….6

    ii.   Authentication……………………………………………………………………7

    iii.  Hearsay………………………………………………………………………..9

    iv.   Undue Risk of Unfair Prejudice……………………………………………………9

D.  Argument………………………………………………………………………...10

    i.   Admission of this Image File of a Photograph of Part of One Side of a Document Violates the Best Evidence Rule, as It Is Not an Original or an Admissible Duplicate, and the Government Has Not Established the Unavailability of the Original……………………………………………………………………...………10

    ii.   The Government Cannot Authenticate the Photograph of the Document…................12

    iii.  The Document Is Hearsay, and the Coconspirator Exclusion Does Not Apply….......21

    iv.  Given the Myriad Genuine Questions About the Authenticity of the Document, the Risk of Unfair Prejudice Substantially Outweighs Any Probative Value…..…...23

    v.   In The Alternative, The Court Should Hold an Evidentiary Hearing Pursuant to Rule 104(a)………………………………………………………………...24

E.  Conclusion………………………………………………………………….........24

This Memorandum of Law is submitted in support of Halima Salman's motion to exclude evidence of a photograph of a fraudulent document.

A.    Introduction

Halima Salman is charged by a single-count indictment with receiving military-type training from and on behalf of the Islamic State of Iraq and al-Sham ("ISIS"), a foreign terrorist organization. ECF No. 13; 18 U.S.C. § 2339D(a). Specifically, the government alleges that Salman received "training regarding the handling and operation of an AK-47 or 'Kalashnikov' style assault rifle, in Syria in or around March 2018." ECF No. 1 at 2. Central to the government's case is an image file of a photograph of part of an Arabic-language document, stored on a cell phone, which was purportedly recovered in early 2019 in the Middle Euphrates River Valley in Syria. *Id*. at 6-7. The government alleges that this phone belonged to Salman's husband. *Id.* The document states that "Umm al-Khattab al-Muhajir"—who the government says is Salman—"has completed her military training successfully and is qualified to receive ammunition for the 'AK47' already in her possession." *Id*. at 8. This purported photograph of a document is fake. It is not admissible for four reasons: (1) its admission violates the Best Evidence Rule; (2) the government cannot authenticate it; (3) its contents are hearsay, and do not qualify for any exclusion or exception; and (4) given the genuine questions raised about its authenticity, the risk of unfair prejudice substantially outweighs any probative value.

B.    Background

On October 23, 2016, when she was a minor, Halima Salman was taken outside of the United States by her parents. Without her knowledge or consent, and while she was still a minor, her father smuggled her, along with her eight siblings, from Turkey into an ISIS-controlled region of Syria. There, her father arranged for her to be married to a stranger. From her wedding

1

day in the summer of 2017 until her capture and detention by the non-governmental, United States-backed Syrian Democratic Forces ("SDF") in March 2019, Salman lived under her husband's control. Once captured, Salman remained in foreign detention, in gender-segregated prisons and camps, from March 2019 until her repatriation to the United States (and this prosecution) in May 2024.

Unbeknownst to Salman, once separated from her husband, the SDF recovered a cell phone somewhere in the Middle Euphrates River Valley in Syria on February 23, 2019.[1] A chain-of-custody record provided by the government in discovery indicates that the cell phone was transferred to the United States-led Coalition Forces on March 28, 2019, for evaluation as evidence and exploitation. On June 23 or 26, 2019,[2] the phone or its contents were transferred to NMEC, believed to be the National Media Exploitation Center. *See* ECF No. 1 at 6. NMEC is described by the government as a "clearinghouse of information that is acquired, seized, or captured outside the United States." *Id*. The same chain-of-custody record also indicates that the phone was no longer required as evidence as of June 23, 2019, and could be disposed.[3] Other

---

[1] The government has not provided Salman with any information regarding the recovery of the cell phone by any government or non-government agency, the manner of transfer of the cell phone or its contents from the recovering agency to United States law enforcement or intelligence agencies, the uploading of its contents to any databases, the search of any databases, or any extractions or analysis conducted following the search of any databases. Salman has requested that information from the government by letter on April 14, 2024, and renews that request here.

[2] Discovery provided by the government states that the chain of custody for the cell phone transferred on either June 23 (the recorded date) or June 26 (the digitally signed date), 2019 from the "CEM Coordinator" to "Techex" for NMEC Exploitation. Other discovery provided by the government indicates that a United States agent performed a physical extraction of the cell phone on June 15, 2019, which is not reflected in the chain of custody record.

[3] The defense is not aware of the current whereabouts of the cell phone. We have received in discovery what purports to be the physical extraction of its contents.

2

discovery provided by the government indicates that a federal agent analyzed the physical extraction of the cell phone's contents on August 18, 2022.

Sometime between June 15, 2019, and August 18, 2022, which has not been disclosed to the defense, the "FBI requested information from NMEC on a number of topics, including but not limited to whether any CEM [Collected Exploitable Material] had been obtained relating to HALIMA SALMAN." ECF No. 1 at 6. That review identified the cell phone recovered on February 23, 2019, and certain contents. NMEC produced to the FBI "Individual-3 Device NMEC Records," which have not been disclosed to the defense. Within those records, the FBI located the following image file:



The photograph appears to display part of one side of a folded piece of paper, which depicts a typewritten form with several blanks. The blanks are filled with handwritten entries in blue ink. Taken together, the document states that "Umm al-Khattab al-Muhajir," or Umm al-Khattab, the migrant, is the wife of "Abu Ali al-Almani al-Khorasani," which translates to Abu Ali of Germany and Afghanistan. ECF No. 1 at 7-8. It "states the personnel number assigned to [Abu Ali] by ISIS; and further states that 'Umm al-Khattab al-Muhajir' has completed her military training successfully and is qualified to receive ammunition for the AK47 already in her

possession." *Id*. at 8. The bottom right corner of the pre-printed, typed portion of the document appears to be in a different font, and translates to Nusaybah bint-Kaab, which the government says is a reference to the Nusaybah Katiba[4] battalion. The document is signed in handwritten blue ink, in Arabic, by "Umm Yousef."

Discovery provided by the government relays that when federal agents confronted Salman with the photograph of the document, she was shocked: she denied receiving this document or seeing it before, and she told them that she believed that it was fake. She told agents that she had not attended the training, she had not received the items listed in the document, and she was unfamiliar with Umm Yousef.

The document is not dated. It does not indicate a location of either the alleged training or where the document was signed. The document does not further identify Umm Yousef or state that person's position or authority to sign such a document on behalf of Nusaybah Katiba. Notably, the document does not display any marking from an ISIS rubber stamp, which was standard for genuine ISIS-issued credentials: "Each department had its own stamp, listing the name of the division and sometimes the name of the official in charge." Rukmini Callimachi, *The ISIS Files: When Terrorists Run City Hall*, The New York Times (Apr. 4, 2018), https://www.nytimes.com/interactive/2018/04/04/world/middleeast/isis-documents-mosul-

---

[4] The government has described Nusaybah Katiba in this and another case as "an ISIS military battalion or unit composed solely of female members of ISIS, principally those who were or had been married to male ISIS fighters." ECF No. 1 at 8. The government has indicated that Nusaybah Katiba was created in or around late 2016. *Id*. According to the government, the battalion began operations in February 2017, and conducted trainings at several locations in Raqqa, Syria. *See United States v. Fluke-Ekren*, 22-CR-92 (LMB) (E.D. Va.), ECF No. 36.

iraq.html; *see also The Islamic State Archives,* https://islamicstatearchives.com/archives/ (examples depicted below):[5]



Forged, fabricated or fraudulent ISIS documents are a known problem. For example, on October 30, 2019, The New York Times published an article, relying on four alleged ISIS documents that a researcher, Aymenn Jawad al-Tamimi, had concluded to be authentic. Rukmini Callimachi, *ISIS Leader Paid Rival for Protection but Was Betrayed by His Own*, The New York Times (Oct. 30, 2019), https://www.nytimes.com/2019/10/30/world/middleeast/isis-leader-al-baghdadi.html. On November 15, 2019, after reviewing four additional alleged ISIS receipts, al-Tamimi concluded not only that the newly analyzed receipts were forged, but also recanted the professed authenticity of the original four receipts. *See Editors' Note: November 15, 2019*, The New York Times (Nov. 15, 2019), https://www.nytimes.com/2019/11/15/pageoneplus/editors-note-november-15-2019.html. Al-Tamimi "concluded that although the receipts appear to be printed on original ISIS stationery, the handwritten information on them was most likely not authentic." Rukmini Callimachi, *Experts Divided on Authenticity of Islamic State Receipts* (Nov.

---

[5] The defense, of course, cannot independently confirm the authenticity of these samples found in the public record on the internet.

14, 2019), https://www.nytimes.com/2019/11/14/world/middleeast/islamic-state-receipts-debate.html. He noted, among other concerns, a mismatch in the dates of the receipts and the known timeline of certain events, as well as the similarity of handwriting on receipts purported to have been written by two different people. *Id*. "Unfortunately, this only leads me to the conclusion that they are not authentic," Mr. al-Tamimi said. *Id*. Finally, on December 18, 2020—more than a year later—The New York Times issued an additional Editors' Note to the article: "The article should also have noted that Mr. al-Tamimi had also reviewed several other documents from the same trove at The Times's request and did not believe they were authentic." Rukmini Callimachi, *ISIS Leader Paid Rival for Protection but Was Betrayed by His Own*, The New York Times (Dec. 18, 2020), https://www.nytimes.com/2019/10/30/world/middleeast/isis-leader-al-baghdadi.html.

> C.    Legal Standards

The Federal Rules of Evidence protect a defendant from being prosecuted by fabricated or unreliable evidence. "In general, a document may not be admitted into evidence unless it is shown to be genuine." *United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990).

> i.    The Best Evidence Rule

Pursuant to Federal Rule of Evidence 1002, commonly known as the Best Evidence Rule, "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." "A 'writing' consists of letters, words, numbers, or their equivalent set down in any form." Fed. R. Evid. 1001(a). "A duplicate is admissible to the same extent as the original *unless a genuine question is raised about the original's authenticity* or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003 (emphasis added). "A 'duplicate' means a counterpart produced by a mechanical,

6

photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e).

Federal Rule of Evidence 1004 creates an exception to the Best Evidence Rule, deeming that "an original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith; (b) an original cannot be obtained by any available judicial process; (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or (d) the writing, recording, or photograph is not closely related to a controlling issue." A party seeking to rely on [subsection (a)] may do so "only where the [party] demonstrates that it has made a diligent but unsuccessful search and inquiry for the missing" document. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). The Advisory Committee notes to subsection (b) explain that "available judicial processes" include taking depositions in other jurisdictions.

    ii.    <u>Authentication</u>

"The proponent" of a piece of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "The requirement of authentication is ... a condition precedent to admitting evidence." *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014). "'The type and quantum of evidence' required to authenticate proffered evidence is 'related to the purpose for which the evidence is offered,' and depends upon a context-specific determination whether the proof advanced is sufficient to support a finding that the item in question is what its proponent claims it to be." *Id*. at 130 (citing *United States v. Sliker*, 751 F.2d 477, 488 (2d Cir. 1984)). Though "[t]he proponent need not rule out all

possibilities inconsistent with authenticity, or ... prove beyond any doubt that the evidence is what it purports to be," there must nonetheless be at least "sufficient proof ... so that a reasonable juror could find in favor of authenticity or identification." *Vayner*, 769 F.3d at 130.

The proponent of a piece of evidence can authenticate it in numerous ways. "The simplest (and likely most common) form of authentication is through the testimony of a 'witness with knowledge' that 'a matter is what it is claimed to be.'" *Id.* (quoting Fed. R. Evid. 901(b)(1)). Or, an expert witness or the trier of fact may compare the proposed evidence "with an authenticated specimen." Fed. R. Evid. 901(b)(3). A piece of evidence may be sufficiently authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4).

The "distinctive characteristics" method may be appropriate only "if the writing deals with a matter sufficiently obscure or particularly within the knowledge of the persons corresponding," and "were not a matter of common knowledge." *Maldonado-Rivera*, 922 F.2d at 957. The relevant Commentary makes it clear that the "distinctive characteristics and the like" that may authenticate a document are those that could only be known to a limited number of persons. See FRE 901, Advisory Committee Notes, 1972 Proposed Rules, Notes to Subdivision (b), Example (4). "A mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity." *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2d Cir. 2001). That information about a person appears in a document is not alone sufficient to "permit a reasonable conclusion that [the document] was created by the defendant or on his behalf" if the information "allegedly tying the [document]" to the defendant is also known by others. *Vayner*, 760 F.3d at 132. This is particularly so when those others "may have had reasons to create a [document] falsely attributed to the defendant." *Id*.

8

### iii.   Hearsay

"Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802. Hearsay statements are those made outside of testimony at the current trial or hearing, being offered by a party "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A statement is excluded from this prohibition, and is not hearsay, if it was made by the party against whom it is being offered, Fed. R. Evid. 801(d)(2)(A), or by the party's coconspirator during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). "The statement must be considered but does not by itself establish the existence of the conspiracy or participation in it under (E)." To admit a coconspirator statement as an exclusion to the hearsay rule, the court must make findings, by a preponderance of the evidence, establishing the existence of a conspiracy including both the defendant and the declarant at the time the document was authored. *United States v. Al-Moayad*, 545 F.3d 139, 173-74 (2d Cir. 2008). Or, statements that are hearsay may nonetheless be admitted if they meet various exceptions, delineated in Federal Rules of Evidence 803 and 804.

### iv.   The Risk of Unfair Prejudice

Even if otherwise admissible, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The rules calling for generous treatment of party-opponent admissions still do not stand for the proposition that Rule 801(d)(2) trumps *all other* Federal Rules of Evidence. For example, Rule 403 clearly applies to admissions, and a trial judge can exclude admission evidence if its probative value is substantially outweighed by the danger

9

of unfair prejudice." *Aliotta v. Natl. R.R. Passenger Corp.*, 315 F.3d 756, 763 (7th Cir. 2003) (emphasis in original). Courts have excluded coconspirator or other agent-made party opponent statements, which were not uttered directly by the defendant, pursuant to Rule 403 when the circumstances surrounding them are so unreliable that they risk unfairly prejudicing the defendant or misleading the jury. *E.g.*, *Mister v. N.E. Illinois Commuter R.R. Corp.*, 571 F.3d 696, 699 (7th Cir. 2009).

        D.     <u>Argument</u>

              i.     <u>Admission of this Image File of a Photograph of Part of One Side of a Document Violates the Best Evidence Rule, as It Is Not an Original or an Admissible Duplicate, and the Government Has Not Established the Unavailability of the Original</u>

At the outset, the Court must exclude the evidence because its admission would violate the Best Evidence Rule. The image file found on the cell phone—of a photograph of part of one side of a document—is indisputably not the original document that the government would ask the jury to believe was created incident to the completion of a military training course in Syria. Thus, Rule 1002 does not permit its admission "in order to prove its content:" that Salman attended military training, the sole count of the indictment.

Neither is the partial photograph admissible as a "duplicate" under Rule 1003. First, to be a duplicate, the government must demonstrate that it is a "counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e). The government has not, and cannot, make a sufficient showing that the image file on the phone "accurately reproduce[d]" the original without presenting evidence of the contents of the original. *E.g.*, *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016) (affirming admission of duplicate where bank employee

testified that she had seen the original loan documents and that the photocopies faithfully reflected the originals).

Given the document's apparent mix of typewritten and handwritten text, the government cannot establish which components, if any, existed on the original folded piece of paper. Rule 1003 expressly provides that purported duplicates cannot be admitted if "a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Salman has sufficiently challenged both: she has denied ever seeing the original form as well as the assertions made within it, specifically putting the government on notice that it was fake. And, given the documented history of fake ISIS documents—specifically, those found to be "printed on original ISIS stationery," but "the handwritten information on them was most likely not authentic"—she has raised numerous "genuine," and unanswered "questions" "about the original's authenticity" such that "the circumstances make it unfair" to admit this image file. *See* Callimachi, *Experts Divided on Authenticity of Islamic State Receipts*; *see also Elliott v. Cartagena*, 84 F.4th 481, 491 (2d Cir. 2023) (finding the district court abused its discretion in admitting a draft document as a duplicate under Rule 1003 where the plaintiff testified that the document was different from the version he had signed).

Nor can the government admit the image file as "other evidence" pursuant to Rule 1004. First, the government has not established that "all the originals are lost or destroyed." Fed. R. Evid. 1004(a). The government has produced no discovery establishing the requisite "diligent but unsuccessful search and inquiry for the missing" document. *Burt Rigid Box, Inc.*, 302 F.3d at 91. If the photograph is a genuine representation of a true document, as the government claims, the paper document would have had to exist at the time it was allegedly issued by Umm Yousef on behalf of Nusaybah Katiba and awarded to Salman. The government has produced no back-end

11

copy of the document recovered from the Katiba, nor any corroborating evidence of the same. Based on its contents, the document was supposedly addressed by the Katiba to the Diwan Al-Jund, the military department, directing it to provide a quiver, magazines, and bullets to Salman. The government has produced no record of the document recovered from the Diwan Al-Jund. Finally, the government claims that this photograph was stored on a phone used by Salman's husband. But the government has made no showing that her husband "lost or destroyed" the original that they would have the jury believed he photographed.

The government has failed to establish that it can rely on subsection (b), that "an original cannot be obtained by any available judicial process." The government has not professed to have deposed Salman's husband, who, upon information and belief, remains in the same foreign custody where United States agents routinely interview detainees, including foreign nationals. Nor has the government deposed (or identified) Umm Yousef, who they claim had authority to issue the document, or Allison Fluke-Ekren, who the government says was the Nusaybah Katiba trainer, and who is presently in United States custody. *See United States v. Fluke-Ekren*, 22-CR-92 (LMB) (E.D. Va.), ECF No. 36. Salman herself was never in custody of the original, which she has steadfastly denied the existence of, and she was not put on notice to preserve the nonexistent document. Fed. R. Evid. 1004(c). And unquestionably, the writing or photograph is closely related to a controlling issue: it is the only issue. Fed. R. Evid. 1004(d). Accordingly, on the record presently before this Court, the document must be excluded by the Best Evidence Rule.

          ii.     <u>The Government Cannot Authenticate the Photograph of the Document</u>

The purported photograph of the document is separately inadmissible because the government cannot authenticate it. It is true that the "bar for authentication of evidence is not

12

particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). But there is a bar, and the government has not, and cannot, overcome it sufficiently to "support a finding that the item in question is what its proponent claims it to be:" a genuine, ISIS-issued certification that Halima Salman did in fact complete military training in Syria. The government has not yet put forth any witness with personal knowledge of the document's authenticity. Fed. R. Evid. 901(b)(1). It has offered no genuine comparator, though Salman has requested any in the government's possession, *see* Letter of April 14, 2025; the defense has not independently found one, despite a worldwide search. Fed. R. Evid. 901(b)(3). And the theoretically "distinctive characteristics" of the document are anything but: the document in fact lacks distinctive characteristics that would be expected of a genuine ISIS-document; its contents contradict known facts; and the information within the document was widely known by a person with a motive to falsify it. Fed. R. Evid. 901(b)(4). Taken together, absent more, the photograph of the document must be excluded, because it is fake.

Three district courts have assessed the authentication of supposedly ISIS-issued documents for use at American trials. All three are instructive here. First, in *United States v. Musaibli*, the government sought to introduce thirteen such documents and one video: several rosters of ISIS fighters, which contained Musaibli's kunya (or nickname), census number, or other personal details; an organizational chart; spreadsheets of ISIS fighters who were treated at an ISIS hospital, including Musaibli; a biographical sheet for another individual with whom Musaibli had allegedly worked to recruit ISIS members; a roster of battalion administrators; ISIS payroll records that included Musaibli; an ISIS Office of the Treasury budget spreadsheet listing Musaibli's information; payment records from the ISIS Soldier's Administration that included Musaibli; a schedule describing how ISIS census numbers were assigned; an ISIS propaganda

13

video; photographs and manifests relating to Musaibli found on a hard drive by counterintelligence officers in Mosul, Iraq; and Musaibli's marriage certificate that he sent his parents, which "bore ISIS's stamp and apparently was issued by the group." 577 F. Supp. 3d 609 (E.D. Mich. 2021), *rev'd and remanded on other grounds*, 42 F.4th 603 (6th Cir. 2022). Next, in *United States v. Sylejmani*, the government sought to introduce excel spreadsheets of payroll and roster data of ISIS fighters, including Sylejmani. 20-CR-106 (RC) (D.D.C.), ECF No. 39. Finally, in *United States v. Ramic*, the government sought to introduce ISIS "General Border Administration Mujahid Information Forms" for Ramic and two codefendants-turned-cooperators and a Microsoft Access database table of information of ISIS fighters, including a witness expected to testify at trial. 21-CR-13 (GNS), ECF No. 221, 2024 WL 2274529, at *4 (W.D. Ky. May 20, 2024).

In *Musaibli*, the district court held an evidentiary hearing to determine the admissibility of the fourteen pieces of evidence. *See United States v. Musaibli*, 18-CR-20495 (DML) (E.D. Mich.), ECF Nos. 166, 167 (Tr. of Evid. Hrg. Held on June 28-29, 2021 re: Motion to Admit ISIS Documents). The government called six witnesses to authenticate the documents. *Musaibli*, 42 F.4th at 610. One of the witnesses was a cooperating witness: an ISIS database administrator to whom Musaibli had reported while in Syria, who personally observed Musaibli's ISIS military service, and discussed with him his personal identifying information. *Id*. at 611. The government also called an NMEC liaison officer who had received information collected about Musaibli, the FBI case agent who had conducted NMEC queries on Musaibli, an FBI intelligence analyst who wrote a report about the recovered documents, researcher Aymenn Jawad Al-Tamimi (the same researcher who authenticated, then recanted, and found inauthentic additional ISIS documents collected by The New York Times), and an investigator with the United Nations. *Id*. at 615-622.

14

At the hearing, the district court found that the government had sufficiently authenticated some of the military rosters and the biographical sheet through the testimony of a witness with knowledge—the cooperator who personally maintained them—as well as his testimony as to their distinctive characteristics, such as a unique purple stripe on them caused by his defective printer. *Id*. at 625. Likewise, the court relied on Al-Tamimi's expert testimony to authenticate these items based on his comparisons to genuine originals. *Id*. The court also credited Al-Tamimi's expertise in authenticating the payroll records recovered in Mosul, Iraq. *Id*. The court credited the organizational chart "based mainly on the stamps and markings" found on it. *Id*. The court credited expert testimony from the UN official to authenticate the budget spreadsheets, based on comparisons to genuine originals, *id*., and his and Al-Tamimi's expert testimony on another roster of foreign fighters. *Id*. The court admitted the marriage contract, as it "bore the characteristic stamp reading 'Islamic State' inside an oval and a notation of the local ISIS court that issued the license," and based on Al-Tamimi's comparison to genuine originals. *Id*. at 626.

Conversely, the district court excluded an additional roster of soldiers including Musaibli, given the limited testimony adduced at the hearing that an agent found the roster on the NMEC Harmony database, but offered up "little other evidence" "to establish the document's provenance or authenticity." *Id*. at 625. The court rejected the hospital records that included Musaibli, because "no witness provided information about the provenance or authenticity of this document." *Id*. The court denied admission of the ISIS census-number schedule, though found in NMEC's database, because it "bore no distinctive markings or legends," and Al-Tamimi was "equivocal about the document's provenance." *Id*. at 626. The court rejected the ISIS propaganda video, as the government presented "no evidence where it came from," and the agent had "no knowledge about when it was created, or by whom." *Id*. And the court rejected the two digitized

15

documents about Musaibli found on a hard drive in Mosul as "fall[ing] considerably short of establishing the authenticity of those items." *Id*. The court found that the testifying investigator "had no first-hand knowledge about how these exhibits came to be and he could not say for himself that they were accurate representations of what they purport to depict." *Id*. Though the government appealed the district court's decision, on other grounds, to exclude the other, authenticated ISIS documents, the government did not appeal the district court's refusal to authenticate these six items, and the Sixth Circuit did not reach them.

In *Sylejmani*, the district court ordered an evidentiary hearing on the government's motion to introduce excel spreadsheets of payroll and roster data of ISIS fighters, including Sylejmani. 20-CR-106 (RC) (D.D.C.), Minute Entry Aug. 7, 2024. The government had proffered in motion practice that it would call a cooperating witness who worked in ISIS bureaucracy to compare the recovered documents to ones he prepared or worked on; expert witnesses, including an ISIS journalist and the same UN researcher called in *Musaibli*; the FBI case agent; and agents who were involved in the collection and querying of the recovered electronic media at NMEC. 20-CR-106 (RC) (D.D.C.), ECF No. 39. The government noted that several of the ISIS documents were the same literal records admitted in the *Musaibli* trial. *Id*. at 8. Before the evidentiary hearing, the parties reached a plea agreement and resolved the case. 20-CR-106 (RC) (D.D.C.), ECF No. 82.

Finally, in *Ramic*, the government proffered that they would authenticate the proposed ISIS documents through the testimony of two cooperating former ISIS members, the first who could corroborate Ramic's application form and Microsoft Access entries by comparison to his own records and entries, and other, an ISIS administrator who would identify the relevant insignia and markers of authenticity. The government also stated that they would call two NMEC

agents and an academic expert witness. *United States v. Ramic*, 21-CR-13 (GNS) (W.D. Ky.), ECF No. 168. Ramic consented to the proposed testimony being assessed at trial, rather than a pretrial evidentiary hearing, *id*., ECF No. 199, and the court held that "assuming these representations" of the government's proffered testimony "are true, the United States may be able to authenticate these documents at trial." 2024 WL 2274529, at *4 (W.D. Ky. May 20, 2024).

Here, the government has not identified any witness with knowledge who can authenticate the photograph of the document, or the original document. Fed. R. Evid. 901(b)(1). *C.f.*, *United States v. Fluke-Ekren*, 22-CR-92 (LMB) (E.D. Va.), ECF No. 2 (Affidavit of Criminal Complaint and Arrest Warrant) (documenting cooperating witness who resided with Fluke-Ekren and had personal knowledge of her provision of weapons training and collection of weapons; a second cooperating witness who was Fluke-Ekren's neighbor in Syria, and went to her house numerous times; a third cooperating witness who was a family member who was in Syria with her, and had personal knowledge of her military training; a fourth cooperating witness who translated a Nusaybah Katiba document for Fluke-Ekren, "which was stamped with the official ISIS seal;" a fifth cooperating witness, who was personally trained by Fluke-Ekren in Raqqa in early 2017; and a sixth cooperating witness, who was also a translator and recruiter for Nusaybah Katiba in Raqqa in early 2016); *Musaibli*, 18-CR-20495 (DML) (E.D. Mich.), ECF. No. 102 (government's motion to admit evidence) (listing numerous cooperating witnesses); *Ramic*, 21-CR-13 (GNS) (W.D. Ky.), ECF No. 168 (same).

The Second Circuit has construed Rule 901(b)(1)'s requirement of "a witness with knowledge" strictly, affirming a district court's determination that an exhibit was not sufficiently authenticated even by the testimony of the signer of the document, when she could not identify it

17

as the document she had signed years earlier, and because of "other evidence suggesting that [it] may have been fabricated." *United States v. Moses*, 109 F.4th 107, 114 (2d Cir. 2024). Conversely, the Circuit has affirmed district court findings of authentication of a transcript of a wiretapped call upon the testimony of the law enforcement agent who personally prepared it. *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir. 2007). *See also CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 225 (E.D.N.Y. 2009) ("Jeff Meininger is a witness with knowledge of the archive CD. In fact, he created it."). The government has not yet proffered any witness with knowledge, let alone one with the type of first-hand knowledge sufficient to authenticate the document. Absent such a proffer, this Court should exclude the document without a hearing.

Nor does the alleged document have the type of "distinctive characteristics" that are "sufficiently obscure or particularly within the knowledge of the persons corresponding" to justify admission pursuant to Fed. R. Evid. 901(b)(4). *Maldonado-Rivera*, 922 F.2d at 957; *see United States v. Al Farekh,* 810 Fed. Appx. 21, 24-25 (2d Cir. 2020) (unpublished) (testimony of a cooperating witness attributing the name that signed the document to the defendant, and expert testimony comparing its handwriting to a known exemplar). That the document lists a kunya that the government alleges that Salman admits she used, and that it correctly identifies her husband, are not sufficient to authenticate that the document is what it purports to be: a graduation certificate from military training. *Vayner*, 760 F.3d at 132 (that information about a person appears in a document is not alone sufficient to authenticate it). Upon information and belief, Salman's kunya was widely known, and it was certainly specifically known by her husband, upon whose cell phone the government claims to have found the photograph of the document. So, too, was her marriage widely known; it was registered in an official document, and it goes without saying that her husband was aware of it. The government has produced nothing to

18

corroborate what it says is her husband's ISIS-issued "personnel number," ECF No. 1 at 7-8, which, in any event would be known at least by him. Taken together, there is nothing about the personal identifying information contained in the document that makes it more likely to have been genuinely created by ISIS than to have been fraudulently created by her husband, or an associate of his, to obtain a benefit, such as additional weaponry.

On the other hand, the document lacks the distinctive characteristics that would be expected of a genuine ISIS-issued document: an official ISIS rubber stamp, a date, a location, and a signature of a person with authority. *C.f. Musaibli*, 577 F. Supp. 3d at 615-16 ("the roster bore a distinctive ISIS stamp that he had seen on many similar unit rosters"); *id.* at 619 (expert testimony that ISIS document is authentic based, among other characteristics, on "the use of an Islamic calendar date stamp);" *id*. at 622 (expert testimony that document is authentic due to "use of a characteristic stamp reading 'Islamic State' inside an oval, with a notation of the local ISIS court that issued the license, which was from a town located in eastern Syria); *id*. at 625 (organizational chart is authentic "based mainly on the stamps and markings found on the chart"). *See also* Callimachi, *The ISIS Files: When Terrorists Run City Hall* ("Each department had its own stamp, listing the name of the division and sometimes the name of the official in charge"). Rather than an ISIS rubber stamp, the proffered document appears to have a word-processed, preprinted logo. It lacks the name of an official in charge, professing to be signed only by "Umm Yousef," a witness the government has not identified. And it lacks a date or location, critical information for assessing its authenticity, as, upon information and belief, Nusaybah Katiba military training took place only in a certain time span and in certain locations, where and when the government has not and cannot establish Salman was present. These are the same issues that have previously been observed in fake ISIS documents, a known problem. *See*

19

Callimachi, *Experts Divided on Authenticity of Islamic State Receipts* ("Al-Tamimi concluded that although the receipts appear to be printed on original ISIS stationery, the handwritten information on them was most likely not authentic" due to a date mismatch with known information).

Neither do the circumstances by which the photograph of the document was recovered support authentication. The government has been silent on the capture circumstances of the photograph, other than asserting that it was found, via an NMEC database search, to have been located on what they say is her husband's phone, "recovered in early 2019 in the area of the Middle Euphrates River Valley in Syria," a sizable geographic region, by SDF. ECF No. 1 at 7. The government has not alleged whether the phone was taken by SDF off his person, the ground, or any other area that would add to the likelihood that its contents were real. *C.f. Al-Moayed*, 545 F.3d at 156 (affirming authentication of physical mujahadin training camp application form, which had been seized by authorities inside of an Al-Qaeda training facility); *United States v. Fawwaz*, 694 Fed. Appx. 847, 850 (2d Cir. 2017) (unpublished) (affirming authentication of physical list of Al-Qaeda members recovered personally by testifying United States Army Command Sergeant in a trunk in Kandahar, Afghanistan). Rather, that the photograph of the document—not a physical document—was recovered from a cell phone, which is not corroborated by any back-end ISIS record logging that it had been issued, makes it less likely that it is real. Just as the district court in *Musaibli* refused to authenticate two digitized documents found on a hard drive where the testifying investigator "had no first-hand knowledge about how these exhibits came to be and he could not say for himself that they were accurate representations of what they purport to depict," the government's evidence "falls considerably

20

short of establishing the authenticity of those items." *Musaibli*, 577 F. Supp. 3d at 626. Absent more, it should be excluded without a hearing.

   iii. The Document Is Hearsay, and the Coconspirator Exclusion Does Not Apply

Even if this Court were to forgive that the photograph is not an original, and to authenticate it, which it cannot, the contents of the document are inadmissible hearsay. Fed. R. Evid. 802. They are the statements of another person—the unidentified Umm Yousef—made outside of testimony at this trial, offered to prove the truth of the matter asserted therein: that Salman completed ISIS military training. And they meet no exception to the hearsay rules. Fed. R. Evid. 803, 804.

In *Musaibli*, the Sixth Circuit held that statements in that case's documents—those that had been authenticated by the trial court—were admissible as exclusions to hearsay, because they were statements of coconspirators. 42 F.4th at 615; Fed. R. Evid. 801(d)(2)(E). Notably, in finding that the statements were made "during and in furtherance of the conspiracy," the Sixth Circuit relied on the testimony of the cooperating witness at the evidentiary hearing who had conversations with Musaibli about his job as an ISIS fighter, and how much he should be paid, in the same time span in which the documents were created. *Id*. at 616. So too did that Circuit rely on witness testimony that corroborated the contents of the document with Musaibli's actions. *Id*. And "Musaibli's own words supported the existence of a conspiracy to provide ISIS with personnel and services." *Id*. Unlike Salman, who has expressly denied attending military training, Musaibli confessed, in detail, to having attended it.

Here, the government cannot establish that Salman was in a conspiracy with the unidentified Umm Yousef at the time the document was made. This case is identical to *Al-Moayed*, where the Second Circuit rejected the coconspirator exclusion basis upon which the

21

district court had relied in admitting the document, and reversed and remanded for a new trial. 545 F.3d at 143. There, the government had admitted a mujahadin training camp application form filled out by an unknown "Abu Jihad," who had listed "Sheikh Mohammed Al Moayad," which the government said was the defendant, as the Al Qaeda member who had recommended him. *Id*. at 156. The Circuit held, "In this case, the district court did not satisfy the requirements of Rule 801(d)(2)(E). The court made no findings, by a preponderance of the evidence or otherwise, about the existence of a conspiracy including Al-Moayad and the individual who filled out the mujahidin form ("Abu Jihad"), nor do we think the court could have done so based on the record before us." *Id*. at 173. The fact that the government had offered other evidence that Al-Moayad had, at some time in the past, conspired to provide material support to Al-Qaeda did not mean that he was in a conspiracy with Abu Jihad at the time Abu Jihad made his statement. *Id*. "The form itself, given that it provides no information about Abu Jihad's relationship with Al-Moayad other than the fact that he wrote Al-Moayad's name as his recommender, is not competent proof of their joint involvement in a conspiracy. Indeed, we do not know if Al-Moayad even knew Abu Jihad, or was aware that Abu Jihad listed him on the form." *Id*. at 174. "The district court had virtually no basis for admitting the mujahidin form for its substance as a co-conspirator statement." *Id*.

*Al-Moayad* binds this Court, requiring exclusion of the photograph of the document. Here, too, the Court can make no findings, on the record before it, about the existence of a conspiracy including Salman and Umm Yousef. That the government has other evidence that Salman even tacitly may have supported ISIS at some point, *i.e.*, photographs of her in front of an ISIS flag, ubiquitous in the area where she was living, or that she shared a home and a marriage with an ISIS fighter, or that she once briefly held a firearm in the privacy of her own

22

home, does nothing to support that on an unknown date, in an unknown location, that she was in a conspiracy with the unknown Umm Yousef, when that person supposedly wrote this document. Indeed, this district court has "virtually no basis" for admitting the document whatsoever. It should be excluded without a hearing.

iv.     Given the Myriad Genuine Questions About the Authenticity of the Document, the Risk of Unfair Prejudice Substantially Outweighs Any Probative Value

Salman has raised numerous and significant questions about the authenticity of this fraudulent document. It is a photograph, not an original. It was written at an unknown time at an unknown place, in a region rife with proven forgeries. It lacks the hallmarks of a genuine document. And its author is unknown. Taken together, even if this Court denies all her objections individually, the risk remains too high that this unreliable document will unfairly prejudice Salman, substantially outweighing its probative value. Fed. R. Evid. 403. Salman is charged solely with receipt of military-type training from ISIS. This photograph of a part of a document is the government's sole evidence of that training. Accordingly, because its admission will be so powerful, this Court must have confidence that it is reliable. On this record, such confidence would be vastly misplaced. In *Mister*, the Seventh Circuit affirmed a district court's exclusion of such a statement on Rule 403 grounds. 571 F.3d at 699. There, the government moved to admit statements of an agent pursuant to Rule 801(d)(2)(D), which has the same requirements as (d)(2)(E), but apply to statements of an agent of the defendant, rather than a coconspirator. Finding that the statements were properly admissible under (d)(2)(D), the Circuit affirmed the district court's exercise of discretion to exclude them as "unreliable based on the multiple layers of hearsay and lack of precise factual statements." *Id*. So too here. On the whole, all of the

23

concerns raised about this document render it too unreliable to serve as the centerpiece of a trial at which Salman risks losing her liberty. It must be excluded.

v.    In The Alternative, The Court Should Hold an Evidentiary Hearing Pursuant to Rule 104(a)

Salman has established that this Court should exclude the evidence. In the alternative, this Court should hold an evidentiary hearing, as held in *Musaibli* and as ordered, at the request of the government, in *Sylejmani*. *See* 20-CR-106 (RC) (D.D.C.), ECF No. 39 ("request[ing] that the Court hold an evidentiary hearing, pursuant to Federal Rule of Evidence 104(a), to determine the admissibility of the ISIS documents before trial"). Given the questions raised by Salman, and the critical importance of the document at her trial, its reliability must, at a minimum, be tested before it may be admitted.

E.    Conclusion

For the foregoing reasons, Halima Salman respectfully requests that the Court grant her motion in its entirety, and (i) exclude the photograph of the fraudulent document from her trial; or (ii) in the alternative, hold an evidentiary hearing outside the presence of the jury before trial to resolve any factual or legal issues raised by this motion; and (iii) grant such other and further relief that the Court deems just and proper.

DATED:    BROOKLYN, N.Y.
April 16, 2025

_____/s/_____
MIA EISNER-GRYNBERG
SAMUEL JACOBSON
Attorneys for Halima Salman
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(718) 330-1257

24