AFM/NJM:ADR/AS
F. #2024R00396

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                   Docket No. 24-CR-206 (NCM)

HALIMA SALMAN,
    also known as "Umm Khattab
    al-Muhajir,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrew D. Reich
Amanda Shami
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iv

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ............................................................................................3

  I.     Background and Offense Conduct ........................................................3

         A.     Background on ISIS ................................................................ 3

         B.     The Defendant's Journey to ISIS-Controlled
                Territory ................................................................................. 4

         C.     The Defendant's Military Training from ISIS .......................... 5

  II.    The Government's Investigation into the Defendant.................................7

         A.     The National Media Exploitation Center ("NMEC") ................ 7

         B.     The Abu Ali Phones................................................................. 9

  III.   The Defendant's Overseas Arrest, Her Repatriation, and
         Her U.S. Arrest ...................................................................................16

  IV.    The Defendant's Mirandized Statements Prior to Her
         Repatriation .........................................................................................17

ARGUMENT ...................................................................................................................21

  I.     Section 2339D Does Not Violate the Non-Delegation
         Doctrine................................................................................................21

         A.     Applicable Law .................................................................... 22

         B.     Analysis................................................................................ 23

  II.    There Was No Pre-Indictment Delay Violative of Due
         Process ................................................................................................25

         A.     Applicable Law .................................................................... 26

         B.     Analysis................................................................................ 27

  III.   The Defendant Is Not Entitled to a Bill of Particulars...........................31

A.    Applicable Law ................................................................. 31

B.    Analysis ........................................................................... 33

IV.    The Defendant Made a Valid Waiver of Her *Miranda*
Rights ....................................................................................34

A.    Applicable Law ................................................................. 35

B.    Analysis ........................................................................... 36

C.    The Court Should Deny the Defendant's Request
for a Hearing ................................................................... 41

V.    The Defendant's Motion to Suppress NMEC Evidence
Fails........................................................................................42

A.    The Defendant Lacks Standing and a Reasonable
Expectation of Privacy to Seek Suppression of the
NMEC Evidence ............................................................... 42

1.    Applicable Law ........................................................ 42

2.    Analysis................................................................... 44

B.    The Fourth Amendment's Warrant Clause Does Not
Apply Extraterritorially .................................................. 53

1.    Applicable Law ........................................................ 53

2.    Analysis................................................................... 53

C.    Because the Abu Ali Phones Were Received from
the SDF, There Is No Basis on Which to Suppress
Them ................................................................................ 56

1.    Applicable Law ........................................................ 56

2.    Analysis................................................................... 57

D.    The Good Faith Exception Would Apply in Any
Event ................................................................................ 58

VI.    The Defendant's Premature Motion in Limine to Exclude
Evidence of the Defendant's Military Training Fails ...........59

A.    Applicable Law ................................................................. 60

1.      Authenticity.................................................................. 60

2.      Co-Conspirator Statements ........................................... 62

3.      Residual Hearsay Exception ........................................ 64

4.      Best Evidence Rule ..................................................... 64

5.      Federal Rule of Evidence 403 ..................................... 65

B.      Analysis.................................................................................... 66

1.      The Military Training Document Is Authentic ............................. 67

2.      The Military Training Document Is a Co-
        Conspirator Statement................................................... 74

3.      The Military Training Document Is Admissible
        Under the Residual Hearsay Exception ......................... 79

4.      The Military Training Document Does Not
        Violate the Best Evidence Rule .................................... 80

5.      The Military Training Document Is More
        Probative Than Prejudicial........................................... 83

6.      An Evidentiary Hearing Pursuant to Rule
        104(a) Is Premature....................................................... 84

VII.    The Court Should Reject the Defendant's Motion for
        Access to the Government's CIPA Submission....................................88

A.      Applicable Law ........................................................................ 88

B.      Analysis.................................................................................... 90

CONCLUSION....................................................................................................101

TABLE OF AUTHORITIES

Page

CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)................................................................................................ 23

*Alderman v. United States*,
394 U.S. 165 (1969)................................................................................................ 43

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946).................................................................................................. 22

*American Arab Anti-Discrimination Committee v. Reno*,
70 F.3d 1045 (9th Cir. 1995) ................................................................................. 94

*Berghuis v. Thompkins*,
560 U.S. 370 (2010)........................................................................................... 35, 36

*Bourjaily v. United States*,
483 U.S. 171 (1987)........................................................................................... 63, 75

*Brady v. Maryland*,
373 U.S. 83 (1963).................................................................................................. 99

*City of Indianapolis v. Edmond*,
531 U.S. 32 (2000).................................................................................................. 48

*Culombe v. Connecticut*,
367 U.S. 568 (1961)................................................................................................ 41

*Davis v. United States*,
564 U.S. 229 (2011)................................................................................................ 59

*Delaware v. Prouse*,
440 U.S. 648 (1979)................................................................................................ 48

*Denis v. Upstate Corr. Facility*,
361 F.3d 759 (2d Cir. 2004) .................................................................................. 28

*Elliott v. Cartagena*,
84 F.4th 481 (2d Cir. 2023) .................................................................. 64, 65, 81, 82

*Grady v. North Carolina*,
575 U.S. 306 (2015)................................................................................................ 43

*Guest v. Leis*,
    255 F.3d 325 (6th Cir. 2001) .................................................. 45

*Gundy v. United States*,
    588 U.S. 128 (2019)............................................................. 23

*Humanitarian Law Project v. Reno*,
    205 F.3d 1130 (9th Cir. 2000) ............................................ 25

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
    552 F.3d 177 (2d Cir. 2008) ........................................ *passim*

*J.W. Hampton Jr., & Co. v. United States*,
    276 U.S. 394 (1928)............................................................. 22

*Katz v. United States*,
    389 U.S. 347 (1967)............................................................. 45

*Mistretta v. United States*,
    488 U.S. 361 (1989)......................................................... 22, 23

*Moran v. Burbine*,
    475 U.S. 412 (1986).......................................................... 35, 36

*North Carolina v. Butler*,
    441 U.S. 369 (1979)............................................................. 37

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935)............................................................. 23

*Pennsylvania v. Ritchie*,
    480 U.S. 39 (1987).............................................................. 100

*Rakas v. Illinois*,
    439 U.S. 128 (1978)......................................................... 42, 44

*Samson v. California*,
    547 U.S. 843 (2006).......................................................... 44, 53

*Smith v. Maryland*,
    442 U.S. 735 (1979).......................................................... 44, 45

*Terry v. Ohio*,
    392 U.S. 1 (1968)................................................................. 48

*United States v. Abu Ali*,
    395 F. Supp. 2d 338 (E.D. Va. 2005) ................................ 40

*United States v. Abuhamra*,
   389 F.3d 309 (2d Cir. 2004) ................................................................................ 94

*United States v. Abu-Jihaad*,
   630 F.3d 102 (2d Cir. 2010) ...................................................................... *passim*

*United States v. Abu-Jihaad*,
   No. 07-CR-57 (MRK), 2007 WL 2972623 (D. Conn. Oct. 11, 2007) .................................. 98

*United States v. Addonizio*,
   451 F.2d 49 (3d Cir. 1971) ................................................................................ 33

*United States v. Ahmed*,
   No. 10-CR-131 (PKC), 2011 WL 4915005 (S.D.N.Y. Sept. 23, 2011) ................................ 99

*United States v. Alameh*,
   341 F.3d 167 (2d Cir. 2003) ........................................................................ 29, 75

*United States v. Albunio*,
   No. 91-CR-0403, 1992 WL 281037 (E.D.N.Y. Sept. 9, 1992) ...................................... 32

*United States v. Al-Farekh*,
   956 F.3d 99 (2d Cir. 2020) ...................................................................... *passim*

*United States v. Ali*,
   799 F.3d 1008 (8th Cir. 2015) ...................................................................... 22, 24

*United States v. Aliperti*,
   867 F. Supp. 142 (E.D.N.Y. 1994) ...................................................................... 32

*United States v. Almaleh*,
   No. 17-CR-25 (ER), 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) .................................... 44

*United States v. Al-Moayad*,
   545 F.3d 139 (2d Cir. 2008) .................................................................. 60, 61, 75

*United States v. Amawi*,
   695 F.3d 457 (6th Cir. 2012) .............................................................. 92, 93, 96, 98

*United States v. Amodeo*,
   71 F.3d 1044 (2d Cir. 1995) ........................................................................ 101

*United States v. Aparo*,
   221 F. Supp. 2d 359 (E.D.N.Y. 2002) .................................................................. 37

*United States v. Aref*,
   533 F.3d 72 (2d Cir. 2008) .................................................................. 91, 92, 93

*United States v. Asgari*,
   940 F.3d 188 (6th Cir. 2019) ................................................................... 95, 96, 97

*United States v. Assi*,
   414 F. Supp. 2d 707 (E.D. Mich. 2006) ............................................................ 22

*United States v. Augustin*,
   661 F.3d 1105 (11th Cir. 2011) ....................................................................... 75

*United States v. Augustine*,
   No. 18-CR-393 (SJ) (RML), 2020 WL 9199944 (E.D.N.Y. Sept. 8, 2020),
   *report and recommendation adopted*, No. 18-CR-393 (SJ) (RML),
   2021 WL 1381060 (E.D.N.Y. Apr. 13, 2021) ........................................... *passim*

*United States v. Avenatti*,
   550 F. Supp. 3d 36 (S.D.N.Y. 2021) ................................................................ 101

*United States v. Bagaric*,
   706 F.2d 42 (2d Cir. 1983) .............................................................................. 62

*United States v. Barret*,
   824 F. Supp. 2d 419 (E.D.N.Y. 2011) ............................................................... 32

*United States v. Barrios*,
   210 F.3d 355, 2000 WL 419940 (2d Cir. 2000) ................................................ 41

*United States v. Birney*,
   686 F.2d 102 (2d Cir. 1982) ............................................................................ 27

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987) ............................................................................ 32

*United States v. Boulos*,
   No. 13-CR-612 (ENV), 2015 WL 502170 (E.D.N.Y. Feb. 3, 2015) ..................... 91

*United States v. Bozarov*,
   974 F.2d 1037 (9th Cir. 1992) ......................................................................... 22

*United States v. Butler*,
   151 F. Supp. 2d 82 (D. Me. 2001) .................................................................... 45

*United States v. Campa*,
   529 F.3d 980 (11th Cir. 2008) ..................................................................... 92, 93

*United States v. Caputo*,
   808 F.2d 963 (2d. Cir. 1978) ........................................................................... 43

*United States v. Chandia*,
   514 F.3d 365 (4th Cir. 2007) ................................................................ 22

*United States v. Chang An-Lo*,
   851 F.2d 547 (2d Cir. 1988) ........................................................... 64, 81

*United States v. Chao Xian Yao*,
   No. 05-CR-1114 (SAS), 2006 WL 1227771 (S.D.N.Y. May 3, 2006) .................. 36

*United States v. Chen*,
   378 F.3d 151 (2d Cir. 2004) ................................................................ 31

*United States v. Cornielle*,
   171 F.3d 748 (2d Cir. 1999) ..................................................... 26, 27, 28

*United States v. Cotroni*,
   527 F.2d 708 (2d Cir. 1975) ................................................................ 58

*United States v. Delva*,
   858 F.3d 135 (2d Cir. 2017) ................................................................ 43

*United States v. Dhafir*,
   461 F.3d 211 (2d Cir. 2006) ................................................................ 23

*United States v. Dore*,
   586 F. App'x 42 (2d Cir. 2014) ............................................................ 44

*United States v. Dumeisi*,
   424 F.3d 566 (7th Cir. 2005) ........................................................ 80, 99

*United States v. Dupree*,
   706 F.3d 131 (2d Cir. 2013) ................................................................ 65

*United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850)*
   *in U.S. Currency*, 461 U.S. 555 (1983) ............................................... 27

*United States v. Elsbery*,
   602 F.2d 1054 (2d Cir. 1979) .............................................................. 27

*United States v. Erie Cnty., New York*,
   763 F.3d 235 (2d Cir. 2014) .............................................................. 101

*United States v. GAF Corp.*,
   928 F.2d 1253 (2d Cir. 1991) .............................................................. 31

*United States v. Gagliardi*,
   506 F.3d 140 (2d Cir. 2007) ......................................................... 60, 69

viii

*United States v. Garnes*,
  102 F.4th 628 (2d Cir. 2024) ........................................................................... 66, 84

*United States v. Getto*,
  729 F.3d 221 (2d Cir. 2013) ............................................................................ 57, 58

*United States v. Gotti*,
  784 F. Supp. 1017 (E.D.N.Y. 1992) ....................................................................... 32

*United States v. Hamama*,
  No. 08-CR-20314, 2010 WL 2649877 (E.D. Mich. June 30, 2010) ........................................ 80

*United States v. Hamilton*,
  334 F.3d 170 (2d Cir. 2003) ............................................................................ 60, 71

*United States v. Hammoud*,
  381 F.3d 316 (4th Cir. 2004) ............................................................................... 22

*United States v. Harun*,
  232 F. Supp. 3d 282 (E.D.N.Y. 2017) ................................................................ 41, 42, 54

*United States v. Harvey*,
  117 F.3d 1044 (7th Cir. 1997) .......................................................................... 61, 78

*United States v. Hasbajrami*,
  945 F.3d 641 (2d Cir. 2019) ......................................................................... *passim*

*United States v. Hasbajrami*,
  No. 11-CR-623 (LDH), 2025 WL 447498 (E.D.N.Y. Feb. 10, 2025) ................................... *passim*

*United States v. Helmel*,
  769 F.2d 1306 (8th Cir. 1985) .............................................................................. 62

*United States v. Henry*,
  888 F.3d 589 (2d Cir. 2018) ............................................................................... 22

*United States v. Horowitz*,
  806 F.2d 1222 (4th Cir. 1986) ............................................................................. 46

*United States v. Ianniello*,
  621 F. Supp. 1455 (S.D.N.Y. 1985) ........................................................................ 32

*United States v. Janis*,
  428 U.S. 433 (1976) ......................................................................................... 56

*United States v. King*,
  509 F.3d 1338 (11th Cir. 2007) ............................................................................ 45

*United States v. King*,
   55 F.3d 1193 (6th Cir. 1995) ................................................................ 46

*United States v. Klimavicius-Viloria*,
   144 F.3d 1249 (9th Cir. 1998) .......................................... 89, 92, 93, 99

*United States v. Lambus*,
   897 F.3d 368, 402 (2d Cir. 2018) ................................................. *passim*

*United States v. Larranga Lopez*,
   No. 05-CR-655 (SLT), 2006 WL 1307963 (E.D.N.Y. May 11, 2006) .................................... 36

*United States v. Lee*,
   723 F.3d 134 (2d Cir. 2013) ................................................ 50, 56, 57, 58

*United States v. Libby*,
   429 F. Supp. 2d 18 (D.D.C. 2006) ............................................ 93, 98

*United States v. Lifshitz*,
   369 F.3d 173 (2d Cir. 2004) .................................................. 45, 46

*United States v. Lovasco*,
   431 U.S. 783 (1977) ................................................. 26, 27, 28, 30

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) .................................................... 64

*United States v. Lustyik*,
   833 F.3d 1263 (10th Cir. 2016) .............................................. 100

*United States v. Manafzadeh*,
   592 F.2d 81 (2d Cir. 1979) ..................................................... 66

*United States v. Maneti*,
   781 F. Supp. 169 (W.D.N.Y. 1991) ............................................. 32

*United States v. Marion*,
   404 U.S. 307 (1971) ....................................................... 26, 27

*United States v. Matthews*,
   No. 03-CR-1214, 2006 WL 8447011 (E.D.N.Y. Mar. 6, 2006),
   *report and recommendation adopted*, No. 03-CR-1214,
   2006 WL 8447012 (E.D.N.Y. May 30, 2006) .................................... 37

*United States v. Maturo*,
   982 F.2d 57 (2d Cir. 1992) ................................................ 57, 58

*United States v. McDuffie*,
  No. 01-CR-808, 2002 WL 654136 (S.D.N.Y. Apr. 18, 2002) .................................................. 37

*United States v. Mejia*,
  448 F.3d 436 (D.C. Cir. 2006) ................................................................................... 92

*United States v. Meriwether*,
  917 F.2d 955 (6th Cir. 1990) .................................................................................... 46

*United States v. Mickens*,
  Nos. 20-258(L), 20-462, 20-630,
  2021 WL 3136083 (2d Cir. July 26, 2021) ....................................................................... 30

*United States v. Mottley*,
  130 F. App'x 508 (2d Cir. 2005) ............................................................................... 41

*United States v. Mount*,
  757 F.2d 1315 (D.C. Cir. 1985) ................................................................................ 56

*United States v. Mullins*,
  No. 22-CR-120, 2023 WL 3159418 (S.D.N.Y. Apr. 26, 2023) ................................................... 101

*United States v. Murphy*,
  16 F. Supp. 2d 397 (S.D.N.Y. 1998) ......................................................................... 37

*United States v. Musaibli*,
  42 F.4th 603 (6th Cir. 2022) ........................................................................... *passim*

*United States v. Musaibli*,
  577 F. Supp. 3d 609 (E.D. Mich. 2021) ...................................................................... 66

*United States v. Musaibli*,
  No. 18-CR-20495, ECF No. 182,
  Opinion and Order (E.D. Mich. Dec. 3, 2021) ............................................................ 34

*United States v. O'Hara*,
  301 F.3d 463 (7th Cir. 2002) ................................................................................. 93

*United States v. Oreckinto*,
  234 F. Supp. 3d 360 (D. Conn. 2017) ...................................................................... 71

*United States v. Padilla*,
  508 U.S. 77 (1993) ......................................................................................... 43

*United States v. Payner*,
  447 U.S. 727 (1980) ......................................................................................... 42

*United States v. Pepin*,
   514 F.3d 193 (2d Cir. 2008) ................................................................ 66, 84

*United States v. Perryman*,
   No. 12-CR-0213 (ADS), 2013 WL 4039374 (E.D.N.Y. Aug. 7, 2013) ........... 42, 54

*United States v. Pierce*,
   No. 06-CR-42 (DLI), 2007 WL 1175071 (E.D.N.Y. Apr. 19, 2007) ................. 41

*United States v. Plugh*,
   648 F.3d 118 (2d Cir. 2011) ................................................................ 35, 37

*United States v. Pluta*,
   176 F.3d 43 (2d Cir. 1999) ....................................................................... 60

*United States v. Pringle*,
   751 F.2d 419 (1st Cir. 1984) ..................................................................... 90

*United States v. Pugh*,
   No. 15-CR-116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) ............ 34

*United States v. Ramic*,
   No. 21-CR-13 (GNS), 2024 WL 2274529 (W.D. Ky. May 20, 2024) ....... 59, 67, 85, 88

*United States v. Reyes*,
   283 F.3d 446 (2d Cir. 2002) ................................................................ 43, 51

*United States v. Richardson*,
   837 F. Supp. 570 (S.D.N.Y. 1993) ............................................................. 37

*United States v. Rubin*,
   609 F.2d 51 (2d Cir. 1979) ................................................................. 26, 27

*United States v. Ruggles*,
   70 F.3d 262 (2d Cir. 1995) ....................................................................... 40

*United States v. Santillan*,
   902 F.3d 49 (2d Cir. 2018) ....................................................................... 43

*United States v. Sarkissian*,
   841 F.2d 959 (9th Cir. 1988) .............................................................. 90, 93

*United States v. Sattar*,
   314 F. Supp. 2d 279 (S.D.N.Y. 2004) ........................................................ 32

*United States v. Sedaghaty*,
   728 F.3d 885 (9th Cir. 2013) .............................................................. 92, 99

*United States v. Simpkins*,
  No. 96-CR-750 (EHN), 1996 WL 629567 (E.D.N.Y. Oct. 16, 1996) ..................................... 37

*United States v. Singh*,
  No. 12-CR-121 (DLI), 2012 WL 2501032 (E.D.N.Y. June 27, 2012) ................................... 36

*United States v. Sliker*,
  751 F.2d 477 (2d Cir. 1984) ..................................................................................................... 62

*United States v. Smith*,
  780 F.2d 1102 (4th Cir. 1985) ................................................................................................... 91

*United States v. Smith*,
  9 F.3d 1007 (2d Cir. 1993) ........................................................................................................ 49

*United States v. Smith*,
  918 F.2d 1501 (11th Cir. 1990) ................................................................................................ 62

*United States v. Spencer*,
  995 F.2d 10 (2d Cir. 1993) ........................................................................................................ 36

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) .................................................................................................. 91, 93

*United States v. Taleb-Jedi*,
  566 F. Supp. 2d 157 (E.D.N.Y. 2008) ................................................................................. 22, 24

*United States v. Tellier*,
  83 F.3d 578 (2d Cir. 1996) ........................................................................................................ 63

*United States v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004) ........................................................................................................ 60

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990) ...................................................................................................... 31

*United States v. Tracy*,
  12 F.3d 1186 (2d Cir. 1993) ...................................................................................................... 63

*United States v. Tropeano*,
  252 F.3d 653 (2d Cir. 2001) ................................................................................................. 61, 78

*United States v. Urso*,
  369 F. Supp. 2d 254 (E.D.N.Y. 2005) ....................................................................................... 32

*United States v. Vayner*,
  769 F.3d 125 (2d Cir. 2014) ................................................................................................. 61, 78

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990)..................................................................................... 53

*United States v. Walia,*
    No. 14-CR-213 (MKB), 2014 WL 2533848 (E.D.N.Y. June 5, 2014) ................... 41

*United States v. Walsh,*
    194 F.3d 37 (2d Cir. 1999) ............................................................................ 32

*United States v. Warsame,*
    537 F. Supp. 2d 1005 (D. Minn. 2008)........................................................... 34

*United States v. Wilson,*
    532 F.2d 641 (2d Cir. 1976) .......................................................................... 62

*United States v. Wolfson,*
    55 F.3d 58 (2d Cir. 1995) ............................................................................ 100

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ..................................................................... 38, 39

*United States v. Yunis,*
    867 F.2d 617 (D.C. Cir. 1989) ................................................................ 90, 93

*United States v. Zazi,*
    No. 10-CR-60 (JG), 2011 WL 2532903 (E.D.N.Y. June 24, 2011) ............ 91, 92, 99

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995).................................................................................... 53

## STATUTES

8 U.S.C. § 1182(a)(3)(B) ................................................................................ 23

8 U.S.C. § 1189 .............................................................................. 21, 23, 24

10 U.S.C § 271 ............................................................................................. 55, 56

18 U.S.C § 2339B ........................................................................................... 22

18 U.S.C. § 2332b(g)(5)(B) ........................................................................... 27

18 U.S.C. § 2339D ............................................................................... *passim*

18 U.S.C. § 2518(3) ........................................................................................ 49

18 U.S.C. § 3286 ............................................................................................. 27

18 U.S.C. § 3500(c) .................................................................................... 99

18 U.S.C. App. 3, § 4 ........................................................................ 90, 96, 99

22 U.S.C. § 2656f(d)(2) ............................................................................ 23

50 U.S.C. § 1801(k) .................................................................................. 46

50 U.S.C. § 1806(e) .................................................................................. 46

50 U.S.C. § 1821(2) .................................................................................. 47

## OTHER AUTHORITIES

Exec. Order 13,526 .................................................................................. 97

Exec. Order 13,224 .................................................................................... 3

Fed. R. Crim. P. 16 Advisory Committee's Note ...................................... 91

Fed. R. Evid. 403 Advisory Committee's Note ........................................ 65

S. Rep. No. 96-823, 96th Cong., 2d Sess., at 3 (1980),
    *reprinted in* 1980 U.S.C.C.A.N. 4294, 4296 .................................. 89, 90

## RULES

Fed. R. Crim. P. 16 .................................................................................. 93

Fed. R. Evid. 1001 .............................................................................. 66, 82

Fed. R. Evid. 1002 .................................................................................. 66

Fed. R. Evid. 1003 .............................................................................. 66, 82

Fed. R. Evid. 1004 .............................................................................. 67, 84

Fed. R. Evid. 403 .................................................................................... 67

Fed. R. Evid. 801 .............................................................................. 64, 77

Fed. R. Evid. 807 .............................................................................. 66, 81

Fed. R. Evid. 901 .............................................................................. 62, 63

PRELIMINARY STATEMENT

The defendant Halima Salman (the "defendant" or "Salman"), is charged in an indictment (the "Indictment") with receipt of military type training from a foreign terrorist organization, specifically the Islamic State of Iraq and al-Sham ("ISIS"), in violation of 18 U.S.C. § 2339D.

The government respectfully submits this memorandum of law in opposition to the defendant's seven pretrial motions: (i) motion to access the government's *ex parte* filings under Section 4 of the Classified Information Procedures Act ("CIPA"), ECF No. 71; (ii) motion for a bill of particulars, ECF No. 72; (iii) motion to dismiss the Indictment on the basis of pre-indictment delay, ECF No. 73; (iv) motion to dismiss the Indictment due to an alleged violation of the non-delegation doctrine, ECF No. 74; (v) motion to exclude evidence of a photograph as an alleged fraudulent document, ECF No. 75; (vi) motion to suppress evidence retrieved from the National Media Exploitation Center ("NMEC"), ECF No. 76; and (vii) motion to suppress the defendant's Mirandized statements, ECF No. 77 (collectively, the "defendant's motions").

The defendant's motions all lack legal and/or factual merit, and they should all be denied. First, both of the defendant's motions to dismiss should be rejected, as the designation process for foreign terrorist organizations is not an unconstitutional delegation of authority by Congress to the Executive Branch, nor was there any pre-indictment delay by the government, much less a delay to gain a tactical advantage that resulted in actual prejudice. Second, the defendant's motion for a bill of particulars is meritless, as the Indictment, complaint, and discovery in this matter specify the nature of the charged conduct and the government's allegations. Third, the Court should reject the defendant's motion to suppress statements she made to Federal Bureau

of Investigation ("FBI") agents in two interviews in Syria as the defendant voluntarily waived her *Miranda* rights, both verbally and by signed written consent.

Fourth, the defendant's motions to suppress the NMEC evidence and to exclude a specific document from one of the NMEC devices—an apparent attempt to take two bites to prevent the admission of NMEC evidence at trial—both fail. As to the defendant's motion to suppress the NMEC evidence, she has no standing to seek suppression, the Fourth Amendment required no warrant for the government's searches, and in any event the good faith exception applies. As to her motion to exclude particular NMEC evidence, the defendant's premature motion is meritless as the government will present witness testimony at trial that will demonstrate that the contested document is authentic and admissible. Finally, the Court should deny the defendant's motion for unredacted copies of any filing the government may make pursuant to Section 4 of CIPA, consistent with the Second Circuit's numerous holdings approving the adjudication of the government's CIPA motions *ex parte* and *in camera*.

FACTUAL BACKGROUND[1]

      The government expects to establish the following facts at trial through witness and expert testimony, electronic evidence, records of electronic communications, physical and documentary evidence, and the defendant's admissions to law enforcement and third parties.

I.     Background and Offense Conduct

    A.    Background on ISIS

      ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad.  These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate" in Iraq and Syria.

      On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawid wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13,224.

      On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13,224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as the FTO's primary name.  The Secretary of State also added the

---

[1]    Unless expressly consented to herein, the government objects to the factual allegations in the defendant's various memoranda in support of her motions, which represent a selective, misleading, and at times internally contradictory recitation of the facts in this case. Because this submission is intended to address the instant motions, it does not set forth all of the facts and evidence that the government will seek to introduce at trial.  Where the content of statements, written communications, or documents are described herein, they are done so in pertinent part and in sum and substance, unless otherwise indicated.  Any translations from a foreign language into English are in draft form and subject to revision.

following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. In an audio recording publicly released on June 29, 2014, ISIS announced a formal change of its name to the Islamic State. On or about September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

      B.    <u>The Defendant's Journey to ISIS-Controlled Territory</u>

        In September and October 2016, the defendant's parents traveled with her and her eight siblings out of the United States, ultimately destined for ISIS-controlled territory in Syria. Specifically, U.S. border crossing records reflect that, on September 27, 2016, the defendant's father, elder sister, and three younger siblings departed the United States aboard a Turkish Airlines flight from John F. Kennedy International Airport in Queens, New York ("JFK Airport"), bound for Istanbul, Turkey. U.S. border crossing records also reflect that on October 23, 2016, the six other members of Salman's family departed the United States aboard an Aeroflot flight from JFK Airport, bound for Moscow, Russia. That group comprised Salman herself, her mother, and Salman's four younger siblings, including a five-week-old baby. Salman, her mother, and her siblings traveled from Moscow to Turkey, rendezvousing with the remainder of her family that flew directly to Turkey.

        Sometime in late 2016 or early 2017, Salman and her family crossed the border from Turkey and entered Syria by car. Also present in the car was the defendant's father's second wife and her children. The defendant's father joined ISIS and did "ribat," or guard duty. Salman's elder sister, who was already 18 years old when the family traveled abroad, married an ISIS fighter

from Bosnia and Herzegovina.  Shortly after Salman turned 18 years old, she also married an ISIS fighter, Mati'allah Bin Abdallah Nurzad, who used the kunya, or nom de guerre, "Abu Ali al-Almani al-Khorasani," which means "Abu Ali from Germany and Afghanistan" (hereinafter "Abu Ali")

The defendant's father died in 2018, after having been injured by a missile or mortar and succumbing to his injuries a few months later.  Salman, her mother, and her siblings remained in ISIS territory after the defendant's father died.

C.    The Defendant's Military Training from ISIS

In or around late 2016, ISIS approved the creation of the Nusaybah Katiba.  The Nusaybah Katiba was an ISIS military battalion or unit composed solely of female members of ISIS, principally those who were or had been married to male ISIS fighters.  Members of the Nusaybah Katiba received training on the use of various weapons, including but not limited to AK-47 style assault rifles and employing suicide belts.  Becoming a member of the Nusaybah Katiba and/or receiving training from the Katiba was entirely voluntary for women.  Moreover, women were able to designate preferences for how they wished to support ISIS and the Nusaybah Katiba, including through martyrdom/fighting, cooking, medical support, or transportation.

The defendant voluntarily signed up to receive weapons training.  As discussed in detail below, the government obtained an image file containing an Arabic language document entitled, "Authorization to Grant a Weapon" directed to the ISIS "Diwan al-Jund," or Department of Soldiers.  The document, referred to herein as the "Military Training Document," is depicted below as Figure 1.



Figure 1

The Military Training Document states in relevant part:

To the brothers at Diwan al-Jund,

We inform you that sister Um Khattab al-Muhajir, the wife of brother Abu Ali al-Almani al-Khorasani, ID number: 12000845343, has completed the training and military test and has the right to have:

|  | Number in Her Possession | Number that Should Be Provided |
|---|---|---|
| Kalashnikov | 1 | - |
| Quiver (bag) | - | 1 |
| Magazines | 2 | 2 |
| Bullets |  | 150 |

** Not necessary to provide everything

This document and this authorization are issued by Diwan al-Jund.  If you have any questions, please contact the brothers at Diwan al-Jund.

6

The Military Training Document is signed with a signature indicating that it is issued by an ISIS unit called the "Nusaybah bint-Ka'ab,"[2] also referred to as the "Nusaybah Katiba" or the "Katiba Nusaybah." The Military Training Document was signed by a woman named "Um Yousef."

The metadata associated with the image file containing the Military Training Document reflects that the image was created on March 17, 2018.

As discussed below, the defendant confirmed that her kunya was Um Khattab al-Muhajir. "Al-Muhajir" means "foreign fighter," and, along with the plural "muhajireen," is a common term used by ISIS to refer to individuals who traveled from outside ISIS territory to ISIS territory to join ISIS as fighters.

II.    The Government's Investigation into the Defendant

Contrary to the defendant's speculative assertions about the timing of the government's investigation, the government did not open its investigation into the defendant until December 2022 and did not learn of the content of the Military Training Document until the second half of 2023.

A.    The National Media Exploitation Center ("NMEC")

NMEC is a U.S. government entity created in or around 2001 that is located in Bethesda, Maryland. NMEC sits within the Defense Intelligence Agency, which is a component of the U.S. Department of Defense. The purpose of NMEC is to serve as a clearinghouse for information that is acquired, seized, or captured outside the United States, including information that is recorded in analog formats, such as papers or documents, and digital formats, such as the

---

[2]    Nusaybah bint-Ka'ab was a female warrior and contemporary of the Islamic prophet Muhammad.

contents of cellular telephones and similar electronic devices. *See United States v. Musaibli*, No. 18-CR-20495 (DML), ECF No. 166 at 50 (E.D. Mich. July 10, 2021) (June 28, 2021 testimony of FBI liaison to NMEC). The information that is stored at NMEC can be searched at the request of the U.S. intelligence community.

The information delivered to NMEC is referred to generally as "Collected Exploitable Material" or "CEM." The sources of CEM provided to NMEC can vary. These sources largely include, but are not limited to, (i) material seized or captured during or following U.S. military, law enforcement, or other government agency engagements *outside the United States*, and (ii) material provided by foreign militaries or law enforcement officials *outside the United States* to U.S. authorities. NMEC maintains records concerning the CEM it ingests, including documentation regarding the circumstances in which the CEM was seized, captured, or delivered, such as time, date, and location of seizure.

When electronic media is captured from a foreign battlefield, the physical devices are not transferred to the United States. Rather, the exploitation and extraction of the devices, *i.e.*, the search of the devices, happens abroad. In particular, the devices are transported to a Regional Exploitation Center ("REC") for exploitation. All CEM entering a REC is handled using established forensic best practices and subject to digital chain of custody forms, known as DA-4137s. The CEM coordination team at the REC inventories each piece of CEM in batches based on the date of capture, identified locations, and/or attribution to associated persons. The DA-4137 is created for tracking the chain of custody of the CEM. Physical CEM is photographed and processed for any potential biometrics. Digital devices are then exploited by creating a forensic image, or a bit-for-bit copy, also known as a "gold copy." Upon completion of the exploitation, the forensic image or gold copy is transmitted to NMEC.

8

Once the gold copy arrives at NMEC, NMEC indexes and catalogues the gold copy so that it is available for further exploitation and querying at the request of the U.S. intelligence community and foreign partners.  Searches for all NMEC-held CEM can only be conducted via NMEC's internal forensic network, Exploit, which can be accessed at the NMEC facility in Maryland or via remote access to Exploit.  Members of the U.S. intelligence community can request that NMEC run searches, or they can visit NMEC and run searches there.

Relevant to this matter, the U.S. Department of Defense obtains and receives CEM from conflict zones across the world, to include Syria and Iraq, in connection with military engagements to defeat ISIS and other foreign terrorist organizations.  In particular, a coalition of military troops and personnel from over 30 countries and led by the United States military ("Coalition Forces"), together with regional partner forces, such as the Syrian Democratic Forces (the "SDF"), drove ISIS out of its strongholds in Syria and Iraq, ultimately pursuing ISIS fighters and supporters down the Euphrates River, where ISIS made its last stand at Baghouz, Syria, in February and March 2019.  During that combat, Coalition Forces and the SDF recovered devices used by ISIS members prior to their surrender, capture, or flight.

B.    The Abu Ali Phones

Beginning in late February 2019, in connection with a specific operation connected to the battle at Baghouz, Coalition Forces abroad began to receive electronic devices, hard copy documents, and other personal property that had belonged to suspected ISIS fighters, ISIS family members, and other non-combatants fleeing the ISIS enclave and other parts of the Middle Euphrates River Valley.  The government's current understanding, based on information recently provided to the government, is that on or about March 20 or 21, 2019, the SDF arrested Abu Ali

and confiscated two cellular phones from him (the "Abu Ali Phones"). The SDF thereafter provided the Abu Ali Phones to Coalition Forces.

The Abu Ali Phones were transported to the REC in Iraq for exploitation and extraction. Following the established protocols at the REC, the CEM coordination team created DA-4137 digital chain of custody forms for the Abu Ali Phones and photographed the devices. As noted on the DA-4137s, the first Abu Ali Phone was received by the REC on March 28, 2019, while the second Abu Ali Phone was received by the REC on April 30, 2019. The associated DA-4137s for the Abu Ali Phones state that the SDF provided the Abu Ali Phones to Coalition Forces. Upon exploitation of the Abu Ali Phones, gold copy extractions were created for each device. The gold copies were then transferred to NMEC for storage and follow-on exploitation and investigative and intelligence searches.

In August 2019, a marriage certificate memorializing the marriage of the defendant and her husband, retrieved from one of the Abu Ali Phones as part of the initial data mining, was disseminated to, among other places, the FBI. The marriage certificate referred to the defendant as Halima Cihat Ghazi Salman.

In July 2022, FBI agents ran a search in a system called Harmony. Harmony is a platform for the dissemination of information between agencies in the intelligence community. Among the material in Harmony is a small percentage of the extractions available at NMEC. The FBI searched for the name of an investigative subject who is *not* the defendant. Among the results responsive to the name the agents searched was a CEM "photobook" from one of the Abu Ali Phones. The CEM photobook contained a number of photographs from one of the Abu Ali Phones. Among the photographs were images of the defendant, including her wedding picture, which

showed her seated in front of an ISIS flag in a wedding dress. In July 2022, the FBI requested the "gold copy" extractions of both Abu Ali Phones from NMEC.

After receiving the gold copies of the Abu Ali Phones in August 2022, the FBI agents began to review them. Among the pictures on one of the Abu Ali Phones was a picture of the defendant with the ISIS flag, as well as a picture of the defendant with an AK-47 in the background, both of which are pictured below.




Figure 2                              Figure 3[3]

Based on the government's analysis to date of the relevant Abu Ali Phone, metadata for Figure 2 appears to indicate that the picture was taken on April 25, 2018, by the same make and model device as the Abu Ali Phone on which the image appears. Moreover, Figure 2 appears

---

[3]    The image of Figure 3 depicted this image reversed such that the Arabic text in the ISIS flag was backwards, and the defendant was depicted to be on the right side of the image. Figure 3 has been reversed so that the ISIS flag is displayed with the Arabic text reading in the correct direction.

to have been located on the same Abu Ali Phone in an application that was meant to hide the images from viewers other than the phone's owner—specifically, an application that appears to be a calculator application but is meant for hiding files like images.[4]  Similarly, the government's current analysis of the Figure 3 metadata, which is also available on the same gold copy, appears to indicate that it was shared with the same Abu Ali Phone on March 21, 2018, using "ShareIt," which is a file sharing application, and that a copy of Figure 3 was also saved within the same "secret[]hide[]calculator" application.

Also on that same Abu Ali Phone is a video that the defendant's husband took of the defendant where she was practicing with an AK-47 in their home.  This video also appears to be located in the same image-hiding calculator application, but within a different folder.  Stills from this video are also below.  At approximately 15 seconds into the video, the defendant appears to realize her husband is taking a video of her.  She then states to him, "You're taking a video," turns away, and walks towards the right of the frame, holding the rifle by its barrel in front of her, as depicted in Figure 7.  Figure 8 shows a still from near the end of the video where the defendant appears to put down the rifle while standing in front and to the right of an ISIS flag.

---

[4]     In particular, based on the metadata in the gold copy Abu Ali Phone already turned over to the defendant, the file directory wherein Figure 2 was found appears to be the following: USERDATA (ExtX)/Root/data/secret.hide.calculator/files/lockerVault/H./.


Figure 4


Figure 5


Figure 6


Figure 7


Figure 8

13

Apart from images of the defendant and weapons, the Abu Ali Phones also contained electronic versions of documents and pictures of hard-copy documents. Most of the documents in the Abu Ali Phones are in Arabic or German. Accordingly, the FBI requested translations for further review. Among the English language documents on one of the Abu Ali Phones was a "note" that the defendant's husband wrote. The metadata shows it was created on December 5, 2018, and last modified on January 23, 2019. The note is evidently addressed to the defendant: within the note, her husband states, "I LOVE YOU HALIMOOO," an apparent nickname for Halima, and refers to the defendant's two brothers by their names. In the note, Abu Ali professes his love to her, calling her his "life," his "breath," and his "everything." In the note, he says he will ask Allah that the defendant be his wife in "Jannah," the Arabic word for heaven. He also directs her to "make duaa," or make a prayer, that Allah "is accepting our hijra and jihad and my Shahadah." "Hijra" means migration, and in the specific context of ISIS is frequently used to describe ISIS adherents' journey from abroad to ISIS territory. "Jihad" refers to the fight against the enemies of Islam. "Shahadah" means martyrdom. The note thus refers to the defendant and her husband's migration to ISIS territory and their jihad against the enemies of Islam, as well as her husband's martyrdom.

Based on, among other things, its ongoing review of the Abu Ali Phones, the FBI opened an investigation into the defendant in December 2022.

In June 2023, the FBI requested updated searches on the CEM extractions within the United States's holdings of CEM for Abu Ali's true name of Mati'allah Bin Abdallah Nurzad. The FBI received those results in approximately August or September 2023. Among the documents provided to the FBI were various ISIS documents about Abu Ali. Also provided was the Military Training Document with a rough English translation. August or September 2023 is

the first time that the FBI received an English translation of the Military Training Document.[5]  The FBI recognized that the Military Training Document described "Um Khattab al-Muhajir," the wife of "Abu Ali al-Almani al-Khorasani," as having completed military training.  At that point, however, the FBI was not able to definitively identify the defendant as the person described, because the FBI knew that Abu Ali had two wives, and the FBI had not yet ascertained that the defendant's kunya was Um Khattab al-Muhajir.

The FBI later came to understand that the Military Training Document in fact referred to the defendant, based in part on information obtained from Google in October 2023.  Specifically, the defendant had created—even before she left the United States in 2016 and entered ISIS territory—a Gmail address containing the name "umkhattab."  The defendant had listed her true first and last name in the subscriber information for the "umkhattab" email address.  Moreover, as described below, the defendant affirmed during her November 2023 interview that her kunya was "Um Khattab."  She also affirmed during her May 2024 interview that her kunya was "Um Khattab al-Muhajir."

In sum, the evidence of the defendant's military training with ISIS came to the FBI's attention based on searches related to Abu Ali (the defendant's husband) and another investigative subject, not through searches that named the defendant.  Searches that named the defendant did not result in the government becoming aware of her crimes.

---

[5]     The Military Training Document is located on one of the Abu Ali Phones and thus was available to the FBI when it received the gold copy; however, because the Military Training Document is in Arabic, the FBI submitted the document for translation.  It was not until August or September 2023 when the FBI received a translation of the Military Training Document that the FBI understood its import.

III.    The Defendant's Overseas Arrest, Her Repatriation, and Her U.S. Arrest

As set forth above, the SDF and Coalition Forces fought ISIS in Baghouz between February and March 2023.  In particular, the Battle of Baghouz began on or about February 9, 2019, and ended in ISIS's defeat on March 23, 2019, on which day the SDF declared victory.

Within the first week of the Battle of Baghouz, the SDF had enclosed ISIS forces into an area along the Euphrates River.  Recognizing that there were a significant number of civilians assessed to be the relatives of ISIS fighters, the SDF launched intermittent assaults and pauses in fighting to allow ISIS fighters, hostages, and relatives to surrender and evacuate.

Despite the multiple opportunities to surrender and evacuate Baghouz, the defendant did not surrender.  Instead, the defendant was arrested on March 21, 2019—two days before the March 23, 2019 fall of ISIS, at which time the defendant was among the last ISIS supporters in Baghouz.

The defendant's arrest date is noted in bio-enrollments[6] created during her time in SDF internally displaced persons camps (the "SDF camps").[7]  The defendant was subject to four bio-enrollments during her time in SDF camps.  During the first two, on or about March 22, 2019 and June 30, 2020, the defendant did not identify herself by name as Halima Salman, nor did she identify herself as a U.S. citizen.  Instead, the defendant provided her first name and her husband's last name.  Moreover, during her March 2019 enrollment, the defendant represented that her place of birth was the country of Georgia, and during her June 2020 enrollment, the defendant

---

[6]    A "bio-enrollment," as performed at the SDF camps, means the process of, among other things, asking an individual for certain pedigree information, like name, date of birth, place of birth, and nationality, and registering the individual's unique biometric data, including the individual's face, iris, and fingerprints.

[7]    The defendant spent time in Al Hawl SDF camp and Roj SDF camp.

16

represented that she was Azerbaijani and born in Hong Kong.  At no point between her arrest in 2019 and 2023—when the defendant's mother requested repatriation of the whole family—did the defendant ever individually request her own repatriation to the United States.

The defendant and her family were repatriated in May 2024 following the U.S. Department of State's process to verify her family as U.S. citizens and confirm that she and her family were related by DNA.  The United States coordinated the repatriation of the defendant's family and certain others to the United States, as well as the repatriation of other foreign nationals to their respective countries.

When the defendant arrived at JFK Airport on May 7, 2024, she was placed under arrest pursuant to a complaint that charged her with receipt of military type training from ISIS, in violation of 18 U.S.C. § 2339D.  The defendant initially waived an initial appearance and agreed to speak with the FBI further.  The FBI took her to another site where she was given food and time to rest.  When she awoke hours later, the defendant stated that she no longer wished to speak to the FBI.  She was thereafter produced that same day for her initial appearance.  The defendant was later indicted for the same offense.

IV.    The Defendant's Mirandized Statements Prior to Her Repatriation

On November 11, 2023, Salman was interviewed by FBI agents for less than ninety minutes while detained in Roj camp in Syria.  On May 6, 2024, Salman was again interviewed by FBI agents in Syria just before leaving on her repatriation flight to the United States, this time for less than one hour.

Salman's November 2023 interview was conducted in a conference room in an administrative building.  As recorded in the FBI's report documenting the interview:

> The room was clean, orderly, and free of debris.  Participants sat
> around a small square table that was centered in the room, facing

17

> each other.   The interview room was quiet, well lit, and the
> temperature was comfortable.  Beverages and snacks were displayed
> and available to Salman.   No weapons were visible within the
> interview room.

Exhibit A at 1; *see also* Exhibit B.  Salman was alert and coherent and was advised of her rights.

She was also given an advice of rights form to read.  *See* Exhibit C.

Salman stated that she understood the rights delineated on the form and was

afforded an opportunity to read it.  Exhibit A at 1.  She then signed the form in front of multiple

witnesses.  *Id.*; *see also* ECF No. 1 at ¶ 12 (Complaint) (sworn statement by FBI agent that Salman

"was advised of her legal rights both orally and in writing, and agreed to waive those rights, orally

and in writing").  The form Salman read and signed stated the following:

### FEDERAL BUREAU OF INVESTIGATION
### ADVICE OF RIGHTS FOR SUSPECTS IN FOREIGN
### CUSTODY

> We are representatives of the United States Government.  Even
> though we are not in the United States, United States laws provide
> you with certain rights in your dealings with us.  Before we ask you
> any questions, you must understand your rights:
>
> You have the right to remain silent.  Even if you have already spoken
> to others, you do not have to speak to us now.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you
> any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, you have the right to have one
> appointed for you before any questioning if you wish.
>
> Our ability to provide you with counsel at this time, however, may
> be limited by the decisions of the local authorities or the availability
> of an American-trained attorney.

> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
>
> CONSENT
>
> I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

Exhibit C.

During this November 2023 Mirandized interview, Salman acknowledged, among other things, that she had been known by the kunya "Um Khattab," that her father joined ISIS and performed "ribat" or guard duty for ISIS, and that her father was killed by a bomb.  Exhibit A at 2, 4.  She further acknowledged that she married an ISIS member after she turned 18 years old.  *Id.* at 2-3.  Salman described her husband as a good husband.  *Id.* at 3.  She also claimed that she did not attend any type of training, was never assigned to a "Katiba," never owned a weapon, and was never involved in any ISIS activities.  *Id.* at 4.

Salman's May 2024 interview was conducted in a trailer at a staging area used by the United States military to facilitate the repatriation of displaced persons from Syria back to their countries of origin.  *See* Exhibit D.  As recorded in the FBI's report documenting the interview,

> The room free from debris and included a table with three chairs. The room included a window to let in natural light and electricity was also provided to provide overhead light.  Agents provided an assortment of snacks and water available for the interviewee.  The room was not climate controlled, but the temperature outside was comfortable between approximately 65 and 70 degrees Fahrenheit. The door to the room was shut to limit noise and distractions. Agents were not armed, and no weapons were present in the interview room.

Exhibit E at 1.  Salman was "alert" and "coherent," and "[a]gents offered her water and snacks, and asked if she was comfortable."  *Id.* at 2.  No one from the SDF was present, and the agents

told her that the SDF did not control the location, nor were they "privy to the interview." *Id.* Salman stated she understood these things. *Id.*

"The interviewing agents advised the interview was voluntary and she could leave at any time to return to her family in the repatriation staging area." *Id.* Interviewing agents discussed with Salman the same advice of rights form described above and told her that they "wanted to ensure she fully understood the form, reviewed it, and acknowledged with her signature if she voluntarily consented to answering questions." *Id.* "Salman advised she understood the form and her rights. She signed the form and consented to answering questions." *Id.*; *see also* Exhibit F.

During the May 2024 Mirandized interview, Salman stated, among other things, that she and her husband loved each other and separated only when detained by the SDF outside of Baghouz. Exhibit E at 3.[8] She also mentioned that at one point prior, her husband had been injured in a bombing, sustaining a broken leg, and that she took care of him when he returned home from the hospital. *Id.* at 4. She also stated that during her time in ISIS-controlled territory, she had a phone, "but it was not connected to any service and she only used it to play games." *Id.*

Salman was shown a number of photographs, and she confirmed the identity of her husband and her husband's father and mother in certain pictures. *Id.* She was also shown pictures of herself from one of the Abu Ali Phones, and she confirmed that it was she who appeared in those photographs. *Id.* She also confirmed that she was the one pictured in two photos with an

---

[8]    This statement, along with the March 21, 2019 date of the defendant's arrest on her bio-enrollment and the information the government learned that Abu Ali was arrested by the SDF on or about March 20-21, 2019, together support the facts that the defendant and her husband were arrested outside Baghouz by the SDF approximately two days before the March 23, 2019 fall of ISIS, at which time the defendant and her husband were among the last ISIS supporters in Baghouz.

ISIS flag.  *Id.* at 5.  Salman also stated that she "had not felt any particular influence" from her husband or his family with respect to ISIS.  *Id.*  The defendant was also shown the Military Training Document and confirmed that the document referred to her by her kunya "Um Khattab al-Muhajir" and "appeared to be about her," but she denied having seen this document or that she had received training from ISIS.  *Id.* at 5-6.  She also denied ever receiving or possessing any weapon and stated that if there were weapons in the homes she lived in, they belonged to others.  *Id.* at 6.  Salman confirmed having heard of the Nusaybah Katiba, but stated she was not affiliated with the unit.  *Id.*  She also stated she did not know the "Um Yousef" who signed the Military Training Document.  *Id.*

ARGUMENT

For the reasons set forth below, each of the defendant's pretrial motions fails, either because the motion lacks legal merit, because it is without factual basis, or both.

I.    Section 2339D Does Not Violate the Non-Delegation Doctrine

Salman argues that the Indictment should be dismissed because the FTO designation process constitutes an unconstitutional delegation of authority by Congress to the Executive Branch.  *See* ECF No. 74.  Sections 2339D(a) and (c)(4) set forth the definition of a terrorist organization by reference to Section 219 of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1189.  Salman argues that Section 1189 fails to state an "intelligible principle" to guide the Secretary of State, who is authorized to make FTO designations, as to what constitutes a terrorist organization.  ECF No. 74 at 3-4 (quoting *J.W. Hampton Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The Court should reject this argument just as every court that has previously examined this issue has done, including multiple courts in this District.  *See, e.g.*, *United States v.*

21

*Augustine*, No. 18-CR-393 (SJ) (RML), 2020 WL 9199944, at *11 (E.D.N.Y. Sept. 8, 2020), *report and recommendation adopted*, No. 18-CR-393 (SJ) (RML), 2021 WL 1381060 (E.D.N.Y. Apr. 13, 2021); *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 172 (E.D.N.Y. 2008); *see also United States v. Ali*, 799 F.3d 1008, 1019-20 (8th Cir. 2015); *United States v. Chandia*, 514 F.3d 365, 371 (4th Cir. 2007); *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (*en banc*); *United States v. Bozarov*, 974 F.2d 1037, 1041-45 (9th Cir. 1992); *United States v. Assi*, 414 F. Supp. 2d 707, 726 (E.D. Mich. 2006).[9]

A.     <u>Applicable Law</u>

Under the non-delegation doctrine, "Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). But it has long been established that not every delegation of authority is a violation of the doctrine. In *Mistretta*, the Supreme Court stated that, "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" 488 U.S. at 372 (quoting *J.W. Hampton Jr., & Co.*, 276 U.S. at 409). An "intelligible principle" is one that "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *United States v. Henry*, 888 F.3d 589, 596 (2d Cir. 2018) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

---

[9]     The charged statute in these cases was Title 18, United States Code, Section 2339B, which prohibits providing material support to designated FTOs. Like Section 2339D, Section 2339B defines terrorist organizations by reference to Section 219 of the INA (8 U.S.C. § 1189). *See* 18 U.S.C. § 2339B(g)(6). Salman does not argue that there is anything about Section 2339D that distinguishes it from Section 2339B for the purposes of her non-delegation claim. In fact, Salman's motion is the same failed motion filed by the defendant in *Augustine*.

As the court observed in *Augustine*, "Since the articulation of the intelligible principle test, 'impermissible delegation has been rarely found.'"  2020 WL 9199944, at *10 (quoting *United States v. Dhafir*, 461 F.3d 211, 215 (2d Cir. 2006)).  In fact, "[o]nly twice in this country's history has the [Supreme] Court found a delegation excessive, in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion."  *Gundy v. United States*, 588 U.S. 128, 130 (2019) (emphasis in original) (quoting *Mistretta*, 488 U.S. at 373 n.7 and citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).  "In contrast, the Supreme Court has 'over and over upheld even very broad delegations.'"  *Augustine*, 2020 WL 9199944, at *10 (quoting *Gundy*, 588 U.S. at 130).

B.    <u>Analysis</u>

Congress has provided clear standards and detailed procedures to govern the process by which the Executive Branch designates FTOs.  In order to issue an FTO designation, the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, must find that "(A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States."  8 U.S.C. §§ 1189(a)(1), 1189(d)(4).  The definitions of terrorist activity and terrorism are further spelled out in detail in the statutory framework.  *See* 8 U.S.C. §§ 1189(a)(1), 1182(a)(3)(B); 22 U.S.C. § 2656f(d)(2).  In particular, engaging in terrorist activity is defined "by reference to specific activities and, in some cases, specific mental states," and terrorism is defined as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."  *Augustine*, 2020 WL 9199944, at *11 (quoting statutes).  Moreover, under

23

Section 1189, Congress retains a role in the designation process. The Secretary of State is required to provide advance notification to congressional officials prior to making a designation. *See* 8 U.S.C. § 1189(2)(A)(i). The statute also explicitly reserves for Congress the authority to prevent a designation from taking effect: "Congress, by an Act of Congress, may block or revoke a designation." *Id.* § 1189(a)(5).

In *Augustine*, Judge Johnson accepted in its entirety Judge Levy's report and recommendation concluding that "[g]iven the detailed statutory guidance regarding the types of activities in which a group must engage to qualify as a 'terrorist organization,' coupled with procedural mechanisms to ensure Congressional oversight over the delegation process, I find that the Secretary's discretion in making FTO designations is sufficiently constrained and that section 2339B(g)(6) [with reference to Section 219 of the INA] states an intelligible principle." 2020 WL 9199944, at *11.

In *Taleb-Jedi*, Judge Cogan concluded, "Congress has established detailed procedures to designate organizations as FTOs and it retains the power to revoke such a designation when made. In addition, the organization has the ability to challenge the designation before the D.C. Circuit." 566 F. Supp. 2d 157, 172. Citing *Taleb-Jedi*, the Eighth Circuit has agreed that "[t]he statutory scheme governing the designation of foreign terrorist organizations provides an intelligible principle" and that Section 1189 "does not grant the Secretary unfettered discretion in designating the groups to which giving material support is prohibited." *Ali*, 799 F.3d at 1020. And the Ninth Circuit has observed, in examining Section 2339B in the First Amendment context:

> The statute authorizes the Secretary to designate only those groups that engage in terrorist activities. This standard is not so vague or indeterminate as to give the Secretary unfettered discretion. For example, the Secretary could not, under this standard, designate the

24

> International Red Cross or the International Olympic Committee as terrorist organizations. Rather, the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts-assassinations, bombings, hostage-taking and the like-before she can place it on the list . . . . And, because the regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context.

*Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000); *see Augustine*, 2020 WL 9199944, at *11 (quoting *Humanitarian Law Project*).

These conclusions apply with equal force to Section 2339D, which incorporates the very same statutory scheme and procedures described above. Salman has provided no reason why this Court should ignore decades of well-settled and well-reasoned jurisprudence to rule otherwise.[10] Accordingly, the court should reject Salman's motion.

## II.    There Was No Pre-Indictment Delay Violative of Due Process

The defendant's motion to dismiss the Indictment due to pre-indictment delay has no basis in fact or law. *See* ECF No. 73. Contrary to the defendant's speculation, the government did not learn that Salman had received military training from ISIS until 2023, and she was arrested immediately upon her repatriation to the United States in May 2024. Moreover, Salman has failed to demonstrate either that the government intentionally delayed prosecution solely to gain a tactical advantage or that any delay actually prejudiced her defense, both of which are required to merit relief.

---

[10]    Notably, Salman nowhere suggests that ISIS was improperly designated as an FTO, instead questioning designations of Mexican drug cartels that have no relevance to this case. *See* ECF No. 74 at 11 nn.6 & 7. Nor could she make any such suggestion. ISIS and its supporters have claimed credit for countless terrorist attacks and mass killings around the world, including in the United States, as part of ISIS's goal of forming an Islamic state in Iraq, Syria, and beyond.

A.    Applicable Law

Prosecutions brought within the statute of limitations carry "a strong presumption of validity" and "are only rarely dismissed."  *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999).

Nevertheless, a pre-indictment delay can violate the Due Process Clause of the Fifth Amendment if it "cause[s] substantial prejudice to [a defendant's] rights to a fair trial" and if "the delay was an intentional device to gain tactical advantage over the accused."  *United States v. Marion*, 404 U.S. 307, 324 (1971).  A defendant "bears the 'heavy burden' of proving both" prongs of this two-part test, namely that "[s]he suffered actual prejudice because of alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose."  *Cornielle*, 171 F.3d at 752 (emphasis added).

In assessing pre-indictment delay, the operative pre-indictment timeline begins when the prosecutors have evidence of guilt.  *See United States v. Lovasco*, 431 U.S. 783, 790-91 (1977) ("It requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed[,] it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause.  It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."); *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979) (finding prosecutor was "justified in not seeking the indictment until she was convinced that there would be sufficient evidence to prove guilt beyond a reasonable doubt").

Prejudice in the context of pre-indictment delay means a "deprivation that impairs a defendant's right to a fair trial" such as the loss of documentary evidence or the unavailability of a key witness.  *Id.* (citing *Lovasco*, 431 U.S. at 796 and *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979)).  In other words, "[a]ctual prejudice" means prejudice that is not speculative. *United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982).  The government's use of delay for a tactical advantage includes "reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges."  *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 563 (1983).

B.    <u>Analysis</u>

The eight-year statute of limitations with respect to the defendant's conduct began to run in or about March 2018, the date that the picture was taken of the Military Training Document—presumably at or around the time that the defendant successfully completed her training.  *See* 18 U.S.C. § 3286 (applying eight-year statute of limitations to certain terrorism offenses, including those listed in § 2332b(g)(5)(B)); *id.* § 2332b(g)(5)(B) (identifying 18 U.S.C. § 2339D).  As such, the May 2024 Indictment carries "a strong presumption of validity." *Cornielle*, 171 F.3d at 752.

The defendant has failed to rebut this presumption.  To the contrary, her timeline of events is incorrect and based on nothing more than supposition.  There was no meaningful pre-indictment delay at all in this case, much less one that "cause[d] substantial prejudice to [a defendant's] rights to a fair trial" and was "an intentional device to gain tactical advantage over the accused."  *Marion*, 404 U.S. at 324.

In reality, barely 18 months passed between the government opening its investigation into the defendant and the grand jury's Indictment.  Even less time elapsed between

the government's acquisition of significant evidence in this case and the grand jury's Indictment. The grand jury indicted approximately eight months after the government received a translation of the Military Training Document, and six months after the defendant admitted to the FBI that her kunya was "Um Khattab." And as the Supreme Court has held, the operative pre-indictment timeline begins when the prosecutors have evidence of guilt. *See Lovasco*, 431 U.S. at 790-91 ("[P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.").

The six to eight months that elapsed between the government's acquisition of fundamental evidence in the case and the grand jury's Indictment do not constitute pre-indictment delay violative of due process rights. *See, e.g.*, *Lovasco*, 431 U.S. at 796 (finding that defendant's constitutional rights were not violated even though he might have been "somewhat" prejudiced as a result of an 18-month delay during which time two witnesses died); *Cornielle*, 171 F.3d at 753 (four-year delay in drug offense indictment not prejudicial); *Denis v. Upstate Corr. Facility*, 361 F.3d 759, 760 (2d Cir. 2004) (77-month delay in murder indictment not unconstitutional). This is all the more true here where, as of August through November 2023, the defendant's repatriation was already pending with the U.S. Department of State, *i.e.*, not in the control of the FBI or the U.S. Department of Justice ("DOJ"), meaning that any alleged "delay" from August/November 2023 through May 2024 was not attributable to the FBI or prosecutors.

Because the government's investigation began, for purposes of the pre-indictment delay analysis, when the government possessed enough evidence to charge the defendant, the defendant's efforts to place the start of the investigation earlier in time are unavailing. In particular, the FBI did not possess enough information to charge the defendant when it interviewed members of the defendant's family at the SDF camps in connection with her family's departure

from the United States and her father's death in combat on behalf of a terrorist organization, *see* ECF No. 73 at 2.

The same analysis applies to the 2019 collection and extraction of the defendant's husband's phone containing the Military Training Document. The defendant's argument turns on the unrealistic notion that the government should have instantly zeroed in on the Abu Ali Phones (out of all the devices collected on the battlefield), recognized the import of the untranslated Military Training Document, and identified the individuals referenced, notwithstanding their use of kunyas.[11]

In short, there is no basis in fact for any argument premised on pre-indictment delay given the actual sequence of events, notwithstanding the defendant's conclusory argument that "[i]t is impossible to view [the government's] lengthy delay as unintentional," ECF No. 73 at 7.

Moreover, even if the Court were to find that a period of six to eight months could, under some circumstances, constitute impermissible pre-indictment delay (and it should not), the defendant would still fail to rebut the presumption against such a finding, because she cannot show that the government intentionally delayed indictment solely to gain an unfair tactical advantage. *See United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) (the absence of a showing that the government intentionally delayed indictment to gain an unfair tactical advantage meant that

---

[11]    Notably, the Military Training Document would not have been returned in any keyword search for the defendant. Even if the government had known that the defendant had a kunya and what her kunya was, the defendant's kunya is handwritten and would not have been rendered into searchable Arabic through text recognition. The only way to have identified the Military Training Document is manually, which is how the document came to be identified—after it was manually translated and disseminated. Even then, the document refers to the defendant and her husband by their kunyas, which ISIS fighters and supporters choose for themselves, such that ascertaining who "Um Khattab al-Muhajir" was would necessarily have required additional investigation.

defendant's "pre-indictment delay claim must, therefore, be rejected, without regard to whether the requirement of actual prejudice was satisfied").

Instead, the time elapsed between the government's opening of the investigation and the grand jury's returning of the Indictment itself was, at worst, an investigative delay. *See Lovasco*, 431 U.S. at 795-96 ("In our view, investigative delay is fundamentally unlike delay undertaken by the government solely 'to gain tactical advantage over the accused,' precisely because investigative delay is not so one sided . . . . We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."); *see also United States v. Mickens*, Nos. 20-258(L), 20-462, 20-630, 2021 WL 3136083, at *2 (2d Cir. July 26, 2021). Nowhere does the defendant allege that the government acted with the improper intent to strategically delay the Indictment for its own benefit.

Finally, the defendant's argument that the government's purported delay led to prejudice cannot be reconciled with the timeline of events, or with the chronology of the government's investigation. The defendant points to the decline of ISIS in 2019 and the concomitant loss of ISIS's centralized recordkeeping, as well as the loss of witnesses who went missing or are dead, *see* ECF No. 73 at 5-6, and laments the "loss of witnesses or investigative opportunities that the defense could only have effectively pursued if the charges were bought promptly after the underlying conduct occurred," *id.* at 5. But the government had no opportunity to investigate the "underlying conduct" at the time it occurred, because the relevant information was saved in the Abu Ali Phones, which the defendant's husband had in his possession. As set forth above, those devices were not collected until March 2019, and the FBI did not receive the applicable CEM photobook until July 2022, after which it promptly requested the underlying

30

forensic phone extractions of the Abu Ali Phones.  And it was not until August or September 2023 that the FBI received a translation of the Military Training Document, and it was not until October and November 2023 that the FBI learned and confirmed that the defendant used the kunya "Um Khattab."  Until then, the government was unaware that the defendant had received military training, much less that there existed records in connection with that training.[12]

III.    The Defendant Is Not Entitled to a Bill of Particulars

Salman's motion for a bill of particulars has no merit and should be denied.  *See* ECF No. 72.  The Indictment specifies the nature of the charged acts, and the detailed 11-page complaint and substantial discovery in this case provide further specifics of the government's allegations.

A.    Applicable Law

Under the Federal Rules of Criminal Procedure, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c).  Additional details, in the form of a bill of particulars, are not appropriate unless the indictment is too vague to inform the defendant of the nature of the charges so as to allow the preparation of a defense, avoid unfair surprise, and preclude double jeopardy.  *See United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004); *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990).  If the information sought by a defendant is provided in the indictment or through some other means, a bill of

---

[12]    Relatedly, the defendant's claim about her time in SDF camps, *see generally* ECF No. 73, and the government's purported ability to repatriate her at any time, *id.* at 7, are belied (i) by the bio-enrollments that show that the defendant hid her known American name and her American citizenship and (ii) the fact that the defendant never made any request for repatriation until her mother made her request in 2023.

particulars is not warranted.  *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Urso*, 369 F. Supp. 2d 254, 271 (E.D.N.Y. 2005).

"[T]he burden is on the defendant to show that non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights." *United States v. Maneti*, 781 F. Supp. 169, 186 (W.D.N.Y. 1991).  The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it is helpful, to the defendant.  *See United States v. Aliperti*, 867 F. Supp. 142, 148 (E.D.N.Y. 1994); *see also United States v. Gotti*, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1992) (bill of particulars is necessary only if "directed to curing defects in an indictment; that is [only if it] clarifies the charges against the defendant") (emphasis in original)).

Crucially, it is improper for a defendant to use Rule 7(f) as a mechanism to limit the government's evidence, or to flush out the prosecution's theories in advance of trial.  *See Urso*, 369 F. Supp. 2d at 272; *United States v. Barret*, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) ("[T]he court is mindful that it cannot compel the government to disclose, through a bill of particulars, the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories." (quotations and citations omitted)); *United States v. Sattar*, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004); *United States v. Ianniello*, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."); *United States v. Albunio*, No. 91-CR-0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which

32

he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.").

B.    Analysis

The defendant claims that, having been charged with receiving military-type training from ISIS, she has never been apprised of "the date, location, and nature of the training she is alleged to have received."  ECF No. 72 at 2.  But Salman simultaneously concedes that she is indeed aware, based on the lengthy complaint in this case, that the government's allegation is that (1) "[t]he training occurred in or around March 2018," (2) "[t]he training occurred in Syria," and (3) "[t]he training [included] the handling and operation of an AK-47 style rifle."  *Id*.  Indeed, Salman's own description of the case in her motions reflects the degree of detailed information that she has been provided, which is more than sufficient to be informed of the nature of the charge.[13]

In reality, through the motion for a bill of particulars, the defendant inappropriately seeks to compel the government to "weave the information in its command into the warp of a fully integrated trial theory for the benefit of the defendant[] . . . ."  *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971).  Salman's request that the government essentially provide a detailed line-by-line syllabus of her training is exactly the type of mining for "evidentiary details" that courts have warned against.  Courts in this district have routinely declined to order a bill of particulars in similar circumstances.  *See Augustine*, 2020 WL 9199944, at *13 (denying request for bill of particulars in material support case based on disclosures already made to defendant); *United States*

---

[13]    The government has made voluminous productions in this case, including on June 17, 2024; August 12, 2024; October 22, 2024; October 25, 2024; December 13, 2024; February 18, 2025; and March 8, 2025.  *See* ECF Nos. 25, 27, 33, 34, 44, 52, 56.

*v. Pugh*, No. 15-CR-116 (NGG), 2015 WL 9450598, at *28 (E.D.N.Y. Dec. 21, 2015) (same and collecting cases) ("[A]n indictment need not say more, with regard to the provision of material support, than that the defendant provided an FTO with material support in the form of personnel.").

The out of circuit cases cited by the defendant are inapposite. In *United States v. Musaibli*, the Court ordered a bill of particulars because, unlike here, the defendant was charged only by indictment and not by complaint, and thus the government's more detailed theory was "not included in any charging document." No. 18-CR-20495, ECF No. 182, Opinion and Order at 2 (E.D. Mich. Dec. 3, 2021). There was similarly no complaint in *United States v. Warsame*, 537 F. Supp. 2d 1005 (D. Minn. 2008). Even still, in that case, the government's bill of particulars only clarified that the defendant "provided material support or resources to Al Qaeda in the form of 'personnel,' 'currency,' and 'training.'" *Id.* at 1010-11. The court found the bill of particulars "sufficiently precise" and observed that the government, in subsequent briefing, had also alleged that the defendant "provided 'personnel' by voluntarily participating in an Al Qaeda training camp in Afghanistan," "provided 'currency' by sending money to a former Al Qaeda training camp instructor," and "provided 'training' by giving English-language lessons to Al Qaeda members in Pakistan." *Id.* That information is no more detailed than what the government has already provided Salman in this case in its charging documents and other disclosures.

The defendant is well positioned to prepare a defense to the charged crimes. Accordingly, the Court should deny her motion for a bill of particulars.

IV.    The Defendant Made a Valid Waiver of Her *Miranda* Rights

Next, Salman moves to suppress statements she made to FBI agents in two brief interviews during her time in Syria. *See* ECF No. 77. Each interview was conducted under accommodating, non-coercive conditions after the defendant had voluntarily waived her *Miranda*

34

rights, both verbally and by signed written consent.  Her motion cites vanishingly little authority of any kind, let alone any that would warrant suppression of her voluntary Mirandized statements under these circumstances.  That is because there is none.

A.    Applicable Law

"Consistent with *Miranda*, all criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel."  *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011).  "But once those warnings are properly administered . . . a defendant is left to make his own choice as to how best to proceed."  *Id.*  "Without question, the most legally remarkable and distinct choices a defendant can make are to (1) unambiguously invoke those rights and thereby cut off further questioning or (2) knowingly and voluntarily waive those rights and cooperate fully."  *Id.* As the Supreme Court held in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), a defendant must assert his rights "through a clear, unambiguous affirmative action or statement."  *Plugh*, 648 F.3d at 124.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement."  *Berghuis*, 560 U.S. at 382 (internal quotation marks omitted).  The waiver inquiry has two components.  *Id.*  First, the waiver of rights must be "knowing," *i.e.*, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must be "voluntary," *i.e.*, "it [must be] the product of a free and deliberate

choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382 (quoting *Moran*, 475 U.S. at 421).

"The question of waiver must be determined on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (internal quotation marks and alterations omitted). Importantly, where defendants have a written waiver in the language they understand, they cannot claim that they misunderstood their rights. *See United States v. Chao Xian Yao*, No. 05-CR-1114 (SAS), 2006 WL 1227771, at *5 (S.D.N.Y. May 3, 2006).

B.    Analysis

The defendant argues that her statements were coerced because the interviews occurred during and immediately following her time at Roj camp in Syria, because SDF representatives were present during the first interview, and because she was allegedly misled during the second interview. None of these arguments is sound.

As a threshold matter, Salman offers no sworn statement to support any of her claims about the circumstances of the interviews or her *Miranda* waivers or to contest the clear record of events reflected in the interview memoranda, the sworn complaint in this case, and her own signed declarations of consent, described above. Accordingly, Salman has failed to present any facts based on personal knowledge in support of her motion, and the motion should be denied on that basis alone. *See, e.g.*, *United States v. Singh*, No. 12-CR-121 (DLI), 2012 WL 2501032, at *2 (E.D.N.Y. June 27, 2012) ("Courts in this Circuit have 'repeatedly' denied motions to suppress without a hearing 'where defendants have failed to provide affidavits alleging facts based on personal knowledge'" (quoting *United States v. Larranga Lopez*, No. 05-CR-655 (SLT), 2006 WL 1307963, at *3 (E.D.N.Y. May 11, 2006) (collecting cases))); *United States v. Aparo*, 221 F.

Supp. 2d 359, 369 (E.D.N.Y. 2002) (denying motion to suppress where defendant had "not submitted an affidavit alleging facts which would require the suppression of statements if those facts were proved at a hearing"); *United States v. Simpkins*, No. 96-CR-750 (EHN), 1996 WL 629567, at *1 (E.D.N.Y. Oct. 16, 1996) ("The motion is denied on the ground that defendant has failed to provide an affidavit based on her own personal knowledge."); *United States v. Richardson*, 837 F. Supp. 570, 572 (S.D.N.Y. 1993) (attorney affidavit was not satisfactory substitute because it did not allege facts based on personal knowledge).

　　　　The defendant's motion also fails on its merits because she voluntarily waived her *Miranda* rights in each interview.  In light of her unambiguous verbal and signed waivers, Salman cannot now claim that she did not make valid waivers of her *Miranda* rights.  *See United States v. Matthews*, No. 03-CR-1214, 2006 WL 8447011, at *9 (E.D.N.Y. Mar. 6, 2006), *report and recommendation adopted*, No. 03-CR-1214, 2006 WL 8447012 (E.D.N.Y. May 30, 2006) ("Matthews appeared to read the waiver of rights form and signed the form acknowledging that he understood his rights.  His express written and oral waiver of the right to remain silent and of the right to counsel are 'strong proof of the validity' of his waiver." (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), *United States v. McDuffie*, No. 01-CR-808, 2002 WL 654136, at *2 (S.D.N.Y. Apr. 18, 2002), and *United States v. Murphy*, 16 F. Supp. 2d 397, 402 (S.D.N.Y. 1998))).

　　　　Moreover, Salman cannot claim that the interviews were conducted under coercive conditions.  She does not assert that any agents threatened her in any way.  To the contrary, the record is clear that FBI agents were respectful and courteous and took every measure to ensure Salman was comfortable.  *See Plugh*, 648 F.3d at 128 (defendant "was never threatened physically

37

or psychologically abused in any manner, or made any types of promises such that his will was overborne").

The mere fact that SDF representatives were present during the first interview does not change this conclusion. *See* ECF No. 77 at 6. It is settled law that statements elicited during overseas custodial interrogations conducted by foreign police and United States law enforcement may be subject to suppression in the absence of *Miranda* warnings. *See United States v. Yousef*, 327 F.3d 56, 145-46 (2d Cir. 2003). But Salman received those warnings and provided her verbal and signed consent to proceed.

Nor does the fact that the defendant had been living at Roj somehow make her interviews coercive. *See* ECF No. 77 at 6. In *Yousef*, as in countless other cases, the Second Circuit found that there was no basis to suppress Mirandized statements made to United States law enforcement officers even where the statements were made during and following the defendants' detention by foreign authorities. In that case, the district court had found that:

> "[A] careful and thorough *Miranda* warning was given and . . . Murad was knowledgeable of his rights and made a knowing and voluntary waiver of them." The [district court] also addressed Murad's contention that "'three months of threats, torture, denial of proper sustenance, and fear at the hands of the Philippine interrogators and the knowledge that he had already confessed, influenced the defendant in such a manner so that he could not have made a conscious and deliberate choice when asked to waive his rights after leaving the Philippines.'" The [district court] found that Philippine authorities were not acting as agents of the United States and that the United States was not alleged to have mistreated Murad in any way. In addition, the [district court] found that, even if Murad had been tortured by Philippine authorities and suffered post-traumatic stress disorder—as Murad's expert witness testified— "Murad's psychological state at the time the statement was given" did not render his confession involuntary. After discerning no allegation of threats, coercion, or other tricks by the FBI agents in obtaining Murad's statement, the Court held that the circumstances of Murad's interrogation were not "unduly coercive." Accordingly, the District Court concluded that, based on the totality of the

circumstances, Murad "understood his rights and made a knowing
and voluntary waiver of them."

*Id.* at 124 (citations omitted) (affirming district court's determinations).

The same is true here. The conditions at Roj were not imposed by United States authorities, and the FBI agents who interviewed Salman did not mistreat her in any way. *See also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 211-15 (2d Cir. 2008) (rejecting argument that defendant's conditions of confinement in Kenya made his Mirandized statements to United States authorities involuntary because he believed confessing was his "only chance to escape" his "prolonged" detention).[14]

In *In re Terrorist Bombings*, the Second Circuit agreed with the district court that, like here, the circumstances of the defendant's interrogation demonstrated voluntariness, notwithstanding the conditions of his detention leading up to the interrogation. Just as here, the defendant "was never in handcuffs during any of his interviews in Kenya. All interviews were held in a library-like room fitted with tables and chairs . . . . Bottled water was provided upon request; food was often provided by the agents. No threats were made by the U.S. agents, nor were any promises made." *Id.* at 213. Salman does not cite a single case where a defendant's statements to United States law enforcement following verbal and signed *Miranda* waivers were suppressed simply because they were made during or after the defendant's detention overseas.

---

[14]    Notably, the defendant's elder sister, who is only two years older and was at Roj for much longer than the defendant without any family members, received the same waiver form when the FBI tried to interview her in Roj on May 18, 2021, and she declined to waive her *Miranda* rights. As soon as the defendant's sister declined to waive, the agents discontinued the interview. The agents' proper response to the refusal of the defendant's sister to waive her Fifth Amendment rights further underscores their respect for those rights and underscores the voluntary nature of the defendant's waiver. A report of the FBI's interview with the defendant's sister was produced to the defendant in August 2024, along with all other interviews of the defendant's mother and siblings in the SDF camps and elsewhere.

Similarly, Salman's claim that her *Miranda* waiver during the May 2024 interview was a product of deception based on promises about her repatriation should be rejected out of hand. *See* ECF No. 77 at 6-7. Salman was told that she and her family were to return to the United States and, as Salman concedes, that was true. *See id.* Salman now resides at her grandmother's home in New Hampshire with her entire family, where she spends part of her pretrial release attending educational classes and craft fairs. *See* ECF Order (Mar. 7, 2025). She was not deceived, much less so in any way that made her unable to voluntarily waive her *Miranda* rights.

Salman's reliance on *United States v. Ruggles* is misplaced. *See* 70 F.3d 262 (2d Cir. 1995). In *Ruggles*, the Second Circuit *affirmed* the district court's denial of the defendant's suppression motion because, like here, the defendant was advised of his *Miranda* rights and signed a written consent form, and there was "nothing in the record to indicate that [the defendant] lack[ed] maturity, education or intelligence" such that he did not understand his rights or was tricked into waiving them. *Id.* at 265. The *Ruggles* court observed that, while "[m]aterial misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will . . . a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." *Id.* (citations omitted). Salman identifies no improper promises, and the alleged promises she does identify were neither material to obtaining her voluntary consent nor misrepresented in any way.[15]

---

[15]    Moreover, as described above, Salman actively concealed her identity from United States authorities in order to avoid repatriation from the camps, endeavoring instead to remain in Syria and work with other ISIS supporters to support ISIS and its cause. Salman can hardly claim that she was coerced into making statements through the promise of leaving the camp when she was instead going to great lengths to remain there. Nor can she claim that her treatment there was coercive when she was actively evading repatriation by United States authorities. *See United States v. Abu Ali*, 395 F. Supp. 2d 338, 374 (E.D. Va. 2005) (defendant who claimed statements were the result of torture "was primarily concerned with ensuring that the United States did not know that he was in custody . . . . It stretches credibility to think that a United States citizen who

*Culombe v. Connecticut*, 367 U.S. 568 (1961), is also inapposite.  In that case, the defendant had "a mental age of nine to nine and a half years" and was "wholly illiterate" and therefore "suggestible and subject to intimidation." *Id.* at 620, 625.  The defendant was "detained in the effective custody of the police for four nights" and "questioned repeatedly" during that time before confessing to criminal conduct. *Id.* at 625.  Salman, on the other hand, was of sound mind and was made comfortable despite only being questioned for less than ninety minutes in one instance and less than an hour in the other.  In neither interview, moreover, did Salman confess to the conduct that she is now charged with.

C.    The Court Should Deny the Defendant's Request for a Hearing

Finally, Salman provides no basis for her request for an evidentiary hearing with respect to her motion, and it should be denied. *See* ECF No. 77 at 7.  "A defendant who is moving to suppress evidence is not automatically entitled to an evidentiary hearing." *United States v. Harun*, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) (citing *United States v. Barrios*, 210 F.3d 355, 2000 WL 419940, at *1 (2d Cir. 2000)).  In particular, a defendant is not entitled to such a hearing absent "a contested issue of material fact." *Id.* (citing *United States v. Pierce*, No. 06-CR-42 (DLI), 2007 WL 1175071, at *3 (E.D.N.Y. Apr. 19, 2007)).  Moreover, as discussed above, "[i]t is well-settled that a hearing is not required if a defendant fails to support his factual allegations with an affidavit from a witness with personal knowledge." *Id.* (citing *United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005) and *United States v. Walia*, No. 14-CR-213 (MKB), 2014 WL 2533848, at *1-2 (E.D.N.Y. June 5, 2014)).  Salman has provided no such affidavit, and the generalized unsworn accounts relayed second- and third-hand by counsel in the motion do not cure

---

had just been beaten and tortured days before by foreign law enforcement officials would *not* want the United States to know that he was in custody abroad and was being tortured.").

that defect.  *See id.* at 286 (citing *United States v. Perryman*, No. 12-CR-0213 (ADS), 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013)).

      For all of these reasons, the Court should deny in its entirety Salman's motion to suppress her voluntary Mirandized statements to the FBI.

## V.    The Defendant's Motion to Suppress NMEC Evidence Fails

      The defendant attempts to shoehorn NMEC evidence into a vastly different statutory framework to argue for its suppression, relying on one irrelevant case focused on data collected pursuant to the Foreign Intelligence Services Act ("FISA") and the FISA Amendments Act ("FAA").  *See* ECF No. 76.  The defendant's motion fails because: (i) she lacks standing and a reasonable expectation of privacy to challenge evidence obtained from devices that she neither owned nor had a possessory interest in, and in any event no search of the defendant's identifiers yielded any results; (ii) the Fourth Amendment warrant requirement does not apply extraterritorially; (iii) the Fourth Amendment's warrant requirement does not apply to evidence provided by foreign authorities to the United States; and (iv) the good faith exception applies.  The defendant's reliance on FISA and FAA is inapposite and should be rejected.

      The defendant does not challenge the lawfulness of the actual seizure and extraction of the devices in question, but only the subsequent query of data maintained by NMEC.  *See* ECF No. 76 at 6 n.4.

### A.    The Defendant Lacks Standing and a Reasonable Expectation of Privacy to Seek Suppression of the NMEC Evidence

#### 1.    Applicable Law

      It is bedrock Fourth Amendment law that "Fourth Amendment rights are personal rights" that cannot "be asserted vicariously."  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978); *see also United States v. Payner*, 447 U.S. 727, 731 (1980).  This means that an individual can move

for suppression only if her Fourth Amendment "rights were violated by the search itself." *United States v. Padilla*, 508 U.S. 77, 81-82 (1993). A motion to suppress is not available to "those who are aggrieved solely by the introduction of damaging evidence," and "[c]o-conspirators and codefendants have been accorded no special standing." *Id.* (quoting *Alderman v. United States*, 394 U.S. 165, 171-72 (1969)). In other words, "a defendant's Fourth Amendment rights are violated only when the challenged conduct invades *his* legitimate [and objectively reasonable] expectation of privacy rather than that of a third party." *United States v. Santillan*, 902 F.3d 49, 62 (2d Cir. 2018) (emphasis in original) (internal quotation marks and citation omitted). A defendant seeking to suppress evidence based on an alleged Fourth Amendment violation "must show that he had a reasonable expectation of privacy in the place or object searched." *Id.* (quoting *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017)).

"For an individual's expectation of privacy to be legitimate, he must have exhibited an actual (subjective) expectation of privacy and the expectation must be one that society is prepared to recognize as reasonable." *United States v. Reyes*, 283 F.3d 446, 457 (2d Cir. 2002) (internal quotation marks and citations omitted). Thus, "where there is no reasonable expectation of privacy, no search warrant is required." *United States v. Caputo*, 808 F.2d 963, 967 (2d. Cir. 1978).

"As a general matter, '[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.'" *United States v. Lambus*, 897 F.3d 368, 402 (2d Cir. 2018) (quoting *Grady v. North Carolina*, 575 U.S. 306, 310 (2015)). "Reasonableness in the totality of the circumstances 'is determined by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy, and, on the other, the degree to which it is needed

for the promotion of legitimate government interests.'" *Id.* (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)).

   With respect to communications, the Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979).

   2. <u>Analysis</u>

   The defendant does not have standing to seek suppression under the Fourth Amendment. There is no fact—even a self-serving affidavit—that even suggests that she had any ownership interest in the phone. *See, e.g.*, *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) ("Dore does not have standing to assert Fourth Amendment rights" in historical cell-site records because "he did not submit an affidavit establishing that" he had a legitimate possessory interest in the cellphones).

   Nor can the defendant show that she has a reasonable expectation of privacy in data collected from a third-party device that was lawfully seized and searched. It is settled law that people do not have legitimate expectations of privacy as to data held on another person's device. For example, a defendant cannot challenge the search of another person's cell phone, or the introduction into evidence of the defendant's text messages recovered from that phone. *See Rakas*, 439 U.S. at 134 ("A person who is aggrieved by [a] . . . search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); *see also, e.g.*, *United States v. Almaleh*, No. 17-CR-25 (ER), 2022 WL 602069, at *13 (S.D.N.Y. Feb. 28, 2022) ("A person has no expectation of privacy in another person's email account."). Here, the defendant readily

concedes that the data she argues should be suppressed came "from the extraction of a cell phone belonging to someone other than Salman." ECF No. 76 at 5.

But even accepting as true the defendant's equivocal suggestion that some of her communications were on the Abu Ali Phones because she had sent her husband the images of herself,[16] it does not follow that the defendant has an independent reasonable expectation of privacy for which she has standing. That is because a person does not have a reasonable expectation of privacy in information that she makes open to the public or shares with others. *See Smith*, 442 U.S. at 743-44; *Katz v. United States*, 389 U.S. 347, 351 (1967); *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (holding that individual does not have "expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient" (citing *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) ("[Users] would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose expectation of privacy ordinarily terminates upon delivery of the letter.")); *see also United States v. Butler*, 151 F. Supp. 2d 82, 83-84 (D. Me. 2001) (finding no reasonable expectation of privacy in hard drives of shared university computers); *United States v. King*, 509 F.3d 1338, 1341-42 (11th Cir. 2007) (holding that defendant did not have a legitimate expectation of privacy in the contents of a "shared drive" of his laptop while it was connected to network). In the context of data transfers, once a file, like a letter, has been transmitted to the intended recipient, the sender's reasonable expectation of privacy in that item

---

[16]    The defendant alleges she sent communications to her husband, but also denied that the phone she used was connected to any service. In particular, the defendant's assertion "on information and belief" that her device contained electronic communications which were seized, *see* ECF No. 76 at 5, is contradicted by her statements to the FBI during her May 2024 interview, during which she stated that during her time in ISIS-controlled territory, she had a phone, "but it was not connected to any service and she only used it to play games." Exhibit E at 4.

terminates.  *Lifshitz*, 369 F.3d at 190; *see also United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995); *United States v. Horowitz*, 806 F.2d 1222, 1225 (4th Cir. 1986); *United States v. Meriwether*, 917 F.2d 955, 959 (6th Cir. 1990) (defendant had no reasonable expectation of privacy in message sent to a pager).  As described above, certain photographs on one of the Abu Ali Phones appear to have been taken on the phone itself, while at least one photograph appears to have been shared via "ShareIt."

The defendant attempts to manufacture standing by relying on another district court's decision imposing a warrant requirement on certain queries conducted pursuant to Section 702 of the FAA.  *See United States v. Hasbajrami*, 945 F.3d 641, 646 (2d Cir. 2019) ("*Hasbajrami I*") (querying databases of stored information derived from Section 702-acquired surveillance "*could* violate the Fourth Amendment, and thus require the suppression of evidence; therefore, a district court must ensure that any such querying was reasonable"); *United States v. Hasbajrami*, No. 11-CR-623 (LDH), 2025 WL 447498 (E.D.N.Y. Feb. 10, 2025) ("*Hasbajrami II*") (finding warrant was required, but declining to suppress on basis of good faith exception).  As part of this argument, the defendant argues that the NMEC database is equivalent to the government's FAA Section 702 holdings, suggests that the SDF seized her phone in March 2019, and argues that, as a result, the NMEC database might contain information derived from her phone.  Stringing these arguments and suppositions together, the defendant claims that *Hasbajrami II* confers standing on her in this action.  ECF No. 76 at 5.

The argument is meritless.  *First*, as a threshold matter, FISA's suppression remedy is available to a much broader set of persons than the ordinary sweep of Fourth Amendment standing.  *See* 50 U.S.C. § 1806(e) (creating suppression remedy for "aggrieved person[s]"); 50 U.S.C. § 1801(k) (defining "aggrieved person" in context of electronic surveillance as "a person

who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance"); 50 U.S.C. § 1821(2) (defining "aggrieved person" in context of physical searches as "a person whose premises, property, information, or material is the target of physical search or any other person whose premises, property, information, or material was subject to physical search"). This case is outside FISA's statutory framework, and caselaw that assumes the availability of FISA's broad remedy is presumptively inapposite.

*Second*, the Second Circuit's decision in *Hasbajrami I* was plainly limited, explicitly and by its reasoning, to the specific context of that case. The Second Circuit there held that querying a database containing communications of U.S. persons collected in near-real time, among other things, was a "Fourth Amendment event." *Hasbajrami I*, 945 F.3d at 670. The scope of that event depended heavily on the nature of the collection at issue in that case. *Id.* at 671 (finding circumstances "closely analogous to precedents drawn from traditional domestic criminal wiretapping"); *cf. Hasbajrami II*, 2025 WL 447498, at *1-3 (detailing history and scope of Section 702); *id.* at *19 n.27 (explicitly restricting the holding to the facts of that case). Physical extractions of data from devices like cell phones and laptops are not equivalent to the acquisition of electronic communications "roughly in real time, or close to real time . . . resembling] a traditional domestic law enforcement wiretap" that drove the Circuit's analysis in *Hasbajrami*, *see Hasbajrami I,* 945 F.3d at 653, and the argument that the same law should apply to both because both involved large database searches is simplistic. FISA surveillance differs in many meaningful respects from the collection of devices captured on the battlefield. As found by the Circuit in *Hasbajrami I*, FISA and the FAA permit the acquisition of communications "roughly in real time, or close to real time," *id.*, from a third-party provider that is being compelled to provide the communications; NMEC contains historical data from a physical device obtained during the course

of military operations.[17]  FISA and the FAA have the potential to sweep across a broad range of
geography and circumstances, with the inherent possibility of unintended collection of third
parties' communications.  By contrast, the collection at issue here occurred in a circumscribed area
(a battlefield recently occupied by ISIS fighters), where the government's interest and the likely
proportion of relevant material were both high, while the likelihood of capturing unrelated third
parties' information was relatively low.[18]  Indeed, these differentiating aspects of FISA and the

---

[17]    Although the defendant argues that *Hasbajrami* and this case concern "the Fourth
Amendment implications of the government's technological capacity for *electronic surveillance*,"
ECF No. 76 at 2 (emphasis added), that argument tortures language.  Neither ordinary usage nor
any case or statute supports equating historical information on a physical device with real-time
electronic surveillance.

[18]    For these reasons, the *Hasbajrami* cases are not relevant to the analysis here.  If
they were, however, the district court's opinion in *Hasbajrami II*, which is an outlier decision, is
wrongly reasoned and unpersuasive (though the decision ultimately declined to suppress evidence
on the basis of the good faith exception).  Notably, among other errors, the analysis in *Hasbajrami
II* conflates the Circuit's conclusion "that querying [Section 702 materials] should be considered
'a separate Fourth Amendment event,' *Hasbajrami [I]*, 945 F.3d at 670," with its assessment that
"a warrant was presumptively required."  *Hasbajrami II*, 2025 WL 447498, at *7.  But of course,
there are "Fourth Amendment events" short of intrusive searches; those "events" do not
"presumptively" give rise to a warrant requirement.  *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1 (1968)
(reasonable suspicion required for a frisk); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)
("individualized suspicion" required for police checkpoint aimed at "investigating crimes");
*Delaware v. Prouse*, 440 U.S. 648, 654 (1979) (noting that the Fourth Amendment requires
reasonableness, which does not always mean probable cause or a warrant).  Far from requiring a
warrant, the Circuit expressly held that the district court should examine whether the "queries of
Section 702-acquired information . . . were reasonable," and if not, "whether the queried
information tainted" future investigative steps.  945 F.3d at 673.

Moreover, the district court in *Hasbajrami II* expressly sought to restrict its holding
to the specific, Section 702-bound facts of that case:

> To be clear, the Court's ruling as to querying applies only to this
> case.  This narrow holding accords with the clear mandate from the
> Second Circuit to only address the reasonableness of any querying
> "in this case."  Hasbajrami *[I]*, 945 F.3d at 676.  In any event, the
> law has drastically changed since the relevant events here.  When
> Congress renewed Section 702 in 2018, it imposed a requirement
> for the FBI to obtain a probable cause order from the FISA Court

48

FAA are acknowledged and addressed by the superstructure of regulations and policies surrounding those statutes, which establish minimization requirements, targeting restrictions, age-off requirements, and use and dissemination restrictions, among others, contrasting with the unrestricted examination that the Fourth Amendment permits with respect to, for example, a cellphone received from a foreign partner. Domestic law similarly acknowledges the differential status of prospective and stored communications, establishing a high procedural threshold for obtaining a Title III wiretap but treating stored communications with a lower level of Fourth Amendment scrutiny. *Contrast United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993) (holding search warrant application "need not relate unproductive or unsuccessful efforts in the course of the investigation") *with* 18 U.S.C. § 2518(3) (requiring showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" to obtain wiretap authorization).

Because the FBI's searches of the United States's holdings of CEM in this case did not violate any legitimately recognized reasonable expectation of privacy held by the defendant, the Fourth Amendment analysis ends. The Abu Ali Phones—the sole sources of NMEC evidence which the defendant seeks to suppress in her motion—are not the defendant's phones, and the presence on one of the devices of her pictures, for which she has no reasonable expectation of privacy, creates no basis to challenge the government's use of properly collected search results.

---

before reviewing the results of U.S. person queries in predicated criminal investigations unrelated to national security. 50 U.S.C. § 1881a(f)(2)(A). Because that amendment was passed after Defendant's arrest, the Court expressly declines to consider whether querying under the current statutory scheme comports with the Fourth Amendment.

*Hasbajrami II*, 2025 WL 447498, at *19 n.27.

*Third*, even if the defendant's phone was seized by the SDF and turned over to the United States, *see* ECF No. 76 at 5, she has no remedy under the Fourth Amendment in this case as discussed *infra*. That is true because the Fourth Amendment's Warrant Clause does not apply extraterritorially even to U.S. citizens, *see* Section V.B, and there is no Fourth Amendment implication to "foreign searches conducted by foreign officials," *United States v. Lee*, 723 F.3d 134, 139 (2d Cir. 2013), *see* Section V.C.

*Finally*, even assuming *arguendo* that the requests to NMEC were separate searches like those found to have occurred in *Hasbajrami II*, the defendant's motion would fail as applied to her because the specific, relevant searches that yielded the inculpatory evidence were not searches of classified databases that contain Section 702-acquired information. *See Hasbajrami II*, 2025 WL 447498, at *12 ("Because [particular searches] were conducted across unclassified databases that did not contain any Section 702-acquired information, these queries are not subject to the Court's foreign intelligence exception analysis.").

Moreover, notwithstanding the inapplicability of *Hasbajrami II* to this case, the analysis employed in *Hasbajrami II* further militates against suppression as applied here because when the district court assessed the queries individually, the court was limited by the Second Circuit to only those queries that used terms relating to Hasbajrami. *Hasbajrami I*, 945 F.3d at 673 (instructing the district court to "conduct an inquiry into whether any querying of databases of Section 702-acquired information *using terms related to Hasbajrami* was lawful under the Fourth Amendment" (emphasis added)). Here, the relevant searches that identified the inculpatory evidence did not name the defendant, meaning that those searches are not implicated by *Hasbajrami I* and *II* at all.

As described above, the Abu Ali Phones were not identified or returned in response to searches that named the defendant or her identifiers.  Instead, the CEM photobook from one of the Abu Ali Phones was returned as a result of the FBI's June 2022 search in Harmony for the name of an investigation subject who is not the defendant.  And it was that CEM photobook that contained images of the defendant, including her wedding picture, which showed her seated in front of an ISIS flag in a wedding dress.  Shortly thereafter, in July 2022, the FBI requested the "gold copy" extractions of both Abu Ali Phones from NMEC.  Furthermore, when the FBI requested the updated searches of CEM extraction holdings in June 2023, it was the search for Abu Ali's true name, not searches of the defendant's name, that yielded the September 2023 results containing the Military Training Document (with English translation) that inculpated the defendant.  Thus, to the extent the Court were inclined "to trace . . . individual pieces of evidence . . . in order to assess whether those pieces of evidence had been obtained consistent with the Fourth Amendment," *Hasbajrami I*, 945 F.3d at 674, no evidence would be traced to the queries of CEM extractions naming the defendant.  Accordingly, even if querying a database of CEM extractions from a battlefield were somehow a violation of the defendant's rights—and it is not— the defendant would not suppress any evidence by prevailing on this claim.

Moreover, even if the defendant somehow had Fourth Amendment standing to challenge searches relating to individuals other than herself, those searches would survive Fourth Amendment review, because "[i]t is well settled that Fourth Amendment protections extend only to *unreasonable* government intrusions into . . . legitimate expectations of privacy."  *Reyes*, 283 F.3d at 457 (internal quotation marks and citations omitted) (emphasis added).  Using the applicable reasonableness framework of assessing "the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable

51

privacy expectations," *Lambus*, 897 F.3d at 402, the defendant cannot demonstrate that the government's searches of other individuals that yielded inculpatory information about her were unreasonable.   That is because, as discussed above, "[r]easonableness in the totality of the circumstances is determined by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *Id.* (internal quotation marks omitted).

Here, as explained above, the defendant has no reasonable expectation of privacy in devices that did not belong to her, much less in searches relating to other individuals.   By contrast, the government has a strong and legitimate interest in collecting devices from ISIS fighters and supporters from the battlefields in Syria (and Iraq) and searching those devices for intelligence.   ISIS and its supporters have claimed responsibility for numerous terrorist activities, including multiple attacks against Americans in the United States and against Westerners abroad, and have called for lone-wolf attacks against targets in the West, including the United States.   The government's interest in intelligence-gathering is thus very significant, ranging from gathering intelligence that could assist Coalition Forces in defeating ISIS on the battlefield to thwarting lone-wolf attacks against civilians.   In short, the government's national security interests are significant, and "[b]alanced against" the defendant's assertions of privacy, "the government's manifest need to investigate possible threats to national security," including "to gather additional intelligence on [ISIS's] activities in [Syria]," was reasonable under the Fourth Amendment.   *In re Terrorist Bombings*, 552 F.3d at 174 (holding that the government's need "to gather additional intelligence on al Qaeda's activities in Kenya" was reasonable when balanced against the warrantless search of the defendant's home in Kenya).

Accordingly, the Court should deny the defendant's motion.

B.     The Fourth Amendment's Warrant Clause Does Not Apply Extraterritorially

1.     Applicable Law

"[T]he Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents" of U.S. citizens, and "such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness." *In re Terrorist Bombings*, 552 F.3d at 167; *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) ("[A] warrant is not required to establish the reasonableness of *all* government searches."). Moreover, the Fourth Amendment's warrant requirement does not apply "to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990).

"The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Lambus*, 897 F.3d at 402. "Reasonableness in the totality of the circumstances 'is determined by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate government interests.'" *Id.* (quoting *Samson*, 547 U.S. at 848).

2.     Analysis

Even if there was any NMEC evidence at issue that was sourced directly from a device that belonged to the defendant—which there is not—seizures and searches abroad, whether they target U.S. citizens or foreign nationals, do not require a warrant. The defendant's arguments otherwise are without merit.

The devices at issue here, the Abu Ali Phones, were seized from Abu Ali, a nonresident alien in a foreign country, shortly before ISIS fell to the SDF and Coalition Forces in

March 2019 in Syria, and were received by Coalition Forces on the battlefield in Syria. The Abu Ali Phones were then searched and extracted overseas at a REC near the battlefield. No warrant was thus required for the search. *See In re Terrorist Bombings*, 552 F.3d at 167.

Absent a warrant requirement, the government's conduct need only be reasonable to satisfy the Fourth Amendment. *Id.* The facts here make clear that the government acted reasonably under the totality of the circumstances in receiving the devices and providing them to NMEC. Balancing "the degree to which [the search] intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate government interests," *Lambus*, 897 F.3d at 402, it is clear that the government's legitimate government interests in receiving terrorist devices abroad for intelligence outweigh the defendant's individual privacy in phones that did not belong to her. Indeed, as already discussed, the Abu Ali Phones are not the defendant's phones, and the presence of the defendant's pictures on one of the devices, for which she has no reasonable expectation of privacy, cannot generate standing to challenge the reasonableness of the government's action, where no such standing exists.

Apart from that, the defendant states that she is not challenging the initial collection, *see* ECF No. 76 at 6 n.4, but only the searches at NMEC inasmuch as she alleges, without any sworn statement establishing a factual basis for her hypothetical privacy interest,[19] that the NMEC

_____

[19]    In the same way that the defendant failed to provide a factual basis for her request for an evidentiary hearing with respect to her motion to suppress statements pursuant to *Miranda*, so too here has the defendant failed to provide a basis for a hearing. As discussed *supra*, *see* Section IV.C, "[a] defendant who is moving to suppress evidence is not automatically entitled to an evidentiary hearing," absent "a contested issue of material fact," presented via affidavit. *Harun*, 232 F. Supp. 3d at 285 (citations omitted). The defendant's motion to suppress NMEC evidence repeatedly makes factual assertions based on "information and belief," but the unsworn accounts relayed second- and third-hand by her counsel do not fulfill the requirement for a sworn statement. *See id.* at 286 (citing *Perryman*, 2013 WL 4039374, at *6).

database contains her seized phone's data and that the military generally collects U.S. persons' data from abroad. Because the defendant is not challenging the initial collection, she appears thus to be conceding the reasonableness of the government's actions in receiving the devices abroad. *See In re Terrorist Bombings*, 552 F.3d at 173-76 (analyzing the reasonableness of the searches abroad of the defendant's home in Kenya and the surveillance of his Kenyan telephone lines).

Even if the defendant were not conceding the reasonableness of the government's conduct, the conduct of the Coalition Forces, including the United States, was independently reasonable—and in fact statutorily authorized and mandated. The United States military is obligated to provide relevant collected information to civilian law enforcement authorities pursuant to 10 U.S.C. § 271, which states:

> (a) The Secretary of Defense may, in accordance with other applicable law, provide to Federal, State, or local civilian law enforcement officials any information collected during the normal course of military training or operations that may be relevant to a violation of any Federal or State law within the jurisdiction of such officials.
>
> . . .
>
> (c) The Secretary of Defense shall ensure, to the extent consistent with national security, that intelligence information held by the Department of Defense and relevant to drug interdiction or other civilian law enforcement matters is provided promptly to appropriate civilian law enforcement officials.

10 U.S.C. § 271. In addition to the statutory basis, the government acted reasonably given its legitimate interest in collecting devices from ISIS fighters and supporters from the battlefields in Syria and searching those devices for intelligence. *See supra* Section V.A.2. The government's interest in intelligence-gathering is thus substantial and at the time included gathering intelligence that could assist Coalition Forces in defeating ISIS, among other weighty national security interests, including thwarting attacks on U.S. targets.

55

Once Coalition Forces disseminated the extracted phones to NMEC, the government's conduct was thereafter also reasonable when balanced against the defendant's nonexistent privacy interest in her husband's phones. In the first instance, the extractions of the Abu Ali Phones took place abroad, and those extractions were then provided to NMEC, which in turn made the extractions available to the intelligence community and the FBI, as well as foreign partners. The extractions are thus properly understood as the full search results from devices properly received pursuant to 10 U.S.C. § 271. Nothing in this section of the U.S. Code, nor anywhere else, creates a warrant requirement to conduct analysis of the data extracted abroad and provided by the U.S. military to law enforcement in the United States to gather intelligence and use in law enforcement proceedings. In short, no further process was necessary to search the CEM extractions, and the government acted reasonably in searching the CEM.

C.    Because the Abu Ali Phones Were Received from the SDF, There Is No Basis on Which to Suppress Them

1.    Applicable Law

"[S]uppression is generally not required when the evidence at issue is obtained by foreign law enforcement officials." *Lee*, 723 F.3d at 140, 139, n.3; *cf. United States v. Janis*, 428 U.S. 433, 455 n. 31 (1976) ("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act."); *United States v. Mount*, 757 F.2d 1315, 1317-18 (D.C. Cir. 1985) ("[T]he exclusionary rule does not normally apply to foreign searches conducted by foreign officials.").

There are only "two circumstances where evidence obtained in a foreign jurisdiction may be excluded" under this doctrine: (i) "where the conduct of foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscience" and (ii) "where cooperation with foreign law enforcement officials may implicate constitutional restrictions." *Lee*,

723 F.3d at 140 (alterations and internal citations omitted).  "Within the second category for excluding evidence, constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials."  *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (internal citation omitted).  The Second Circuit has "long allowed foreign authorities to share the fruits of an investigation with their American counterparts without suggesting or assuming that the latter controlled the investigation."  *United States v. Getto*, 729 F.3d 221, 231 (2d Cir. 2013).

    2.   <u>Analysis</u>

As set forth above, the government understands that the Abu Ali Phones were seized by the SDF from Abu Ali on his arrest on or about March 20 or 21, 2019.  The Phones were thereafter provided by the SDF to Coalition Forces, after which they were sent to a REC operated by Coalition Forces for exploitation.

Because a foreign partner provided the Abu Ali Phones to the United States government, suppression is not available as a remedy.  *See Lee*, 723 F.3d at 139 n.3.  Nor does any applicable exception apply.  First, no conduct of the United States, or the SDF, at issue here, whether proven or even alleged, can be said to "shock the conscience."  *See Getto*, 729 F.3d at 229 ("We have accordingly held that conduct did not shock the judicial conscience when, for example, there was no act of torture, terror, or custodial interrogation of any kind, or when there was no claim of rubbing pepper in the eyes, or other shocking conduct.").

Second, the SDF, an independent and separately commanded fighting force, was not acting as "agents" of the United States.  *See, e.g.*, *id.* at 230 ("In order to render foreign law

enforcement officials virtual agents of the United States, American officials must play some role in controlling or directing the conduct of the foreign parallel investigation."); *Lee*, 723 F.3d at 140 (noting that a foreign law enforcement agency did not "solicit the views, much less approval, of [American] agents prior to conducting surveillance"); *United States v. Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975) (declining to suppress the fruits of foreign wiretaps where the "United States government did not in any way initiate, supervise, control or direct the wiretapping" (internal quotation marks omitted)).  Much less was there any cooperation "designed to evade constitutional requirements applicable to American officials."  *Maturo*, 982 F.2d at 61; *see also Getto*, 729 F.3d at 232-33 ("[T]he record demonstrates that the decision to request [foreign] assistance was motivated by the inability of American law enforcement agents to further investigate criminal activity occurring substantially within the territory of a foreign sovereign," not any "*intent* to evade the Fourth Amendment's requirements"); *Maturo*, 982 F.2d at 62 ("[T]he [Turkish National Police's] wiretapping of phones in Turkey was prompted not by a desire to circumvent [American] constitutional constraints, but by [a] logistical problem.").

      D.    <u>The Good Faith Exception Would Apply in Any Event</u>

      Finally, the defendant's motion to suppress would also fail for the same reason that the court in *Hasbajrami II* declined to order suppression—because the government acted in good faith.  2025 WL 447498, at *20-21.  There is no case, much less any binding Second Circuit case, that would have put the FBI agents on notice that their use of NMEC could have even arguably run afoul of the Fourth Amendment.

      As described above, NMEC has been serving the U.S. and foreign intelligence communities and law enforcement for over 20 years.  NMEC evidence has never been suppressed on any of the grounds that defendant raises.  To the contrary, NMEC evidence has been deemed

admissible at trial by multiple courts in the United States. *See*, *e.g.*, *United States v. Musaibli*, 42 F.4th 603 (6th Cir. 2022); *United States v. Ramic*, No. 21-CR-13 (GNS), 2024 WL 2274529 (W.D. Ky. May 20, 2024). Because nothing could have put the FBI or government on notice that its use of this database could arguably have been problematic under the law, the "harsh sanction of exclusion" is unwarranted, just as it was deemed unwarranted in *Hasbajrami II*. *See* 2025 WL 447498, at *20. This result follows from the Supreme Court's repeated affirmations that the "[exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations," and "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotations and citation omitted). Here, law enforcement agents had no reason to doubt that their conduct comported with statute, as well as Supreme Court and Second Circuit law. This accordingly counsels against application of the exclusionary rule, as its deterrent value simply would not be furthered in this case.

VI.     The Defendant's Premature Motion in Limine to Exclude Evidence of the Defendant's
        Military Training Fails

        Defendant moves in limine to exclude evidence of the Military Training Document, arguing that it is fraudulent. *See* ECF No. 75. As a threshold matter, the defendant's motion is premature, because the admissibility of trial evidence should be explored at trial or in a hearing close in time to trial, not on the basis of legal argumentation alone when no trial date has been set. Notably, the defendant's self-serving statements are supported by nothing more than her attorneys' assertions, as she has failed to submit a sworn affidavit sufficient to raise any genuine issues. In any event, the arguments in the motion are meritless; the government will present witness testimony at trial that will demonstrate that the document is authentic and admissible. Moreover,

the defendant's denials of culpability are belied by other documentary and video evidence on one

of the Abu Ali Phones corroborating her use of an AK-47.

     A.    <u>Applicable Law</u>

        In order to introduce evidence at trial, the proponent must demonstrate that the

evidence is authentic and admissible.

     1.    <u>Authenticity</u>

        Under Federal Rule of Evidence 901(a), a proponent "must produce evidence

sufficient to support a finding that the item is what the proponent claims it is." The question of

authenticity turns on whether the document is what it purports to be, not on its veracity. *See United

States v. Hamilton*, 334 F.3d 170, 186-87 (2d Cir. 2003) ("Once [proffered evidence] has been

sufficiently authenticated, any question as to the veracity of the [evidence] . . . goes to the

evidence's weight rather than to its admissibility."). "The bar for authentication of evidence is not

particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007); *see also United

States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) (Rule 901 "does not erect a particularly high

hurdle"). The proponent need not "rule out all possibilities inconsistent with authenticity, or []

prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176

F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted). Rather, "the standard

for authentication is one of 'reasonable likelihood,' and is 'minimal.'" *Gagliardi*, 506 F.3d at 151.

"Proof of authentication may be direct or circumstantial." *United States v. Al-Moayad*, 545 F.3d

139, 172 (2d Cir. 2008) "Rule 901 is satisfied if sufficient proof has been introduced so that a

reasonable juror could find in favor of authenticity or identification." *Id.* at 173 (internal quotation

marks omitted).

"The ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury." *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014). In other words, authentication "merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury." *United States v. Tropeano*, 252 F.3d 653, 661(2d Cir. 2001). "Thus, after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party 'remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility." *Vayner*, 769 F.3d at 131 (internal quotation marks omitted); *see also United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) ("Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury.").

Rule 901(b) provides a non-exhaustive list of ways that proponents can use to meet the low standard for authentication, two of which are relevant here. First, under Rule 901(b)(1), authenticity can be established through "testimony of a witness with knowledge"—for example, an expert witness familiar with the documents or an individual with firsthand knowledge of the documents—that "an item is what it is claimed to be." Second, under Rule 901(b)(4), authenticity can be established by a record's "distinctive characteristics," such as "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" that demonstrate a document's authenticity. These "circumstances" can include, for instance, the circumstances surrounding the acquisition or discovery of the documents. *See Al-Moayad*, 545 F.3d at 173 (relying in part on testimony of where a document was seized and received by the United States in deeming the document properly authenticated); *see also United*

61

*States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) (holding that a document may be authenticated by the circumstances surrounding its discovery); *United States v. Helmel*, 769 F.2d 1306 (8th Cir. 1985) (finding gambling ledger sufficiently authenticated even though author of the ledger was unknown, because the contents of the ledger were such that only those persons acquainted with the particular transactions and persons involved could have written them, the ledger was found in one of the defendant's homes, and the names in the ledger corresponded to members of the gambling enterprise).

Nor do the "distinctive characteristics" of the record have to be established by a witness with personal involvement in the creation or receipt of the record. *See United States v. Sliker*, 751 F.2d 477, 488 (2d Cir. 1984) ("The contents of these documents, taken in conjunction with Deputy Superintendent Griffith's testimony that they were seized at the purported office of the bank, provided adequate basis to establish their authenticity."); *see also United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983) (contents of letter found in defendant's home sufficient to authenticate); *United States v. Wilson*, 532 F.2d 641, 644-45 (2d Cir. 1976) (contents together with fact that notebooks were found at apartment where crime was committed were sufficient to establish authenticity).

2.    Co-Conspirator Statements

A statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In order to admit an extra-judicial statement by a co-conspirator under this Rule, the district court must find by a preponderance of the evidence (i) that there was a conspiracy, (ii) that its members included the declarant and the party against whom the statement is offered, and (iii) that the statement was made both (a) during the course of and (b) in furtherance of the

62

conspiracy. *See United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). In making a preliminary factual determination of these elements, the court may consider the hearsay statements themselves. *See Bourjaily*, 483 U.S. at 181. "However, these hearsay statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) (citation omitted).

   The co-conspirator exception to the rule against hearsay is applicable even in cases where no conspiracy is charged, or where the conspiracy charged is different from the conspiracy during which the statement offered was made. *See*, *e.g.*, *Musaibli*, 42 F.4th at 615 ("[T]he alleged conspiracy need not be the same as the one charged. In fact, there need not even be a conspiracy charge in the case for Rule 801(d)(2)(E) to apply."). *Musaibli* is particularly instructive in that it reached a very similar evidentiary issue relating to a U.S. citizen who joined ISIS in Syria and where certain of the government's evidence came from NMEC. There, the Sixth Circuit posed the question as follows: "if a criminal defendant is alleged to have been part of a terrorist group, then do records documenting that group's organizational structure, logistics, and activities qualify as statements of co-conspirators under Federal Rule of Evidence 801(d)(2)(E)?" *Musaibli*, 42 F.4th at 606. Noting that the ISIS "conspiracy was large" but not "boundless," the court held that "statements generated by ISIS's bureaucratic apparatus to support the mission of providing the terrorist group with personnel and services . . . fit comfortably within the alleged conspiracy's scope," and that the ISIS documents at issue in that case—such as documents identifying the defendant as an ISIS fighter—were "also in furtherance of the alleged conspiracy." *Id.* at 618-19.

3.    Residual Hearsay Exception

Rule 807 permits hearsay evidence to be admitted under a residual or catch-all exception.  To be admissible under the residual exception, hearsay evidence must be "supported by sufficient guarantees of trustworthiness" and "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807(a).  This analysis requires consideration of "the totality of circumstances under which [the hearsay statement] was made and evidence, if any, corroborating the statement."  *Id.* at 807(a)(1).  "To evaluate whether a statement is sufficiently trustworthy, [courts] look to evidence that corroborates both the declarant's trustworthiness and the truth of the statement."  *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999).

4.    Best Evidence Rule

Under Federal Rule of Evidence 1002, known as the "best evidence rule," "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise."  Fed. R. Evid. 1002.  Each of Rules 1003 and 1004 are separately able to "provide[ the] otherwise."  *Elliott v. Cartagena*, 84 F.4th 481, 489 (2d Cir. 2023).

Rule 1003 states: "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."  Fed. R. Evid. 1003.  A duplicate is defined as "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original."  Fed. R. Evid. 1001(e).  The party opposing the admission of a writing has the burden of "demonstrating a genuine issue as to . . . the trustworthiness of the duplicate, or as to the fairness of substituting the duplicate for the original."  *United States v. Chang An-Lo*, 851 F.2d 547, 557 (2d Cir. 1988) (citation and quotation marks omitted).

Under Rule 1004, "[a]n original is not required and other evidence of the content of a writing . . . is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith; [or] (b) an original cannot be obtained by any available judicial process." Fed. R. Evid. 1004(a), (b). A party seeking to rely on "other evidence" may do so "only where the [party] demonstrates that it has made a diligent but unsuccessful search and inquiry for the missing" document. *Elliott*, 84 F.4th at 491. "Whether the party's search was sufficiently diligent is to be decided by the court." *Id.*

"A document admitted under Rule 1003 is treated differently than a document admitted under Rule 1004." *Id.* Whereas "[a] duplicate admitted under Rule 1003 is admissible to the same extent as the original," in contrast, "a document admitted under Rule 1004 is admissible only as 'other evidence' of the original because admission under Rule 1004 does not require such high guarantees of authenticity." *Id.*

5.    Federal Rule of Evidence 403

Finally, Federal Rule of Evidence 403 instructs that the district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. In making a Rule 403 determination, "[a] court should consider the possible effectiveness of a jury instruction and the availability of other means of proof." *United States v. Dupree*, 706 F.3d 131, 138 (2d Cir. 2013) (citing Fed. R. Evid. 403 Advisory Committee's Note); *see also* Fed. R. Evid. 403 Advisory Committee's Note ("The availability of other means of proof may . . . be an appropriate factor."). The Advisory Committee's Note for Rule 403 define "unfair prejudice" as an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* Typical examples that courts confront are evidence of other crimes because such evidence can lead

65

a jury to convict a defendant "because of his participation in the other crimes rather than because he is guilty beyond a reasonable doubt of the crime alleged." *United States v. Manafzadeh*, 592 F.2d 81, 86 (2d Cir. 1979).

Because a district court is "well-positioned" to conduct the Rule 403 balancing test, its decision will not be disturbed unless the "conclusion is arbitrary or irrational." *United States v. Garnes*, 102 F.4th 628, 635, 638 (2d Cir. 2024) (reversing the district court and determining that the court had "considerably misperceived the significance of the challenged evidence" where it had excluded evidence "of the actus reus of the crime"). The court properly admits evidence under Rule 403 where the evidence is "part of the 'res gestae, the narrative the government rightly seeks to tell at the guilt phase of a trial.'" *Garnes*, 102 F.4th at 641-42 (quoting *United States v. Pepin*, 514 F.3d 193, 201 (2d Cir. 2008)).

B.    Analysis

The defendant's arguments seeking to exclude the Military Training Document each fail. As a preliminary matter, it is certainly not the case that NMEC documents are categorically inadmissible, which is the import of the defendant's arguments if accepted. One district and one circuit court have already approved the admissibility at trial of ISIS documents retrieved from NMEC. *See United States v. Musaibli*, 577 F. Supp. 3d 609 (E.D. Mich. 2021), *rev'd*, 42 F.4th 603 (6th Cir. 2022). In two other cases where the government had proffered evidence from NMEC, the defendants pleaded guilty after the government sought to admit the NMEC evidence. *See United States v. Sylejmani*, No. 20-CR-106 (RC) (D.D.C.); *United States v. Ali*, No. 21-CR-20123 (BB) (S.D. Fl.).[20] And in one case, the defendant consented to the proposed

---

[20]    The defendant's motion does not mention the *Ali* case.

NMEC evidence being assessed at trial, rather than at a pretrial evidentiary hearing, and the district court therefore held that "[a]ssuming these representations" of the government's proffered testimony "are true, the United States may be able to authenticate these documents at trial." *Ramic*, 2024 WL 2274529, at *5. To introduce NMEC documents, all that the government must do is proffer testimony in support of the authenticity and admissibility of the documents. The government here intends to do so and intends to move in limine to admit such evidence, as the government did in each of *Musaibli*, *Sylejmani*, *Ali*, and *Ramic*. As described below, the government intends to call multiple witnesses who provide a sufficient basis to conclude that the government "may be able to authenticate" the Military Training Document at trial without need for an evidentiary hearing.

        1.   <u>The Military Training Document Is Authentic</u>

To establish the authenticity of the Military Training Document, the government intends to call some or all of the following witnesses:

      (i)    an ISIS expert, who the government expects would testify regarding various aspects of ISIS, including its founding, history, structure, strategic goals, geographic location, record-keeping, recruitment, means and methods of ISIS's operation, and jihadist terminology;

      (ii)   an ISIS document expert, who the government expects would testify regarding ISIS documents, including the unique language, characters, and terminology used by ISIS in the Military Training Document and other documents that demonstrate authenticity;

      (iii)  a foreign member of the Coalition Forces who worked at the REC and received, among other devices, both Abu Ali Phones, and who the

government expects would testify about, among other things, the receipt of CEM, the procedures involved in exploiting and forensically extracting CEM, and the chain of custody of the relevant devices;

(iv)    a DOJ senior digital intelligence analyst who the government expects would testify regarding, among other things, the metadata, hash, and other technical details relating to the forensic image of the relevant devices, and the documents contained within, to demonstrate their authenticity;

(v)    a non-U.S. female witness who was present in Syria during the formation of the Nusaybah Katiba, and who the government expects would testify, based on her firsthand knowledge, regarding, among other things, how women came to sign up for training with the Nusaybah Katiba, the military training certifications issued to women like the defendant, and why these certifications were important;[21]

(vi)    a non-U.S. individual who traveled to ISIS-controlled territory and who the government expects would testify regarding, among other things, the process of entering ISIS-controlled territory, experiences in the SDF camps, and repatriation; and

(vii)    an FBI agent, who the government expects would testify regarding, among other things, the investigation into the defendant, including the various

---

[21]    The defendant states that the government has not identified a witness with knowledge who can authenticate the Military Training Document, *see* ECF No. 75 at 17, but much like the defendant's motion in limine more broadly, this assertion is premature. The government intends to present this witness, who had seen documents of this type during her time in ISIS-controlled territory.

documents on the Abu Ali Phones and other devices, and the defendant's admissions that corroborate the information in the Military Training Document.

Taken together, the testimony from these witnesses would firmly establish that the Military Training Document (and other NMEC evidence) clear the relatively low hurdle of authenticity. *See Gagliardi*, 506 F.3d at 151.

Certain of the testimony—in particular, the ISIS expert, ISIS document expert, and the FBI agent testimony—would further corroborate authenticity based on comparisons to similar documents and the corroboration the defendant herself provided. As to similar documents, the government has identified additional military training documents (the "Additional Military Training Documents") upon further inquiries to NMEC. Specifically, the government has identified eight Additional Military Training Documents, one on the phone of another ISIS fighter (the "ISIS Fighter Phone") and seven on a hard drive belonging to an ISIS fighter who appears to have been more senior in the ISIS bureaucracy (the "ISIS Fighter Hard Drive").[22] In all eight Additional Military Training Documents, the typewritten portion is identical to that of the defendant's Military Training Document. Indeed, the typewritten portion appears to comprise a photocopied template that was filled out as needed as women successfully completed military training and were authorized to receive weapons, ammunition, and accessories. The handwritten portions all differed, as they contain the handwritten kunyas of the women who completed training, their husbands' kunyas, their husbands' ISIS personnel numbers, and what the women were

---

[22] The government expects to be able to produce to the defendant the full forensic gold copies of these two devices this week.

authorized to receive in terms of weapons, ammunition, and accessories, as well as what weapons, ammunition, and accessories the women already had in their possession.

The single Additional Military Training Document found alone on the ISIS Fighter Phone is similar to the defendant's Military Training Document in that it bears no ISIS rubber stamps. The seven Additional Military Training Documents found on the ISIS Fighter Hard Drive, on the other hand, bear the rubber stamps of different ISIS governorates. This pattern suggests a bureaucratic routing procedure, under which a document would be validly issued by the Nusaybah Katiba without a stamp, then routed up the chain of command for subsequent stamping at a higher level of authority. Thus, the absence of a stamp on the Military Training Document suggests, not that the document is inauthentic, but that it was photographed between the time of its issuance and the time it was routed to the governorate for stamping.[23] Also, critically, two of the Additional Military Training Documents found on the ISIS Fighter Hard Drive and bearing ISIS rubber stamps were signed by "Um Yousuf." The handwritten signature of the "Um Yousuf" in these Additional Military Training Documents appears to be consistent with the signature of the "Um Yousuf" who signed the defendant's Military Training Document.

As to the defendant's particular Military Training Document, the defendant confirmed during her May 2024 Mirandized interview that the document identified her by her kunya, that the document contained her husband's kunya, and that the document was about her. The defendant's denials of her receipt of military training, *see* ECF No. 75 at 4, are self-serving and contradicted by the video on one of the Abu Ali Phones, which shows her practicing with what

---

[23]    Moreover, the Additional Military Training Documents on the ISIS Fighter Hard Drive were found along with other Nusaybah Katiba documents, including documents authorizing the provision of supplies to the Katiba generally. These documents also bore ISIS rubber stamps, further confirming the way in which the ISIS governorates would ratify already-issued documents.

appears to be an AK-47, the same model of weapon that she received authorization to continue to possess. Her denials are also belied by multiple pictures of her with an ISIS flag and her husband's reference to their joint jihad in support of ISIS. *See supra* Factual Background II.B (Abu Ali telling the defendant to make a prayer that Allah "is accepting *our hijra and jihad* and my [martyrdom]" (emphasis added)).

The defendant's arguments all boil down to challenges to the veracity of the Military Training Document, not its authentication. In particular, the defendant speculates that either her husband or his associate forged the document "to obtain a benefit, such as additional weaponry," *see* ECF No. 75 at 19. But "[o]nce [proffered evidence] has been sufficiently authenticated, any question as to the veracity of the [evidence] . . . goes to the evidence's weight rather than to its admissibility." *Hamilton*, 334 F.3d at 186-87. That is because "[t]he focus of Rule 901 is on whether the item of evidence (be it genuine or fake) is what the party claims it to be." *United States v. Oreckinto*, 234 F. Supp. 3d 360, 364-65 (D. Conn. 2017).

Even if the defendant could undermine the authenticity of the Military Training Document by self-servingly declaring it a fake, her arguments in support of the document being fraudulent are disingenuous and illogical.

*First*, the defendant's argument that "[f]orged, fabricated or fraudulent ISIS documents are a known problem," *see* ECF No. 75 at 5-6, is misleading. The entirety of the defendant's example rests on *one* anecdote involving eight receipts that were provided to a reporter by a purported retired former American intelligence operative named Asaad Almohammad. Whatever scrutiny may fairly be ascribed to documents delivered to a journalist without any forensic record, that is quite different from the instant case, where the physical phones seized from the defendant's husband by the SDF were then received by Coalition Forces and forensically

imaged as received.  Moreover, the anecdote that the defendant relies on repeatedly in declaring a "known problem," ECF No. 75 at 5, 19, was indeed at the time a sensational story that drew immediate skepticism and criticism.  That is because the receipts purported to show that ISIS's caliph Abu Bakr al Baghdadi was paying an al Qaeda affiliate for protection, even though al Qaeda was a sworn enemy of ISIS.  Such a purported bombshell in the world of foreign terrorist organizations and ISIS leadership is far afield from the relatively quotidian record here at issue— a military training certificate pertaining to one obscure woman with no leadership status in ISIS.[24] The suggestion that anyone would forge the Military Training Document stretches the bounds of reason.

*Second*, the defendant's particular theory that either her husband or his associate forged the document "to obtain a benefit, such as additional weaponry," *see* ECF No. 75 at 19, is contradicted by the Military Training Document itself, as well as other documents on the Abu Ali Phones.  In particular, if the defendant's husband or associate wished to defraud ISIS out of additional weaponry, it would make little sense for them to have filled out the Military Training Document to indicate that they already had the AK-47 in their possession.  Instead, if they wanted more weapons, they would have filled in the table to receive an additional weapon.  Moreover, in order to carry off this effort, the defendant's husband or his associate would have had to procure a copy of the Nusaybah Katiba authorization template.  But if they had access to such copies and wanted to gain more weapons, it would stand to reason that the Abu Ali Phones would be *filled*

---

[24]    The defendant's receipt of military training is entirely consistent with everything that is known about the Nusaybah Katiba.  Indeed, it is publicly known that ISIS authorized a female battalion and that women received weapons training from the Katiba.  It is also widely known that ISIS's bureaucracy and record-keeping was extensive.  Thus, the background conditions pertaining to this document corroborate its likely authenticity, in contrast with the improbable nature of the al Baghdadi receipts cited by the defendant.

with copies of such documents purporting to authorize them to receive weapons.  However, the Abu Ali Phones contain no such volume of documents.  Instead, the Abu Ali Phone on which the Military Training Document was found shows that the defendant's husband took pictures of numerous ISIS documents relating to him.  One of those documents, which is dated February 8, 2019, is a weapons possession certificate in the name of the defendant's husband that legally confirmed that he owned an M16A2 (with a listed serial number), in addition to 13 magazines, all of which he had purchased three years before—*i.e.*, in 2016—for $1,100.  It would be illogical for the defendant's husband to forge a document for AK-47 ammunition, which the Military Training Document authorized, when he had a superior, U.S.-designed assault rifle that required different ammunition.

Apart from that, the Abu Ali Phone also contains pictures of numerous documents created during the time period in which the Military Training Document was photographed that indicate that the defendant's husband was being reassigned to a different brigade, and that moreover, he had been derelict in his duty, having been absent from his post for ten days.  One related document appears to be a memorialization of a deposition of Abu Ali before a "Soldiers' Judge," where Abu Ali indicated his absence was because of Abu Ali's father's heart attack, the defendant's father's injuries sustained from the rocket attack described above, and Abu Ali's need to take care of his father-in-law's family of two wives and 12 children.  There are also numerous documents regarding Abu Ali's own injuries, as he sustained a broken leg and an extensive burn on his arm in 2018, images of which are also on the relevant Abu Ali Phone (and which injuries the defendant discussed during her May 2024 interview, *see supra* at Factual Background, Section IV).  These documents and pictures are only a sample of the numerous ISIS documents that the defendant's husband took pictures of on his phone and organized.  Put differently, the defendant's

husband clearly maintained relevant ISIS records on his phone and did so by taking pictures of them. The idea that the defendant's husband planted the Military Training Document or forged it is contradicted by everything else on the Abu Ali Phones.

Finally, the defendant argues that the government must provide a host of other specific details to authenticate the Military Training Document, *see* ECF No. 75 at 20, but there is no support for this assertion. In the first instance, the government has described the capture circumstances, which are consistent with how devices were acquired, captured, or seized from the battlefield in Syria. And as described above, *see* Factual Background, Section II.B; Argument, Section V.C, the Abu Ali Phones were seized by the SDF upon Abu Ali's arrest by SDF shortly before the fall of Baghouz, as Coalition Forces and the SDF advanced on the city to defeat ISIS. There is also no question that the Abu Ali Phone containing the Military Training Document belonged to the defendant's husband—apart from all of the documents and pictures, the Abu Ali Phone also has records of an email account that the phone logged into, which traces back to an account held by the defendant's husband. On top of that, there are a number of pictures on this specific Abu Ali Phone of the defendant, of her husband, and of the defendant and her husband in very intimate moments. To the extent that the defendant argues that the phone is not what it purports to be and that all of these documents and images were manufactured, her argument is irrational.

### 2.    The Military Training Document Is a Co-Conspirator Statement

A statement is not hearsay if it is offered against an opposing party and was made by the opposing party's co-conspirator "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To introduce the Military Training Document as evidence, the government must show by a preponderance of the evidence that: (1) a conspiracy existed; (2) the conspiracy

included the declarant and the defendant against whom the statement is offered; and (3) the declarant made the statement during the course of and in furtherance of the conspiracy. *Al-Moayad*, 545 F.3d at 173 (quoting *Alameh*, 341 F.3d at 176); *see also Musaibli*, 42 F.4th at 614-19. Further, the Military Training Document itself may be considered in determining its admissibility. *See Bourjaily*, 483 U.S. at 181.

ISIS, unlike other terrorist organizations, such as al Qaeda, attempted to establish a fully functioning, centrally controlled, and organized hierarchical government with various subcomponents. The Military Training Document reflects an important goal of the conspiracy to provide material support to ISIS that the defendant joined, which is the provision of fighters who would take up arms in support of ISIS against the SDF, Coalition Forces, and the United States. The Military Training Document is thus admissible as a non-hearsay co-conspirator statement of Um Yousuf, who confirmed the defendant's successful military training in furtherance of the provision of material support to ISIS. And as the Sixth Circuit noted in affirming the admissibility of NMEC documents, "statements generated by ISIS's bureaucratic apparatus to support the mission of providing the terrorist group with personnel and services . . . fit comfortably within the alleged conspiracy's scope." *Musaibli*, 42 F.4th at 618.

Each of the elements for admissibility of a co-conspirator statement is easily met:

(i)     *A conspiracy existed*. As the Sixth Circuit found in *Musaibli*, there was a conspiracy to provide material support to ISIS. *Musaibli*, 42 F.4th at 614-19. In the instant case as well, the defendant entered into a conspiracy to provide material support to ISIS through her physical service in support of ISIS. *See United States v. Augustin*, 661 F.3d 1105, 1121 (11th Cir. 2011) (per curiam) ("A jury could find that by volunteering his service to Al

Qaeda—whether for financial or other reasons—Augustin conspired to provide material support to a foreign terrorist organization in violation of § 2339B").

(ii)    *The conspiracy included the declarant and the defendant against whom the statement is offered.*  A conspiracy to provide material support to ISIS by way of the defendant providing her services to ISIS would necessarily include the defendant and those involved in her training, among whom would be Um Yousuf, who signed the defendant's Military Training Document memorializing the defendant's successful weapons training and authorization to maintain her AK-47.

(iii)    *The declarant made the statement during the course of and in furtherance of the conspiracy.*  The metadata associated with the image file containing the Military Training Document shows an image taken date of March 17, 2018.  Moreover, it denotes the defendant by reference to her husband, whom she married sometime in mid-2017.  The conspiracy to provide the defendant's services to ISIS would thus necessarily have been to provide said services while ISIS was fighting Coalition Forces and the SDF in 2017 through 2019, meaning that the Military Training Document was signed during the course of and to further the conspiracy of the defendant providing material support.  The timing is also relevant given the widely known losses that ISIS was sustaining in 2017 and 2018.  Indeed, in July 2017, at the point where many ISIS members had fled from Raqqa under bombardment by forces allied against ISIS, a female ISIS member wrote in the ISIS

76

propaganda magazine *Rumiyah* that the time had come for women to "[r]ise with courage and sacrifice in this war . . . not because of the small number of men but rather, due to their love for jihad."  It is against this backdrop that the defendant took up arms in support of ISIS and received military training.

To establish the three prerequisites discussed above, the government intends to present witness testimony regarding the conspiracy to materially support ISIS, including through the testimony of the ISIS expert, the ISIS document expert, and the non-U.S. female witness who was present in Syria during the formation of the Nusaybah Katiba, all of whom are discussed above.

Moreover, the Military Training Document itself, together with the defendant's Mirandized admissions, confirm the conspiracy, as does the video depicting the defendant practicing with an AK-47, the multiple pictures she took with the ISIS flag, and the note from her husband discussing their collective jihad in support of ISIS.  The defendant's conspiracy to provide material support to ISIS is also supported by her arrest circumstances: the defendant was arrested in Baghouz, the site of the final large-scale battle between ISIS and Coalition Forces and the SDF. In fact, she was arrested a mere two days before the battle ended.  As described above, the SDF provided multiple pauses in fighting to allow ISIS fighters and their families to surrender.  The defendant did not surrender.  She persisted in her support of ISIS until the bitter end, being among the last ones arrested before ISIS finally fell.[25]   These facts further support a determination that

---

[25]    The defendant's motions contradict each other in describing how she came to be arrested.  The defendant asserts in her motion to suppress statements pursuant to *Miranda*, *see* ECF No. 77 at 2, that she was "captured" by the SDF.  But in her motion to dismiss based on alleged pre-indictment delay, she states that she "surrendered," *see* ECF No. 73 at 2.  The defendant's varying descriptions of the circumstances of her arrest closely track the tactical

the defendant entered into a conspiracy to provide material support to ISIS, namely through her services to ISIS in taking up arms against the SDF, Coalition Forces, and the United States.

The defendant's self-serving denials that she did not receive military training, *see, e.g.*, ECF No. 75 at 21, are not enough to establish that a conspiracy did not exist. Instead, those questions will be determined by the jury, and the defendant may make all of these arguments to the jury in rebutting the government's evidence. *See Tropeano*, 252 F.3d at 661 (holding that authentication "merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury"); *Vayner*, 769 F.3d at 131 ("Thus, after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party 'remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility." (internal quotation marks omitted)); *Harvey*, 117 F.3d at 1049 ("Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury."). Finally, unlike the facts of *Al-Moayad*, which the defendant cites to argue against the admissibility of the co-conspirator statements, ECF No. 75 at 22, the government has proffered a relationship between the defendant and Um Yousuf: the defendant's training was completed under Um Yousuf's supervision such that Um Yousuf was able to sign and verify the defendant's receipt of military

---

requirements of her various motions. Regardless, the facts speak for themselves: (i) The defendant was arrested on March 21, 2019, two days before ISIS fell at Baghouz, (ii) she was not arrested during any of the SDF's early pauses in fighting that were expressly for the purpose of facilitating surrenders and evacuations, (iii) such that the defendant was among the last ISIS supporters in Baghouz.

training—in the same way that Um Yousuf signed two of the Additional Military Training Documents discussed *supra*.

      3.    <u>The Military Training Document Is Admissible Under the Residual Hearsay Exception</u>

The Military Training Document is not hearsay, as it was made in furtherance of the defendant's conspiracy to provide material support to ISIS by way of her services. Moreover, even if it were hearsay, the Military Training Document would still be admissible pursuant to Rule 807's residual hearsay exception because it is sufficiently trustworthy and probative.

Rule 807 permits evidence to be admitted if it has sufficient "circumstantial guarantees of trustworthiness," and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. Here, the evidence of the trustworthiness of the Military Training Document is significant. As discussed above, the Military Training Document was contained on the Abu Ali Phones. The Abu Ali Phones were seized from Abu Ali, an ISIS terrorist, shortly before ISIS fell in Baghouz, and bear substantial indicia that they were used by Abu Ali, including the above-described email account, ISIS documents, and photographs of the defendant. Furthermore, the Military Training Document bears the defendant's kunya and her husband's kunya, which the defendant confirmed. And as discussed above, the phone contains other evidence of the defendant's support of ISIS and her handling of an AK-47. In fact, the same Abu Ali Phone contains a video that appears to depict the defendant practicing with what appears to be an AK-47, the very weapon the Military Training Document authorizes her to use and notes she successfully trained on—and the defendant concedes that she is the woman in the video, *see* ECF No. 75 at 22-23.

Apart from these circumstantial guarantees of trustworthiness, the government expects, as described above, to provide testimony at trial of a woman who can, through her

familiarity with the military training certifications issued to women like the defendant based on having seen them while in ISIS-controlled territory, authenticate the document and describe why these certifications were important, as well as an ISIS expert and an ISIS document expert. *See United States v. Hamama*, No. 08-CR-20314, 2010 WL 2649877, at \*19 (E.D. Mich. June 30, 2010) (applying the residual hearsay exception after finding the documents trustworthy based on the testimony of former Iraqi Intelligence Service officials and experts); *United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005) (affirming the district court's finding of the residual exception to Iraqi Intelligence Service files).

    4.   <u>The Military Training Document Does Not Violate the Best Evidence Rule</u>

The defendant's arguments regarding the Best Evidence Rule are all baseless. The defendant's premature motion accuses the government of not setting forth certain details, but the defendant's motion assumes the absence of details that the government has not yet been required to provide. Any government motion in limine to admit the evidence would, of course, need to contain the basis for admission, and the government would have made these arguments. The defendant's Best Evidence Rule argument fails, as the Military Training Document is appropriately received as the best evidence under both Rules 1003 and 1004.

*Rule 1003*. "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. A duplicate is defined as "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e). In the first instance, there is no question that the Military Training Document is a counterpart produced by a "photographic" and "electronic" process. The defendant argues that the government cannot "make a sufficient

showing that the image file on the phone accurately reproduce[d] the original without presenting evidence of the contents of the original," ECF No. 75 at 10 (internal quotation marks omitted), but this argument would essentially eliminate the admissibility of duplicates in general.  The defendant's argument would render Rule 1003 a dead letter because if the proponent of the evidence had the original, they would not need to rely on Rule 1003 as a path to admit the evidence.

Moreover, the metadata of the image file undermines the defendant's argument. The metadata of the file is consistent with the image having been taken from a camera and the image itself not modified thereafter.  The document itself is a photocopy of a typewritten template, which typewriting matches the Additional Military Training Documents in all respects; the only other information is the handwritten content, and nothing on the face of the image or metadata would suggest that the defendant's husband somehow modified the handwritten text in the Military Training Document.  The defendant bears the burden of "demonstrating a genuine issue as to . . . the trustworthiness of the duplicate, or as to the fairness of substituting the duplicate for the original," *Chang An-Lo*, 851 F.2d at 557 (citation and quotation marks omitted), but the defendant has not demonstrated any reason to doubt the authenticity and trustworthiness of the Military Training Document.

Instead, the defendant offers unsworn denials and speculative, unsupported, and contradicted accusations that her husband forged the document—once again relying on her misleading characterization of "the documented history of fake ISIS documents," ECF No. 75 at 11, which amounts to eight receipts submitted to a journalist in circumstances wholly distinct from the circumstances here.  *Id.* at 5-6.  In any event, without a sworn statement, the defendant cannot raise a genuine issue so as to merit a hearing on the admissibility of the document.  *See Elliott*, 84 F.4th at 490 (a genuine issue as to untrustworthiness was demonstrated where the non-moving

party "submitted sworn testimony indicating that the Draft produced is not identical to the version he signed"). The Military Training Document is a picture taken of an original document, and it is appropriately received under Rule 1003.

   *Rule 1004*. "An original is not required and other evidence of the content of a writing . . . is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith; [or] (b) an original cannot be obtained by any available judicial process." Fed. R. Evid. 1004(a), (b). A party seeking to rely on "other evidence" may do so "only where the [party] demonstrates that it has made a diligent but unsuccessful search and inquiry for the missing" document. *Elliott*, 84 F.4th at 491.

   Consistent with Rule 1004, testimony will establish that, to the best of the government's understanding, the original of the Military Training Document is lost or destroyed or otherwise unavailable to the government despite its searches, *see id.* at 492 (recognizing that "more often the only available evidence [of loss or destruction] will be circumstantial, usually taking the form of testimony that an appropriate search for the document has been made without locating it"),[26] and the United States government did not procure such a loss, destruction, or unavailability in bad faith. To the contrary, the government would certainly prefer to offer the original document in this proceeding, but the government cannot as the original is not available after diligent searches. If the document is not lost or destroyed, it may remain in the possession of ISIS and is thus otherwise unavailable to the government through "judicial process." Fed. R. Evid. 1004(b). Furthermore, to the extent that Coalition Forces and the SDF collected hard copy

---

[26]   The defendant's assertion that the government should produce "discovery establishing the requisite diligent but unsuccessful search" for the terrorist records is thus misguided.

documents and turned them over for digitization, the government expects that it would have been able to return the document in a search in the same way that it was able to identify the Additional Military Training Documents.  The government has undertaken diligent but unsuccessful searches for the original Military Training Document, such that the Military Training Document is appropriately received under Rule 1004.

As to the defendant's argument that the government cannot admit the Military Training Document because the government has allegedly chosen not to depose the defendant's husband, *see* ECF No. 75 at 12, that argument is incorrect on the law and facts.  First, the defendant cites no case for the proposition that the government must depose a specific individual to offer a photograph extracted from that person's phone, and second, the government has tried unsuccessfully for years to locate the defendant's husband.  While the defendant asserts "upon information and belief" that her husband is in foreign custody, ECF No. 75 at 12—yet another "information and belief" averment that fails to raise any material issue because it is not a sworn statement in an affidavit—the government has not located the defendant's husband or confirmed that he remains alive.  And although Abu Ali was arrested by the SDF in March 2019, his whereabouts subsequent to that are not known to the government.  That said, if the defendant truly has "information" regarding where her husband is currently located, the government requests that information so that the government can seek to interview him.

5.    The Military Training Document Is More Probative Than Prejudicial

The defendant's argument that the Military Training Document should be precluded because it is more prejudicial than probative is wrong.  The Military Training Document is direct evidence of the actus reus, and as the Second Circuit recently held in vacating a district court's decision to preclude evidence of certain of the defendant's threats in a threats case, *see*

83

*Garnes*, 102 F.4th at 635, the district court "considerably misperceived the significance of the challenged evidence" where it had excluded evidence "of the actus reus of the crime." The Military Training Document is "part of the 'res gestae, the narrative the government rightly seeks to tell at the guilt phase of a trial,'" and it is wholly proper under Rule 403. *Garnes*, 102 F.4th at 641-42 (quoting *Pepin*, 514 F.3d at 201). Evidence of a defendant's crimes are not unduly prejudicial—they are precisely the evidence that the government appropriately seeks to submit to the jury. The "prejudice" the defendant purports to identify is the possibility that a jury will conclude, based on the evidence, that the defendant committed the crime—but that is the result to which highly probative evidence of guilt leads. The defendant is free to argue to a jury that the Military Training Document is inaccurate for the reasons she identifies—but Rule 403 does not provide a mechanism for the defendant to exclude the government's evidence of the defendant's actual crime.

6.    An Evidentiary Hearing Pursuant to Rule 104(a) Is Premature

The defendant's motion in limine is premature at this pretrial stage, as is her request for an evidentiary hearing. Motions in limine are typically filed shortly before trial, but the defendant opted to move now. The government has responded to provide the Court with an outline of the evidence that it would have moved to admit closer to trial. The Court has before it the government's proffer of evidence and witness testimony that it will seek to admit at trial, and this proffer is entirely consistent with the other cases that have admitted CEM evidence.

For example, in *Musaibli*, the government called six witnesses at the evidentiary hearing regarding its ISIS documents: (i) a cooperating ISIS database administrator who knew Musaibli; (ii) an NMEC liaison officer; (iii) an FBI special agent; (iv) an FBI intelligence analyst; (v) ISIS document expert Aymenn Jawad Al-Tamimi; and (vi) an investigator with the United

Nations.  *See* No. 18-CR-20495 (DML), ECF Nos. 166, 167, 171 (E.D. Mich. Jul. 30, 2021).  In *Sylejmani*, the government had proffered that it would call (i) an ISIS expert; (ii) an investigator with the United Nations; (iii) a cooperating ISIS database administrator; (iv) a foreign CEM coordinator; (v) an FBI agent acting as a liaison to NMEC; and (v) an FBI agent.  *See* No. 20-CR-106 (RC), ECF No. 39 (D.D.C. Nov. 20, 2023).

In *Ramic*, the government proffered that it would call the following witnesses in support of the admissibility of its ISIS documents: (i) an ISIS expert; (ii) an FBI agent; (iii) an FBI agent acting as a liaison to NMEC; (iv) a former ISIS member witness who knew Ramic; and (v) a former ISIS member who worked in ISIS's Administration department.  *See* No. 21-CR-13 (GNS), ECF No. 168 (W.D. Ky. Apr. 12, 2024).  Ramic consented to the proposed testimony being assessed at trial, rather than at a pretrial evidentiary hearing, *id*., ECF No. 199, and the court held that "assuming these representations" of the government's proffered testimony "are true, the United States may be able to authenticate these documents at trial."  2024 WL 2274529, at *5.

Finally, in *Ali*, the government proffered that it would call at trial the following witnesses in support of the documents offered: (i) an ISIS expert; (ii) an ISIS document expert; (iii) a former U.S. Department of Defense employee who worked at a REC and received one of the hard drives on which certain documents appeared; (iv) an FBI forensic examiner; (v) a British military officer who worked at a REC who was authenticating a physical document arrivals logbook; and (vi) a cooperating ISIS database administrator.  *See* No. 21-CR-20123 (BB), ECF No. 60 (S.D. Fl. Oct. 4, 2022).

Here, to admit the Military Training Document (and other documents from the Abu Ali Phones as well as the new devices on which the referenced Additional Military Training Documents were found), the government intends to call some or all of the following witnesses:

(i) an ISIS expert; (ii) an ISIS document expert; (iii) a foreign member of the Coalition Forces who worked at the REC and received both Abu Ali Phones, among other devices, on which certain documents appeared; (iv) a DOJ senior digital intelligence analyst; (v) a witness who was present in Syria during the formation of the Nusaybah Katiba, is familiar with how women came to sign up for training with the Katiba, is personally familiar with ISIS military training certifications for women, and is familiar with why they were important; (vi) a non-U.S. individual who went to ISIS-controlled territory and can provide relevant testimony regarding entering ISIS-controlled territory, the SDF camps, and repatriation; and (vii) an FBI agent.  If necessary, the government may also call (viii) an FBI agent acting as a liaison to NMEC.

To the extent the Court wishes to hold an evidentiary hearing, the government respectfully requests that such a hearing be held closer in time to trial.  An evidentiary hearing on admissibility when there is no trial date set (and indeed where there may not be one) is inefficient at best.  Moreover, this appears to be an attempt by the defendant to access the government's order of proof several months, if not up to a year or more, before trial.  Indeed, the defendant has requested much of this information from the government, *see* ECF No. 69, even though there is no basis for such a request, nor any basis for the government to turn this information over at this juncture.  *Cf. supra* Argument Section III.  As comparison points, in none of the cases referred to above was the evidentiary hearing held at such an early point in time.

For example, in *Musaibli*—the first case to analyze the admissibility of NMEC records—the government moved to admit its ISIS documents on December 31, 2020, at which point trial had been set for October 5, 2021, and the court had set the deadline for such motions in limine to be filed by December 31, 2020.  *See* No. 18-CR-20495 (DML), ECF Nos. 100, 102 (E.D. Mich.).  The court set the evidentiary hearing for April 7, 2021, *id.*, ECF No. 110 (E.D. Mich. Jan.

15, 2021), and then reset it multiple times, with the hearing proceeding on June 28-29, 2021, *id.*, ECF Nos. 166, 167.  The court received supplemental briefing, reset trial to begin January 11, 2022, and issued an adverse ruling on December 28, 2021 (at which point the government took interlocutory appeal).  *See id.*, ECF Nos. 171, 172, 180, 203, 212. The Sixth Circuit reversed and remanded on those aspects of the district court's adverse order that the government appealed.  *See id.*, ECF No. 239.

In *Ali*, at the point that the government moved to admit the documents on October 4, 2022, trial had been set for October 24, 2022.  *See* No. 21-CR-20123 (BB), ECF Nos. 50, 51, 60 (S.D. Fl.).  The court thereafter moved trial to begin January 3, 2023, and set an evidentiary hearing on the government's motion in limine for December 14, 2022.  *Id.*, ECF Nos. 66, 69, 70. On November 17, 2022, the court cancelled the hearing because the defendant had pleaded guilty that day during a previously scheduled hearing on a motion to suppress statements.  *Id.*, ECF No. 74.

In *Sylejmani*, the government moved in limine to admit ISIS documents on November 20, 2023, pursuant to the court's motion schedule.  *See* 20-CR-106 (RC), ECF No. 39 (D.D.C. Nov. 20, 2023); *id.*, Minute Order (Aug. 30, 2023).  The court had not set a trial date by the time the motion was filed, but thereafter set a trial date of February 10, 2025.  *Id.*, Minute Entry (Feb. 22, 2024).  Later, on August 7, 2024, the court set an evidentiary hearing for October 28, 2024, on the ISIS documents.  *Id.*, Minute Entry (Aug. 7, 2024).  The court also ordered the government to produce the names of the witnesses testifying at the evidentiary hearing, as well as the 3500 material for the testifying witnesses, by October 15, 2024—that is, two weeks before the hearing.  *Id.*, Minute Order (Oct. 1, 2024).  The court then rescheduled the evidentiary hearing, and before the rescheduled date of November 18, 2024, the court vacated the evidentiary hearing,

as the defendant had indicated that he would be pleading guilty. *Id.*, Minute Orders (Nov. 8 and 21, 2024).

And in *Ramic*, the defense consented to the government's proposed testimony being assessed at trial rather than holding an evidentiary hearing, *id.*, ECF No. 199. The court there held that "[a]ssuming these representations" of the government's proffered testimony "are true, the United States may be able to authenticate these documents at trial." 2024 WL 2274529, at *5. This is the appropriate resolution here.

The government's representations of proffered testimony are sufficient for the Court to determine that the government may be able to authenticate the documents at trial without need for an evidentiary hearing. And if the Court believes an evidentiary hearing needs to be held on some of the issues or with respect to some or all of the witnesses the government is proffering, such a hearing should be held closer in time to trial.

VII.   The Court Should Reject the Defendant's Motion for Access to the Government's CIPA Submission

Salman asks the Court to order the government to disclose unredacted copies of any filing it may make pursuant to Section 4 of the Classified Information Procedures Act ("CIPA"). *See* ECF No. 71. The government has not yet moved pursuant to CIPA Section 4. However, when it does, it will request that the Court receive its submission *ex parte* and *in camera*, as expressly permitted by CIPA, the Federal Rules of Criminal Procedure and well-established case law, for the reasons that will be set forth in the submission. For the reasons below, the Court should reject Salman's instant request not to permit the government to file its CIPA Section 4 motion *ex parte*.

A.   Applicable Law

Discovery of classified information in federal criminal cases is governed by CIPA. *See United States v. Abu-Jihaad*, 630 F.3d 102, 140-41 (2d Cir. 2010). Congress enacted CIPA to

88

enable the government to fulfill its duty to protect national security information, while simultaneously complying with its discovery obligations in federal criminal prosecutions. *See* S. Rep. No. 96-823, 96th Cong., 2d Sess., at 3 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4294, 4296. Thus, CIPA applies the general law of discovery in criminal cases to classified information, and further restricts discovery of that information to protect the government's national security interests. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1260-61 (9th Cir. 1998).

On January 29, 2025, the government filed a motion requesting that the Court hold a pretrial conference pursuant to CIPA. *See* ECF No. 50. As part of that motion, the government provided background for the Court and the parties on CIPA's provisions, including that CIPA Section 4 authorized *ex parte* filings and that district courts in the Eastern and Southern Districts of New York have universally and uniformly upheld the use of *ex parte* and *in camera* proceedings in CIPA Section 4 motions. *See id.* at 7-8 (citing more than twenty examples since 2012). The government indicated in its motion that in the event it identified potentially discoverable classified information, the government would request authorization from the Court pursuant to Section 4 of CIPA to make an *in camera*, *ex parte* submission regarding classified materials that the government believes should be subject to deletion, substitution, or disclosure pursuant to a protective order. *See id.* at 17. The Court granted the government's motion and on February 19, 2025 it held a pretrial conference pursuant to Section 2 of CIPA. At that time, the Court set a briefing schedule for the government to file any motion pursuant to Section 4 of CIPA by June 20, 2025. *See* Minute Entry (Feb. 19, 2025).

Salman argues that the government should not be permitted to file its Section 4 motion *ex parte*. As an initial matter, Salman's objection is premature, as the government has not yet filed a Section 4 motion. When the government files its CIPA Section 4 motion, the

government intends to move that the motion be received *ex parte* and *in camera* and will explain in further detail, and with reference to classified information contained within that motion, why *ex parte* and *in camera* treatment is appropriate. Below, the government responds to Salman's arguments with reference solely to legal principles and unclassified information. For the reasons set forth below, the Court should reject Salman's arguments.

      B.    <u>Analysis</u>

      Section 4 of CIPA provides, in pertinent part, that "[t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting the relevant facts that classified information would tend to prove." 18 U.S.C. App. 3, § 4.

      Section 4 further provides that the United States may demonstrate that the use of such alternatives is warranted through an *ex parte*, *in camera* submission to the Court:

> The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an *ex parte* showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

*Id.*; *see United States v. Yunis*, 867 F.2d 617, 622-23 (D.C. Cir. 1989); *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988); *United States v. Pringle*, 751 F.2d 419, 427 (1st Cir. 1984). CIPA's legislative history makes clear that the Court may take national security interests into account in determining whether to permit discovery to be denied, restricted or deferred. S. Rep. No. 96-823, at 6, *reprinted in* 1980 U.S.C.C.A.N. 4294, 4299-4300 (1980); *United States v. Smith*,

780 F.2d 1102, 1110 (4th Cir. 1985) (holding that defendant's right to discovery must be balanced against public's interest in non-disclosure).

Similarly, Rule 16(d)(1) of the Federal Rules of Criminal Procedure allows a district court to "permit a party to show good cause by a written statement that the court will inspect *ex parte*" seeking the entry of a protective order "deny[ing], restrict[ing], or defer[ring] discovery or inspection." Fed. R. Crim. P. 16(d)(1). "The Advisory Committee notes to Rule 16 make clear that 'good cause' includes 'the protection of information vital to the national security.'" *United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008) (quoting Fed. R. Crim. P. 16 Advisory Committee's Note to 1966 amendment). Thus, Rule 16(d)(1) provides an independent basis for the Court to permit the *ex parte* filing of an application for a protective order governing classified discovery upon a showing that said filing promotes "the protection of information vital to the national security." *Id.*

Courts have consistently held that *ex parte*, *in camera* submissions to a district court in matters involving national security are proper. *See, e.g.*, *United States v. Al-Farekh*, 956 F.3d 99, 109 (2d Cir. 2020) ("Far from abusing its discretion, the District Court properly exercised its authority under CIPA when it reviewed and adjudicated the Government's CIPA motions *ex parte* and *in camera*."); *Abu-Jihaad*, 630 F.3d at 143 (district court "acted well within its discretion in reviewing [CIPA] submissions *ex parte* and *in camera*"); *United States v. Stewart*, 590 F.3d 93, 132-33 (2d Cir. 2009) (rejecting claim that district court erred in reviewing CIPA materials *ex parte* and *in camera*); *Aref*, 533 F.3d at 81 (same); *United States v. Boulos*, No. 13-CR-612 (ENV), 2015 WL 502170, at *2 (E.D.N.Y. Feb. 3, 2015) (noting that the government's CIPA Section 4 submission "was appropriately filed *ex parte* and under seal"); *United States v. Zazi*, No. 10-CR-60 (JG), 2011 WL 2532903, at *3 (E.D.N.Y. June 24, 2011) ("With respect to the government's

request to delete irrelevant classified materials from discovery, an adversary proceeding would be particularly anomalous, as it would provide defense counsel access to sensitive information to which, if the government is correct, they are not entitled under any theory."); *see also United States v. Sedaghaty*, 728 F.3d 885, 904-05 (9th Cir. 2013) ("Long ago we underscored that '[e]x parte hearings are generally disfavored,' but held that '[i]n a case involving classified documents, however, *ex parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information.'" (quoting *Klimavicius-Viloria*, 144 F.3d at 1261)); *United States v. Amawi*, 695 F.3d 457, 472-73 (6th Cir. 2012) ("every court that has considered this issue has held that CIPA permits *ex parte* hearings."); *United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008); *United States v. Mejia*, 448 F.3d 436, 457 (D.C. Cir. 2006).

The defendant correctly notes that CIPA permits, rather than requires, the Court to allow the government to submit its Section 4 motion *ex parte*. *See* ECF No. 71 at 4-5. However, the Second Circuit has affirmed "*ex parte* consideration of CIPA motions as the rule." *Zazi*, 2011 WL 2532903, at *2. Specifically, the Second Circuit has "recognized that where the government moves to withhold classified information from the defense, 'an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.'" *Abu-Jihaad*, 630 F.3d at 143 (quoting *Aref*, 533 F.3d at 81)). "The right that [CIPA] section four confers on the government would be illusory if defense counsel were allowed to participate in section four proceedings because defense counsel would be able to see the information that the government asks the district

court to keep from defense counsel's view." *Campa*, 529 F.3d at 995; *see Sarkissian*, 841 F.2d at 965 (same).[27]

It is for these reasons that the federal courts have universally and uniformly upheld the use of *ex parte* filings and *in camera* proceedings in CIPA Section 4 applications. *See, e.g.*, *Al-Farekh*, 956 F.3d at 109; *Abu-Jihaad*, 630 F.3d at 143; *Stewart*, 590 F.3d at 132-33; *Aref*, 533 F.3d at 81; *Campa*, 529 F.3d at 995; *Amawi*, 695 F.3d at 472-73; *United States v. O'Hara*, 301 F.3d 463, 568-69 (7th Cir. 2002); *Klimavicius-Viloria*, 144 F.3d at 1261; *Yunis*, 867 F.2d at 620; *Sarkissian*, 841 F.2d at 965. In fact, the government is aware of no instance in which a court has denied the government permission to file a CIPA Section 4 application *ex parte*, and the defendant cites none.

While the defendant accurately recites the principle that *ex parte* proceedings are generally disfavored, the courts have uniformly found that an exception to the general rule is merited in cases involving classified documents whose disclosure potentially puts at risk the national security. *See, e.g.*, *Klimavicius-Viloria*, 144 F.3d at 1261 ("*Ex parte* hearings are generally disfavored. In a case involving classified documents, however, *ex parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use to decide the relevancy of the information." (internal

---

[27]     To the extent that Salman is arguing that the government must first demonstrate to her a basis for proceeding *ex parte*, *see* ECF No. 71 at 6, 9-10, this assertion has been appropriately rejected in the CIPA context, including in the very cases she cites. *See Abu-Jihaad*, 630 F.3d at 143; *United States v. Libby*, 429 F. Supp. 2d 18, 25 (D.D.C. 2006) ("First, the Court declines to adopt the defendant's position that he must first have the opportunity to litigate whether the government has established exceptional circumstances before the government can submit to the Court *ex parte* filings pursuant to Section 4. There is simply no requirement for such a showing in the CIPA, and this Court cannot not judicially require it."), *amended by* 429 F. Supp. 2d. 46 (D.D.C. 2006).

citation and quotations omitted)).  Salman presents no authority to the contrary, and the cases she cites in support of the proposition that *ex parte* proceedings are generally disfavored, *see* ECF No. 71 at 5-6, do not involve classified discovery or CIPA proceedings.[28]

Next, the defendant argues that the security clearance provided to defense counsel is adequate protection to permit defense counsel to review the government's Section 4 motion in its entirety or at least the government's legal arguments and justifications in support of the motion. *See* ECF No. 71 at 6-9.  However, the fact that defense counsel may possess a previously issued security clearance in a separate matter has no bearing on the propriety of the Court's *ex parte* review of the government's CIPA Section 4 motion and the discoverability of classified information.  Defense counsel do not have a clearance for this particular matter, nor do they have a need to know.

In *United States v. Al-Farekh*, the Second Circuit rejected the defendant's argument that "where a defense counsel has an appropriate security clearance, the District Court may not adjudicate the CIPA motions *ex parte* and must give defense counsel access to the classified information." 956 F.3d at 107.  In so holding, the Second Circuit first noted that "notwithstanding the rarity of *ex parte* proceedings in criminal matters, there can be no question that a district court's *ex parte*, *in camera* adjudication of CIPA motions falls squarely within the authority granted by Congress."  *Id.*  The Circuit then stated that "[n]othing in the text of § 4 limits the District Court's authority to review classified information *ex parte* only where defense counsel lacks a security

---

[28]    For instance, *United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004), involved an *ex parte* submission in the context of a bail hearing, while *American Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995), involved an immigration proceeding.  In neither case was classified discovery at issue.

clearance[,]" further observing that the defendant's "proposed rule cannot be reconciled with CIPA as enacted by Congress and interpreted by our Court." *Id.*

The Second Circuit further noted that CIPA Section 4 "makes clear" that it is the district court that decides "in the first instance" whether the classified information is discoverable. *Id.* In addition to the plain text of Section 4, *Al-Farekh* held that CIPA's structure supported its conclusion. First, CIPA Section 6 demonstrates that Congress knew exactly how "to provide for the participation of defendants in certain *in camera* proceedings[.]" *Id.* But it did no such thing in Section 4. Moreover, CIPA Section 7 permits the government to file an interlocutory appeal from a district court's decision denying a protective order. Yet, "[i]f a defendant's counsel was required to participate in a § 4 proceeding and be provided access to classified information . . . the alternative relief authorized in these provisions would be rendered insignificant, if not meaningless." *Id.* at 107-08.

Ultimately, the Second Circuit rejected the same argument the defendant makes here, concluding that:

> because it may well be that the information in a § 4 motion is not discoverable at all, [the defendant's] theory would permit a defendant represented by counsel with a security clearance to gain access to classified information that would otherwise be unavailable to the defendant. That possibility could result in the improper disclosure of information that, by its very nature, may put the national security of the United States at risk.

*Id.* at 108.

The Sixth Circuit has come to the same conclusion. In *United States v. Asgari*, the government filed a CIPA Section 4 motion seeking to withhold irrelevant classified information. 940 F.3d 188, 189 (6th Cir. 2019). The district court initially granted the motion but reconsidered its decision after learning that defense counsel possessed a top-secret security clearance. *Id.*

Having reconsidered the matter, the district court ordered the government to disclose to defense counsel the classified material it had previously declared irrelevant. The government appealed under CIPA Section 7.

The Sixth Circuit reversed, concluding that "the existence of a security clearance by itself does not change the equation or offer a legitimate basis for changing course, and above all it does not alter the directive of the Act that the district court make these decisions on an *ex parte* basis." *Id.* at 191. The Sixth Circuit held:

> [n]othing in § 4 suggests that defense counsel has a role to play when the district court assesses the relevance or helpfulness of the classified information. Just the opposite. The statute refers to the district court's assessment of these factors through an *ex parte* hearing ("a written statement to be inspected by the court alone") that occurs without the defendant's knowledge ("If the court [grants relief] following such an *ex parte* showing, the entire text of the statement of the United States shall be sealed.").

*Id.* at 192 (quoting 18 U.S.C. App. 3, § 4). *Asgari* also explained that CIPA § 4 "vests the *district court*, a confidential arbiter, with responsibility to evaluate the information's relevance[,]" and "[d]efense counsel's security clearance becomes relevant if and only if the court determines the material should be disclosed." *Id.* at 191 (emphasis added); *see also Amawi*, 695 F.3d at 473 ("The possession of a security clearance only becomes relevant after the district court determines, in accordance with section 4, that any classified information is discoverable.").

The Sixth Circuit also rejected the same argument the defendant appears to make here, that any risk to national security is diminished because of defense counsel's security clearance. As the court put it, "this argument does not move the needle either. Section 4 expresses a clear view of what measures are necessary to protect against improper disclosure. Whether defense counsel has a security clearance or not, top secret or not, are considerations that do not

explain why we can read defense counsel's involvement into the § 4 relevance inquiry." *Asgari*, 940 F.3d at 192.

   Additionally, classified information may be disclosed only to individuals who both possess the requisite clearance *and* have a "need to know" the information at issue. *See* Executive Order 13526, §§ 4.1(a) and 6.1(dd) (requiring that a "need-to-know" determination be made prior to the disclosure of classified information to anyone, including those who possess a security clearance). Cleared counsel do not have a need to know the classified information submitted to the Court in connection with the government's Section 4 motion unless the Court rules that the classified information is discoverable. *See Al-Farekh*, 956 F.3d at 109 n.19 ("A defense counsel does not 'need to know' classified information that is neither helpful nor material to the defense of his or her client."). No such determination has been made in this case. The purpose of the *ex parte* CIPA Section 4 proceedings is to allow the Court to make that determination—and thus determine whether defense counsel has a need to know the classified information at issue. Therefore, to hold that the proceedings themselves provide defense counsel with the need-to-know is a form of bootstrapping that would negate the very purpose of CIPA Section 4. As the district court noted in *Abu-Jihaad*:

> [T]he purpose of the Government's [CIPA Section 4] Motion is to permit this Court to determine whether the classified information in question is discoverable at all. *See United States v. Libby*, 429 F. Supp. 2d 46, 47 (D.D.C. 2006) (holding that CIPA § 4 allows the Government to ask the Court to determine that classified information need not be produced at all). If the Court were to conclude that some or all of the information is discoverable, the Government would then need to decide . . . whether to produce the information to defense counsel subject to appropriate security clearance, [or] seek alternate relief under CIPA . . . . If, on the other hand, the Court decides that the information is not discoverable at all, Defendant is not entitled to production of the information, regardless whether his counsel is willing to submit to security clearance procedures.

*United States v. Abu-Jihaad*, No. 07-CR-57 (MRK), 2007 WL 2972623, *2 (D. Conn. Oct. 11, 2007), *affirmed* by *Abu-Jihaad*, 630 F.3d at 143.[29]

Similarly, in *Libby*, the district court was called upon to determine whether to permit defense counsel to review the government's CIPA Section 4 motion where defense counsel (and the defendant) held appropriate security clearances. 429 F. Supp. 2d 18, *amended by* 429 F. Supp. 2d. 46. In deciding this issue, the district court emphasized that the key question was not whether defense counsel had the appropriate security clearance, but rather whether defense counsel had both a security clearance and a "need to know." As the *Libby* court explained, "[i]t is axiomatic that even if the defendant and his attorneys had been granted the highest level of security clearances, that fact alone would not entitle them to access to every piece of classified information this country possesses." *Id.* at 24 n.8. In short, when the defense does not have a "need to know" with respect to certain classified information, a court filing that references that information may be made *ex parte*.

The defendant's argument that excluding defense counsel from access to the government's CIPA Section 4 motion and to the classified evidence underlying that motion would "deprive[]" Salman "of her right to counsel at this stage, and of the other Due Process rights to which she is constitutionally entitled," ECF No. 71 at 7, also lacks merit. Courts have consistently

---

[29] The possession of a security clearance may become relevant only *after* the district court determines, in accordance with CIPA, that specific classified information is discoverable. *See Amawi*, 695 F.3d at 473-74. Should a court conclude that classified information is discoverable, however, the defense still would not be *entitled* to review it even if they possessed a valid security clearance. Rather, in lieu of such disclosure, the government could "seek alternative relief under CIPA—such as substitution of a summary or statement of the discoverable information—or file an interlocutory appeal under CIPA § 7." *Abu-Jihaad*, 2007 WL 2972623, at *2.

rejected the premise that CIPA Section 4's *ex parte* provision violates a defendant's right to due process or other similar constitutional rights. *See, e.g.*, *Sedaghaty*, 728 F.3d at 909 (defendant "has no due process right to receive a description of materials in the government's possession that are not discoverable."); *Klimavicius-Viloria*, 144 F.3d at 1261-62 (*ex parte* CIPA Section 4 hearing does not violate the defendant's right to be present at all phases of trial); *Dumeisi*, 424 F.3d at 577-78 (*ex parte* CIPA Section 4 proceedings did not deny the defendant his right to counsel and fair trial); *United States v. Ahmed*, No. 10-CR-131 (PKC), 2011 WL 4915005, at *4-5 (S.D.N.Y. Sept. 23, 2011) (same).

The Court should similarly reject the defendant's contention that "*ex parte* proceedings also present an overwhelming danger of erroneous decisions" because "the Court cannot properly function as Ms. Salman's surrogate advocate." ECF No. 71 at 7. In fact, CIPA authorizes the Court to make discovery determinations without any input from the defense. *See* 18 U.S.C. App. 3, § 4; *see also, e.g.*, *Zazi*, 2011 WL 2532903, at *3.

Indeed, there are various statutorily provided and court-approved instances—of which CIPA is one—whereby discovery determinations requiring judicial imprimatur are made without the provision of input by the defense. For example, the Jencks Act provides that if there is a question as to whether a statement potentially covered by the Act sufficiently relates to the subject matter of a witness's testimony to be rendered discoverable pursuant to the Act, the government should "deliver such statement for the inspection of the court *in camera*" and the court shall rule on its discoverability. 18 U.S.C. § 3500(c). The procedure prescribed does not allow any opportunity for defense counsel to view the statement or provide the Court with their views as to its discoverability. Similarly, the federal courts have held on numerous occasions that the rule established in *Brady v. Maryland*, 373 U.S. 83 (1963), does not endow a defendant with the right

99

to inspect all evidence which is only potentially, and not actually, exculpatory, nor with the right to assess such evidence's materiality him or herself.  *See, e.g.*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-61 (1987) (holding that while the procedure might deny a defendant "the benefits of an 'advocate's eye,'" a defendant's right to "a fair trial can be protected fully by requiring that [the potentially exculpatory materials] be submitted only to the trial court for *in camera* review"); *United States v. Wolfson*, 55 F.3d 58, 60 (2d Cir. 1995) ("A defendant's *Brady* request for discovery of exculpatory materials . . . does not give the defendant the right to compel the disclosure of documents that are not material for those purposes; nor does it give the defendant the right to assess materiality himself.  To the extent there is a question as to the relevance or materiality of a given group of documents, the documents are normally submitted to the court for *in camera* review."); *United States v. Lustyik*, 833 F.3d 1263, 1271 (10th Cir. 2016) (noting district court's *in camera* review of classified material was similar to circumstances courts routinely face in addressing confidential or private information).

In light of the foregoing, the defendant's suggestion that the Court would be unable to make the appropriate determination regarding the government's CIPA 4 submission without defense counsel's review of the submission is untethered to the law and the Constitution.  In any event, defense counsel has already requested that it be permitted to submit a letter *ex parte* to the Court describing its theories of the case and what might be relevant and material to the defense, and to meet with the Court to discuss the same, so that the Court can take that information into consideration when evaluating the government's CIPA 4 motion.  The government had no objection to that request and the Court granted it.  *See* Minute Entry (Feb. 19, 2025).

For all these reasons, the government respectfully requests that the Court consider the arguments herein, as well as the arguments anticipated to be set forth in the government's CIPA

100

4 motion, and grant the government's forthcoming request for authorization to file its CIPA 4 motion *ex parte* and *in camera*.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's motions in their entirety.[30]

Dated:      Brooklyn, New York
          May 27, 2025

                          Respectfully submitted,

                          JOSEPH NOCELLA, JR.
                          United States Attorney
                          Eastern District of New York


        By:               /s/
                          Andrew D. Reich
                          Amanda Shami
                          Assistant U.S. Attorneys


cc:     Clerk of Court (NCM) (via ECF and Email)
        Counsel of Record (via ECF)

---

[30] The government respectfully requests that it be permitted to file Exhibits A and E under seal. The FBI reports documenting Salman's interviews referred to herein describe uncharged third parties and aspects of the ongoing investigation that will likely not become public until trial, if at all. While these Exhibits are arguably "judicial documents" to which a "presumption of [public] access" applies, *see United States v. Avenatti*, 550 F. Supp. 3d 36, 45 (S.D.N.Y. 2021) and *United States v. Erie Cnty., New York*, 763 F.3d 235, 240 (2d Cir. 2014), "significant privacy and law enforcement interests" favor sealing at this time. *See United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (identifying law enforcement concerns and privacy interests as important balancing considerations). Should these Exhibits be publicly introduced at trial or the interests favoring sealing otherwise become moot, the government will not oppose unsealing of the Exhibits at that time. *See United States v. Mullins*, No. 22-CR-120, 2023 WL 3159418, at *4 (S.D.N.Y. Apr. 26, 2023) (scope of sealing is "narrowly tailored to protect only those . . . [m]aterials that implicate the compelling interests in preserving sensitive law enforcement practices and protecting third-party privacy interests.").