1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    : 24-CR-206(NCM)
                             :
                             :
                             :
                             :
                             : United States Courthouse
     -against-               : Brooklyn, New York
                             :
                             :
                             :
                             : Thursday, August 7, 2025
HALIMA SALMAN,               : 10:00 a.m.
                             :
          Defendant.         :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE NATASHA C. MERLE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                       BY: AMANDA SHAMI, ESQ.
                            ANDREW REICH, ESQ.
                            Assistant United States Attorneys


For the Defendant:     FEDERAL DEFENDERS OF NEW YORK
                       For the Defendant -
                       Halima Salman
                            One Pierrepont Plaza
                            16th Floor
                            Brooklyn, New York  11201
                       BY: MIA EISNER-GRYNBERG, ESQ.
                            SAMUEL I. JACOBSON, ESQ.

2

A P P E A R A N C E S: (Continued.)

                    NATIONAL ASSOCIATION OF CRIMINAL
                    DEFENSE LAWYERS
                    FOURTH AMENDMENT CENTER
                    For the Defendant -
                    Halima Salman
                              1660 L Street, N.W.
                              12th Floor
                              New York, New York 20036
                    BY: MICHAEL WILLIAM PRICE, ESQ.


Court Reporter:   Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                  Official Court Reporter
                  Telephone: (718) 613-2487
                  Facsimile: (718) 613-2694
                  E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Oral Argument*                                                        3

1          (In open court.)

2          COURTROOM DEPUTY:  Criminal cause for oral

3    argument in United States of America versus Halima Salman,

4    Docket No. 24-CR-206.

5          Would you all please state your appearances for

6    the record starting with the Government.

7          MS. SHAMI:  Good morning, your Honor.  Assistant

8    United States Attorneys Amanda Shami and Andrew Reich for

9    the Government.  We're also joined by an intern in our

10   office, Shriyah Singh.

11         THE COURT:  Good morning.

12         MR. REICH:  Good morning.

13         MS. EISNER-GRYNBERG:  Good morning, your Honor.

14         Federal Defenders by Mia Eisner-Grynberg and Sam

15   Jacobson for Ms. Salman.  Also, we are joined by attorney

16   Michael Price from the NACDL.

17         THE COURT:  Good morning.  Good morning,

18   Ms. Salman.

19         Can you hear me?

20         THE DEFENDANT:  Yes, I can.

21         THE COURT:  So we're here for oral argument on

22   defendant's pretrial motions and, as I indicated during our

23   last conference, I am particularly interested in the

24   parties' arguments regarding Ms. Salman's motion to exclude

25   evidence at ECF Number 75.

*Oral Argument*                                          4

1          I have thoroughly reviewed the briefing and I want

2    to hear from the parties as to their various arguments and I

3    have a few questions.

4          So I will hear from the parties if they have

5    anything additional to their materials, to their briefing.

6    And, if not, then we can move to the next motion.  I won't

7    be covering defendant's CIPA motion today; so I will be

8    covering the other motions instead.

9          And I want to start with ECF Number 75,

10   defendant's motion to exclude evidence.  Specifically, the

11   photograph of the alleged military training document.

12          Is it going to be you, Ms. Eisner-Grynberg?

13          MS. EISNER-GRYNBERG:  Yes, Judge.

14          THE COURT:  I will give you an opportunity to make

15   any additional arguments that you may want to make for this

16   motion.

17          MS. EISNER-GRYNBERG:  Thank you, Judge.

18          It's our position that under various rules of

19   evidence, both the photograph of a training document is not

20   admissible.  Most importantly, the Government has not and

21   cannot sufficiently authenticate the document, and the

22   Government cannot prove any exclusion or exception to the

23   hearsay rule.

24          Just briefly on the authentication point.  Nothing

25   about this document makes it more likely to be authentic

1    than inauthentic and that's what the Government, as a

2    proponent of the evidence, has to show.  The Government has

3    put forth a document that is partially typewritten,

4    partially handwritten, and that is signed by an unknown

5    person who the Government has never even claimed to

6    identify, Umm Yousef.  The Government has not put forward

7    any evidence or proffered any witness that can tell us this

8    is a real person, a person with an identity, a person who is

9    in a position of authority to sign a document or write a

10   document such as this, and the document lacks all other

11   indicia of reliability.

12           The Government has not put forward evidence of any

13   witness with any knowledge that any of the contents of that

14   document are true.  They are not calling as a witness the

15   supposed declarant, Umm Yousef.  They're not calling as a

16   witness any person who claims to have ever seen Ms. Salman

17   at this training.  They have no evidence that Ms. Salman has

18   admitted to the training; in fact, they have the opposite,

19   she's denied it.  They have no witness whose ever claimed to

20   have heard her state that she's been to the training.  They

21   have no witness who was present for the training.  The

22   document is not dated and there's no location on it.  The

23   document doesn't have a stamp which is the critical

24   identifying mark of genuine documents like this.

25           Without that information, with nobody to confirm

1   that the document is real.  That a real person wrote it.

2   That it was made at a time where trainings such as this were

3   held.  That it was made at a place where documents such as

4   this were held; or that any person can corroborate any piece

5   of the document aside from what is known by others, which is

6   Ms. Salman's nickname, the document cannot be authenticated.

7           The Second Circuit case of *United States v. Vayner*

8   is dispositive here.  That case found in a different

9   circumstance the document that purports to be about an

10  individual but is not written by that individual, that

11  contains only information that is known by others and known

12  specifically by others who have a reason to fabricate such a

13  document is not sufficient to authenticate the document.

14          As for hearsay, the Government --

15          THE COURT:  May I ask you about authenticity

16  before you move on?

17          MS. EISNER-GRYNBERG:  Yes.

18          THE COURT:  I know a lot of the issues you raise,

19  which I think are real issues, and I'll hear from the

20  Government on them.  And obviously, it is the Government's

21  burden to prove authenticity but is there any reason to

22  believe the document is fake aside from the speculation

23  about the benefits that the husband would gain from forging

24  such a document?

25          MS. EISNER-GRYNBERG:  Yes.

1          As a step back, there is no evidence to suggest

2   that it's real.  The Government has not put forth any

3   similar document that has itself been authenticated.  There

4   is nothing suggesting that this document or any document

5   that looks like this document has ever actually been awarded

6   to or written about a person who actually attended a

7   training.

8          THE COURT:  Didn't they say they're going to put

9   forth other women, I'm paraphrasing, but I believe they're

10  going to put forth women who know something about the

11  training documents.  They're going to put forth FBI agents

12  who supposedly know something about the document.

13          Are you saying that that's not adequate?

14          MS. EISNER-GRYNBERG:  I'm saying that's not

15  actually what the Government has proffered.  The Government

16  says they have a female witness who is present in Syria at

17  the time that Nusaybah Khatiba, the women's brigade, began

18  and has seen documents like this.  They have not proffered

19  that this person was the recipient of such a document or the

20  author of such a document, that she attended any of these

21  trainings or held any of these trainings.  There are known

22  witnesses who presented these trainings and that's not who

23  the Government's calling here.

24          So for the Government to say we have a witness who

25  is a woman who has no familiarity with this document, and

1   has not received or authored such a document but has seen

2   documents like this is not sufficient to prove

3   authentication.  Neither has the Government put forth any

4   expert witness or agent who has experience with this

5   specific type of document.  The Government has said that

6   they have an ISIS document expert, unnamed, who will opine

7   on this document.  The only witnesses that the Government

8   has called in cases like this whose offered that kind of

9   testimony have themselves noted that many documents of this

10   specific type are fraudulent, specifically, ISIS documents

11   that have a typewritten portion and a handwritten portion

12   have been found by the Government's expert to be fraudulent

13   time and time again.  And the reason that that's the case is

14   because the bureaucracy that was in place widely

15   disseminated documents of this type making them easy to

16   fabricate.  This document is unlikely to be real,

17   specifically, because it lacks the stamp that genuine ISIS

18   documents have.  Time and again, and in district courts such

19   as in *Musaibli*, courts have found that the ISIS stamp is

20   what tells us the document is real.  And that's because that

21   stamp tells us various important things about the providence

22   of the document.  It tells us specifically where it was

23   issued, when it was issued, by whom, and that person's

24   authority to issue the document and none of those are

25   present here.

1          On the Government's comparators, which are

2     themselves unauthenticated, seven of the eight of them have

3     such a stamp.  Most of them say, this is the Government that

4     issued this document on this day, at this location, by this

5     actual person.  And from that information, the trier of

6     fact, and here the Court, can say this document is more

7     likely to be real because we know where it came from and who

8     authored it and who they were and when and where it was

9     made.  None of that is present here.

10          We do not know if this document was made at a time

11     or place where trainings even existed, and we do not know if

12     this document was made at a time or place that Ms. Salman

13     was in those places.  So without any of that corroborating

14     information, there's simply nothing here that suggests that

15     it's real and several factors that suggest that it's fake.

16          THE COURT:  So the Government, obviously, has an

17     argument under §901(b)(4) about the circumstances of the

18     seizure.  And I assume that other evidence was found on the

19     phone that they think lends that is more likely to be

20     authentic or at least authentic enough to get in front of a

21     jury.

22          Is your argument that the surrounding factors for

23     this search or the seizure of this photograph is not

24     adequate?

25          MS. EISNER-GRYNBERG:  Surrounding circumstances

*Oral Argument*                                              10

1    make it more and more likely that this specific document is

2    real.  What the Government says is that this document was

3    found on a cell phone that was collected by U.S. military

4    forces from the person who is believed to be Ms. Salman's

5    husband.  And that it was located in his phone in an area

6    where his purportedly genuine documents are.  If you compare

7    those documents to this document in the same way, it

8    demonstrates why this document is not real.  The documents

9    that they're talking about all contain an ISIS stamp that

10   says when it was issued, where it was issued, by whom, and

11   that person's position of authority.

12          And they contain specific corroborative and

13   corroborated information about Ms. Salman's husband; for

14   example, the narrative portion that talks about where he was

15   on a certain day.  Why he was not present for military

16   service on that day.  What happened when he came to a

17   hearing to discuss where and why he was not present at that

18   hearing.  None of that is present here.

19          The fact that this document is also on the phone

20   that contains documents that are more likely to be true does

21   not lend any legitimacy to this document.  A person can

22   certainly possess any number of real documents and also a

23   fake document.  And the fact that this one lacks the

24   distinctive characteristics of the real documents or the

25   more likely to be real documents is dispositive.

*Oral Argument*                                                    11

1        THE COURT:  Okay.

2        MS. EISNER-GRYNBERG:  On the hearsay point, even

3   if the Court finds that this document reaches the bar for

4   authentication which, again, we'd say it doesn't on the

5   papers.  But, at a minimum, requires a hearing where these

6   witnesses can come forward and be cross-examined about who

7   they are and why they believe the opinions that they're

8   making are true.  Even if the Court, after a hearing, finds

9   the document to be authentic, it is hearsay and it is not

10  admissible and this court is bound by *United States versus*

11  *Al-Moayad*.  That's 545 F.3d 139 out of the Second Circuit in

12  2008.

13        *Al-Moayad* and our case are exactly the same.  In

14  *Al-Moayad*, there was a document purporting to be by a person

15  with a nickname named "Abu Jihad."  And Abu Jihad, like

16  Umm Yousef, was never identified by the Government as a

17  specific person or as a real person or as a person with

18  authority to make this kind of document.  In Abu Jihad's

19  documents, Abu Jihad said that Al-Moayad, who he did not

20  call Al-Moayad, he called him by a nickname, just like

21  Umm Katab in our case, is the person who recommended him for

22  admission into al-Qaeda.  The Court found that on the record

23  before that Court, there was not sufficient evidence to

24  admit the statement as a co-conspirator statement for the

25  exact same reasons as present here.

1          In that case, the district court had made no

2    findings, and was unable to find, that there was an

3    existence of a conspiracy at the time the document was made

4    by the unknown Abu Jihad just like the unknown Umm Yousef

5    here and the actual Mr. Al-Moayad just like the actual

6    Ms. Salman here.  The Court found, for example, that

7    evidence that Mr. Al-Moayad had previously offered any kind

8    of support to al-Qaeda at a different time than this

9    document was not itself sufficient to establish at the time

10   this document, their document, was made there continued to

11   be a relationship between those people.  They found that

12   there was no information that Mr. Al-Moayad had any kind of

13   relationship with Abu Jihad.  They found that there was no

14   information that Al-Moayad knew who Abu Jihad was or that he

15   was aware of this document.  All of those circumstances are

16   the exact same as here.

17          The Government's alleged corroborative evidence

18   that Ms. Salman had at any time and in any place even

19   tacitly supported ISIS, a characterization that we reject,

20   but simply, for example, by being present in its territory

21   or taking a photograph with its flag at some other time does

22   not support that she was in a conspiracy with whoever

23   Umm Yousef was at the time that this document was made.

24   And, again, the reasons we know that is we do not know the

25   time that this document was made because the Government has

*Oral Argument*                                                13

1   never proffered a time that this document was made.  They've

2   proffered a time when the photograph they believe was taken.

3   That's in March of 2018.  And they've proffered a front-end

4   date of mid-2017 when Ms. Salman married her husband, who is

5   listed as her husband, in the document.  And no evidence as

6   to whether trainings, genuine trainings, actually existed in

7   that time period or in the places where she was.

8         So we have no idea if Ms. Salman ever knew

9   Umm Yousef, if that's even a real person, was in any kind of

10  relationship with her that would give Umm Yousef the ability

11  to recount the things noted in the document.  And certainly,

12  there's no evidence that Ms. Salman was aware of this form.

13  We know from the evidence that the Government, the agents,

14  showed it to her and she stated she was not aware of this

15  form and she denied that its contents were true.

16        So there is nothing about *Al-Moayad* that is

17  different in our case.  And, in fact, the circumstances in

18  that case were more likely to have established a conspiracy

19  given the evidence in that case that Mr. Al-Moayad had

20  materially supported in that case Al-Qaeda which is not

21  evidence that's present here.

22        Until the Government can establish who Umm Yousef

23  is, that this person is a real person who exists and had the

24  authority to sign a document like this, there cannot be any

25  conspiracy proven between Ms. Salman and a potentially

1    fictitious person or a person we have no ability to probe

2    whether or not they were real and whether or not they were

3    in a position to sign a document like this one.  The

4    Government claims to have witnesses who are present in that

5    time and in that place, and they do not proffer that any of

6    these witnesses can tell us who this person is.

7            The Government says that Ms. Salman must have been

8    in a relationship with this person because she signed her

9    training document, that belies common sense.  Documents,

10   graduation documents and the like, are signed all the time

11   by the person who is not the trainer themselves.  Nobody in

12   this document purports that Umm Yousef was the trainer

13   herself and no actual trainer is being called by the

14   Government to corroborate who this person is.

15           And finally, the fact that the Government has

16   found other documents that purport to be signed by this same

17   person does not advance the ball either because those

18   documents are themselves uncorroborated.

19           Each of the pieces of evidence that the Government

20   says makes this document more likely to be true and makes

21   the conspiracy between Umm Yousef and Ms. Salman more likely

22   to have existed relies itself on something that's

23   uncorroborated.  And until one of those pieces can be met

24   with sufficient evidence that can then downstream

25   corroborate the Government's other claims, this document is

*Oral Argument*                                                    15

1    not authentic and its contents are hearsay.

2            THE COURT:  Are you going to talk about best

3    evidence?

4            MS. EISNER-GRYNBERG:  Yes.

5            Our position that admission of this document also

6    violates the Best Evidence Rule.  It's clear that this

7    document is not an original.  It appears to be a photograph

8    of one side of a folded-up piece of paper that would, if

9    real, have some corresponding original.  That original would

10   be itself the piece of paper.  And this document does not

11   meet the exceptions that are otherwise required to admit a

12   duplicate because of the questions about the authenticity of

13   the original itself.

14           THE COURT:  Let me confirm I understand.

15           Is the question that you're raising whether the

16   document itself for the Best Evidence Rule whether the

17   original itself is authentic or whether the photograph is an

18   accurate copy of the original?

19           MS. EISNER-GRYNBERG:  It's both, Judge.  We have

20   no idea if the photograph is an accurate copy of the

21   original because we have no evidence as to the contents of

22   the original.

23           In terms of the original itself, we have no reason

24   to believe that that's authentic for all of the same reasons

25   that I've already given.  Missing importantly here is

*Oral Argument*                                               16

1   anything corroborating that this document ever was real or

2   ever had an original because the Government has not provided

3   any supplemental corroborating evidence that we would expect

4   to exist and that did exist in other cases like this such as

5   in *Musaibli* and *Al Jumani*.

6            In those cases, there existed rosters from the

7   ISIS side of people who had attended military trainings such

8   as this, people who are in a military battalion; people who

9   are being paid for their military service.  In this case,

10  the Government found and turned over the contents of a hard

11  drive that they say appear to belong to an ISIS bureaucrat.

12  And missing from that hard drive is any corroboration that

13  this training existed or that Ms. Salman attended it.  If it

14  was true that Ms. Salman voluntarily attended a training

15  such as this one, there should be some record, a sign-up

16  sheet, an attendance log, a list on ISIS's side of who the

17  people are that they awarded these diplomas to, a list on

18  the weapons provision side of the weapons that were provided

19  to and when and so on.  And because there are none of those

20  corroborating documents, there are questions about the

21  authenticity of the original which require it to be

22  admissible under the Best Evidence Rule.

23            The Government has said in its pleadings, in an

24  unsworn pleading, that they've looked for the original but

25  can't find it.  That's not sufficient.  The Second Circuit

*Oral Argument*                                    17

1   has told us that in order to find -- in order to use a

2   duplicate, you must have a showing of the diligent, but

3   unsuccessful, search and inquiry.  It's not enough to just

4   say, We can't find it so we can just use other evidence.

5   And for all of the reasons that the document is not

6   authentic, it also cannot qualify as a duplicate.

7           THE COURT:  What else do they need to show?

8           MS. EISNER-GRYNBERG:  They need to show exactly

9   the items that I was just mentioning.

10          THE COURT:  No, I'm sorry.  For them to establish

11  that they don't have access to the original, I think they're

12  saying it's in Syria, ISIS controls the document; it's been

13  destroyed.  Do they need to give me a list of items they did

14  to find the document.

15          What else do they need to do?

16          MS. EISNER-GRYNBERG:  That requires testimony of a

17  witness with knowledge as to their search and their

18  inability to find any such document.

19          THE COURT:  So if Ms. Shami says, We searched far

20  it; these are the steps we took to search for it that's

21  still not adequate?

22          MS. EISNER-GRYNBERG:  If she says that under oath

23  or in a sworn affidavit, that would be further along than we

24  are here.

25          THE COURT:  Okay.  Anything else for this motion?

*Oral Argument*                                            18

1          MS. EISNER-GRYNBERG:  Judge, I would just note if

2    the Court has any questions.  The Government raised a

3    question as to the timeliness of the motion.  The motion is

4    clearly timely.  Federal Rule of Criminal Procedure

5    §12(b)(1) states that, At any time, a defendant may raise by

6    pretrial motion and objection that the Court can determine

7    without a trial on the merits.  That's what we've done here.

8    There is no time bar or time set in that rule for when

9    motions of this type are to be filed.

10          And it's our view that this motion is most

11   efficient for the Court to decide this motion now because

12   this motion is outcome determinative to the case.  This is

13   the only evidence supporting the only charge in the

14   indictment.  If the Government does not have this training

15   certification document, the Government cannot make any

16   showing, let alone beyond a reasonable doubt, that

17   Ms. Salman attended military training.

18          So just like the gun in a suppression hearing for

19   a §922(g) charge.  In this case, if the Court excludes the

20   document as we argue it must, the case must be dismissed.

21   So deciding that question now is the most efficient way to

22   determine the outcome of this case.

23          THE COURT:  Thank you.

24          Ms. Shami.

25          MS. SHAMI:  Thank you, your Honor.

1          I actually do want to start with the question of

2    the timeliness and Ms. Eisner-Grynberg's reference to

3    Federal Rule of Criminal Procedure §12(b)(1).  Had they

4    continued to read the notes for §12(b)(1), they would have

5    noted that under the 1944 Advisory Committee Notes on its

6    adoption that §12(b) motions, and there have been changes to

7    the numbering, but the thrust is that §12(b)(2) and

8    §12(b)(3) currently in the Rule, they actually identify the

9    full universe of what pretrial motions may be brought under

10   §12(b)(1).

11          It states in that note that paragraphs that

12   classify into two groups all objections and defenses to be

13   interposed by motion.  In one group are defenses and

14   objections which must be raised by motion.  Failure to do so

15   constitutes a waiver.

16          In the other group are defenses and objections

17   which, at the defendant's option, may be raised by motion.

18   Failure to do so, however, not constituting a waiver.

19   Nowhere in the list at (b)(2) and (b)(3) is there a listed

20   item for a motion in limine which makes it completely

21   distinct from the defendant's example of the suppression of

22   a gun in a §922(g) case.  Suppression is absolutely itemized

23   in §12(b).  Under §12(b)(3)(C), for suppression of evidence.

24   It is appropriate to seek the suppression of evidence

25   pretrial especially where, usually in a §922(g), there is an

*Oral Argument*                                                    20

1    allegation of some kind of Fourth Amendment violation that

2    would lend itself to a legal resolution.

3            Here, what the defendant has raised, an

4    evidentiary issue that is typically brought during motion in

5    limine practice; in fact, it is titled "A Motion to Exclude

6    a Fraudulent Document."  At the same time, although the

7    Government believes that the defendant has actually no

8    vehicle to bring this motion right now and there a reference

9    to §12(b) does not support this motion, the Government won't

10   object if the Court wants to resolve this issue now.  And if

11   the Court wants to resolve this issue now, I think that the

12   issue that defense have raised on all of the questions about

13   what is missing or what the Government hasn't shown or why

14   the document is fake all miss the mark because they all go

15   to the veracity of the document.

16           THE COURT:  Before you move on, I want to confirm

17   then you are no longer taking the position that I guess the

18   Court doesn't have the authority to have a hearing sooner

19   rather than later.

20           MS. SHAMI:  Well, no.  I mean, I think the

21   Government still believes that an evidentiary hearing at

22   this point would be untimely and would require the flying in

23   of witnesses and an enormous amount of work just to

24   determine what the Government believes actually is very

25   easily and straightforwardly determined based on the fact of

*Oral Argument*                                                    21

1   a Second Circuit case that was issued two weeks ago that

2   actually undercuts the entirety of the defendant's argument

3   with respect to authenticity versus veracity.

4          Sorry, your Honor.

5          THE COURT:  Well, I guess you didn't really answer

6   my question.  If I decided I wanted an evidentiary hearing,

7   the Government is no longer objecting and saying, I need to

8   wait for a trial date to be set?

9          MS. SHAMI:  No, the Government still believes that

10  an evidentiary hearing should be held closer to trial.  What

11  we're seeing is that even though the Government does not

12  believe that this is an appropriate vehicle for the motion,

13  meaning, that it's just -- there is no basis for this

14  motion; it is an improper motion.  The Court can just

15  dismiss it out of hand based on fact that it is improper.

16         What we're saying is it's fully briefed, if the

17  Court wants it resolved, it can.  But if your Honor still

18  wants an evidentiary hearing, the Government submits that it

19  should be closer to trial.

20         THE COURT:  And why is that?

21         MS. SHAMI:  Because that is the typical practice

22  for evidentiary hearings.  The Government would need to be

23  presenting multiple witnesses.  We would be preparing for

24  multiple witnesses, bringing them into the country for

25  several of them.

*Oral Argument*                                    22

1          THE COURT:  How close to trial?

2          MS. SHAMI:  I think that the Government's motion,

3    opposition, noted that for the majority of them it was a

4    couple months before trial.

5          THE COURT:  I looked at your examples.  In a

6    number of those, the hearing was scheduled perhaps a month

7    or two before trial but then the trial date was adjourned.

8    I wouldn't adjourn a trial date, so why would I wait until

9    the last minute to have this hearing?

10          MS. SHAMI:  Your Honor, it's not last minute, it's

11    just --

12          THE COURT:  It's the last minute to me, sorry.  A

13    month before is the last minute for me.  So why would I wait

14    until then to have it and then potentially have to adjourn

15    the trial date?  In three of the examples you gave me, the

16    trial date has to be adjourned; so, why would I go that

17    route instead of having it sooner rather than later?

18          MS. SHAMI:  Your Honor, I think if the concern is

19    that a month does not give the Court enough time to resolve

20    the issue, certainly, you can set it sooner than one month

21    out before trial.  But I think what the Government is saying

22    we don't even have a trial date set.  We haven't completed

23    pretrial motions on the six other motions that the

24    Government has raised.  We are still obviously briefing

25    CIPA.  The defense has raised a number of discovery issues

1   that they want us to look into.  And, in fact, as the Court

2   knows, made a production last night or yesterday morning.

3   And the Government is looking into producing an additional

4   drive from NMEC.  And so, at this point, we are not near a

5   trial date to be even able to work backwards from that date.

6           And so, I would submit that if you're arguing or

7   you're -- not arguing -- if you're saying that it would

8   potentially derail a trial, I understand that concern and I

9   hear you that let's look at the trial date and then work

10  backwards to what would make the Court comfortable in terms

11  of a timing for that.

12          THE COURT:  Thank you.  Continue.

13          MS. SHAMI:  Sure.

14          With respect to all of the issues that the defense

15  has raised about the document, calling into question several

16  items about its qualities, the lack of insignia, lack of

17  stamps, lack of dates.  These all go to the reliability, the

18  veracity, or the weight of the document not to its

19  admissibility and, in particular, its authenticity.

20          Authentication, of course, as the Court knows in

21  *United States versus Tropiano*, 252 F.3d 653.  A

22  Second Circuit case from 2001.  Authentication, of course,

23  merely renders evidence admissible leaving the issue of its

24  ultimate reliability to the jury.  And although the

25  proponent of evidence has to adduce is sufficient evidence

*Oral Argument*                                          24

1   to support a finding that the proffered evidence is what

2   it's claimed to be.  And then the opposing party, the

3   defense here, would be free to make all of these arguments

4   to a jury about why they should not rely on this document.

5           But the authentication, your Honor, turns entirely

6   on the fact of whether or not the Government can establish

7   and, in fact, the defendants concede that we have, that the

8   phone belonged to the defendant and that the Cellebrite

9   extraction --

10          THE COURT:  Her husband.

11          MS. SHAMI:  Her husband, excuse me.

12          That the Cellebrite extraction is of the phone.

13          Two weeks ago, the Second Circuit decided in

14  *United States versus Adamou*, and it will be published at an

15  F.4th, but currently, there's only a WestLaw citation and

16  that's 2025WL2025147.  And on WestLaw, it's noted as

17  *United States versus Gonzalez*.

18          But in either case, the Circuit affirmed the black

19  letter law that under Rule 91 to satisfy the requirement

20  authenticating or identifying an item of evidence, the

21  proponent must produce evidence sufficient to support a

22  finding that it is what the proponent claims to be.  It is

23  not a high hurdle.  And here, just like in *Gonzalez*, the

24  Circuit found expressly that Rule 91 was satisfied where the

25  Government proved that the cell phones were owned by who the

*Oral Argument*                                                    25

1    Government said they were owned by, there the defendants;

2    here, the defendant's husband and offered testimony from

3    analyst who interpreted the data from the Cellebrite and

4    explained the process by which it was extracted and that the

5    size of the forensic extraction of the physical cell phone

6    matched the size of the data contained in the extraction

7    report.

8              That is all that is necessary.  It just shows the

9    provenance.

10             THE COURT:  What type of evidence was it?

11             MS. SHAMI:  A Cellebrite report just like this

12   one.

13             THE COURT:  Was the document that they were

14   authenticating, is it a text message?  Was it a diploma?

15             MS. SHAMI:  It was text messages and I think there

16   was some other documents on the report.  But I think the

17   point is that it looks to the question of the Cellebrite

18   extraction.  The question here, is there any issue with the

19   Cellebrite extraction?  There isn't.  The defendant's

20   husband had a phone; it was seized from him upon his arrest.

21   It was taken by the SDF; it was then given to

22   Coalition Forces who then extracted it in a bit-for-bit

23   forensically sound way creating a Gold Copy.  And there is

24   no suggestion, and the defendant never responded to any of

25   the items that the Government raised, noting that there is

*Oral Argument*                                          26

1  no suggestion that the document itself was doctored or there

2  was anything that happened to the forensic image and that is

3  all that is necessary.

4          Indeed, in *Musaibli* --

5          THE COURT:  Let me make sure I understand because

6  I don't have case in front of me.

7          If it was extracted appropriately bit for bit or

8  whatever you said.  If it was extracted appropriately, then

9  presumably the picture is authentic?  Presumably, the

10  picture of the original is thus authentic?

11          MS. SHAMI:  What is on the Cellebrite report is

12  authentic.  Authenticity is not the same as veracity.  The

13  question of whether or not the document is exactly what it

14  purports to be and is a fake or fraudulent document as the

15  defense calls it or, in the Government's view, a true

16  document that shows the defendant committed the crime of

17  receiving military-type training from ISIS is beside the

18  point.

19          The question is:  Is the document itself

20  authentic?  And here, is the extraction authentic?  Can the

21  Court be assured that there is a chain of custody.  And even

22  there, the Court was very clear that a chain of custody may

23  not be perfect.  That also goes to the weight, not to the

24  admissibility.

25          Authenticity is a question of whether or not the

*Oral Argument*                                          27

1   Government can establish this document is what it is.  And
2   here, what the Government is stating is that this document
3   is a photograph from the defendant's husband's phone.  That
4   is what is at issue here.  It is a picture that was taken
5   off of the defendant's phone.  Off a phone that the
6   defendant agrees was her husband's phone.  Off of a
7   Cellebrite extraction that was forensically made.

8           And, your Honor, you have a copy of the decision
9   from *Adamou*.  If you don't have a copy and would like to
10  look at it or to have a copy of it if you would like.

11          But I think the other point here is that even in
12  *Musaibli*, the district court had no issue with authenticity
13  for most of the documents.  The issue in the Sixth Circuit
14  was the question of hearsay.  And all of the issues that the
15  defendant raises with respect to *Musaibli* that was present
16  there that is not present here, that is actually not
17  accurate.  If you look through all of the exhibits and what
18  insignia, characteristics, et cetera were present in each.
19  In fact, one of the exhibits bears no insignia and the
20  witness, the live witness, Mr. Al Madioum, and I'll spell
21  that for the Court.  It's A-l space M-a-d-i-o-u-m.  He
22  testified as to that particular exhibit that he didn't have
23  access to that database but that it contains the types of
24  information that would typically be present which makes him
25  exactly the same as the female witness that the Government

*Oral Argument*                                                28

1  would offer.  She has seen documents exactly like this.  She

2  didn't say she saw the defendant's document, but as the

3  Court knows, the document is a photocopied typewritten

4  template in which a person will fill in by hand the

5  information related to the woman who took the training, her

6  husband, and his ISIS number as well as what she is

7  authorized to possess and what she's already been authorized

8  to possess.  In that way, she is exactly the Government's

9  proffered witness is exactly like Al Madioum who did not

10 have -- he had not previously seen the exhibit that had no

11 insignia on it but was able to say, yes, this is the type of

12 stuff that they would typically save.

13         And I think what's really important here, your

14 Honor, is that the Circuit didn't have to reach authenticity

15 on this issue because the district court had determined that

16 authenticity was present for most of these documents.  The

17 issue wasn't authenticity, it was hearsay.  Authenticity

18 simply is, is this document what it claims to be?  And here,

19 is this a photograph of a Cellebrite extraction taken from

20 the defendant's husband's phone and emphatically it is.  The

21 defendant even concedes it.

22         Instead, what the defendant argues is, here are

23 all the reasons why I should doubt that it's reliable.

24 Those are questions for a jury.  Those are precisely the

25 questions for the jury.  The jury is the ultimate arbiter of

*Oral Argument*                                              29

1  the document's ultimate reliability.  The defendant can

2  present all of these same arguments and say, Where is the

3  stamp?

4          The other concern that I understand that defense

5  has raised is with respect to, well, the other document the

6  Government has found hasn't been authenticated.  We're not

7  at trial, the expert deadline for the Government has not

8  passed which is two months before trial.  The notion the

9  Government hasn't presented expert testimony yet is frankly

10 ludicrous when the expert testimony or the expert disclosure

11 deadline is teed off of trial as should the evidentiary

12 hearing.

13         The Government has proffered, however, that it

14 will be presenting testimony from an ISIS document expert

15 and an ISIS expert.  These proffers of what the Government

16 will be demonstrating at trial are sufficient at this

17 juncture for the Court to determine that the Government

18 would be able to admit this document, and frankly, the

19 entire Cellebrite extraction at trial.

20         THE COURT:  I need to make sure I understand.

21         I think this argument is slightly different than

22 the argument in your briefing.  But I'm understanding you to

23 say that as for the for authenticity, you only have to

24 determine that it is a likelihood that the document is a

25 document or is a picture of a document that was on

*Oral Argument*                                                      30

1   Ms. Salman's husband's phone.  That gets you past the

2   authenticity hurdle and then you'll have to deal with

3   hearsay.

4            MS. SHAMI:  Exactly.

5            THE COURT:  Okay.

6            MS. SHAMI:  Would you like me to turn to hearsay

7   or would you like to me speak further?

8            THE COURT:  Yes.

9            MS. SHAMI:  With respect to hearsay, and just give

10  me a moment to organize myself.

11           *Musaibli* is instructive here.  That is the case

12  where the district court reached the issue of hearsay, found

13  that there was no conspiracy, and the Sixth Circuit reversed

14  entirely.  And the defendant in her reply argued that there

15  is a difference because there is more information provided

16  in *Musaibli* but that is not actually accurate.

17           As a practical matter, *Musaibli* does not require

18  testimony of someone with knowledge.  Rather, *Musaibli*, in

19  the Sixth Circuit, indicated that the additional testimony

20  by Al Modium dispel any lingering doubts.  However, the

21  Court determined that the three items that you look at to

22  determine whether or not there is a co-conspirator statement

23  were all present.  Was there a conspiracy?  Did it exist?

24  Second, were the declarant and the defendant part of that

25  conspiracy?  And third, was the declaration by the declarant

*Oral Argument*                                                    31

1   made during, and in furtherance to, the conspiracy?

2           And the Government submits that all of those

3   factors are met.  The defendant erects all of these hurdles

4   and requirements that are nowhere found in any case.

5   Instead, it tries to collapse the question of authenticity

6   with the question of whether or not it's hearsay and also

7   with respect to the defense argument regarding best

8   evidence.  All of it boils down to the defense's critiques

9   of whether or not the document is real but those are

10  separate questions.

11          On the first instance, is it authentic?  Yes, it

12  is a document that was pulled off of an extraction off of

13  the defendant's husband's phone.  And the Government can

14  show the chain of custody for that and will have testimony

15  to fill in the blanks.

16          The next question is hearsay.  Yes, the conspiracy

17  that existed is a conspiracy to provide material support to

18  ISIS in the form of the defendant's service to ISIS.  That

19  is why she took military training.  Was the declarant and

20  the defendant part of that conspiracy?  Yes.  Because

21  Umm Yousef signed the document.  The Government noted in its

22  brief that it is our position that she must have supervised

23  in some way the training.  The Government didn't she say she

24  was the trainer.

25          THE COURT:  Who is Umm Yousef?

*Oral Argument*                                                    32

1          MS. SHAMI:  Excuse me.

2          THE COURT:  Who is Umm Yousef?

3          MS. SHAMI:  Umm Yousef is the woman who signed the

4     document.

5          THE COURT:  I got that.  Who is she?  Is that her

6     real name?

7          MS. SHAMI:  That's her pseudonym.

8          THE COURT:  You know who this person is?

9          MS. SHAMI:  The Government does not know her true

10    identity, no.

11         THE COURT:  How do you know that's not her true

12    name?  How do you know that's her kunya.

13         MS. SHAMI:  Umm Yousef because it follows the

14    convention for kunyas.  So Umm is "the mother of" and Yousef

15    is a male name.  So it could be that her first son, the

16    eldest son, is Yousef, that's typically how it's done, or

17    you can choose whatever name you want.  In the case, the

18    defendant chose the name Umm Ali.  She has no son named Ali.

19    She has no son Ali, she chose it because her husband was Abu

20    Ali Al Korsani Algermani.

21         THE COURT:  The question is, how do we know

22    Umm Yousef is a real person?

23         MS. SHAMI:  There is no question that this

24    document is, or that the picture, is of a document, right?

25    The question is, it's not whether or not -- I think

*Oral Argument*                                          33

1   one -- someone clearly wrote the document.  Clearly, this is

2   a template and clearly there's handwriting on it.  The

3   question of who wrote it is not dispositive or relevant to

4   the question of is the document real?  The document is real,

5   it exists.

6          THE COURT:  We're talking about hearsay.  Do you

7   not have to demonstrate that she is in a conspiracy with

8   Umm Yousef?

9          MS. SHAMI:  Yes.  And to do so, you know that the

10  declarant -- it is all outlined, in fact, in the document.

11  It is completely appropriate to rely --

12         MS. EISNER-GRYNBERG:  Judge, I'm sorry.

13         I'm hearing from Ms. Salman that they're frozen

14  and they can't hear the proceeding and that does appear to

15  be the case.

16         THE COURT:  Okay.  Give us a moment.

17         (A brief pause in the proceedings was held.)

18         THE COURT:  Welcome back.

19         Ms. Shami, I was asking who Umm Yousef is and if

20  you do not need to know that this person exists to establish

21  that there is a conspiracy.

22         MS. SHAMI:  The Government does not need to know

23  who she is but her real name is to establish that a

24  conspiracy existed.  The document is real and that it exists

25  as a picture on a Cellebrite extraction.  It didn't come --

*Oral Argument*                                    34

1     THE COURT:  That is an authenticity argument.  I'm

2  asking about hearsay, no?

3     MS. SHAMI:  It is also a hearsay document inasmuch

4  as the defendant is saying that we have no proof that there

5  is a real person; there is a real document.  The questions

6  that the defense raise collapse on each other.  And it is

7  because by taking each item in the document and saying the

8  Government hasn't proven each of these elements, they

9  haven't shown who Umm Yousef is.

10     THE COURT:  Let's forget -- not forget -- let's

11  move past what the defendant is saying.

12     MS. SHAMI:  Sure.

13     THE COURT:  I am looking at the document, it looks

14  like hearsay.  You're saying there is a conspiracy.  ISIS is

15  a conspiracy.  Umm Yousef is part of the conspiracy because

16  this person signed this document.  And somehow Ms. Salman is

17  in a conspiracy with Umm Yousef, I guess, because this

18  document is about Ms. Salman.

19     Is that your argument?

20     MS. SHAMI:  Receiving training, thus materially

21  supporting ISIS or being in a conspiracy materially

22  supporting ISIS by means of her service to ISIS, yes.

23     THE COURT:  But you know or you think you know

24  that based on this document.  So you're using a hearsay

25  document to establish conspiracy?

*Oral Argument*                                              35

1          MS. SHAMI:  Yes.  And that is actually permissible

2    under Second Circuit law to use the statements themselves.

3    But there also needs to be other factors that corroborate

4    it.  And here, what is corroborative is the fact that there

5    are two other documents.

6          THE COURT:  Can you tell me the Second Circuit

7    case that you are referring to that says you can use hearsay

8    to establish?

9          MS. SHAMI:  Sure.

10         THE COURT:  If it's in your briefing, you can

11   point me to the page.

12         MS. SHAMI:  Yes.

13         It's the Second Circuit *Musaibli* case that says:

14   Statements generated by ISIS' bureaucratic apparatus to

15   support the mission of providing the terrorist group with

16   personnel and services --

17         THE COURT:  Slow down just a little bit.

18         MS. SHAMI:  I'm so sorry.

19         Statements generated by ISIS' bureaucratic

20   apparatus to support the mission of providing the terrorist

21   group with personnel and service fit comfortably within the

22   alleged conspiracy scope.

23         Just give me one moment, your Honor.

24         THE COURT:  Take your time.  I think we need to

25   reconnect.

*Oral Argument*                                                        36

1          MS. SHAMI:  Okay.

2          THE COURT:  Do we need to reconnect?

3          MS. EISNER-GRYNBERG:  They can hear.

4          THE COURT:  You can continue when you're ready.

5          MS. SHAMI:  Your Honor, I can follow up with the

6    case.  I am having a hard time finding it.  It might just be

7    in my notes, something that I read as part of preparing for

8    today.

9          THE COURT:  I think so.  I think when I reviewed

10   your briefing you cite the rule but I didn't see any case

11   law so if you could provide that.

12         MS. SHAMI:  Absolutely, your Honor.

13         THE COURT:  Okay.  Go ahead.

14         You were saying that there's other corroboration.

15         MS. SHAMI:  Yes.  And that is the existence of

16   Umm Yousef is corroborated by the additional documents that

17   were identified on the more senior ISIS fighter's hard

18   drive.  In those documents, Umm Yousef signed two military

19   training documents and they bear the insignia, the ISIS

20   stamps, that the defendant put so much stock in.  In fact,

21   they are with additional documents authorizing other

22   resources to the Nusaybah Katiba which means that the

23   Nusaybah Katiba also existed.

24         I want to also return to something that the

25   defendant has said in the reply and said during the last

1  status conference that the Nusaybah Katiba was small; that

2  it was only 100 people.  The defendant mischaracterizes the

3  statement of facts in Allison Fluke-Ekren's case.  In the

4  statement of facts, it states that Allison Fluke-Ekren

5  herself only trained 100 people in Raqqa.  It has nothing to

6  do with the full volume of women who were trained.  There

7  were multiple trainers.  There were multiple locations for

8  training.

9          In fact, the Government expects to provide to the

10  defendant a hard drive that contains sign-ups by over 900

11  women in an eight-month time period in Raqqa, the vast

12  majority of whom seek to learn how to use an AK-47 or a

13  suicide belt.  And Raqqa is not the only location that

14  training existed.

15          The Government has witness testimony that training

16  happened in Mayadin where the defendant was -- where she got

17  married.  And one of the documents, in fact, on the hard

18  drive that has an insignia stamp that the defendants have

19  noted is important to them is stamped by the Al Barrakah

20  Governorate and that encompasses a territory that includes

21  the city of Hajin where the defendant also was.

22          So the idea -- and additionally, the documents

23  also show stamps from Alfurat Governorate, which is in Iraq,

24  which demonstrates that there was training happening in

25  multiple locations.  And the Government need not tell the

*Oral Argument*                                                    38

1    defendant.  If the Government doesn't know, the Government

2    does not know precisely where the defendant received her

3    training.  The important piece is that the defendant

4    received training and the Government should be permitted to

5    make that argument to a jury by presenting the evidence from

6    the defendant's husband's phone which were retrieved via a

7    bit-for-bit Gold Copy Extraction and are thus authentic, and

8    thus show a conspiracy.  And, your Honor, frankly, the

9    conspiracy could also include her husband inasmuch as the

10   defendant was seen on video being taken by her husband

11   practicing.  And the fact that his name was on the training

12   document itself.

13          Certainly, the defendant has --

14          THE COURT:  Was it his statement?  Going back to

15   hearsay.  If you're saying she was in a conspiracy with her

16   husband, even if she was, if he's not the declarant in the

17   document, does that matter?

18          MS. SHAMI:  It's an additional person in the

19   conspiracy.  And I think here, you know, conspiracies can

20   have hundreds, thousands of people.  It depends on what the

21   conspiracy is and how it is being identified.

22          I think the Government's view here is that the

23   defendant's view of, like, rigidly identifying who is

24   Umm Yousef, and if the Government can't do that then they

25   can't prove the conspiracy.  The Government, first of all,

*Oral Argument*                                                    39

1    rejects that because Umm Yousef was a person, she signed

2    multiple documents including documents that were routed to

3    more senior ISIS people and stamped.

4            But apart from that, given that the defendant's

5    husband's name is also on the document, and given additional

6    documents that the defense will receive from the hard drive,

7    that indicate that the husband had to permit or OK his wife

8    taking the training, the Government could also argue that he

9    is part of the conspiracy inasmuch as he OK'd her taking the

10   training because, again, it was voluntary which actually

11   goes back to another argument that the defense made with

12   respect to compulsory training that was also --

13           THE COURT:  I want to stay on hearsay.

14           MS. SHAMI:  Sure.

15           THE COURT:  Perhaps ISIS is a conspiracy, perhaps

16   her husband was part of ISIS and part of the conspiracy.

17   You would have perhaps a stronger argument that they were

18   co-conspirators but her husband is not the declarant.  If,

19   my understanding, to get over this hearsay by the conspiracy

20   theory, you'd have to show that she's in a conspiracy with

21   the declarant which is Umm Yousef.

22           MS. SHAMI:  Yes.

23           THE COURT:  How do you intend to prove that the

24   statement is made, that she was in a conspiracy with

25   Umm Yousef and that the declaration was made during the

*Oral Argument*                                                    40

1    course of a conspiracy?

2           MS. SHAMI:  Because the document itself notes the

3    inclusion of both the defendant and Umm Yousef.

4           THE COURT:  You're going to use the hearsay

5    document to prove the conspiracy to get the hearsay document

6    in?

7           MS. SHAMI:  Yes.

8           THE COURT:  And you're going to provide me a case

9    that tells me that you can do that?

10          MS. SHAMI:  Yes, your Honor.

11          THE COURT:  Okay.

12          MS. SHAMI:  But, in either event, the Government

13   also submits that the residual exception would also permit

14   the admissibility of this document.  And that is because it

15   was made in furtherance of the conspiracy and it meets the

16   requirements of §807 which is that it has sufficient

17   circumstantial guarantee of trustworthiness and it is more

18   probative on the point for which it is offered than any

19   other evidence that the proponent can obtain through

20   reasonable efforts.

21          Here, the evidence of the trustworthiness of the

22   military document is significant.  The fact of the matter

23   is, it was taken off of a Cellebrite extraction.  I've said

24   this, and I don't want to repeat myself, but it is an

25   important point.  It is on her husband's phone it is in a

*Oral Argument*                                            41

1   folder called "Adari Stuff."

2           THE COURT:  You told me earlier that that that

3   goes to authenticity, not veracity.

4           MS. SHAMI:  It does go to authenticity.

5           THE COURT:  You're saying that it also supports

6   its veracity?

7           MS. SHAMI:  Hearsay is also about authenticity but

8   it's also about -- the question is, is the evidence of the

9   trustworthiness of the document.  So now we're moving to the

10  question of trustworthiness and that is a question that is

11  part of §807.  And so, here we're talking about

12  trustworthiness:  How can the trust that this document is

13  what it purports to be?  First, it was on her husband's

14  phone.

15          THE COURT:  I'm sorry.  Maybe I need to take a

16  closer look at this because you just said that -- let me go

17  back to my handy court reporter here.

18          So here we're talking about trustworthiness.  "How

19  can you trust that this document is what it purports to be.

20  First, it was on the husband's phone."

21          MS. SHAMI:  Yes.

22          THE COURT:  That sounds like a straight

23  authenticity issue.  I want to know how can you trust the

24  statements, how do you overcome hearsay by demonstrating

25  that the statements in this document, even if we agreed that

*Oral Argument*                                                      42

1    the document -- that the picture is an accurate, authentic

2    picture of a document, of an original, how do we trust the

3    statements in the document?  But you're telling me that's

4    it's trustworthy because it came from the phone.

5              MS. SHAMI:  Yes, your Honor.

6              In the first instance, I use the word

7    "trustworthy" because that is what comes from the rule.

8    §807 asks whether the document being offered, or the

9    evidence being offered, has sufficient circumstantial

10   guarantees of trustworthiness.  I understand how that can

11   seem alighting with the question of authenticity and they

12   are interrelated.  There is a question of how can you trust

13   that this document is what it purports to be and that is the

14   question that is asked on §901.

15             So here, I mean, the analysis is pretty similar.

16   But here, focusing specifically on §807, the phones were

17   seized from her husband, a terrorist, a member of ISIS,

18   shortly before ISIS fell in Baghouz and it bears substantial

19   indicia that Abu Ali used that phone.  There were multiple

20   documents on the phone that belonged to him.  There were

21   multiple pictures of the defendant and her husband on the

22   phone.  The document itself was located in a folder on the

23   phone that the defendant's husband had created for ISIS

24   material.  It was surrounded by additional other ISIS

25   documents.  When you examine the metadata of the picture

1  itself, it was taken by the husband's phone along with

2  several other photographs taken at or around the same time

3  that he then, through the metadata analysis, you can see he

4  transferred to a folder related to all of his ISIS

5  materials.  There are no additional versions of the document

6  suggesting the defendant's theory of the case which is that

7  he forged the document to be able to get more weapons which

8  is also belied by the fact that the document itself notes

9  that the weapon is already in her possession.

10        And I will also note, your Honor, that there is a

11  video of her using an AK-47, practicing.  He gives her an

12  instruction.  And then when she sees that he's videoing her,

13  she puts the AK-47 down near an ISIS flag and she took

14  multiple pictures of herself in front of an ISIS flag or an

15  AK-47.  The ISIS flag picture she sent to her husband.  She

16  made the decision to send a selfie in front of an ISIS flag

17  and send it to her husband via Share It app.  These are

18  circumstantial guarantees of trustworthiness.

19        Moreover, the Government will be able to offer

20  testimony from a woman who was in ISIS territory, who was

21  present near Nusaybah Katiba's founding, near people in the

22  Katiba, saw documents exactly like this one.

23        The fact of the matter is, your Honor, it is a

24  typewritten document and you could actually -- when you look

25  at the documents themselves, you can see that they're

*Oral Argument*                                                    44

1   photocopied documents.  And so, there were documents being

2   created for women who were receiving training.  And it's

3   because what is the document itself?  It is an authorization

4   to carry a weapon.  The defendant needed the authorization

5   to be able to carry that AK-47 that she is practicing with,

6   that she is seen on video practicing with.

7              And so, all of these items demonstrate that the

8   document has circumstantial indicia of trustworthiness

9   coupled with the testimony of a witness who saw this precise

10  kind of document and would be able to tell the Court and a

11  jury why this document was issued and why it's important.

12  And that's because a woman needed to have it to be able to

13  hold a weapon.

14             THE COURT:  And so, everything you just said about

15  trustworthiness and why she needed the document and all

16  that.  You're saying all that goes to support why we should

17  trust Umm Yousef and what she declared in that document.

18             MS. SHAMI:  Yes, your Honor.

19             And, in fact, Umm Yousef appears on two documents

20  that were also stamped.  The fact is that defendant puts a

21  lot of stock in the ISIS stamps.  And you have two documents

22  signed by Umm Yousef that were stamped and approved and

23  routed through the governates of ISIS which further support

24  that this was a person who was signing training documents

25  for women and they were found on devices.

*Oral Argument*                                           45

1           I will note that that the fact of this particular,

2    like the photocopy itself, the template, and the filling of

3    the person's information being found on three separate

4    devices.  The defendant has no supposition as to why it

5    exists on three devices.  Why some of them have stamps.  Why

6    they're also in connection with other documents authorizing

7    Nusaybah Katiba resources.  It is because the Katiba was

8    authorized to allow women who wanted to volunteer to fight

9    for ISIS, to wear a suicide belt for ISIS, to drive for

10   ISIS, to cook for ISIS, a medium by which they can measure

11   out and exact their allegiance to ISIS.  And that is what

12   the document shows, and it shows that multiple women wanted

13   that opportunity and that the defendant was among them.

14           I think your Honor asked questions of the

15   defendant about the Best Evidence Rule.  And here, I think

16   the Government believes it made out its arguments in the

17   brief.  But I do want to just say that the notion that the

18   Government has to provide the original of a photographic

19   rendering of a document would basically eviscerate the Best

20   Evidence Rule.  It exists for situations like this where the

21   original is not in the Government's possession.

22           The Government has tried to find this original

23   document.  Of course, the Government would much prefer to

24   provide an original document at trial.  But the Government

25   cannot find it in its electronic repositories.  And in so

1    far as ISIS might still have the original or it might have

2    been destroyed, the fact of the matter is that lots of the

3    cities that were besieged by the SDF, by the Syrian Arab

4    Army, by Coalition Forces, there was lots of damage.  The

5    Government does not have the document and the idea that the

6    Government can't present the next best thing, which is an

7    exact picture of the document, would basically render the

8    Best Evidence Rule a dead letter.

9             THE COURT:  What do you have to present to

10   demonstrate that you made efforts to obtain the original?

11            MS. SHAMI:  So, your Honor, all there is really

12   necessary is testimony that, or an affidavit, that the

13   Government has tried to do so, and the Government can do

14   that.  If the Court needs an affidavit from the Government.

15            THE COURT:  Does the affidavit have to include the

16   steps that you took to locate it?  I mean, because from what

17   I'm hearing right now, I'm assuming that it's no longer

18   available because it's in Syria or in ISIS-controlled area,

19   so it seems like we're assuming.

20            Do you have to show that there is some additional

21   steps taken?

22            MS. SHAMI:  Your Honor, I don't know if there are

23   specific steps that need to be itemized or whether or not

24   it's just simply a statement that the Government made its

25   best efforts.  I can get back to you in a letter, or the

*Oral Argument*                                    47

 1   Government can get back to you on that in a letter as to

 2   what the affidavit might contain.

 3              THE COURT:  Why don't you send me the affidavit.

 4   And in the affidavit, when you say you made your best

 5   efforts, you can tell me what those best efforts include

 6   generally.  And if I want more detail, I will let you know.

 7              MS. SHAMI:  Okay.

 8              THE COURT:  Because, like as I stated, I

 9   understand where the original is presumably located.  And

10   so, I'm wondering if we're just presuming that it doesn't

11   exist which may be satisfactory, which, given where it's

12   located, but I want to know the full universe of your best

13   efforts before I decide.

14              MS. SHAMI:  Yes, your Honor.

15              THE COURT:  Thank you.

16              MS. SHAMI:  And then I think the final issue that

17   the Government opposed in its opposition relates to the

18   probative value of the document.

19              And here, I think it's interesting that the

20   defense has raised the question of, well, it's just like a

21   fake drivers license, and a fake drivers license is not

22   probative compared against eight other fake drivers

23   licenses, but a fake document can be probative.

24              The Government believes this document is real and

25   it is genuine and it represents the fact that the defendant

*Oral Argument*                                    48

1    received military-type training.  But a fake drivers license

2    in the possession of a person who is charged with aggravated

3    identity theft is probative.  It is probative of the crime.

4    It is probative of the mens rea of the defendant charged

5    with aggravated identity theft.  The fact that there is a

6    document on her husband's phone authorizing her to carry a

7    weapon coupled with the video of her carrying a weapon is

8    probative.  The Government believes that it's genuine and

9    will submit testimony and evidence that it is genuine.  But

10   the question of the probative value of it, it is clearly

11   probative to the charged crime and the Government is

12   entitled to present that evidence.  And the Second Circuit's

13   reversal in *Garnes* made it very clear in affirming that the

14   Government has to be permitted to present evidence of the

15   res gestae of the crime charged and that is what this

16   document does.

17            Also, I want to just conclude on one point and I'm

18   happy to answer any questions.

19            But the defendant has said multiple times now that

20   the admissibility of this document is case dispositive

21   suggesting that the Government would dismiss the case if the

22   Court ruled it inadmissible.  I don't know how the defense

23   would presuppose to know what the Government's other avenues

24   would be in the event of an adverse ruling but I just wanted

25   to say that the Government believes the defendant committed

*Oral Argument*                                              49

1    this crime and will continue to prosecute this case.

2              THE COURT:  Thank you.

3              MS. EISNER-GRYNBERG:  May I respond to the

4    Government's argument?

5              THE COURT:  Quickly.

6              MS. EISNER-GRYNBERG:  First of all, what the

7    Government has stated that what *Adamou* stands for is

8    fundamentally incorrect.

9              THE COURT:  Remind me of which one -- Adamou

10   stands for?

11             MS. EISNER-GRYNBERG:  This case where the

12   Government says, as a profound premise, that if items are

13   pulled off a Cellebrite report they are admissible.

14             THE COURT:  That's not admissible truly.

15             MS. EISNER-GRYNBERG:  That's obviously not true.

16             The rules of evidence apply to each piece of

17   evidence and their contents that are put before a Court.

18   It's clearly not the case that so long as any piece of

19   evidence is photographed on a phone and then pulled off the

20   phone by a Cellebrite that the authentication question is

21   cured.  That's not a rule of evidence and that's because

22   evidence is only admissible in terms of what it is being

23   offered to prove.  Here, the Government is offering to prove

24   this training document to prove the truth of the matter

25   asserted therein, that Ms. Salman did receive training.  The

*Oral Argument*                                                50

1    fact that --

2            THE COURT:  Ms. Shami, I think, she's trying to

3    chop up the argument a little bit, right?  She's saying this

4    is a picture that was on her husband's phone and that she

5    proves that, or she tries to prove that, and then she moves

6    on to hearsay.  You're saying she can't chop it up that way.

7            MS. EISNER-GRYNBERG:  Yes.  The fact that it is

8    authentically taken from the phone doesn't do anything to

9    tell us whether the contents are authentic and that's the

10   part that matters.  Imagine this.  Imagine right now I print

11   out the exact template of the training document in this

12   case.  I fill it out with all of the exact same information

13   that is in our case.  And then on the signature, my oldest

14   son's name is Brent, B-r-e-n-t, I sign "Umm Brent," I take a

15   picture of it with my phone and I send it to the FBI.  The

16   FBI plugs Cellebrite into it and pulls it out.  There is no

17   question that it is a photograph of the document that I

18   created.  But there is also no question that it is an

19   inauthentic document.  I, Umm Brent, are not a person who

20   can make a document certifying Umm Katab or Umm Ali to

21   receive an AK-47.

22           THE COURT:  But isn't it an authentic document,

23   there is just no veracity to it.

24           MS. EISNER-GRYNBERG:  No, it's not an authentic

25   document for the purposes that it will be offered in a trial

*Oral Argument*                                                51

1    against Halima Salman, it's fake.  The document is not what

2    it purports to be.  It purports to be a graduation

3    certificate from training.  That's what it's being offered

4    for.  And I, Mia, "Umm Brent," am not authorized make that

5    kind of document.  So it can't reach even the low threshold

6    of authenticity.  And it also then would not meet the

7    threshold for a co-conspirator statement because "Umm Brent"

8    is not or never was in a conspiracy with Halima Salman.  We

9    know that to be true.

10             Your Honor asked the Government, who is

11   Umm Yousef?  How do we know that she is a real person?  And

12   the Government has no answer to that question.  So they

13   can't prove that the defendant was written by a person that

14   they don't know to even exist, it's entirely circular.

15             THE COURT:  I think she says that Umm Yousef has

16   signed other documents that had the insignia.

17             MS. EISNER-GRYNBERG:  Right.  That also doesn't

18   make this document any more likely to be true.

19             THE COURT:  Are you saying Umm Yousef is a real

20   person?

21             MS. EISNER-GRYNBERG:  Who knows?  It might be a

22   fictitious person who people in this area sign the document

23   as.  Or she might have been a real person, which the

24   Government has not established, who signed the other

25   documents and then not Umm Yousef signed this one.

*Oral Argument*                                    52

1          Let's go back to my example.  I, Mia

2    Eisner-Grynberg, see a document signed by Umm Yousef.  I

3    say, okay, now I know when I make my fake document,

4    Umm Yousef is one of the people authorized to sign.  So I

5    write Umm Yousef or I trace Umm Yousef.  My document is not

6    true, it's both inauthentic and it's still hearsay because

7    the declarant in the case is not actually Umm Yousef.  The

8    declarant is me.  Just because I write "Umm Yousef" on it

9    doesn't prove that Umm Yousef, an actual person if she is

10   one, was actually the declarant.  And the Government is

11   offering no evidence, zero, that Umm Yousef is actually the

12   declarant of this document.

13          The Government is saying that this document was

14   made by a person that they don't know who it is.  They don't

15   know if she is real.  They just said they don't know where

16   it was made.  They said they don't know where it was made.

17   But the Court can trust it because it was found on a phone.

18   That eviscerates both authenticity and hearsay.  The

19   document is made, as the Court pointed out, by a declarant.

20   The declarant is proffered to be Umm Yousef.  Umm Yousef is

21   proffered to be, we don't know.  If instead of Umm Yousef it

22   said "Jane Doe," we would be in exactly the same position.

23   We have no idea who this person is even if this is a person.

24          If, for example, Ms. Salman's -- somebody in

25   Ms. Salman's life made this document and that person then

*Oral Argument*                                             53

1   was the true declarant and they signed "Umm Yousef," we

2   would be in exactly the same position that we are here.  And

3   that person would not have been in a position to speak on

4   her behalf to certify the truth of the matter asserted.

5         The idea that we should turn to §807 is frankly

6   absurd.  §807 is to be used only in the most trustworthy

7   circumstances.  That's what the Second Circuit said in

8   *Parsons versus Honeywell* that the Residual Exception would

9   be very rarely used only in exceptional circumstances.

10  Those are where the authenticity is least in question where

11  we're certain that the document is real and there's just a

12  question about the truth declared by this declarant.  That's

13  the opposite of the situation that we're in here.

14        When we have myriad questions about whether the

15  document is real and the defendant concedes they have no

16  idea who wrote it, and if the person who wrote it is even a

17  real person, that would be the last place we would use the

18  Residual Exception rather than here.

19        Just to last point out.  The Government has just

20  stated that they have corroborating evidence for 900 other

21  women who signed a sign-up sheet to attend this training.

22  Notably absent from that is Ms. Salman.  When we said we

23  think there should be a sign-up sheet or a roster, that was

24  our supposition based what we've seen in other cases.

25        Now, the Government now tells us that that's true

*Oral Argument*                                      54

1    and she is not on here.  So, again, that's yet another

2    reason to doubt the authenticity of this document.

3            MS. SHAMI:  Your Honor, I would like to respond to

4    a couple of these points.  I also found a case that said

5    that you can rely on the hearsay statements themselves.  So

6    at least I have that.  I would like to provide to your

7    Honor.

8            There is a Supreme Court case *Bourjaily versus*

9    *United States*, 483 U.S. 171.  In making a preliminary

10   factual determination of these elements, the Court may

11   consider the hearsay statements themselves; however, they

12   are unreliable.  For such statements to be admissible, there

13   must be some independent corroborating evidence of the

14   defendant's participation.  And the Government submits that

15   there is.

16           Regarding the quote, sign-up sheet, I don't

17   believe that I characterized it as a sign-up sheet.  I

18   characterized that there is evidence on a drive that will

19   show that over 900 women sought to sign up and that I

20   cabined the specific time and also I believe, and if I

21   haven't, I'll cabin it in right now.  These are sign-ups in

22   Raqqa.  The defendant has indicated that she was not in

23   Raqqa.  So the fact that her name is not going to be on it

24   is not dispositive of anything.  It is dispositive of the

25   fact that she was not in Raqqa.  So it's not a fake document

1   showing that she's on a list that she otherwise couldn't be

2   on because she was not in that location.

3          And to return to the defendant's example of if she

4   created a document on her own phone and signed it.  Your

5   Honor is absolutely right, it would be an authentic document

6   on her phone.  But there is no corroboration for a Mia

7   Eisner-Grynberg to sign her son's name on a document and

8   purport it to be a training document.  However, a woman who

9   traveled to ISIS territory with her parents.  Who turned 18.

10  Who married an ISIS fighter.  Who went to live with the ISIS

11  fighter.  Who took up arms and practiced on an AK-47.  Took

12  pictures of herself with ISIS.  Who socialized with ISIS

13  supporters.  Who also, while in the camps, continued to

14  socialize with ISIS supporters and demonstrate her own

15  support of ISIS by, and I'll reference here the chat that

16  the Government referenced in its defense, excuse me, not the

17  defense, the detention arguments that have thus subsequently

18  been produced to the defendant showing that she joined a

19  chat, or was added to a chat, that had extremist content.

20  The defendant was in ISIS territory, married to an ISIS

21  terrorist; the daughter of an ISIS terrorist; taking

22  pictures in front an ISIS flag; practicing with an AK-47;

23  arrested two days before Baghouz fell where only the

24  die-hard ISIS supporters and fighters were.

25          There is sufficient corroborating evidence to

*Oral Argument*                                                56

1   demonstrate that the document found on her husband's phone

2   is authentic.  Unlike a Mia Eisner-Grynberg document that is

3   on her phone sitting in Brooklyn being offered to the FBI

4   for reasons unknown.

5              Thank you, your Honor.

6              MS. EISNER-GRYNBERG:  I'll clarify.  I'm not

7   Halima Salman.  In my example, I'm Umm Yousef.  I cannot

8   certify that Halima Salman went to my training because there

9   was no training held by me.  And I'm not an appropriate

10  person to be making that declaration.  Just the same a

11  Umm Yousef who the Government concedes may not even be a

12  real person.

13             THE COURT:  Thank you.  That clarified a lot.

14  Maybe.

15             Let's move on to ECF 76, the NMEC database.

16             Mr. Price, if you want to make any additional

17  arguments in addition to your briefing and then I think I

18  may have a few questions for you.

19             MR. PRICE:  Yes, your Honor.  Good morning.

20             With respect to the NMEC motion here, the Court

21  needs to answer two questions:

22             First, was querying NMEC a separate Fourth

23  Amendment search?

24             And second, were those queries reasonable?

25             We are not, right now, at a point where we can

*Oral Argument*                                               57

1    actually have that argument.  We do not know what queries

2    the Government ran.

3              We don't know --

4              THE COURT:  I'm sorry to cut you off.  Let me ask

5    you preliminarily.

6              I believe the parties are conferring about some

7    discovery issues in defendant's motion to compel.  Should I

8    be holding this motion in abeyance pending that motion to

9    compel and whether some of the issues are going to be

10   resolved?

11             MR. PRICE:  Yes, your Honor.

12             So, as background, the defense has narrowed our

13   discovery requests with respect to NMEC.  We sent those to

14   the Government.  We are waiting for a response from the

15   Government to those more narrow requests.  We have not yet

16   received one except that we are scheduled to have a meet and

17   confer tomorrow afternoon.

18             The issues there, as we spoke about the last time,

19   relate to the database itself.  You know, which database was

20   searched?  What's in it?  What were the parameters of that

21   search?  That goes to the first question that the Court has

22   to answer.

23             Was this database so big and different from

24   searching, say, just a single cell phone that searching it

25   amounts to a Fourth Amendment event.  So we need additional

*Oral Argument*                                    58

1   information from the Government about the database itself to

2   answer the first question.  The second question, assuming

3   that the Court finds.

4           THE COURT:  Sorry.  To put a finer point on it.

5           So you don't think that whatever the Government

6   comes back with tomorrow, you don't think that's going to

7   resolve the motion then?

8           MR. PRICE:  I don't think, whatever the Government

9   comes back with, it will not resolve the substantive motion.

10  We will then presumably argue about whether the facts that

11  they disclosed meet the standard or not.

12          THE COURT:  I see.  Okay.

13          So first you need to know whether this database is

14  a dragnet?

15          MR. PRICE:  So that is question number one.  We

16  have a little bit of that information from the *Musaibli*

17  case.  We know, for example, that the NMEC database is 66

18  times the size of the §702 database in *Hasbajrami*.  We know

19  that it contains more and different sensitive types of

20  information than just the e-mails in the §702 database.

21          I think based on that, this court could conclude

22  that querying was a Fourth Amendment event.  The next

23  question is whether those queries were reasonable because

24  they were, of course, done without a warrant.  The

25  reasonableness, the Fourth Amendment standard, kicks in at

*Oral Argument*                                          59

1   that point.  And, as in *Hasbajrami*, as the Second Circuit

2   remanded back to Judge DeArcy Hall to determine, it is

3   necessary to examine those queries themselves to know what

4   they are in order to determine whether they were, in fact,

5   reasonable.  We don't know what the queries were in this

6   case, we are asking for that information.  We would also

7   like to know what was returned in response to those queries.

8   We do not have that information either.

9        THE COURT:  Would you agree that if the queries --

10  and we're going to obviously ask the Government questions as

11  well -- but would you agree that the queries targeting

12  another person?  I seem to remember the Government saying

13  that it wasn't Ms. Salman's name at least, I have questions

14  if it was other searches that perhaps were related to her.

15  But do you agree that the queries were targeting another

16  person and were not Ms. Salman's name related to Ms. Salman,

17  those queries would not violate the Fourth Amendment?

18        MR. PRICE:  No, your Honor.

19        THE COURT:  Okay.

20        MR. PRICE:  So, even in *Hasbajrami*, some of the

21  queries were not for Mr. Hasbajrami.

22        THE COURT:  How do you know that?

23        MR. PRICE:  In the Second Circuit opinion and in

24  the E.D.N.Y. opinion.

25        THE COURT:  I thought in Judge Dearcy Hall's

*Oral Argument*                                60

1   opinion, she redacted the queries.  Was there something else

2   in there that which you know what the queries were?

3          MR. PRICE:  It does state that the supplemental

4   record consists of -- sorry.

5          Nonetheless, because redacted use terms associated

6   with defendant in databases containing Section 702 acquired

7   information, these queries are subject to the Court's

8   foreign intelligence exception analysis.

9          THE COURT:  Can you give me a pincite?

10          MR. PRICE:  I can in a moment.

11          It's going to be in the E.D.N.Y. 2025 opinion; so,

12   at Page 11.  So that's WestLaw, 2025 WestLaw 447498 at Star

13   11.  It describes the queries that were Remen Hasbajrami

14   with a lot of redactions; however, it does become clear that

15   they were searching for terms other than Mr. Hasbajrami's

16   name.  And the Court finds that those queries are still

17   subject to its Fourth Amendment analysis because they

18   concern Mr. Hasbajrami; they were about Mr. Hasbajrami.

19          THE COURT:  That was included in my question.  I

20   said, I think my question was, would you agree that the

21   queries were targeting another person.  So they were not

22   Ms. Salman's name or related to Ms. Salman then those

23   queries would not violate the Fourth Amendment.  So here it

24   seems like they were related to Mr. Hasbajrami if they were

25   not related to him or to Ms. Salman do we not have a Fourth

*Oral Argument*                                    61

1   Amendment issue.

2           MR. PRICE:  The queries need to be related to

3   Ms. Salman involved in the investigation of her sure.

4           THE COURT:  What does that mean?  This may be --

5   what does that mean to be related to?

6           MR. PRICE:  I'm speculating here because I don't

7   know what queries they ran.  But if they ran queries for her

8   family members seeking information about her, that would be

9   about Ms. Salman.

10          THE COURT:  So if they searched her husband's name

11  or they searched her father's name?

12          MR. PRICE:  Correct.

13          THE COURT:  You would say that that's related to

14  Ms. Salman.

15          MR. PRICE:  Yes.

16          THE COURT:  Okay.

17          MR. PRICE:  Again, we are speculating about what

18  those queries were at that point.  We don't actually know

19  what the Government was searching for.  But, yes, the

20  question then that the Court will ultimately have to answer

21  is:  Were those warrantless queries of this database

22  reasonable?

23          And *Hasbajrami*, Judge DeArcy Hall found that

24  reasonableness in this context means get a warrant.  That

25  the Government had every opportunity in the many years that

*Oral Argument*                                                      62

1   transpired between the collection and the use to obtain a

2   warrant.  Here, that was four years.

3            The initial collection of these phones was in

4   2019.  The Government says that it ran its first NMEC search

5   some time in the second half of 2023.  It is, I think,

6   entirely reasonable, as Judge Dearcy Hall found, to require

7   the Government to get a warrant at some point in those four

8   years.  Especially -- this is not information that was being

9   intercepted in real-time and acted upon.  It was data that

10  was seized, put into a massive database where it sat for

11  four years until the Government went on its fishing

12  expedition.  This is an, in our understanding of this, a

13  warrantless search of data from and about Ms. Salman through

14  that query.

15           THE COURT:  Can I confirm?

16           So I understand you to be saying, given the size

17  of the database, and assuming for now that the queries were

18  Ms. Salman's name or related to Ms. Salman that that's the

19  Fourth Amendment violation.  And I want to confirm that you

20  take this position even if Ms. Salman was in Syria at the

21  time of the search.  I believe in *Hasbajrami*, he was in the

22  United States in another, I think, perhaps, who knows,

23  important difference is that the information that was seized

24  and funneled into the database was also seized in the

25  United States where this information, as I understand it,

*Oral Argument*                                        63

1   was seized internationally and then perhaps housed

2   domestically.  So is this query of the database of the

3   search would that be a domestic search or a foreign search.

4           Yes, so that's my...

5           MR. PRICE:  It's our opinion here it's the query

6   that counts.  And the query here was done, I believe, in

7   Maryland.  That's where NMEC is located.  But the Fourth

8   Amendment event happened here in the U.S., in Maryland and

9   not abroad.

10          THE COURT:  So you would say it's a domestic

11  search even if the information was gathered overseas and, I

12  guess, it's housed in servers in Maryland perhaps.

13          MR. PRICE:  We're not contesting the

14  constitutionality of the initial collection.

15          THE COURT:  I agree.  I understand that.

16          I think I still need to determine whether it's a

17  domestic search or a foreign search.  And I'm not sure from

18  *Hasbajrami* that it matters just where NMEC is located.  If

19  it's your argument that all that matters is where NMEC is

20  located, okay, but I'm not sure from *Hasbajrami*.

21          MR. PRICE:  It matters where and when the search

22  occurred.  And it was a domestic law enforcement query done

23  in the United States targeting a U.S. citizen.

24          THE COURT:  Does it matter if a U.S. citizen

25  wasn't in the U.S.?

*Oral Argument*                                          64

1          MR. PRICE:  I do not believe it matters to the

2     analysis.

3          THE COURT:  Okay.

4          MR. PRICE:  I would also add, your Honor, as far

5     as the timing goes here that one of the things that the

6     Second Circuit was concerned about in *Hasbajrami* was the

7     Government going back and conducting a fishing expedition

8     across this massive database here.  They draw a distinction

9     and they say, you know, we would treat this differently.  If

10    it was, say, happening in real-time, if there were

11    interceptions, if information was being passed back to the

12    FBI for purposes of investigation.  But here we know that

13    that was not the case.  The marriage certificate was

14    obtained by the Government in 2019.  They did not have any

15    derogatory information about Ms. Salman by their own

16    admission until February of 2021.  That was disclosed, I

17    think, yesterday in the Government's production.

18          So what we're dealing with here is not some sort

19    of continuing ongoing investigation, there was a -- there

20    was a collection.  There was no supposition that Ms. Salman

21    was engaged in ISIS-related activity at that time.  It

22    wasn't until years later that the Government went back,

23    queried this database for her and for information about her,

24    that they obtained this derogatory information.

25          So that, I think, puts us squarely in the fishing

*Oral Argument*                                              65

1  expedition category as opposed to, say, the police officer

2  going back to check the evidence locker.  That's the

3  distinction that the Court is trying to make in *Hasbajrami*

4  when deciding whether a query of the database is a Fourth

5  Amendment search saying, is it more like an officer going

6  back to the evidence locker to check one piece of evidence

7  that they've already seized?  Or is digital different,

8  right, combining, you know, hundreds of thousands of devices

9  in a database that is known to collect information about

10  U.S. citizens.  Is that different than just going back to

11  the evidence locker to check?

12          We submit that it is here in the same way that

13  searching the §702 database later on for domestic law

14  enforcement purposes is its own Fourth Amendment event.  I

15  do believe that we need to have additional information from

16  the Government about the queries that they ran.  Whether

17  that is a record of the searches that they performed and the

18  results.  Or, as in *Hasbajrami*, declarations from the

19  Government about what searches they ran and what those

20  results were.  Or we can have live testimony from anybody

21  who ran those searches?  But we're going to need to know

22  what those searches were in order to assess their

23  reasonableness.

24          THE COURT:  Thank you.

25          Ms. Shami.

*Oral Argument*                                                    66

1           MS. SHAMI:  Yes, your Honor.

2           So I think the fundamental flaw in the defendant's

3      argument is this superimposition of *Hasbajrami* on to Fourth

4      Amendment law and trying to supplant black letter Fourth

5      Amendment law in place of a statutory framework that has its

6      own definition of a breached person.  That has its own

7      minimization requirements.  That has its own requirements

8      for what the FBI must do to be able to query.  And that by

9      Judge DeArcy Hall's own recognition has changed since the

10     time of *Hasbajrami* making the Court's decision completely

11     siloed to only the facts of that case where she declined to

12     reach any other case or to indicate any applicability.

13          I think, as a baseline, the defense seems to be

14     that if there is a database, and there is a search of it,

15     then that is a Fourth Amendment event and that is not the

16     case.

17          THE COURT:  I don't think that's what he's saying.

18          MS. SHAMI:  It is essentially the case because, in

19     the first instance, the Government argues here based on the

20     collection that the search took place abroad.  The search is

21     the extraction of the phone that took place in Iraq.  There

22     is no question that the extraction took place in Iraq and

23     the extraction is the search.  The extraction is what takes

24     the information off of the phone and then it is provided to

25     NMEC to put into a database.  That is no different than an

*Oral Argument*                                                    67

1    individual who is picked up by the police and then has

2    information put into the N.Y.P.D. database and that N.Y.P.D.

3    database can be searched later on, has this person been

4    arrested before?  That information was already provided, it

5    goes into the database.  It is like a DNA database in the

6    same way.  That database can always be queried because the

7    information in it was seized through lawful means.

8            Here, it was seized lawfully because -- for so

9    many reasons.  The first is that it was seized abroad from a

10   non-U.S. citizen.  And even if he was a U.S. citizen, the

11   Fourth Amendment not apply extraterritorially whether it's a

12   U.S. citizen or a non-U.S. citizen.  The SDF, a separate

13   foreign entity, seized the phone from the defendant's

14   husband and then provided it to the United States and

15   Coalition Forces who then, overseas in Iraq, extracted it,

16   conducted the search in Iraq, and then provided that to

17   NMEC.

18           So, in any way that you frame it, the subsequent

19   querying is similar to going back to the evidence locker

20   because the evidence was provided to NMEC by a foreign

21   nation via Coalition Forces.

22           THE COURT:  I'm wondering if we're miss -- you're

23   saying that extracting the information is a search?

24           MS. SHAMI:  Yes, your Honor.

25           THE COURT:  What is the definition of a search?

*Oral Argument*                                                68

1          MS. SHAMI:  Well, the search here is, like, the

2     search and seizure of the phone.  So the seizure of the

3     phone is when it was physically seized from Abu Ali's

4     person.

5          THE COURT:  Yes.

6          MS. SHAMI:  The search is the extraction of the

7     phone.  Taking the information from the phone and being able

8     to then search it because, right, the Government did search

9     the phone.  DoD did search the phone and then provided it to

10    the Intelligence Community.

11         And actually I think --

12         THE COURT:  What does that mean "the DoD searched

13    phone"?  Just that they extracted it, or did somebody

14    actually look at it?  Yes?

15         MS. SHAMI:  Yes.  So, again, the purpose of why

16    DoD collects devices abroad, as outlined in the Government's

17    brief, is to be able to mine it for intelligence

18    information.  It is critical when you are conducting a

19    military operation against a terrorist organization to be

20    able to get intelligence from what you are seizing.

21         And so, that is why in 2019, the FBI received

22    information about the marriage certificate because there was

23    an ongoing mining of the information seized abroad and being

24    conducted and searched abroad.  But the extraction itself is

25    the full search being provided to NMEC so that it can also

*Oral Argument*                                69

1    be used by law enforcement which is consistent with the

2    statutory language related to DoD providing to law

3    enforcement information evidence seized abroad.

4            THE COURT:  So the entire phone isn't extracted

5    and then going to NMEC.  It's extracted, it's evaluated, and

6    then what they deem important is put into NMEC?

7            MS. SHAMI:  No, the full phone.  It has to be

8    bit-for-bit Gold Copy Extraction.  That way it's

9    forensically sound.

10           THE COURT:  How is that a search rather than just

11   an extraction and you're storing it in a database at NMEC?

12           MS. SHAMI:  Your Honor, extraction is the search.

13   When the Government extracts information from a phone, that

14   is part of when we get a search warrant, we have to do that,

15   right?  If we have a phone in our possession, we cannot

16   simply extract it.  Part of the extraction is covered by the

17   search warrant.  And then the seizure, what we're searching

18   for specifically, is what we are ultimately are authorized

19   to search for and seize.  But the extraction itself can't

20   happen without authorization.  But in the circumstance

21   here --

22           THE COURT:  In *Hasbajrami*, the Second Circuit says

23   there is an additional Fourth Amendment event when you query

24   what was seized.  So why is that not a query?  Or why is

25   that query not a search?

*Oral Argument*                                                    70

1          MS. SHAMI:  Yes, your Honor.

2          It's because the way that *Hasbajrami* collected the

3     information is far different.  Your Honor hit it on the head

4     when you indicated this is partially a domestic collection.

5     The collection that is described in *Hasbajrami* is quite

6     specific as to what's happening.  It is very different than

7     the seizure of physical evidence:  The phone, the device,

8     the laptop.  And the extraction of the information abroad.

9     It is not real-time, as the Second Circuit provided,

10    real-time collection of communications which is what I think

11    the Second Circuit had made that dividing line that this

12    §702, in their understanding, accomplishes this particular

13    outcome.

14          Whereas, we're talking about devices.  Devices

15    have nothing to do with Hasbajrami; it has nothing to do

16    with §702.  It has nothing to do with FISA.  The imposition

17    of that statutory framework on a device is inapposite.  The

18    Court should be applying the Fourth Amendment precedents

19    which is that if you do not have standing, and the defendant

20    doesn't have standing, it was not her phone.  She did not

21    assert it vicariously.  The phone belonged to her husband.

22          I think it's also important to note how the

23    information about the defendant's criminality came to light

24    because the defendant characterizes it as a fishing

25    expedition.  But the Government's brief shows how

*Oral Argument*                                                        71

1    information basically trickled in.  They received the

2    marriage certificate.  They then saw the Kem photo book that

3    showed her with pictures of her with an ISIS flag, with an

4    AK-47.  They then requested the Gold Copy.  They saw --

5    there were documents they could not understand because they

6    were either in Arabic or German and sent them for

7    translation.

8            And then subsequently, they received a translation

9    as part of another search that did not name the defendant.

10   And they were able to see, in fact, the defendant received

11   military-type training from ISIS.  It was not a fishing

12   expedition to find crime by her.  It was the fact that

13   evidence existed on a device that was extracted lawfully

14   abroad of a device that was seized by a foreign partner, and

15   by "foreign partner," I mean a foreign military partner and

16   nothing to do with any kind of agency which is one of the

17   factors that the Government notes in its brief would be

18   relevant but is not present here because the SDF is a

19   separate entity from U.S. law enforcement.  U.S. law

20   enforcement did not direct SDF to do anything.  And apart

21   from that, then was able to look at the information.

22           But I'll also note what the Government noted in

23   its brief which is that the Fourth Amendment doesn't require

24   a warrant in every single instance.  Reasonableness is the

25   touchstone of the Fourth Amendment.  There are a number of

*Oral Argument*                                        72

1   instances where a search is permitted without a warrant.

2           As the Government notes in its brief, stops under

3   *Terry*, they are Fourth Amendment events but those events do

4   not require a warrant.  A border search does not require a

5   warrant.  The touchstone is reasonableness.  And here, it

6   was reasonable for the Government to search a database that

7   contains extractions.  The search results received from

8   abroad of a non-U.S, or even a U.S. citizen, but the

9   defendant was not -- was not her phone and to search that

10  information.  And even if the Court determines that it was

11  not appropriate, the good-faith exception would still

12  capture all of this because the Government has been

13  searching NMEC.  Evidence from NMEC has been submitted and

14  admitted, or presented to be admitted, at trial and it has

15  been found to be admissible.

16          So there was nothing that would put the FBI on

17  notice that there was some kind of inappropriateness to the

18  search.  But, as a fundamental matter, the Government

19  believes that both because the defendant did not own the

20  phone, she was abroad, it was her husband's phone, and

21  because it was seized by a foreign entity, that the Fourth

22  Amendment framework that's applicable to all of those

23  scenarios would find that there was no search here that

24  required a warrant.

25          The only way that the defendant gets to the point

*Oral Argument*                                                    73

1   of a warrant is by superimposing FISA and §702 on to the

2   Fourth Amendment.  And that's just not appropriate here

3   because the definition of "aggrieved person" in FISA is far

4   different than how the Fourth Amendment defines it.

5           If you have any questions, I'm happy to answer

6   them but that is my response to the defendant's arguments

7   here.

8           THE COURT:  I do have questions.  Just a moment.

9           Mr. Price, I am still not clear.  Well, you just

10  said because the definition of an aggrieved person is

11  different.  But I am still -- the distinction you are trying

12  to make between what happened here and what happened in

13  *Hasbajrami* is not clicking for me.  They said that the

14  database was a dragnet.  They got redacted versions of what

15  the queries were to determine.  Judge DeArcy Hall redacted

16  versions of the queries to determine whether the Fourth

17  Amendment applied to the search, meaning, to me, that the

18  search was using those queries of the database which was a

19  dragnet to search for information concerning Mr. Hasbajrami

20  or whatever was searched.

21          That is what I understood *Hasbajrami* to be saying.

22  But now I think you're saying that we don't look at

23  *Hasbajrami*, we just look at the Fourth Amendment because the

24  definition of an aggrieved person is different.  But that's

25  based on Ms. Salman being in Syria.  Based on the search or

*Oral Argument*                                    74

1   the extraction happening overseas.  But it seems in

2   *Hasbajrami* they're saying that it is the collection of data

3   which constitutes a dragnet that is important.  I don't know

4   that it says where the collection happened.  That's why I

5   was asking the defendant, defense counsel, as well.  Does it

6   matter where the extraction happened or does it matter where

7   it's stored?  What matters here?

8            MS. SHAMI:  I think that it does matter, your

9   Honor.  I think domestic law acknowledges that there is a

10  differential perspective when you're talking about

11  prospectively seized information whether it's a Title III

12  wiretap or a FISA or a §702 versus something that exists on

13  a device that the Government has or, here, in this instance,

14  the SDF has seized and has turned over to the Government.

15  These are very specifically different circumstances.  And

16  the defendant only is able to get to the point of querying

17  is a problem by first stating that the database itself

18  matches on to what was at issue in *Hasbajrami* but that's

19  just not applicable.

20           The database in *Hasbajrami* is different than the

21  NMEC database.  The NMEC database contains information

22  captured abroad and the Supreme Court and the Second Circuit

23  are very clear that evidence abroad is treated differently,

24  it just is.  It is different than domestic collection.  And

25  apart from that...

*Oral Argument*                                        75

1          THE COURT:  So it doesn't matter if the database

2     is a dragnet.  If all the information that's in it is

3     abroad, then you can search whatever you want to search?

4          MS. SHAMI:  Your Honor, it's not that it's all

5     abroad.  It's the question of how it was seized.  The

6     Second Circuit and the Supreme Court have noted that if the

7     seizure happens abroad, and it's done by a foreign entity,

8     and then given over to the United States, that does not

9     violate the Fourth Amendment because the Fourth Amendment is

10    not extraterritorial.

11         THE COURT:  So if you -- if it's seized by a

12    foreign entity, given to the United States, and it's stored

13    in a dragnet database then you can search whatever you want

14    to search?

15         MS. SHAMI:  Yes, your Honor.

16         THE COURT:  Okay.

17         MS. SHAMI:  I obviously wouldn't call it a dragnet

18    database.

19         THE COURT:  You're saying it doesn't matter how

20    much information is in there as long as it's extracted by a

21    foreign entity and given to the United States.

22         MS. SHAMI:  Here, it was seized by a foreign

23    entity and extracted by Coalition Forces in Iraq.  But, yes,

24    effectively everything that happened with respect to the

25    search happened abroad.  The seizure, the extraction, all of

*Oral Argument*                                    76

1    that happened abroad and then it was turned over to the

2    United States.

3          THE COURT:  That's what makes it okay to search

4    it?

5          MS. SHAMI:  Yes.

6          THE COURT:  Okay.

7          MS. SHAMI:  Your Honor, I think here in *Hasbajrami*

8    I want to add the point that this dealt, *Hasbajrami* dealt

9    with a highly sensitive and classified set of information.

10   That is not what's happening here.  There is some

11   transparency as to -- the Government has turned over at this

12   point four devices, soon five devices, of information that

13   was seized.  It's because it was seized, we have the

14   extractions, we're able to search it.  The defendant has the

15   ability to search those devices just as well as the

16   Government does because they have the full Gold Copies.

17         The sensitivity around *Hasbajrami* does not affect

18   the Fourth Amendment interests that the Supreme Court and

19   Second Circuit have otherwise verbalized in a number of

20   opinions about the extent to which the Fourth Amendment

21   requires reasonableness.  And here, the reasonableness

22   standard does not require a warrant.

23         THE COURT:  Okay.  Let me ask you some other

24   questions.

25         MS. SHAMI:  Sure.

*Oral Argument* 77

1        THE COURT:  To clarify, on Page 67 of your

2   opposition, the Government states that:  No evidence would

3   be traced to the queries of NMEC extractions naming the

4   defendant.  I want you to say it plain.  Are you saying that

5   you didn't make any searches related to Ms. Salman, or just

6   that you didn't search her name?

7        MS. SHAMI:  What we're saying is that the

8   Government did search her name.  And that's itemized, not

9   itemized, that's reflected, excuse me, in the search warrant

10  that the Government sought in respect of her G-mail address.

11  The Government noted that it had run searches for her name.

12       The important piece of this is Judge DeArcy Hall

13  did an analysis in *Hasbajrami* where she traced the queries

14  to determine whether or not there was a Fourth Amendment

15  violation that collapsed with the warrant requirement which

16  the Government submits is not the correct way to have

17  analyzed that because the question of reasonableness and

18  whether a warrant is required are separate questions.

19       But putting that aside.  So here, if you were to

20  analyze the queries that returned the inculpatory

21  information, the individuals named in those searches were

22  not the defendant.  One of them was the defendant's

23  husband's real name, Myatollah Nerzad, and the other was

24  another investigative subject.  And so, the question is, I

25  think it's a question that you started with, with respect to

*Oral Argument*                                                    78

1    opposing counsel is:  Does the query matter?  And the query

2    does matter.  The defendant cannot say that she has an

3    interest in the searches of other individuals' names that

4    are not her retrieving information.  Those are separate

5    subjects.  And while they are related to her because they're

6    family, that does not undo the fact that it's not her name,

7    it's not her e-mail address, it's not her Telegram UID.

8    Those are identifiers that would be related to her.  But the

9    names of other people, she cannot drag them into the search

10   and say she has a Fourth Amendment interest in those

11   searches and that therefore that query was inappropriate and

12   violated *Hasbajrami* which, again, is very narrow on its

13   facts to §702, to FISA, and to particularly what happened in

14   *Hasbajrami* prior to the revisions of FISA subsequent to

15   *Hasbajrami's* decision in the Circuit.

16           THE COURT:  What does "related to" mean?

17           MS. SHAMI:  I don't think that the Circuit defines

18   it.  And as the Court notes, there are redactions.  And so,

19   I do not want to suppose what "related" means, I don't know.

20           But I do think that if the defendant is saying,

21   any person who I am related to, if they're searched and some

22   information about me comes out, how does that comport with

23   Fourth Amendment standing?  The defendant wouldn't have the

24   ability to say because it's just not appropriate and it's

25   been rejected.  Well, I sent a message.  I sent an e-mail to

*Oral Argument*                                    79

1   this person and that inculpatory e-mail or inculpatory

2   message sits on his phone and I have some standing to object

3   to a search that doesn't name me on the other person's

4   device.  That's what's happening here.  She has no -- it is

5   not her device and it's not her name being searched.

6              THE COURT:  So you searched her name and nothing

7   came up?

8              MS. SHAMI:  Yes, exactly.

9              THE COURT:  Then you searched her husband's name

10  or the other subject's name and then her information about

11  her did pop up?

12             MS. SHAMI:  Your Honor, the Government has a

13  number of subjects and the Government searches the names of

14  subjects and other identifiers.

15             As the Government noted with the military training

16  document, the photo that we discussed earlier, the

17  defendant's name is not on it.  She is referred to by a

18  kunya that the Government did not know she had until they

19  were able to receive the translation in 2023 and then

20  confirm through G-mail returns and the defendant's own

21  statement that, in fact, it referred to her.  So which is to

22  say that it makes sense that the Government wasn't able to

23  return that document in a search, it didn't refer to the

24  defendant by her name.  It referred to her by a name that

25  the Government did not know until it found the document.

*Oral Argument*                                                    80

1    And as the Government also noted in its brief, even if we

2    knew the kunya, we would not have been able to return the

3    search because it's handwritten Arabic.  It would not have

4    rendered into text searchable Arabic to be able to find it.

5    In the same way that handwriting, someone's script

6    handwriting, if you try to render that into text recognition

7    and search it, you won't be able to get that information.

8            And so, here it just happened that the Government

9    received information showing that an Umm Katab Al Muhajir

10   received military-type training and they were able to

11   connect that kunya to the defendant.

12           THE COURT:  Can you remind me.  Is the Government

13   objecting to disclosing the queries?

14           MS. SHAMI:  Yes, your Honor, we are.

15           THE COURT:  Why?

16           MS. SHAMI:  Your Honor, the searches that the

17   Government conducts, the Government doesn't typically share

18   those nor is it appropriate to share in this instance.  As

19   the Government noted, the searches are done by agents, by

20   the Government, and are just trying to identify information

21   related to a number of subjects.  And so, here, again, as

22   the Government notes, the fact of the matter is that the

23   searches that the Government conducted that retrieve the

24   inculpatory information didn't name the defendant.  The

25   defendant has no entitlement to know all of the Government's

*Oral Argument*                                                    81

1   subjects.

2          THE COURT:  How am I to make a determination if

3   the searches were related to the defendant if you're not

4   disclosing the searches?

5          MS. SHAMI:  I think that sort of puts the cart

6   before the horse because it assumes that the querying has to

7   be evaluated.  And it's only being evaluated under

8   Hasbajrami's framework which is inapplicable here.  The

9   question here is, does the defendant have standing and she

10  doesn't.  The phone was retrieved abroad belonging to a

11  non-U.S. national ISIS terrorist.

12         THE COURT:  I understand.  And I don't mean to cut

13  you off.  But if I disagree with you, that just because it

14  was -- if I disagree with you that the database, as you

15  represent, only contains information extracted by a foreign

16  entity and given to the U.S. and therefore the Fourth

17  Amendment doesn't necessarily doesn't apply, I need to know,

18  and we can assume that it's a dragnet, I think maybe the

19  defendant is saying they need more information to confirm

20  that it's a dragnet.  If it's a dragnet, I need to know what

21  the queries were to understand if there was a Fourth

22  Amendment search, or there was a search that implicates the

23  Fourth Amendment.

24         MS. SHAMI:  I think your Honor, again, that

25  assumes that four steps out, we get to a place where we are

1  describing the NMEC database as a dragnet; and again,

2  imposing the *Hasbajrami* framework.  I think the gating

3  question is, how was the information seized and searched

4  abroad?  That is the operative question.  It was seized

5  abroad.  The Fourth Amendment does not apply

6  extraterritorially.  Whatever the Government received from a

7  foreign partner, the Government is able to search.  It does

8  not need to come back and get a warrant.  That is

9  longstanding Supreme Court and Second Circuit.

10          And again, I also want to note that much of the

11  litigation in *Hasbajrami* was classified and ex parte and I

12  think that the classified portions, obviously, would provide

13  more information but that's not what we have here.

14          And so, it's also trying to not only shoehorn what

15  should just be a straight Fourth Amendment analysis into

16  *Hasbajrami* but it's the redacted version of *Hasbajrami*.  And

17  I don't know how that sort of gets done because it is not

18  the full picture.  And as both the Circuit and

19  Judge Dearcy Hall noted, the facts of *Hasbajrami* are just

20  entirely unique to themselves.  And the Government's view is

21  that the Fourth Amendment, with respect to standing, with

22  respect to foreign searches, with respect to

23  non-U.S. citizens, all of those things dictate that there

24  was no Fourth Amendment violation here.

25          THE COURT:  Okay.  Thank you.

*Oral Argument*                                                    83

1           MR. PRICE:  If I may?

2           I think the Government's focus here on collection

3     is absolutely misplaced.  There is no question that there is

4     a difference between Section 702 surveillance and the

5     collection that took place here but that's irrelevant.

6           The Second Circuit determined that the §702

7     Program was lawful at the time.  We are not challenging the

8     initial collection here.

9           I will note that the NSA surveillance, according

10    to *Hasbajrami*, the Second Circuit said that it occurred

11    where those communications were made from which would be

12    abroad in that case.  But what we're talking about is the

13    step beyond collection.

14          THE COURT:  Sorry.  I understand your argument to

15    that point.  But I just want to confirm I'm understanding

16    your argument.

17          The Government seems to be saying if it's seized

18    abroad by a foreign entity necessarily no Fourth Amendment

19    issue or incident you're saying.

20          MR. PRICE:  With respect to the initial seizure,

21    that is correct.  Can the Government go back and search that

22    information at will as part of a massive database, that is a

23    big no.  That's the position that *Hasbajrami* explicitly

24    rejects and they do so for a number of reasons.  They lay it

25    out and they talk about the fact that courts are

*Oral Argument*                                                        84

1    increasingly recognizing the need for additional probable

2    cause or reasonableness assessments to search and to support

3    a search of information already lawfully collected.

4              I'm talking specifically about *Reilly versus*

5    *California*.  Sure, you can seize the cell phone but you need

6    a warrant to actually search the contents.  The Court looks

7    to the vast technological capabilities that this supported

8    this database.  The size of it.  The ability to have in that

9    case 250 e-mails annually, here we have 66 times that

10   amount.  That that querying makes it easier to target

11   U.S. persons.

12             So the idea is that in Section 702 world and

13   *Hasbajrami*, the Court was willing to overlook the idea of

14   incidental collection of information about U.S. citizens for

15   foreign intelligence purposes.  It's a different story when

16   you go back and query a database full of that information

17   because all of the bits and pieces that you are collecting,

18   you know, hundreds of thousands of cell phones.  As the

19   Second Circuit says, you can stitch enough information

20   together about a person as if you had targeted them in the

21   first place.

22             And so, it's saying digital here is different.

23   This is not like a traditional cell phone search, it is

24   something different, and it is beyond collection.

25   Collection is not at issue here.  We are not trying to map

*Oral Argument*                                             85

1   anything on to FISA.  FISA is irrelevant to this case.  The

2   question is the database of that collected material.  And

3   the Second Circuit is saying you do not get to search at

4   will a massive database like that without additional

5   probable cause or reasonableness.

6           The search in this case.  In the *Musaibli* case,

7   the Government puts on a witness who talks about how it is

8   very important for the Government to have all this

9   information stored for a later query.  They are not looking

10  at in real-time.  This is not supporting an ongoing

11  investigation but it is meant as reference, as a library, to

12  go back and search later and that is what happened here.  It

13  is also what the Second Circuit was actually concerned about

14  in *Hasbajrami*.  They're saying, we have more of a concern if

15  this is getting stored and searched later as opposed to

16  being passed along to the FBI in real-time.

17          So, here, we're dealing with a search of that vast

18  library of data.  And the Government does not get to do that

19  at will under *Hasbajrami*.  That much is clear.

20          Did your Honor have any other questions?

21          THE COURT:  Did you have a response to the

22  Government's argument regarding the good-faith exception?

23          MR. PRICE:  Yes.

24          The searches here were conducted in 2023.

25  *Hasbajrami* was decided by the Second Circuit in 2019.  I

*Oral Argument*                                                    86

1   think there was more than enough time between the search and

2   that decision coming down for the Government to recognize

3   that conducting a database search of even lawfully seized

4   material like this could potentially present a Fourth

5   Amendment concern.

6           The Second Circuit did not limit its discussion to

7   Section 702 except when, look, when we're dealing with

8   databases that are this massive, this is the analysis that

9   we have to go through.  It wasn't dependent on the

10  particulars of Section 702.  It was looking at, well, do we

11  have to have a different standard if we have, if we have a

12  database this massive as opposed to just going back and --

13  going back to the evidence locker and searching an

14  individual phone.  Are we going to treat this differently?

15  And the Court said, yes, absolutely we are.  And I think

16  that logic holds true one hundred percent here.  We're not

17  talking about the initial collection about the lawfulness of

18  that collection.  The question is, is the database

19  sufficiently similar?  Does that database contain

20  information about U.S. citizens?  Is it large enough to pose

21  a privacy problem if the Government were to be able to just

22  search it at any point in time?  And the Second Circuit

23  absolutely rejected the Government's position here that they

24  can go back and lawfully search anything that they had

25  lawfully collected.

*Oral Argument*                                        87

1          THE COURT:  If they searched her name and

2     nothing -- none of the evidence they're going to use came up

3     that they searched something else, and information about her

4     did come up, you would still say there is a Fourth Amendment

5     issue to exclude that --

6          MR. PRICE:  Yes.

7          THE COURT:  -- evidence?

8          MR. PRICE:  In *Hasbajrami*, in Judge DeArcy Hall's

9     opinion, obviously, we have limited information about the

10    queries but its says it used terms associated with

11    defendant, with Hasbajrami.  So other than his name.  And I

12    think that is what we have here in terms of searches for

13    family members of Ms. Salman.

14         MS. SHAMI:  Your Honor, I have three brief points

15    in response because they need to be responded to.

16         *Hasbajrami* does not stand for the principle that

17    as long as there is a database, the Government needs to get

18    a search warrant.  The Government maintains databases like

19    N.Y.P.D., FBI, DNA.  The Government does not need a warrant

20    to query a name or a DNA match against the DNA database.

21    This would impose a warrant requirement on every single law

22    enforcement database that simply does not exist.  The

23    holding of *Hasbajrami* is not that broad.

24         The holding of Hasbajrami is specific to FISA and

25    §702 because FISA and §702 implicate the most sensitive data

*Oral Argument*                                                        88

1    and a very controversial technique in collection.  And the

2    sensitivities and the application completely scoped why the

3    Court ruled the way that it did in the Second Circuit and

4    how Judge DeArcy Hall applied that ruling in reaching the

5    queries with respect to *Hasbajrami*.  And, again, even noted

6    that her decision has no precedential value apart from the

7    case at hand, it is because it is very specific.  And so,

8    the idea that it should be applied in this way to any

9    database as long as it contains information about

10   U.S. citizens.  DNA databases have information about

11   U.S. citizens, certainly they do, and its biometric

12   information about them, DNA information about them.

13   Information that potentially could connect them to other

14   individuals.

15         The notion that simply a database means there

16   needs to be a warrant does not comport with the Fourth

17   Amendment nor does it comport with *Hasbajrami*.

18         THE COURT:  I guess there is no need for us to

19   keep going back and forth.  But *Hasbajrami* focuses on the

20   size and the scope of the database.  But you're saying it

21   doesn't matter how large the database is, that wasn't the

22   focus, the focus was on the sensitivity of the database?

23         MS. SHAMI:  The sensitivity informed the concern

24   with respect to the size and the scope.  But the sensitivity

25   was paramount, among all other factors, as to what was being

*Oral Argument*                                           89

1    collected.

2          And, your Honor, I do think that the defendant's

3    concession that the seizure abroad cannot be challenged is

4    just -- is reality.  The Supreme Court has been very clear:

5    The Fourth Amendment's warrant requirement does not apply to

6    the search and seizure by United States agents of property

7    that is owned by a nonresident alien and located in a

8    foreign country.  And that's *United States*

9    *v. Verdugo-Urquidez*, V-e-r-d-u-g-o hyphen U-r-q-u-i-d-e-z,

10   494 U.S. 259 in a 1990 case.

11         Here that is what happened...

12         THE COURT:  I think we all agree, I think, that

13   the search or the seizure and the extraction isn't the

14   issue.  The issue is when you put it all together into this

15   database that is massive.  Well, we're presuming massive.

16   If it is a massive database, can you then go back and do a

17   search without a warrant?

18         MS. SHAMI:  Again, the question is just limited to

19   the question of a database.  And the Government submits that

20   a database is not the hallmark of whether or not a search

21   requires a warrant.  The Government searches DNA databases

22   without a warrant.  The FBI searches its own databases

23   without a warrant.  It's information that is in the

24   possession of a database because, frankly, when you get a

25   DNA sample it gets input into a system.

*Oral Argument*                                    90

1          There is no holding in any court that requires a

2    warrant simply because there is a database.  And the idea

3    that the material that is seized abroad from foreign

4    fighters, of terrorists, from Al-Qaeda, from ISIS has to be

5    searched pursuant to a warrant simply because it ended up in

6    a database is not supported by any law except the

7    defendant's attempt to impose *Hasbajrami*.

8          THE COURT:  Only if you want to search a

9    U.S. citizen in the database.  I don't think they're saying

10   any search, well, maybe I'm wrong but a search of a

11   U.S. citizen in this database.

12         MS. SHAMI:  And I think --

13         THE COURT:  Without reason.

14         MS. SHAMI:  It also cannot be supported because,

15   again, the DNA database, the great example.  If you search

16   the DNA database for a U.S. citizen, how is that any

17   different than what the defendant is positing here?  The

18   only difference is the defendant is arguing, well, it's so

19   much bigger.

20         But size is not the determining factor here, the

21   question is the collection.  And that is what was at issue

22   in *Hasbajrami*.  The sensitivity of the data, sensitivity of

23   the collection.  And that is just not at issue here with

24   devices belonging to foreign terrorists seized abroad.

25         Thank you, your Honor.

*Oral Argument*                                          91

 1          THE COURT:  Okay.  So we have a few more motions
 2   to get through.  It's also 12:20.  I'm happy to take a
 3   15-minute recess and to come back to finish it.
 4          MR. PRICE:  Yes, your Honor.  Thank you.
 5          MS. SHAMI:  Your Honor, would we be able to take a
 6   20-minute break around 12:20?  I have another --
 7          THE COURT:  It's 12:20.
 8          MS. SHAMI:  1:20.  As well.
 9          THE COURT:  So you want to keep going now?
10          MS. SHAMI:  I think I would be happy to keep going
11   now just because I have another court appointment at 1:30
12   and I am happy to come back after.
13          MR. JACOBSON:  If we can take maybe a five-minute
14   break?
15          THE COURT:  Hopefully we'll get through at 1:20.
16          MS. SHAMI:  That will be great.
17          THE COURT:  Let's take a five-minute recess.
18          (A recess in the proceedings was taken.)
19          COURTROOM DEPUTY:  All rise.  Have a seat, please.
20          THE COURT:  Is Ms. Salman with us?
21          MR. JACOBSON:  Yes, she is.
22          THE COURT:  Before I move on to the Bill of
23   Particulars, if anyone has any arguments to that motion I
24   did have one follow-up question for the Government regarding
25   the NMEC motion.

*Oral Argument*                                            92

1            And, as I understand it, as I believe I understand

2      your argument, you are differentiating between the

3      §702 database and the -- the §702 database and the NMEC

4      database.

5            You are saying the §702 database is sensitive.

6      And then you also brought up the DNA database which I assume

7      you would be arguing is not sensitive.  And so, I'm

8      just -- and the NMEC database is not sensitive is what I

9      believe you're arguing is not a sensitive database.

10           How is the Court to determine what is a sensitive

11     database, what is not a sensitive database?  Why is the DNA

12     database and the NMEC database not sensitive, but the

13     §702 database is?  Are there any other sensitive databases

14     out there, or is it just §702 is a sensitive database?

15           MS. SHAMI:  Your Honor, the §702 database, there

16     is nothing like it and that is really what guided the

17     Second Circuit.  How information is collected.  How the

18     Government has to submit those requests, those

19     authorizations, the minimization factors.  The way that the

20     Government searches or the Government's request have to be

21     tailored.  The way that they have to relate to a specific

22     purpose.  It is because of the inherent sensitivity of the

23     information and the technique of collection that §702 stands

24     for apart from any other database.  And there is just no

25     comparison between §702 and NMEC.

*Oral Argument*                                          93

1          THE COURT:  So I understand.  So there are

2   parameters that kind of guide how information is collected

3   for the §702 database and that is what makes it sensitive.

4   Is it just that that makes it sensitive so that no other

5   database could be sensitive, that no other database could be

6   sensitive?

7          MS. SHAMI:  I don't know that no other database

8   can be sensitive.  But I think that as the law currently

9   stands, the §702 database stands apart in terms of the

10  analysis and there is no other case that analyzes any other

11  database the way that it analyzes the §702 database.  And

12  that is based on the specific framework, the sensitivities

13  of the collection, sensitivities related to the technique

14  and sensitivities of the information.  It just stands apart

15  in every metric that the Second Circuit's decision really

16  focuses on those factors.

17         THE COURT:  What does -- and I'm not -- what does

18  sensitive mean?  Isn't there a universe where some of the

19  that NMEC would be similar to the information in the

20  §702 database.  Would it not be...

21         MS. SHAMI:  Your Honor --

22         THE COURT:  Not the same but similar information

23  or similar data.

24         MS. SHAMI:  Your Honor, the Second Circuit, I

25  think, went through a couple of ways in which information is

*Oral Argument*                                          94

1   collected with respect to §702 and FISA and the difference

2   between, I think, upstream and I can't remember the name of

3   the other variation and how that is affected, I mean, how

4   the information is otherwise seized.  How it is -- also

5   implicates in instances other providers.  It's just very

6   different and it also is a very controversial and highly

7   litigated database and statute, quite frankly.

8           FISA and §702 present very unique circumstances

9   about the Government's perspective as the Second Circuit

10  identified it, prospective real-time collection.  And that

11  sensitivity is very different than just the device and I

12  don't have any case that I can think of that treats any

13  other database the way that the Second Circuit analyzes the

14  §702 database in Hasbajrami's circuit opinion.

15          THE COURT:  Okay.  All right.

16          MS. SHAMI:  Could I also, your Honor, I'm trying

17  to -- I was messaging with the clerk for my other matter, I

18  know you want to go through the Bill of Particulars and

19  we're happy to answer any questions about any motions that

20  you may have.  And we consulted with the defense if they had

21  any objection.  But just so that I could potentially go also

22  meet the second obligation.  If you wouldn't mind, if you

23  have any questions on Motion 73, that is the other -- that's

24  the third motion that I have that I would be responsible

25  for.

*Oral Argument*                                            95

1           THE COURT:  Which one is 73?

2           MS. SHAMI:  73 is a motion to dismiss on the basis

3    of pre-indictment delay.

4           THE COURT:  Okay.  We can move to that one next.

5           Mr. Price is jumping up.

6           MR. PRICE:  May I respond briefly?

7           THE COURT:  Are you going to tell me what

8    sensitive means?

9           MR. PRICE:  I will say this.  The Section 702

10   database, at least as far as the *Hasbajrami* court was

11   concerned, involved a lot of e-mails.  The NMEC database is

12   going to involve everything that is on a cell phone.  So

13   it's e-mail, it's social media, it's photos, it's messaging.

14   And I believe the Government even said last time that this

15   is chock full of sensitive information; so, that was one of

16   the reasons for not wanting to give us the results.

17          But here, I think you can absolutely draw a

18   difference between COTUS and other databases.  If we want to

19   talk about cell phones, the Supreme Court has said a warrant

20   is required upon arrest to take and search a cell phone but

21   not your DNA under *Maryland v. King.*  See, *California v.*

22   *Reilly.*  Cell phone data is considered highly sensitive.

23   That is exactly what we're talking about here and it is a

24   giant database 66 times of the §702 database.

25          THE COURT:  Thank you.

*Oral Argument*                                          96

1           Let's move to -- was it 73 you said?

2           MS. SHAMI:  Yes, your Honor.

3           And thank you for considering this application

4    from the Government.

5           THE COURT:  No, of course.  All right.  Just a

6    moment.

7           So we're going to move to defendant's motion to

8    dismiss due to pre-indictment delay, ECF Number 73.

9           Mr. Jacobson, welcome.

10          MR. JACOBSON:  Thank you, Judge.

11          THE COURT:  Go ahead.

12          MR. JACOBSON:  The relevant facts here are largely

13   undisputed.  We know that in late 2016 early 2017,

14   Ms. Salman was trafficked into ISIS territory.  We know that

15   in March of 2019, she surrendered to SDF forces in the town

16   of Baghouz in Northeast Syria.  We know that she spent

17   approximately five years in the custody of the SDF in a

18   detention camp.

19          We also know from the discovery that in 2019 the

20   FBI opened an investigation into the Salman family.  And as

21   early as June of 2019, law enforcement conducted an

22   extraction of Ms. Salman's husband's phone.  And by August

23   2022, at the latest, the phone had been examined and a

24   report had been filed.

25          We know from reporting in the New York Times that

*Oral Argument*                                    97

1    in September 2023, the Government was working to repatriate

2    the Salman family.  Yet, Ms. Salman was not charged with any

3    crime until May 2024, which was at least seven years since

4    the alleged conduct, although it depends on the timeframe

5    that we're looking at whether it's the complaint or the

6    indictment, and five years after the investigation was first

7    opened.

8              Now, the Government claims that the investigation

9    only began in 2022; yet, they also concede that they knew

10   that Ms. Salman was an American as early as 2019 when they

11   started interviewing members of Ms. Salman's family.  We

12   have no idea why they waited three years to examine the

13   contents of the phone by their estimation.

14             And even if we use 2022 as a starting point of the

15   criminal investigation into Ms. Salman, that's still more

16   than two years prior to the arrest and indictment in this

17   case which itself would be an unconstitutional delay.

18             So I think, Judge, if any of the facts are

19   disputed, we would at the very last least need a hearing.

20   But due to the more than two-year delay, and by our

21   calculation, five-year delay in this case, the indictment

22   can be dismissed on the papers.

23             THE COURT:  Do you have any proof to offer that

24   Ms. Salman has suffered an actual prejudice as a result of

25   the pre-indictment delay like witnesses or evidence that are

*Oral Argument*                                                98

1    now unavailable due to the delay?

2            MR. JACOBSON:  Sure, Judge.

3            It's always hard to -- we don't know what we don't

4    know, right?  And we have made numerous discovery demands on

5    the Government for documents, for witness testimony.  But

6    what we do know is that after the fall of the Caliphate,

7    thousands of documents were destroyed.  And it's the very

8    documents that we have asked the Government for and the

9    Government says that are not in their possession.

10           The case law --

11           THE COURT:  What documents, can you be more

12   specific?  You said you requested documents that were

13   destroyed, which documents?

14           MR. JACOBSON:  Other training documents, for

15   example.  We have received a few of them but the Government

16   now tells us that there were at least 900 women who signed

17   up just in Raqqa.  We have a small handful of comparator

18   Nusaybah Khatiba documents, training documents, but also

19   sign-up sheets.  The Government has also told us today that

20   they have sign-up sheets only for the training in Raqqa but

21   not for trainings that were held in alleged other locations.

22   And we have requested all of that.

23           It's relevant for us to show by omission that

24   Ms. Salman was not on any of the sign-up sheets.  That she

25   was not on any of the other types of documentation that you

*Oral Argument*                    99

1   would expect to see here.  And so, that loss of documentary

2   evidence not only between, for example, 2018 and 2019 but

3   during the five years that Ms. Salman was sitting at

4   Camp Solihull in Rujj is substantial prejudice to her

5   ability to prepare a defense in this case.

6           THE COURT:  And do you have anything to

7   demonstrate that this delay was an intentional device to

8   gain a tactical advantage over Ms. Salman?

9           MR. JACOBSON:  I think there is circumstantial

10  evidence of that, sure.  The ease and the speed with which

11  the Government was able to repatriate other Americans

12  suggests that they delayed in repatriating the Salman family

13  and Ms. Salman, specifically.  We know for, for example, in

14  the *Musaibli* case, he only spent, I believe, six weeks in

15  SDF custody before the United States quickly repatriated him

16  for the purpose of prosecution and that included -- and they

17  had initiated their investigation prior to that so they were

18  able to do it quickly and efficiently.  That's true of all

19  of the other repatriation cases that we are aware of since

20  it seems as if Ms. Salman is the last American to be

21  prosecuted after repatriation.

22           So there is just no explanation in this case of

23  why they were able to repatriate *Musaibli*, repatriate other

24  individuals in the Eastern District of New York, but were

25  unable to repatriate Ms. Salman despite knowing she was an

*Oral Argument*                                        100

 1   American for years prior to that.

 2              THE COURT:  Okay.  Anything in addition?

 3              MR. JACOBSON:  I think also as it prejudice, the

 4   loss of essential witness testimony.

 5              Witnesses who knew Ms. Salman in Syria could speak

 6   to the fact that she hasn't been trained.  Obviously, her

 7   husband is the -- would be central to her defense here.  We

 8   don't know where he is.  All these years later, it's --

 9   we're significantly hindered in our investigation into

10   figuring out his whereabouts in this case.  So there is

11   substantial prejudice to Ms. Salman and I think under the

12   case law, the indictment should be dismissed.

13              THE COURT:  Regarding the husband.  That example

14   of the husband being now unavailable or unable to locate

15   him, why would that be more due to the Government's delay

16   versus just where he is, his location, and what he is

17   alleged to be involved in?

18              MR. JACOBSON:  Right.

19              Well, if the Government had repatriated Ms. Salman

20   in 2019, soon after March of 2019, the Government or the

21   defense likely would have been able to figure out whether he

22   had been captured by the SDF, which prison camp that he was

23   located at.  And due to the passage of time, it seems that

24   the Government has no information on his whereabouts.

25              THE COURT:  Thank you.

*Oral Argument*                                                        101

1          MS. SHAMI:  Thank you, your Honor.

2          I think that the brief in response outlines the

3    timeline and I don't want to rehash any of it unless your

4    Honor wants to go into it.  But I think the fact of the

5    matter is that in 2019 ISIS collapsed, it was defeated.  And

6    the idea that the Government when it seized the phone from

7    Abu Ali would have been able to instantaneously pick it out,

8    of all devices, identify who the persons are, identify who

9    the kunyas are, and connect them to the defendant in a way

10   that treated that investigation above all others is fantasy.

11         The Government did not know about the defendant

12   and did not open up an investigation until December of 2022.

13   That is not two years from when she was charged, that is

14   the -- that is 18 months, excuse me, from when she was

15   charged from December 2022 to May 2024.

16         And the Supreme Court and Second Circuit are clear

17   that the time that when you start counting is when the

18   Government, when the prosecutor believes, that he or she has

19   evidence of guilt.  And if the Government believes that they

20   need evidence beyond a reasonable doubt, that is within the

21   prosecution's judgment to determine.

22         And it is not a question of, well, she was in the

23   camps and why wasn't she repatriated.  Those are asides.

24   And, in fact, they are asides that are explained by

25   documents that the Government has previously produced and

*Oral Argument*                                      102

1    additional documents that the Government produced yesterday

2    showing that the defendant and her mother were in the camps

3    but were afraid of the Americans when they came to the

4    camps.  That one of her sisters was in Rujj.  Was

5    interviewed by the Americans and was concerned about being

6    deported and they asked for help from the brothers, which is

7    a reference to ISIS males, to prevent that.

8             The Salmans did not want to return to the

9    United States.  They only decided to be repatriated and made

10   that request in 2023.  It is not the Government's position

11   that it will by force repatriate people into the country

12   against their will.  There was a request made and the State

13   Department honored that request.

14            THE COURT:  What happened in December of 2022?

15            MS. SHAMI:  That is when the Government opened up

16   its investigation into the defendant, in particular.

17            THE COURT:  Is there something that caused that

18   investigation to be opened then versus earlier like when the

19   phone was first...

20            MS. SHAMI:  Exactly.  Right, your Honor.

21            When the phone was first seized, it was one phone

22   among thousands, right?  That's what was happening.  And, in

23   particular, as the Government's evidence showed, this was

24   past of an operation called "Operation Goalie" where the

25   defense, excuse me, not the defense, where the Government of

*Oral Argument*                                                     103

1   the SDF was seizing phones from ISIS fighters and supporters

2   as part of the Battle of Baghouz which went over for two

3   months.  Thousands of devices were collected.  And then they

4   had to be routed to Iraq to be extracted and assessed.  And

5   then information from that intelligence gathering was being

6   sent out to law enforcement.

7           So, in August 2019, five months after the seizure

8   of the phone, that is when the Government understands we

9   received the first sort of item from the Abu Ali phone which

10  is the certificate of marriage between Abu Ali and the

11  defendant noting that they were married.  That did not

12  initiate the investigation.  The fact that she married an

13  ISIS fighter is not in and of itself a reason to initiate an

14  investigation in this case and that's not what happened.

15          Instead, later on, the Government received a photo

16  book as part of the ongoing review in connection with a

17  search of a subject that is not the defendant and they

18  received a photo book of photos from the Abu Ali phone.  And

19  on that phone, were pictures of the defendant with the ISIS

20  flag, with the AK-47 and that is what prompted the opening.

21          THE COURT:  So that was around December of 2022?

22          MS. SHAMI:  I believe so.  I have the timeline in

23  the brief and I can refer you specifically to the pages.

24          Again, at that point, the Government, the FBI, had

25  not understood the import of the military training document

*Oral Argument*                                                    104

 1   because they requested the full Gold Copy.  But as the
 2   Government noted in its brief, most of the documents are in
 3   Arabic or German; that requires translation.  And so, they
 4   requested translations.  And it was not until August or
 5   September of 2023 when they received the translation of the
 6   military training document that indicated that Abu Ali's
 7   wife, who they now know he had two wives, received training.
 8   So then they have to determine which of his wives is
 9   Umm Katab Al Mujahir.
10          Google returns, and the defendant's own admission
11   during a November 2023 interview, gave the Government that
12   information.  And so, frankly, if you were to start counting
13   as to when the Government had evidence of a crime to seek
14   charges really would be November 2023 when the defendant
15   admits that's her kunya and we have the training document.
16   So counting from November 2023 until May 2024, it is about
17   six months.  And, frankly, at that point, the repatriation
18   was pending and was being handled by the State Department
19   separate and apart from the FBI.  The FBI has nothing to do
20   with the State Department's processes for adjudicating
21   repatriation requests and whatever procedures need to happen
22   in advance of that.
23          More than that, when the repatriation flight
24   happens implicates all sorts of issues including security.
25   At the time, in early 2024, there were a lot of, I don't

1   know how to describe them, but there were military

2   happenings related to some other countries nearby that would

3   have impacted the Government's decision to send a plane out

4   there for repatriation.  The safety of both the Government

5   and the Salman family was at issue, frankly.  And so, this

6   issue that the Government can immediately repatriate anybody

7   just does not comport with reality.  And frankly, the

8   Government did not initiate its investigation until 2022,

9   the end of 2022, and did not form the basis for charges

10  until the end of 2023 and that is when the Government

11  submits the Court should start counting.

12          THE COURT:  Thank you.

13          Shall we move to the Bill of Particulars if

14  defense counsel has anything that you want to add to your

15  papers?

16          MR. JACOBSON:  I do.  Briefly, your Honor.

17          And I won't belabor what's already in the briefing

18  but I do want to address briefly a number of new facts that

19  came up earlier today at argument.

20          I think starting from the premise, and this goes

21  to the timeline, and what we know about the timeline in the

22  case.  The complaint says that Ms. Salman received military

23  training in or around March of 2018 which appears to be

24  based on the metadata of the photograph of the document.

25  But the indictment returns several days later walks that

*Oral Argument*                                              106

1    back and we don't know why.  It has an unusually wide date

2    range saying that Ms. Salman was trained somewhere in Syria

3    somewhere between July 2017 and February 2019.

4           Why the backpedaling?  We don't know whether we

5    have to defend against an allegation that Ms. Salman was

6    trained in March 2018 or that Ms. Salman was trained on any

7    day between July 2017 and February 2019.  We simply don't

8    know from the discovery or from the complaint or the

9    indictment in the case.

10          The discovery, while voluminous, lacks a lot of

11   critical detail about the date, nature, and location of the

12   training.  We have no photographs of the training, no

13   videos, no map, no location data of the training, no

14   information about the timing or the date of the training.

15   And we don't know what it entailed or who the trainers were.

16          But I think importantly, earlier today, the

17   Government -- we had assumed that the trainings that

18   occurred in Raqqa during the siege of Raqqa during July and

19   October of 2018.  The Government today, for the first time,

20   without producing any discovery that points to this fact,

21   tells us that, actually, trainings also occurred in Hajin in

22   Al Barrakah; in Mayadin in Iraq, and possibly other places

23   as well.  So which actually, I think, makes the fact that

24   the indictment says "Syria" all the more broad because we've

25   now just been told that there were numerous locations in

1   Syria where Ms. Salman may have been trained.  We have no

2   idea where the Government actually believes that she was

3   trained, they haven't told us.

4          The Government also says today that they'll be

5   turning over sign-up sheets from for 900 women in Raqqa.  We

6   don't know if we will be receiving sign-up sheets for the

7   trainings in other locations.  We don't know how the

8   Government intends to prove that there were trainings in

9   other locations and we've received no discovery about

10  trainings in other locations.

11         THE COURT:  So you haven't received any discovery

12  that tells you where any trainings took place?

13         MR. JACOBSON:  No.

14         THE COURT:  Okay.

15         MR. JACOBSON:  Now, the Government says that we

16  say that Ms. Salman was never in Raqqa.  But it's also not

17  clear if the Government credits that.  Do they think that

18  maybe Ms. Salman was trained in Raqqa?  Again, we simply

19  don't know because we haven't been told or given any

20  discovery that speaks to that.

21         We also learned today for the first time that the

22  Government doesn't know who Umm Yousef is which creates

23  additional questions and perhaps we'll have to supplement

24  our motion for a Bill of Particulars.  But we no longer have

25  any idea who trained Ms. Salman.  Was it Umm Yousef herself,

*Oral Argument*                                                    108

1   whoever Umm Yousef might be.  Was it some other individual

2   that trained Ms. Salman and Umm Yousef is just the

3   fictitious or individual who signed the document.  Again, we

4   don't know.  It's as if, Judge, as to location, if this were

5   a gun possession case, an indictment would not say,

6   "Defendant possessed a gun in New York or California or

7   Pennsylvania or Florida," and that's essentially by proffer

8   only what the Government is doing today.  That it was

9   somewhere in Syria perhaps in Raqqa, perhaps in these

10  new -- these other alternative locations that we know

11  nothing about.  And it's just -- it would be insufficient in

12  any other case and it's insufficient in this case, too.

13          THE COURT:  It's not so much of them saying that

14  the defendant possessed a gun in the Eastern District of New

15  York even if they don't tell me it was Queens or Brooklyn,

16  why is that not similar?

17          MR. JACOBSON:  The reason that that's usually

18  sufficient is the discovery will include more specificity,

19  right?  We'll receive surveillance footage that shows a

20  certain corner where an possessed a gun or we'll receive

21  some other evidence that narrows that location range.

22          So, without discovery that includes more

23  specificity, an indictment that says, "Somewhere in the

24  Eastern District of New York" would not be sufficient.  But

25  even the Eastern District of New York is a much narrower

1   location than saying, "Somewhere in Syria," or "Somewhere in

2   the extraterritorial jurisdiction of the United States."  It

3   could be anywhere.

4           THE COURT:  Okay.

5           MR. JACOBSON:  And so, I think an indictment that

6   says "Eastern District of New York" is only saved where the

7   complaint or the discovery includes facts that allow the

8   defense to investigate further as to the location.

9           THE COURT:  Why do you need to know more at this

10  time, a more specific location in order to prepare a

11  defense?

12          MR. JACOBSON:  Because we don't know if we're

13  defending against an allegation that she was trained in

14  Raqqa and we should be focusing our investigation on that

15  city.

16          I think the Government can't proceed to trial with

17  the theory that she was trained somewhere in Syria at some

18  time.  It's impossible for us to focus our investigation

19  without more specifics, right?  We can't interview witnesses

20  who were in Raqqa and in Mayadin and in Iraq and in Hajin.

21  It's simply impossible for us to do or to focus, for

22  example.

23          And as to the sign-up sheets that the Government

24  was mentioning earlier.  If there were 900 women, well,

25  should we assume that the fact that Ms. Salman is not on the

*Oral Argument*                                                  110

1   Raqqa sign-up sheets, does that mean she wasn't trained in

2   Raqqa?  The fact that the Government isn't producing sign-up

3   sheets for the other places that they claim trainings were

4   held, trained in those other those other locations, we just

5   don't know because the Government has not produced discovery

6   that speaks to that but they haven't proffered any more

7   specific facts.

8           THE COURT:  Is the location issue less of a issue

9   if it's narrow to March 2018.  And I know you said that

10  they've walked that back.  But if it is narrowed to

11  March 2018 is the broad location less of an issue?

12          MR. JACOBSON:  We don't know where Ms. Salman was

13  in March 2018.  So if the Government says -- we need to have

14  both the location and the timeframe.  Because if we know

15  that if the Government is saying Ms. Salman was trained in,

16  as an example, Mayadin in March of 2018 but we can establish

17  that Ms. Salman was not in Mayadin in March 2018, that would

18  be a complete defense to the charges.

19          So we have to be able to marry up the location and

20  the timeframe.  But we have neither here because we have

21  Syria.  And then, again, using the sort of gun possession

22  analogy, we have somewhere in the United States between

23  July 2017 and February 2019, the defendant possessed a gun.

24  That would be insufficient in both respects.

25          THE COURT:  Okay.

*Oral Argument*                                                     111

1          MR. JACOBSON:  The location and the timeframe.

2          And I think, finally, the case law supports some

3    narrowing of the date range and location here.  We cited *Ray*

4    in our motion.  I think *Musaibli* is also instructive.  I

5    think that was a 30-plus month timeframe that the judge

6    ordered the Government to narrow.

7          And *Augustine* and *Pugh,* which the Government

8    relies on heavily, are just inapposite in this case.  Those

9    are cases that charge inchoate attempt crimes where the

10   Government just has to show intent and a substantial step.

11   And I know that in both of those cases there was discovery

12   that was produced that laid out in great detail what those

13   steps were, where they occurred, how they occurred.

14          And, you know, finally, I think timeline and

15   location were just never an issue in those cases.  It was

16   very clear where and when the attempts were alleged to have

17   occurred.

18          THE COURT:  Thank you.

19          MR. REICH:  Your Honor, as the Government made

20   clear in its motion, in its opposition to the defendant's

21   motion, the Government has provided ample information under

22   the law around Bill of Particulars here.

23          It is important to understand that the Government

24   cannot be compelled to disclose through a Bill of

25   Particulars the manner in which it will attempt to prove the

1    charges, the precise manner in which a defendant committed

2    the crime charged or give a preview of its evidence and

3    legal theories.

4            In this case, the Government has given more than

5    enough information for the defendant to be able to defend

6    against these charges.  The question is not whether

7    additional information would be helpful, the question is

8    whether additional information would be necessary.  And, in

9    this case, the Government is more than entitled to proceed

10   to trial on a theory that allows multiple theories of

11   liability here.

12           It is not the case, your Honor, that the

13   Government backpedaled on anything.  An indictment

14   oftentimes has a broad date range.  In this case, we have a

15   much more specific date range in the complaint.  And we have

16   relayed to the defense multiple times through discovery and

17   in our papers in other contexts in this case, and to the

18   Court, that it is most likely that the timeframe during

19   which the training occurred had to have happened after the

20   marriage to Abu Ali which happened in July 2017, and no

21   later than March 2018 which is the metadata on when the

22   photo of the training document was taken.  Mr. Jacobson

23   mentioned something along the lines of 30 months as an

24   appropriate range of time; this is much narrower than that.

25           So, your Honor, the Government would posit that

*Oral Argument*                                                   113

1    not only was the date range more than narrow enough for the

2    defendant to be able to defend the case but also the other

3    elements that the Government has already provided.

4           So, for example, your Honor, with respect to the

5    location.  Multiple cases in the terrorism context involve

6    either indictments or charging -- other charging instruments

7    or a Bill of Particulars which rise to the highest level of

8    specificity being just a country where a particular thing

9    happened.  The Government cited examples from the

10   defendant's own cases where a Bill of Particulars identified

11   that training happened or material support happened in

12   Afghanistan or material support happened in Pakistan.  And

13   in this case, identifying that it happened in Syria is more

14   than sufficient, your Honor.

15          THE COURT:  In those cases, did they give a more

16   narrow timeframe?

17          MR. REICH:  Your Honor, I'm not sure that

18   timeframe was at issue in the way that it is in this case.

19   But I will make two points on that question, your Honor.

20          The first is that, obviously, the defendant has

21   the best access to information of any of the parties.  The

22   defendant knows where she was.  The defense has repeatedly

23   said that if we don't identify exactly what days and times

24   and specific locations the trainings happened and who

25   trained, et cetera, that they have no way of defending

1    against the case because they don't know where their client

2    was.  But, of course, your Honor, the defendant knows better

3    than anyone where she was at any given particular time.

4              THE COURT:  I mean, I think Mr. Jacobson made a

5    good point.  If they were presuming it was going to be Raqqa

6    but now Ms. Salman is presumably not on that list, does that

7    necessarily mean it's not Raqqa, or does it just mean that

8    she wasn't on this list?

9              MS. SHAMI:  Your Honor, that's a fair question.

10   The defendant stated unequivocally that she was not in Raqqa

11   during that timeframe.

12             THE COURT:  During what time frame?  In March 2018

13   or between July 2017 and March 2018?

14             MR. REICH:  Our understanding was that he was not

15   in Raqqa at any time during that entire timeframe.  And so,

16   defense counsel can certainly make assumptions based on the

17   information they have available to them from their own

18   client that the Government has also produced back to them

19   through her own statements.

20             THE COURT:  And so, now you're saying, or

21   Ms. Shami said earlier, that there is multiple other

22   locations.  The way for Raqqa they could say she was never

23   in Raqqa.  But if they don't know what these other

24   possibilities are, how can they make that similar argument

25   that she was never there if that is an argument to be made.

*Oral Argument*                                             115

1          MR. REICH:  Your Honor, that can certainly be

2    fleshed out at trial.  But there is no requirement that the

3    The Government specifically point out exact locations.  If

4    the Government's theory is that based on the overwhelming

5    evidence she certainly received military-type training

6    during a period of time in a general location.  There is

7    nothing about the elements of this offense that require any

8    more specificity than that.  And the defendant is free to

9    argue before the jury that the evidence is not strong

10   enough; that the evidence doesn't meet the standards.  But

11   that doesn't mean that the Government is not permitted to

12   proceed at the level of extraction that the evidence shows.

13          And the Government would posit to your Honor that

14   this is not at all like a case where if -- a §922(g) case

15   with a gun.  As your Honor identified, in that case, they

16   could simply say that it is within the Eastern District of

17   New York.  And there is nothing about those cases in any

18   event that require evidence that the gun was held in a

19   particular place at a particular address.  If the

20   overwhelming evidence in that case proves beyond a

21   reasonable doubt that the defendant was, in fact, in

22   possession of a gun illegally, there is nothing about the

23   statute that requires a showing that you demonstrate what

24   particular place it happened in other than, as your Honor

25   identified, the venue.  And, obviously, in that case, there

1  are issues of interstate commerce that are not relevant

2  here.

3            So, in this case, the Government has more than

4  posited evidence and provided discovery, and also provided

5  information in its detailed charging documents that give

6  more than enough information to meet the elements of this

7  particular offense that don't require any more specificity

8  than what the Government has already provided.  And if the

9  defendant wants to argue to the jury that we haven't been

10  specific enough, then the defendant is free to do that.

11            THE COURT:  How many training locations are there

12  or were there?

13            MR. REICH:  That's not something the Government

14  knows specifically, your Honor.  We understand there were

15  multiple locations but we don't have any more specific

16  information than that.

17            THE COURT:  And to the extent you know, when

18  you're saying "multiple," are you saying two or you saying

19  15.  What range are we thinking?

20            MR. REICH:  Your Honor, the Government is aware of

21  a handful, three or four.

22            THE COURT:  Okay.  Those three or four are

23  identified in discovery or will be identified in the

24  discovery that you're -- or the discovery you gave

25  yesterday, those three or four?

1          MR. REICH:  That either is clear or will be made

2     clear.  It's certainly not something that the Government is

3     hiding from defense counsel.

4          And another point I want to make sure the Court

5     understands, your Honor.  Counsel has sort of implied that

6     the Government has some specific evidence that it's keeping

7     from counsel so that -- and without which they can't defend

8     the case.  The Government is not hiding information about

9     its allegations in this case.  We are providing that

10    information and they have ample information about the

11    charges.

12          THE COURT:  Thank you.

13          MS. SHAMI:  Thank you.

14          THE COURT:  Shall we move --

15          MR. JACOBSON:  Very briefly, Judge.

16          I think the Government has made it impossible for

17    us to even to provide alibi notice in this case which is

18    required under the Federal Rules because we don't know where

19    and when they allege Ms. Salman to have been trained.  And

20    now the Government is saying yet another claim they have no

21    idea how many trainings there were.  Maybe three or four,

22    maybe more.  So it just enables the Government to pivot in

23    their theory.  If Ms. Salman says I was in Mayadin on a

24    certain date in her testimony, then the Government says, oh,

25    well, it just happens to be that there was a training in

*Oral Argument*                                                118

1    Mayadin or in Iraq or in Hajin or in other cities in

2    Al Barrakah.  We have no way of defending against it.  And

3    we have not received any discovery that shows these

4    alternate locations.  Maybe the Government expects to

5    produce it but we don't have it yet.

6                THE COURT:  Okay.

7                MR. JACOBSON:  It's certainly something that we

8    have moved to compel and I think it's essential for our

9    defense.  But I think, like, even the Government's -- the

10   Government continues to use this hedging language that makes

11   it impossible for us to defend against.

12               The Government just stated that, and I want to get

13   the wording right, most likely that Ms. Salman was -- that

14   her training most likely probably happened after her

15   marriage to Abu Ali in July 2017.  And the Government says

16   that as if they're offering us some narrowing of the

17   timeframe and scope here.  But the indictment already uses

18   July 2017 as the earliest date.  It essentially says that,

19   at some point, during the time that Ms. Salman was in Syria,

20   she was trained in some location and that's all we know and

21   to makes it impossible to defend at trial.

22               THE COURT:  Okay.

23               MR. REICH:  Your Honor, if I could briefly

24   respond?

25               I just want to make it clear that at least a

1   couple of the other training locations are clear from

2   discovery that has already been produced including other

3   documents that were stamped that counsel has referred to

4   themselves.  But, to be clear, it is not the case that the

5   Government is going to simply create stories that Ms. Salman

6   was in a particular place based on statements that come out

7   in trial as Mr. Jacobson suggested.  That's just simply not

8   the order of operations.  The Government has a theory that

9   based on a document, it is clear beyond any doubt, and

10  that's what we're presenting at trial; that at some point in

11  that narrow timeframe, in a particular general location, the

12  Government will argue to the jury that it is clear that she

13  received military-type training based on this evidence that

14  we have.

15          THE COURT:  Okay.

16          MR. JACOBSON:  Can I respond very briefly?

17          THE COURT:  Sure.

18          MR. JACOBSON:  It is not true that the discovery

19  we have to date shows locations of other trainings.  The

20  training document itself does not list the location.  I

21  think what the Government is referring to is the stamps on

22  the documents that do have stamps, unlike Ms. Salman's, that

23  have a stamp from various other directorates in other

24  provinces in Syria.

25          The Government's own theory in their briefing is

*Oral Argument*                                          120

1    the stamp is only added by the directorate in the province

2    where the training document is routed.

3              So to the extent the stamps have location

4    information in them, those are not locations of training,

5    those are locations of the directorate that received the

6    training certificate.

7              THE COURT:  Okay.  Can we move to ECF 74?

8              Ms. Shami, do you need to be excused?

9              MS. SHAMI:  Actually, I requested from the Court

10   if they would allow me to meet later with them.

11             THE COURT:  Okay.

12             MS. SHAMI:  I can remain at the hearing here.

13             THE COURT:  Happy to have you.

14             ECF 74.

15             MS. EISNER-GRYNBERG:  Sorry, Judge, ours don't

16   have the ECF markings.

17             THE COURT:  "Motion to Dismiss the Indictment

18   Pursuant to Nondelegation Doctrine."

19             MR. JACOBSON:  I'm back up, Judge, on this one.

20             THE COURT:  I don't mean to cut off what I am sure

21   was going to be a very eloquent argument.

22             Let me just preface by saying I am quite skeptical

23   of this argument in large part because of the district

24   courts within this circuit and some courts outside this

25   circuit have rejected it.  And I understand your position, I

*Oral Argument*                                           121

1   understand your argument fully, and I understand the

2   academic sources you rely on, and this is a very interesting

3   academic argument, but what case law can I rely on for this

4   point?

5           MR. JACOBSON:  That's a good question.  And I

6   think it's in some ways we have to sort of intuit what the

7   Supreme Court would do in a case like this because the

8   nondelegation case law has not addressed a situation like

9   this where Congress has delegated the authority to impose

10  criminal liability to the Executive Branch, right?  There

11  just hasn't been a case like that so we have to look at, I

12  think, the --

13          THE COURT:  You mean this particular statute about

14  the training or do you mean to any criminal case?  Because

15  isn't there a similar situation in cases where a person

16  provides material support, isn't it the same issue?

17          MR. JACOBSON:  There are district court decisions

18  in that context in criminal cases.

19          THE COURT:  I see.

20          MR. JACOBSON:  District court cases.

21          THE COURT:  So you want me to be the first?

22          MR. JACOBSON:  I want you to be the first and I

23  think the reason --

24          THE COURT:  To take down the statute and the whole

25  principle?

*Oral Argument*                                              122

1          MR. JACOBSON:  Yes.  I believe that the Supreme

2     Court will uphold the district court's decision in that

3     regard because they have already signaled in cases like

4     *Gundy* and *FCC versus Consumers Research* that the context of

5     the statute is important and have also signaled that the

6     nondelegation concerns are heightened in the criminal

7     context, specifically, where the delegation creates criminal

8     liability.

9          And I want to just address what I think is the

10    Government's conflation of the grounds on which other

11    district courts have denied challenges to §2339(b) and the

12    ground on which we're challenging §2339(d).

13         Our objection is not with Section 1189 which

14    authorizes the Secretary of State to delegate an FTO, we

15    have no issue with that.  There are other purposes that

16    FTO -- other reasons why FTO delegation -- why FTO -- like,

17    essentially why FTO -- FTOs serve functions in other context

18    in government.  The problem here is that Section 1189 is

19    incorporated into a criminal statute, thus creating criminal

20    liability in §2339(d).  And I think the Government has

21    conflated that.  I think other district courts that have

22    looked at the issue have conflated that and that is our --

23    that is the thrust of our challenge here today.

24         THE COURT:  So you take this -- just confirming --

25    you also take issue with the Intelligible Principle

*Oral Argument*                               123

1   entirely?

2              MR. JACOBSON:  Yes.

3              THE COURT:  Okay.

4              MR. JACOBSON:  And the reason we have an issue

5   with that is, I think, again, district courts that have

6   looked at §2339(b) have not had the opportunity to address

7   recent FTO designations.  And I think the recent

8   designations of drug cartels, for example, highlights the

9   fact that there is no outer bound in the delegation because

10  Congress provided no principle by which the Secretary of

11  State makes these decisions.  And the fact that the

12  Secretary of State willy-nilly can say I am now designating

13  a drug cartel.  I am now designating a gang or some other

14  organization as an FTO really proves the point.

15             THE COURT:  But there are bounds but you just kind

16  of disagree with how they applied those bounds with these

17  gangs; correct, or no?

18             MR. JACOBSON:  There is a principle that's

19  articulated in §1189.

20             THE COURT:  You just think they're not following

21  it?

22             MR. JACOBSON:  Right.  And there is no meaningful

23  judicial review of designation of ISIS or a cartel or any

24  other organization.

25             THE COURT:  Okay.

*Oral Argument* 124

1          MR. REICH:  Your Honor, I won't belabor this.

2          Just to say that the Government agrees that the

3  law of this court is bound by is the law in existence now,

4  not what it believes the Supreme Court might one day do.

5          And I also just want to note that with respect to

6  §1189, it's not clear to me how this is different from

7  §2339(b), material support context.  In those cases, they

8  rely on the definition in §1189 just as much as it does

9  here, and those are criminal cases just as much as here.

10  And every single court to look at those cases has all

11  reached the same conclusion.

12          THE COURT:  Thank you.

13          MS. SHAMI:  Thank you, your Honor.

14          THE COURT:  Can we move to Ms. Salman's motion to

15  suppress statements at ECF 77.

16          MS. EISNER-GRYNBERG:  Judge, we're prepared to

17  rest on the written record.  If the Court has any questions

18  on this, I'm happy to answer them.

19          THE COURT:  No questions.

20          MS. EISNER-GRYNBERG:  Thank you.

21          MR. REICH:  That's fine for the Government, your

22  Honor.

23          THE COURT:  I think that is everything.

24          Ms. Shami, I gave you an assignment earlier.  What

25  did I ask you to provide?

*Oral Argument*                                           125

1           MS. SHAMI:  Yes, your Honor.

2           You asked for a best efforts affidavit in

3    connection with the efforts to locate the original.

4           THE COURT:  Yes.

5           MS. SHAMI:  And you had also given me the

6    assignment, or I had taken it upon myself, to give you a

7    case citation I finally did find while I was sitting here

8    which was the *Bourjaily* case that said you can look to the

9    document itself.

10          THE COURT:  The hearsay?

11          MS. SHAMI:  Yes, exactly.

12          THE COURT:  I think you gave me that citation

13   already.

14          MS. SHAMI:  I did.

15          THE COURT:  Best efforts affidavit, how much time

16   do you need?

17          MS. SHAMI:  I would need to just connect with the

18   agents because I don't know personally every single person

19   who might have run the search and all the details of that,

20   so three weeks?

21          THE COURT:  Sure.

22          COURTROOM DEPUTY:  August 28th.

23          MS. SHAMI:  Thank you.

24          THE COURT:  Mr. Jacobson, regarding the Bill of

25   Particulars, I believe did you say that you may, after

*Oral Argument*                                    126

1  getting discovery, the discovery yesterday or some upcoming

2  discovery, you may want to amend your motion?

3       MR. JACOBSON:  I think we may have to, Judge.

4  We'll consider that internally and we can advise the Court.

5       THE COURT:  Can I set a deadline for three weeks

6  from today for you to either amend your motion or not.

7       MR. JACOBSON:  So long as the Government provides

8  the additional discovery before that.

9       THE COURT:  I noticed they disclosed -- you did a

10  discovery production yesterday; is that correct?

11       MS. SHAMI:  Yes, your Honor we did.

12       But, in particular, the documents where there are

13  indications that there were 900 women who signed up.  And I

14  think they've been referred together as the sign-up sheets.

15  I haven't actually seen the underlying documents, so I won't

16  call it a "sign-up sheet" but documents that reflect that

17  over 900 women in Raqqa during the specific time period

18  sought to sign up.  That is on a hard drive that I'm

19  currently seeking, that we are currently seeking the

20  authority to produce to the defendants.  And so, we've made

21  that request, that request is pending.  And hopefully, it's

22  very quick because we believe that it's been released to

23  another team.  And so, hopefully, there isn't any kind of

24  overlap that needs to happen.  But as soon as we have it, we

25  will be able to produce it but I can't give you a specific

*Oral Argument*                                     127

1   time because I just don't know.

2           THE COURT:  I'm not going to give you a deadline,

3   then, Mr. Jacobson.

4           MR. JACOBSON:  Thank you, Judge.

5           THE COURT:  After you receive the discovery,

6   within a week of receiving the discovery, can you just let

7   the Court know whether you intend to amend the motion and

8   then I'll set a schedule for that.

9           MR. JACOBSON:  Yes, absolutely, Judge.

10          And to be clear, we're not asking the Court to

11  defer judgment on the motion.  We can always file a second

12  motion for Bill of Particulars.

13          THE COURT:  I see.  Okay.

14          I wanted to note last before we adjourn, Counsel

15  for the Government makes a sealing request in a footnote in

16  its opposition to defendant's pretrial motions that's at

17  Note 30.

18          To the extent the request is a motion, I'm going

19  to deny that request with leave to renew.  And the

20  Government should make a motion for leave to file under seal

21  on the docket in accordance with the Local Rules and a

22  memorandum of law in support of such request.

23          Anything additional before we adjourn?

24          MS. EISNER-GRYNBERG:  No, Judge.  Thank you.

25          MR. REICH:  Thank you, Judge.  Nothing from the

*Oral Argument*                                              128

1    Government.

2              MS. SHAMI:  Thank you, your Honor.

3              THE COURT:  Thank you for your preparation today.

4    We're adjourned.

5              (WHEREUPON, this matter was adjourned.)

6

7                              *   *   *

8

9                    <u>CERTIFICATE OF REPORTER</u>

10
     I certify that the foregoing is a correct transcript of the
11   record of proceedings in the above-entitled matter.

12

13

14

15

16   _____
     Anthony D. Frisolone, FAPR, RDR, CRR, CRI
17   Official Court Reporter

18

19

20

21

22

23

24

25