UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 24-CR-206(NCM)

-against- : United States Courthouse
Brooklyn, New York

HALIMA SALMAN, :
March 17, 2026
Defendant. : 10:00 o'clock a.m.

\- - - - - - - - - - - - - X

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE NATASHA C. MERLE
UNITED STATES DISTRICT JUDGE

For the Government: JOSEPH NOCELLA, JR.
United States Attorney
BY: AMANDA SHAMI
ANDREW REICH
ELLEN SISE
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: FEDERAL DEFENDERS OF NEW YORK INC.
One Pierrepont Plaza, 16th Floor
Brooklyn, New York

BY: MIA EISNER-GRYNBERG, ESQ.
SAMUEL JACOBSON, ESQ.

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: Criminal cause for evidentiary hearing, docket 24-CR-206, United States versus Halima Salman.

Will the parties please state their appearances for the record starting with the government.

MS. SHAMI: Good morning, Your Honor. Assistant U.S. Attorneys Amanda Shami, Andrew Reich and Ellen Sise for the government. We are joined at counsel table by our paralegal Matthew Jennings.

THE COURT: Good morning.

MR. REICH: Good morning.

MS. EISNER-GRYNBERG: Good morning. Federal Defenders by Mia Eisner-Grynberg and Sam Jacobson for Halima Salman who is to Mr. Jacobson's right and we're joined by our paralegal Chase Leito.

THE COURT: Good morning.

Just a moment.

(Pause.)

THE COURT: So we are here for a hearing on Ms. Salman's motion to exclude ECF No. 75.

I have thoroughly reviewed the parties' briefings. We had a bit of argument about this motion in the past and today we are here for this hearing.

Before we begin, I know there's a matter of a motion, the government's motion to preclude defendant's expert Dr. Khalil Barhoum.

I have reviewed the parties' letters for the court to preclude such testimony and for the purposes of today's hearing, I'm going to deny the government's request to preclude Dr. Barhoum's testimony.

I believe the defendant is correct that for the purposes of this hearing, I can hear his testimony. I'm also not concerned that there's any danger of any unfair prejudice or confusion to me in admitting his testimony. So I will hear his testimony and give it the weight that I deem appropriate. My ruling does not preclude the government from raising a Daubert motion before trial, if necessary.

I know the defendant also had a motion or a letter asking that their expert be able to testify out of order. That's fine with me. Let's see where we are after lunch and if it's necessary, we can find an opportunity for Dr. Barhoum to testify today.

Anything else before we get started?

MS. EISNER-GRYNBERG: Just so that we can schedule Dr. Barhoum's appearance, is it fair to tell him that it won't be before 1 o'clock or is there a time that we should tell him to be here?

THE COURT: I have no idea how many witnesses you have.

How many witnesses does the government have?

MS. SHAMI: Your Honor, the government has two

witnesses and our direct testimony is about two hours in total for both.

THE COURT: And then you are going to have cross-examination so I don't think it will be before lunch.

MS. EISNER-GRYNBERG: Okay.

THE COURT: Okay. Anything additional before we get started?

Do the parties want to make any statements or should we go with the first witness?

MS. SHAMI: I think the government is ready to proceed with the first witness, Your Honor.

MS. EISNER-GRYNBERG: That's fine with us.

THE COURT: Okay. Call your first witness.

MS. SHAMI: Yes, Your Honor.

The government calls Hassan Hassan.

THE CLERK: Please approach the witness stand and remain standing.

Please raise your right hand.

(The witness, HASSAN HASSAN, was duly sworn/affirmed by the clerk.)

THE CLERK: Thank you. Have a seat.

Please state and spell your name for the record.

THE WITNESS: Hassan Hassan, H-A-S-S-A-N.

MS. SHAMI: May I inquire, Your Honor?

THE COURT: Yes. Please proceed.

DIRECT EXAMINATION

BY MS. SHAMI:

Q Good morning.

A Good morning.

Q How are you employed?

A Full time as the editor in chief of New Lines Magazine.

Q What is New Lines Magazine?

A It's a global affairs magazine, journalism outlet.

Q Stepping back, where are you from originally?

A Syria.

Q Were you born in Syria?

A I was born in Syria.

Q Did you attend school there?

A Yes, I did.

Q How much schooling did you attend in Syria?

A Most of my studies, from the beginning until undergraduate studies.

Q Where did you do your undergraduate studies?

A In the University of Damascus in Syria.

Q Did you complete a degree there?

A Yes, I did.

Q What degree?

A Bachelor degree in English literature.

Q Did you complete any additional education after receiving your Bachelor's degree?

A Yes.
Q What did you do?
A I did postgraduate studies in the University of Nottingham in the United Kingdom.
Q And what degree, if any, did you receive from the University of Nottingham?
A MA in international relations.
Q Have you done any other postgraduate studies or are you currently doing other postgraduate studies?
A Not postgraduate studies but I'm doing Islamic studies at Al-Azhar University in Cairo, Egypt.
Q When did you complete your Master's degree?
A In 2008.
Q What did you do after completing your Master's?
A I went back to the Middle East to work in journalism.
Q And where specifically did you go?
A United Arab Emirates, UAE.
Q And where did you work in the United Arab Emirates?
A English language daily in the UAE called The National.
Q What kind of reporting did you do for The National?
A So it changed over time. In the beginning, I was doing more local news in the country. And then from 2011, I started covering more regional news.
Q What happened in 2011 that caused you to change to do more regional news?

A There were -- there was a waive of uprisings in the region in Syria and elsewhere, so I wanted to cover what was happening in my country at the time and throughout the region.
Q And what kind of work did you do in writing on the region including Syria?
A I was writing, writing about mostly conflicts, extremism, geopolitics, political events in the region.
Q During this time period, about how often were you preparing pieces on Syria extremism in the region?
A I was -- as part of my work, at the time, I was writing daily, weekly.
Q After working at The National, where did you next work?
A So I worked there for a few years and then started writing for other publications outside the Middle East, from especially in the beginning, it was the Foreign Policy and The Guardian, Foreign Policy in the U.S. and The Guardian in the UK, as well as for think tanks, research papers for think tanks.
Q And directing you to 2014, what, if anything, did you do that year?
A I moved as full time from working for The National to working for a local think tank in the UAE or started to. I was also writing or started to write a book about ISIS.
Q And we're going to ask you more about ISIS, but what was the book that you were writing in 2014?

A I was writing or co-writing a book with Michael Weiss about ISIS that's called "ISIS: Inside the Army of Terror."
Q Was that book ultimately published?
A It was published in 2015, yes.
Q And not to belabor the point, but what was the book about?
A About the Islamic State, ISIS.
Q In particular, what about the Islamic State?
A Anything from the history of ISIS, where it began, the context, the geopolitical context, political context in the region, as well as ideology, structures, membership, and so on and so forth.
Q How did you research writing this book?
A I was already doing research about Syria, but then I started, as part of focusing on writing the book, interviewing anybody and everybody involved, not everybody but, like, those stakeholders involved, different stakeholders involved in ISIS, whether ISIS members themselves, active ISIS fighters and members, as well as people who fought against ISIS, people who lived under ISIS, and so on and so forth.
Q You testified just now about interviewing including active fighters.
How were you able to interview active fighters of ISIS?
A So a mix. In part, I was called, you know, from the UAE,

communicating with them through social media, through WhatsApp, other, you know, digital means, as well as actually going to southern Turkey, meeting members and smugglers and other people involved in ISIS and in the fight against ISIS.

Q In 2014 when you started writing your book, what was the state of ISIS?

A ISIS was at its peak at the time in both Iraq and Syria, expanding, and the fight against it started later in 2014, but it was at the peak of ISIS.

Q Why did you want to interview ISIS fighters and those people who were fighting against ISIS during the height of ISIS power?

A Because for reasons related to the book but also, you know, for me as a scholar in the region, to understand ISIS more is to, was to speak to them directly and understand their ideology, why they fought, why they killed, why they committed all these atrocities whether against fellow Muslims and non-Muslims.

So it was really me trying to understand and getting close to understanding the, you know, every aspect of ISIS ideology, how it operated and all, you know, various aspects of its operation in the area.

Q Did you study any of the materials that ISIS put out itself as part of your research for your book?

A That was a big part of it, to follow everything that ISIS

issued publicly and as well as circulated privately in ISIS areas.

Q What kinds of things did ISIS publish publicly?

A All types of materials, mostly news about what they did day to day, their operations, their advances, their losses, their expansion, their propaganda, their ideology, because they wanted to basically advertise everything that was happening to kind of attract more followers.

Q And where were you able to locate these publications by ISIS?

A In the beginning, it was easy to find on social media. ISIS was, like I said, actively advertising its ideology so they would publish weekly, daily and periodically, and then they would publish it online. Also, it was circulated, these materials were circulating on the ground in ISIS areas.

Q Why was ISIS trying to advertise itself, to use your terminology?

A Well, so ISIS had a slogan called "Hear from us, not about us." So they wanted to speak and talk about the ideology. They shied away -- they didn't shy away from basically advertising their violence, their savagery, their propaganda, because that was seen as a way to attract hardliners. So they wanted to spread their ideology by saying exactly what they did.

So that was -- they were active. They thought media

is a big part of the war and in order to win and to neutralize their enemies, they wanted to basically tell their story.

Q In what language were the documents that you were reviewing?

A Primarily Arabic but they published in different languages.

Q And are you able to read Arabic?

A Yes.

Q What is your fluency level?

A Native tongue Arabic.

Q As a result of your research, did you become familiar with ISIS's writing style?

A Yes.

Q And as a result of your research, did you become familiar with ISIS terminology?

A Yes.

Q What are -- sorry.

Was the book commercially successful?

A Yes, to a large degree.

Q What awards, if any, or recognition, if any, did it receive?

A So the book became a New York Times bestseller. It was a Washington Post bestseller. It was picked by or selected by Wall Street Journal as one of ten books on terrorism, as well as in the UK by the Times of London as the best book of 2015.

Q In what language was the book published?
A English. English. It was published in English but also translated.
Q Approximately how many languages has it been translated into?
A Over -- more than 15 languages, foreign languages.
Q And since publishing your book, have you done further work on ISIS and other extremist groups?
A Yes, I continued watching, following ISIS, as well as other groups in the region and beyond.
Q So I think you had mentioned or you had testified earlier that after working at The National, you went to some think tanks. What think tanks did you work with?
A First, like, in terms of full time, it was Delma Institute in Abu Dhabi. And then but the main one was in 2016 when I moved to the U.S. and started working for a Middle Eastern think tank in Washington, D.C. called Tahrir Institute, T-A-H-R-I-R, Tahrir Institute.
Q And what work did you do at the Tahrir Institute?
A Syria, extremism, Middle East.
Q And what kind of work did you provide to the think tank on Syria, extremism, and the Middle East?
A Research, public engagement, as well as talking basically in the media and writing about the subject I was studying.
Q How long did you work in the Tahrir Institute in

Washington?

A For about three, two and a half years or three.

Q What did you do after that?

A I moved to, briefly to the George Washington University to work at the program on extremism in 2018, in September 2018.

Q And what kind of work did you do at the George Washington University program on extremism?

A I was mainly preserving ISIS documents and reviewing. They -- at the time, they were given, they were handed over documents to study by the New York Times. So George Washington University obtained these documents. I think at the time, there were over 10,000 ISIS documents that were taken from Iraq from ISIS areas.

Q And did you review these documents?

A I did.

Q After your time at the George Washington University program on extremism, what did you do?

A I continued writing for various media publications, researching, and then in 2019, I started working for a new think tank in Washington called New Lines Institute.

Q What is the New Lines Institute?

A It's a think tank, specialized mostly in the Middle East but other parts of the world.

Q What was your job title at the New Lines Institute?

A Director of non-state actors.
Q What is a non-state actor?
A Basically, militant armed organizations that were not a state.
Q Would that include a terrorist organization?
A Terrorist organizations, militias and so on.
Q What were your job responsibilities as a director at the New Lines Institute?
A Study extremist organizations in context as well as overseeing work by others, whether it's staff or external contributors about that subject.
Q Are you still a director at the New Lines Institute?
A I moved to -- I'm still with the Institute and title, the title, but the main task is I founded a magazine in 2020 to, that's part of the institute.
Q And what was the name of that magazine?
A New Lines Magazine.
Q Is that what you testified to earlier?
A Yes.
Q And I believe that you mentioned or you testified earlier that it's a global affairs magazine?
A Yes.
Q How often does it publish pieces?
A Every weekday.
Q And is that Sunday through Saturday or Monday through

Friday?
A Monday to Friday.
Q How often -- excuse me.
Where is it printed?
A In the U.S. It was printed and now it's mostly online.
Q And just to clarify, you mean that it was printed in hard copy in the United States?
A Yes.
Q And now it's online?
A Yes.
Q What kind of pieces does the New Lines Magazine publish?
A So we published primarily about the Middle East, but we call ourselves, like, a local magazine for the world meaning we provide reportage from different parts of the world from local writers or people who know the legal environment very intimately.
Q Since writing your book about ISIS, have you done or have you prepared any other books or written other books about ISIS?
A I wrote book, a book chapter, book chapters, or two, and other research papers but not a book.
Q What book chapters did you write?
A In 2018, I wrote a book chapter for Oxford University Press about the sectarianism and ideology of ISIS.
Q And what about the other chapter that you wrote?

A I wrote one for the Middle East Institute also about the strategy of ISIS, the military strategy and so on.
Q Have you published any academic studies on ISIS?
A I did a few research papers for the West Point's CTC Sentinel.
Q And by West Point, is that West Point Military Academy?
A Yes.
Q Were there any other institutions where you published research papers?
A Yes. I did one for, various ones for Carnegie Endowment. That's a think tank. And Chatham House in the UK and, like, other ones.
Q And what were some of the topics of these research studies that you did on ISIS for these papers?
A Mostly about ISIS military strategies, moves, tactics, as well as the origins and different aspects of ISIS operations.
Q And you testified about writing for The Atlantic.
What other publications, if any, have you written for?
A I wrote pretty much for all the major publications for New York Times, The Atlantic, Foreign Policy, Foreign Affairs, in the UK for the Guardian, for Telegraph.
Q Have you provided any testimony to the United States Congress about ISIS?
A I did.

Q What Houses of Congress did you testify in, if any?
A I testified before the Senate, before the Senate in 2016, and before the House, the House, before the House in 2017.
Q When you testified in front of the Senate in 2016, what was the subject of your testimony?
A Before the Senate, it was about the origins, the ideology of ISIS and its origins.
Q And when you testified in front of the House, what was the subject matter of your testimony?
A It was also terrorism in Syria, ISIS terrorism in Syria.
Q You testified earlier, of course, about your research and your review of ISIS propaganda and documents for your book published in 2015.

After that book was published, did you continue to review ISIS-produced statements and documents?
A Yes.
Q About how many ISIS documents do you think you have reviewed?
A In the thousands. I mean the Washington University documents were more than 10,000 documents.
Q Did ISIS publish periodicals like magazines?
A Yes.
Q Did you review those periodicals?
A Yes.
Q What kind of content was written there?

A Typically, it would be ISIS propaganda like military, military events. They run obituaries, for example, profiles of ISIS members. They give their opinions about world events, and, basically, ISIS, you know, kind of a variety of materials ranging from opinion to profiles to military, military statistics and military events.

Q How are you able to access and review these ISIS publications?

A In the beginning, it was easy, easily available online. A link would be distributed before social media platforms started cracking down on ISIS materials. After that, it became harder to get on social media.

You still have it on social media, but it was mostly in Telegram, more like encrypted platforms like Telegram and other social media. Still accessible to experts, yes, as well as on, like, underground. It would be -- people would circulate it underground and you can, you know, they can be sent from there.

Q And did you have contacts on the ground?

A Yes.

Q Did you receive materials from your contacts?

A Yes, like pictures, you know, content, specific pages and things like that.

Q Did you review materials published by governments on ISIS?

A Yes.
Q What kinds of materials?
A Documents provided by the U.S. Government about military logs and things like that.
Q In the time period from the rise and establishment of ISIS through its military defeat, did you follow any local reporting from Syria and Iraq, in particular?
A Yes, daily, following the news.
Q Did you also review scholarly articles or reports conducted by other researchers like yourself?
A Yes.
Q What types of article or research did you review?
A Anything written on subjects of interest in academic papers or in the media, think tanks and such.
Q As part of your research, did you become familiar with ISIS's organizational structure?
A Yes.
Q Did you become familiar with ISIS's leadership?
A Yes.
Q And did you become familiar with its military structure?
A Yes.
Q Did you become familiar with its recruitment efforts?
A Yes.
Q And as part of your research, did you also become familiar with ISIS's recordkeeping, in particular, its own

documents?
A Yes.
Q Have you ever testified in court before on the topic of ISIS?
A Yes, I did.
Q Approximately how many times?
A Three times.
Q In which courts have you testified?
A Twice in Michigan, Detroit, and one in Florida, Miami, Florida.
Q In those cases, for whom did you testify?
A For the government.
Q What is the value of your contract with the government in this case?
A So my billing rate is 300, it's hourly, $300.

MS. SHAMI: Your Honor, at this time, the government moves to qualify Mr. Hassan as an expert on ISIS and internal ISIS documentation.

MR. JACOBSON: May we briefly voir dire, Your Honor?

THE COURT: Sure.

MR. JACOBSON: Thank you.

VOIR DIRE EXAMINATION

BY MR. JACOBSON:

Q Good morning, Mr. Hassan. You're a journalist by trade?
A Yes.

Q And your book about ISIS is about ISIS generally, is that right?
A Yes, about everything related to ISIS.
Q And I think you said that between 2016 and 2019, you were in Washington, D.C.?
A Yes.
Q You were not in Turkey?
A No, I wasn't in Turkey. I don't remember. I was in 2014 in Turkey.
Q 2014? Between 2016 and 2019, you were not in Syria either, were you?
A No, I wasn't in Syria.
Q You don't have any law enforcement training or background?
A No.
Q You've only ever looked at Nusaybah Katiba documents in connection with this case, is that right?
A I looked at different documents but, yes, primarily Nusaybah Katiba.
Q In this case?
A Yes.
Q Okay. And you've never written about Nusaybah Katiba, is that right?
A No.
Q I think you said that while you were at GW, you reviewed

10,000 ISIS documents?
A Yes.
Q You were at GW for two months, is that right?
A About over, you know, about that. I don't recall exact number.
Q And, primarily, the documents you were reviewing were similar ISIS documents, is that right?
A Yes.
Q You're not an ISIS military document expert?
A As far as I remember, they were primarily about, like, land logs and, like, you know, civil, governments.
Q And you've never been called on in court to authenticate an ISIS document?
A Only in, like, such a context, but not specifically to authenticate, no.
Q This would be the first time?
A I think so.
Q Your testimony in prior --
A I testified about documents but not -- I don't know if the technical word is write, authenticate.
Q Right.
Your testimony in prior cases was about ISIS generally, is that right?
A For the most part.
Q You've never been asked in court to determine a real ISIS

document from a counterfeit ISIS document?
A I testified about, like, I reviewed ISIS documents, talked about them.
Q You've never been asked to determine a real from a fake?
A As a technical expert? I don't think so.
Q Thank you.

MR. JACOBSON: Judge, we have no objection to Mr. Hassan's testimony about ISIS generally, but we don't think he's qualified to authenticate a ISIS military document.

MS. SHAMI: I think, Your Honor, that I would have a few follow-up questions.

THE COURT: Go ahead.

VOIR DIRE EXAMINATION

BY MS. SHAMI:

Q Before this case, were you familiar with Nusaybah Katiba?
A Yes.
Q How were you familiar with it?
A So as part of my studies on ISIS, Nusaybah Katiba was one of many brigades we looked at. It was -- one memorable kind of detail I got was from one of the wives, not directly to me but like one of the testimonies publicly available of the former wife of Abu Bakr al Baghdadi, the leader of ISIS at the time, who was part of Nusaybah Katiba. And it also operated in my area, in eastern Syria. So I'm very familiar with the different brigades and especially the ones that operated in my

hometown.

Q And setting aside the documents that you reviewed at the GW program for extremism, before this case, have you reviewed military documents from ISIS?

A Yes. Yes, like, a lot of documents. Part of -- a big part of my study is to kind of daily review of ISIS and study of ISIS is to look at ISIS documents and examine whether they're fake or forged or real because that was part of understanding ISIS and writing about ISIS.

Q And setting aside testimony about whether or not a document might have been real or fake, have you ever opined between scholars or in any kind of capacity about the genuineness of ISIS documents?

A Yes, many times.

So one prominent case is I was the first to call out New York Times, the New York Times on publishing a forged document by ISIS because I looked at -- even though other experts examined the documents and authenticated them, I looked at them and immediately, you know, knew that the document was forged and that forced New York Times to recant, that kind of publish a follow-up basically walking back the you authenticity of the document.

So, you know, as part of my expertise, I know whether a document is an ISIS document or not.

Q How are you able to determine that the documents

published by the New York Times were fake documents?

A So I look at different -- first, I look at the document, read it, its written in Arabic.

If something is inconsistent with ISIS ideology, that's a first, a red flag, but what I did there was the content of the document itself contradicted what we know about ISIS. Specifically, not to elaborate too much, but specifically it was claiming that ISIS was paying another group that ISIS called infidel money to protect its own leader which made zero sense and that passed through different experts, but for me, I look at the content in the document and I found red flags that led me to believe the document was forged.

MS. SHAMI: Your Honor, I believe that the witness has a basis to opine on the Nusaybah Katiba based on his prior experience as well as military documents based on his prior experience and his general expertise in genuine and inauthentic ISIS documents.

THE COURT: Thank you.

MR. JACOBSON: If I can ask two or three follow-up questions, Judge.

THE COURT: Sure. Go ahead.

FURTHER VOIR DIRE EXAMINATION

BY MR. JACOBSON:

Q Mr. Hassan, I think you were just referring to the

Callimachi article, is that right?
A Correct.
Q And it sounds like you published something that caused them to retract that article or issue a correction, right?
A Yes.
Q Where did you publish this?
A On social media.
Q On Twitter?
A Twitter, yes.
Q Who is the wife of Abut Bakr al Baghdadi?
A I don't recall her name now but one former wife. He has, you many -- you know, I don't recall right now.
Q And your testimony is that she was a member of Nusaybah Katiba?
A Yes, she testified. She said that to Iraqi authorities.
MR. JACOBSON: That's all I have. Thank you.
THE COURT: Okay. I'll hear from you -- sorry.
MS. SHAMI: Thank you, Your Honor.
THE COURT: I'll hear from this witness.
DIRECT EXAMINATION (Continued)
BY MS. SHAMI:
Q Mr. Hassan, what is ISIS?
A So ISIS is an Islamist, an extremist Islamist organization that emerged out of the jihadist Al-Qaeda world and, specifically, emerged from Iraq after, in the wake of

their invasion of Iraq.

Q And particularly when was ISIS created?

A So ISIS was originally -- so ISIS evolved over time. What we know today as ISIS evolved from different names. It's the same organization but changed its name according to its different strategies.

It was founded by a Jordanian foreign jihadist who traveled to Iraq around the time of the U.S. invasion of Iraq in preparation to fight the Americans. He founded this extremist organization from a small franchise that he established in Iraq in 2003. And then within a year, he pledged allegiance to Al-Qaeda. So he changed his group's name to Al-Qaeda in Iraq. Specifically, Arabic, it's called Al-Qaeda in the land of the two rivers.

Then they operated in Iraq as the local franchise of Al-Qaeda until 2006. There was another change, change of name because the founder of ISIS at the time was killed. So the group changed its name after it merged with other jihadist organizations in Iraq, and called itself the Islamic State of Iraq. So now it pretended to be an Islamic State, a governing body, and started to govern parts of Iraq at the time.

That continues, the Islamic State of Iraq, until 2013 because it had already from -- sorry, it's confusing. From 2011, they established a franchise in Syria but it was in secret, but in 2013, they publicly announced that the local

organization in Syria is actually part of ISIS. So they claimed a merger between these two organizations and called themselves, instead of the Islamic State of Iraq, now it's called the Islamic State of Iraq and Syria, hence, ISIS. And in 2014, they claimed to be a global caliphate so they called themselves just the Islamic State and they tried to expand beyond Syria and Iraq.

Q So you've used the word "caliphate." What does that mean?

A "Caliphate" is from an Arabic word that means the governing, the government, to simplify it, the government that succeeded the Prophet Muhammad. After Prophet Muhammad died, his successor was called "caliph" or *khalif* in Arabic, a caliph. And then whoever followed that is called caliph and the system of governance is called caliphate.

Q And when ISIS announced a global caliphate, what was ISIS saying about its goals?

A Very specific. So ISIS ideology is a very specific ideology even within jihadist extremist organizations. Even within Al-Qaeda, it's more extreme. That's why Al-Qaeda itself in 2014, they publicly disavowed ISIS. They said this is too extreme for us. So they said they're no longer part of ISIS, no longer a part of Al-Qaeda.

So ISIS, when it announced the global caliphate, it was saying the only legitimate governed Islamic state in the

world, the only legitimate Muslim form of governance is theirs and, therefore, anything else, anyone who doesn't obey ISIS, anyone who doesn't pledge allegiance to ISIS, or anything that's not ISIS, basically, is non-Muslim or non-Islamic. And everyone has to basically come to ISIS, join ISIS and become part of this organization. Anyone else, local governments in the region, Saudi Arabia, Turkey, Egypt, they're all apostates, they called them. Anyone who lived outside their areas is living in a land of apostasy, not a land of Islam.

So it's a very specific declaration when they announced it.

Q And where did they make this announcement?

A Online through their -- I mean Iraq and Syria, generally speaking, but formally, when Abu Bakr al Baghdadi, the leader of ISIS at the time appeared in the, in a mosque in Muslim called Nouri Mosque, N-O-U-R-I, and he announced that he's the caliph and he dropped his name Abut Bakr al Baghdadi and called himself Ibrahim, his real name.

Q Directing your attention to mid 2014, did ISIS claim to control any territory at that time?

A Yes. Large swaths of Iraq and Syria, almost 40 percent of Iraq and almost half of Syria, territorially speaking. At the time, the shorthand was basically the size of Great Britain. It was a large, large entity that stretched, you know, encompassing Iraq and Syria, parts of Iraq and parts

of Syria.
Q How was ISIS able to conquer this territory in Iraq and Syria?
A Through military means, infiltration, local, basically local presence, and taking over through their military means, overrunning Iraqi army and Syrian, Syrian forces, and through terror. For example, they used -- one of their slogan is terror is key to everything because essentially, for many areas including my areas, they would just drive through because they were scared they were going to behead them or kill them or execute them. So they took over key areas and from there, they just expanded.
Q During the period 2014 to 2015, what was happening with respect to ISIS' control of territory?
A That was -- they're still expanding in some areas, but that was the peak of ISIS, 2014, 2015.
Q And during the period 2016 to 2017, what was happening with respect to ISIS' control of territory then?
A That's when the campaign against them started to essentially work effectively and they started to lose territories very rapidly and be the back foot.
Q And when you say campaign, what campaign was against them?
A This is the campaign launched by President Obama at the time, the U.S.-led coalition to combat ISIS included dozen,

like tens of countries, and they launched this campaign on behalf of Iraq and Syria in these areas.

Q And during the period 2018 to 2019, what was happening with respect to ISIS-controlled territory then?

A 2018 and '19?

Q Yes.

A ISIS already lost its capitals in Iraq and Syria, Mosul in Iraq and Raqqa in Syria, and lost all of the territories in Iraq and then lost all their territory in both Iraq and Syria after their last stand in Syria.

Q How many people lived under ISIS control at its height?

A Ten million was the estimate.

Q Earlier, you testified about ISIS propaganda attracting hardliners.

What was the purpose of attracting hardliners to ISIS?

A So ISIS was -- the focus for ISIS in 2013, so before the caliphate, was to attract the most hardened fighters or ideological loyal fighters and members, and those were foreign fighters who came to Syria in the context of the war in Syria.

So at the time, Syrians, local Syrians were fighting and struggling against the Assad regime to remove the dictatorship in Syria, not for ideological reasons but for political reasons. Whereas, foreign fighters who came to Syria and Iraq, they were, they came there for the ideology,

they came there because they saw, they saw an opportunity to be part of an Islamic State.

That distinguished foreign fighters from locals, and jihadist organizations like ISIS wanted foreign fighters because those people came to die in martyrdom and that's what they wanted. They wanted to establish an Islamic State or die for it or die trying, essentially.

Q What was the cultural and nationality background of the foreign fighters that came to ISIS to join?

A Like religious? Like they were Sunni --

Q Countries.

A Like from around the world.

Q How many foreign fighters joined ISIS approximately?

A The estimate at the time was 35,000 fighters and, if you included their family members, there were around 100,000.

Q Did foreign fighters need to have any special skills to join ISIS?

A No.

Q Did foreign fighters have to bring weapons with them to join ISIS?

A No.

Q If a foreign fighter came to ISIS without a weapon, how would they be able to get one?

A There was a process. So foreign fighters typically came through Turkish borders into Syria and when they joined, when

they entered, they enrolled in training orientation that involved military training and ideological training so when they graduate, they will be assigned to different functions within ISIS and they would be given weapons and so on and so forth.

Q Are you familiar with the word "*katiba*"?

A Yes.

Q What is a *katiba*?

A It just means brigade or formation, like military formation.

Q Are you familiar with specific *katibas* in ISIS?

A Yes.

Q Are you familiar with the Nusaybah Katiba or Nusaybah bint Ka'ab?

A Yes.

Q What is it?

A It was an all female fighting group.

Q How are you familiar with it?

A I was familiar --

Q There's water there for you.

A That's okay.

I was familiar with ISIS's different brigades, local brigades, and one of them was Nusaybah. One of them was part of the materials I saw, interviews, like I said earlier, testimonies by the former wife of Abu Bakr al Baghdadi, and

general materials, you know, references to them.

Q Where does the name of this *katiba* come from?

A So Nusaybah Bint Ka'ab was an early Muslim companion of the Prophet meaning she was one of the earliest Muslims to convert to Islam and she was also an active participant of early Islam, you know, including fighting for, in major battles in the beginning of Islam.

Q Did ISIS typically recruit female fighters?

A Yes. So even relative to other jihadist organizations, ISIS pioneered, essentially, this idea of using women strategically for, to advance its ideology. Even from the earliest days in Iraq, one of the earliest suicide bombings in Jordan was carried out by an Iraq ISIS at the time, whatever the name was, Islamic State of Iraq, and it was a failed attempt suicide, and then the Jordanian executed her later.

Q And what requirements, if any, did ISIS impose on women to become fighters?

A So ISIS generally, men and female, men and women, nobody would be obliged to join ISIS. They had to volunteer to pledge allegiance to ISIS. So no requirement except wanting to join ISIS.

Q And if one wanted to join ISIS and fight for ISIS, did they have to pledge any kind of oath?

A Yeah. It's called *bayat*, B-A-Y-A-T. It's an oath of allegiance to the leader of ISIS and ISIS itself.

Q And why was that a requirement?
A That's a requirement for everyone to join ISIS.
There's an oath that if they -- if someone pledge allegiance to or pledges that oath, they can't retract it. It's, like, for life. So it's a requirement for anyone to join ISIS to pledge allegiance and if they somehow retract that, ISIS can execute them.
Q You testified earlier that at its height, roughly 10 million people lived under ISIS control.
How did ISIS control its territory?
A Just like with violence, with, like, they use, they mimic other law enforcement means. So they have police, they have military, they have spies, informants, and they control these areas by force, checkpoints, so and so forth.
Q And then within the territory, how did ISIS manage the people and the land under its control?
A Also they mimic government structures. So they have departments, ministries, officials, bureaucracy to govern these areas.
Q Are you familiar with the word "*diwan*," D-I-W-A-N?
A Yes.
Q What is a *diwan*?
A *Diwan* is just a term for department, equivalent to ministry.
Q Are you familiar with ISIS *diwans*?

A Yes.
Q Can you name a few examples that you're familiar with based on your research?
A They -- yes. They have departments for justice, for police, for military. The have one they called Diwan al-Jund, the Department of Soldiers. D-I-W-A-N, A-L, J-U-N-D.
Q And do these *diwans*, just generally, maintain records?
A Yes.
Q How did the ISIS *diwans* or departments maintain records?
A Through the departments, they issued documents, they record details, and they keep the records in their possessions.
Q Focusing on the Diwan al-Jund or the Department of Soldiers, what was the responsibilities of that department?
A Anything related to military matters and the welfares, welfares of families of soldiers, soldiers -- so military matters, soldier affairs and their families.
Q Did the Department of Soldiers issue documents?
A Yes.
Q What kinds of documents?
A Again, documents relating to the specific, like, stats within, like, a brigade, numbers and names who joined them, they would have details about weapons and which soldier has what, and issues like that.
Q And did the Diwan of Soldiers or the Department of

Soldiers receive documents?
A Yes.
Q What kinds?
A They would have, if it's a *diwan*, they would have it from their local offices, local departments, or from different ministries.
Q Are you familiar with the word *mekteb*, M-E-K-T-E-B?
A Yes.
Q What does it mean?
A It just means "bureau" or "office."
Q Were there any *mektebs* or offices or bureaus within ISIS's structure?
A Yes.
Q What was the difference between a department or a *diwan* and an office or a *mekteb*?
A An office is under the *diwan*. *Mekteb* is under the office under the department. Thus, offices would be in different parts of ISIS.
Q Are you familiar with ISIS stamps?
A Yes.
Q What are ISIS stamps?
A Stamp usually include, typically includes the reference to Islamic State and, like, certain design that ISIS uses to stamp documents.
Q And how were ISIS stamps used?

A It was used by bureaucrats, by their clerks, whenever there's a, you know, there's a process, procedure and they use the stamp whenever available.

Q Were all ISIS documents stamped with an ISIS stamp?

A No.

Q Why not?

A So ISIS controlled areas in Iraq and Syria already the hinterlands of Iraq and Syria meaning the remote areas, they don't have all services available, and some of these hinterlands, within them, there are small villages and different areas.

So if you were in Mosul and Raqqa, these are the capitals of ISIS, then stamps were more likely to be there, to be available, whereas in remote areas, ISIS document itself is official because only ISIS issues these documents and only ISIS fills these documents and, therefore, not all of them are stamped.

Q Who had authority to possess and use stamps to stamp a document?

A ISIS officials.

Q And how does one get an ISIS document to have a stamp put on it?

A How does an official?

Q No. How does someone, if they receive an official ISIS document and they want it stamped, how would they go about it?

A Oh, they go to a department that ISIS, a department of ISIS somewhere and they would get a stamp if a stamp is available.

Q Have you reviewed ISIS documents with ISIS stamps on them?

A Yes.

Q How many approximately?

A Like I said, thousands.

Q And have you reviewed ISIS documents that didn't have ISIS stamps on them?

A Yes, fewer. I would say probably in the hundreds.

Q Are you familiar with ISIS using printed document templates?

A Yes.

Q What is an ISIS printed document template?

A Usually a template that has the general expected information to be filled, like the place, the bureau, if it's, you know, or, like, the department, and then specifically, then the specific details, whether a bureau or something, it would be filled later.

So they would have general template addressed to whom it may concern, essentially, and then, and then they leave spaces to be filled by officials.

Q And to be filled by officials how?

A Handwriting. By hand.

Q Why did ISIS use printed document templates?
A It's easier. I mean they have, they issue documents and they give them to different departments and these departments would just fill them in themselves.
Q As part of your work, have you reviewed printed ISIS document templates?
A Yes.
Q The document templates that you've reviewed, what were they for?
A Different, like, military logs, agricultural logs like the ones in the George Washington University, and then they would be filled by hand.
Q What were some of the indicators that these templates were, in fact, genuine ISIS documents?
A So only ISIS issues these documents. So, for me, as someone who grew up in this area, in these areas, governments issue documents and they give them to bookstores. So they can go to a bookstore and buy a document or get a document and fill it yourself or fill it with a card. ISIS was completely different. Only ISIS issued these documents or these papers and not the kind just buy it from somewhere.
So for me, I look at the templates and the details available there and the terminology and the language used and the style. So I look at these things and kind of make sure they're in line or consistent with ISIS documents.

Q In connection with this case, did you examine certain documents provided to you by the U.S. Attorney's Office for this District?
A Yes.
Q I'm going to show you what has been marked as Government Exhibit 1 through Government Exhibit 8, and I think we can use our computer.
I know this is a hearing, but I imagine it's okay to show them?
THE COURT: Yes. Go ahead.
Q Can you please scroll through them?
MS. SHAMI: They're a little blurry on my screen. I don't know if we can focus it.
(Pause.)
MS. SHAMI: Maybe we can blow them up a little bit. I'm not sure they would be easy to read.
Q Mr. Hassan, are you able to read these blown up?
A Yes, I can.
Q Having scrolled through Government Exhibit 1 through Government Exhibit 8, do you recognize these documents?
A Yes. Yes.
Q Are these among the documents that the U.S. Attorney's Office provided to you in this case?
A Yes, they were.
Q What language are these documents in?

A Arabic.
Q Are you able to read these documents in Arabic?
A Yes.

MS. SHAMI: Your Honor, the government moves to admit Government Exhibit 1 through Government Exhibit 8.

Although the government's testimony will focus on the Arabic, the government has provided draft translations at Government Exhibits 1-T through Government Exhibit 8-T that I can also authenticate through Mr. Hassan. They're not final but they are the current translations.

THE COURT: Any objections?

MR. JACOBSON: Yes. We object, Your Honor. There's a lack of foundation here. We have -- there's been no testimony about where these documents came from, how they have made it from Syria to this courtroom, what these documents even are.

MS. SHAMI: Your Honor, that's not the topic of this hearing, Your Honor.

THE COURT: It's okay. It's okay.

Overruled.

MS. SHAMI: Thank you.

THE COURT: They're admitted.

(Government Exhibits 1 through 8 so marked.)

MS. SHAMI: So let's focus on Government Exhibit 1 and, Your Honor, you might want to look at Government

Exhibit 1-T.

Q Can you please read the title of this document in Arabic?

A (Read in Arabic.)

Q What does this title mean?

A So I would translate it, like, "Authorization for gun or weapon permit."

Q And is that title in printed Arabic or handwriting?

A Printed Arabic.

Q And if we were to flip through Government Exhibits 2 through 8, do these documents have the same title?

MS. SHAMI: And, Mr. Jennings, if you can make sure they're all sort of zoomed in.

A Yes, they do. They do, yes.

MS. SHAMI: That's fine.

Q Do they all have the same title?

A Yes, they do.

Q And turning back to Government Exhibit 1, and directing you to the second line of the table, what is the particular weapon listed?

A So in Arabic, it refers to AK-47.

Q What is the Arabic word used?

A "Kalashnikov."

Q And you understand a Kalashnikov to be an AK-47?

A Yes, that's an Arabic name for it.

Q And looking at documents 2 through 8, and we can make it

a little bit bigger, is it the same -- is it, excuse me, the same weapon in each document?
A Yes. In the table? Yes. In print, it's call AK-47.
Q Having reviewed these documents, can you please explain what they are?
A So they are weapon authorization meaning it's a document by ISIS to acknowledge that someone is allowed to carry whatever they're carrying.
Q And why was it necessary or why did ISIS choose to create a document that acknowledged who was permitted to carry a weapon?
A So I remember I wrote about this early on.
ISIS, one of their first moves, was to ban anyone from carrying weapons unless they are members of ISIS. So ISIS issued this kind of mass disarmament because they feared the local population. So only members of ISIS or people issued like guns by ISIS are allowed to carry those.
So they had to basically give them a document to, you know, to prove that this is a legitimate weapon they carry.
Q Why would an ISIS member need to prove that he was authorized or she was authorized to carry a weapon?
A Because, otherwise, they get punished by ISIS if they carry weapons they're not allowed to, they're not registered with ISIS as allowed to carry weapons, permitted to carry

weapons.

Q And who might inquire of an ISIS member regarding whether or not they're permitted to have a weapon?

A ISIS member, ISIS fighters. So they could be raiding a place or stopping someone at the checkpoint at a certain town, like, you know, in a certain area in the streets or on the road.

Q And what would happen if an ISIS member who was carrying a weapon was asked to provide an authorization but was not able to produce one?

A They get in trouble for, you know, certain trouble if they carry weapons and they don't have anything to prove that they are carrying weapon, they are allowed to carry weapons by ISIS.

Q What kind of trouble would that include, if you know?

A Harsh, usually, like, they could accuse them of working against ISIS or conspiring against ISIS, so it's a serious offense.

Q You testified earlier about foreign fighters coming and not being required to bring weapons with them.

Did ISIS do anything to record who came with weapons or who received weapons?

A Yes.

Q What did they do?

A If someone comes with a weapon, they usually had to, you

know, record it somewhere. So if someone came to Syria or Iraq with a weapon and they go to ISIS and say, This is my weapon, they have to register it, they have to record it. And if they're given a weapon by ISIS, they also have to record it.
Q Why did ISIS do that?
A Like I said, because ISIS only allows people who are part of it to carry weapons. Anybody else is considered a threat so, therefore, they wouldn't be given a weapon.
Q How would a gun owner in ISIS territory carry proof of their weapon authorization?
A They have to have the permit on hand or proof of it, a copy of it.
Q And did they need to have the original in their possession?
A No because it was -- you know, when they move from one area to another, like a copy in their mobile, for example, is enough or, you know, any -- yes, a copy, essentially. It works.
Q So whether it was a printed copy or a copy on a phone?
A Yes.
Q Was it commonplace for ISIS members to maintain pictures of documents on their phone?
A Yes, especially after ISIS started losing territory, ISIS moved digital, essentially, so they started moving, relying

less on physical copies and more on digital copies.

Q And per your earlier testimony, that was in approximately 2016 through '17 when the U.S.-led campaign was gaining ground?

A Correct.

Q Were all weapon authorizations issued with an ISIS stamp?

A No.

Q Why not?

A Like I said, sometimes it's -- if it's in a remote area, like on the borders between Iraq and Syria, the stamps are not available but because ISIS -- ISIS, there's a weight to ISIS documents because these documents are issued by ISIS and traditionally, actually, ISIS only used written documents to communicate because that was their way of avoiding surveillance. So, you know, communicating between two people would be in a piece of paper moved from one person to another.

Q Was getting an ISIS document stamped with a seal a requirement for the document to become official?

A No.

Q Why not?

A Like I said, ISIS documents themselves are issued by ISIS. These are not -- they don't need to be authenticated. So if the document is an ISIS document itself, it has weight. The stamp is obviously ideal, but not all areas have stamps. ISIS was still, you know, not like other governments in the

Region. They still lacked resources.

Q If a document was not stamped with an ISIS seal, would that make the document unofficial or in any way deficient?

A No, because people used that to move around and prove things with those documents without stamp.

Q Focusing on the second line of Government Exhibit 1 where there is both printed Arabic and a blank, can you please read that in Arabic?

A Which part, the whole thing?

Q No, the second line, please.

A Second line. In print, it says, "To the brothers in," addressed "To the brothers in," and then in handwriting or in writing, it's called the Department of Soldiers.

Q And the brothers, the word there is "il ikuat."

What significance does the word "brother" or "brothers" have in ISIS terminology?

A So ISIS refers to each other, members, they refer to each other as "*ekh*," "brother," or *"ikuat*," "brothers," or "*ikuat*," "sisters." That's how they communicate with each other.

They wouldn't refer -- they wouldn't say that to someone living in ISIS areas unless they are member of ISIS. And so when you say, "Meet the *ekh*," "meet the brother," means meet another ISIS member.

Q And I think you might have mentioned it. Was there significance for the word "sister" or "sisters" in ISIS

terminology?

A Same but for female members.

Q And I believe you also read Diwan al-Jund, the Diwan al-Jund or Department of Soldiers that you testified about earlier?

A Yes.

Q What does the next line say, in translation, please?

A So rough translation: We hereby confirm that the sister or sister," and then the name of the sister, Um Khattab Al-Muhajir.

Should I spell it?

Q U-M, K-H-A-T-T-A-B, A-L, hyphen, M-U-H-A-J-I-R.

A And then in print, it says, The wife of the brother, and then the name Abu Ali al-Almani al-Khorasani.

Q A-B-U, A-L-I, A-L, dash, A-L-M-A-N-I, A-L, dash, K-H-O-R-A-S-A-N-I.

A And then the ID number shown as, in English, Arabic numbers. And then basically, like I said, "Hereby confirm the sister has completed training and military," or, sorry, "military training and test, and therefore she has or thereby she has the right to obtain the following." And then there's a table.

Q What kinds of names are Um Khattab al-Muhajir and Ali al-Almani al-Khorazani?

A What are these names? These are -- we call them or they

call them, in Arabic, *"kunya*," K-U-N-Y-A, which means like a nom de guerre, kind of a surname they use or nickname they use to identify members of ISIS without using their real name.
Q How does someone get a *kunya*?
A Different ways but basically, ultimately, they have to be approved by ISIS, the name. So someone can pick their name, suggested name, and ISIS has to approve it, yes.
Usually, it has a very typical, almost like template where either "Abu" or "Um," if it's a female, "Um", or "Abu." Other ways, but that's usually like. And then the son of, like, usually the father of or the son of, that's the first part.
Then the second part would be background of the person. It could be, if it's an American person, it would be the American or "Amriki," for example. So they would be referring to the background and that could be a variation of ways of referring to the background of the person.
Q What does the *kunya* "Abu Ali al-Almani al-Khorasani" mean?
A So in this case, it means the father of Ali, who comes from or who is, the background is German or -- German doesn't have to be from Germany. It could be somewhere German. And Khorasani, Khorasan, you already spelled that, it means from the areas of Pakistan and Afghanistan.
Q And what does the *kunya* "Um Khattab al-Muhajir" mean?

A The mother of Khattab, the immigrant. And in this case, basically a foreign fighter who joined ISIS.
Q And is that because *"muhajid"* has a particular meaning in ISIS context?
A Yes, particular meaning. *"Muhajid"* means it's a reference to a foreign ISIS fighter in ISIS areas, non-Syrian, non-Iraqi.
Q Looking at the table that is next on this document, what information is being conveyed in this table?
A So the first one says weapons that, in this case, she, the person referenced here, she already has, so has been given on the spot or already has. And the second one would be weapons that she should have or entitled to.
Q Entitled to receive?
A Entitled to receive in the future.
Q And pursuant to this table, what weapons or other materials did the Um Khattab and Muhajir in this document already have in her possession?
A From what I can see, AK-7, one, and then two magazines.
Q And pursuant to this table, what was she being provided in the future to receive?
A "One quiver, two magazines, and 150 bullets."
Q And then underneath that, there are the line beginning with two asterisks.
What does that say in translation?

A It just says basically not necessarily to be given, as in it's not -- basically, it says here to be given in the future. Here it says that's -- what's, I'm thinking of translation. Basically not necessarily to be given, as in they can decide against it if they want to.
Q Okay. And then after that, can you roughly translate what is the next line?
A Yes. It says: This document and this permit or authorization has been issued by the Department of Soldiers. If you have any further questions or inquiries, please refer to or check with the brothers in the Department of Soldiers.
Q And so when it says Department of Soldiers, does it have the words "Diwan al-Jund"?
A Yes.
Q And does it use the word "brothers" in Arabic?
A Yes.
Q And that's the same Diwan al-Jund you testified about earlier?
A Correct.
Q And then looking at the next lines, what is represented there?
A So that's a phrase in Arabic that essentially means "sincerely" at the end. So, basically, like may God reward you. And then underneath that, the name of the katiba, the brigade, Nusaybah. And then a signature in handwriting.

Q And are you able to read the signature on the signature line?
A Yes. It says, "Um Wousef," and then a signature.
Q U-M, space, W-O-U-S-E-F.
And turning to Government Exhibit 2, what can you tell us about Government Exhibit 2 as compared to Government Exhibit 1?
A Similar template with different details filled.
Q And by the details filled, do you mean the handwriting?
A The handwriting, yes.
Q Looking at the second line on Government Exhibit 2, who is this document addressed to here?
A To the brothers in the Bureau of Martyrs.
Q An is the Arabic word there *mekteb*?
A *Mekteb*.
Q That's the word you defined earlier as office or bureau?
A Right.
Q And what is the Arabic word for martyrs?
A *Shahada*.
Q S-H-A-H-A-D-A.
Are you familiar with the word *"shahada"* based on your expertise in ISIS?
A Yes.
Q What does it mean in ISIS?
A It means killed in action, martyrs. Literally, martyrs,

but it refers to ISIS members who are killed in fight, in fighting.
Q And are you familiar with the Office of Martyrs?
A Yes.
Q What was the Office of Martyrs responsible for?
A This specifically is, like, family members of people, ISIS members who were killed by, killed in the fight for ISIS.
Q And scrolling to the bottom, does Government Exhibit 2 have a signature?
A Yes.
Q Is it in English or in Arabic?
A That, the signature itself, and the name is Umu Mahdi, but the signature above it is presumably in English.
Q U-M-U, M-A-H-D-I.
A Yes. Umu Mahdi, yes.
Q Does either Government Exhibit 1 or Government Exhibit 2 have any ISIS stamps on them?
A No.
Q And in looking at Government Exhibit 3, comparing Government Exhibit 3 to the previous documents 1 and 2, again, can you tell us about the comparison between 3 versus 1 and 2?
A So same template, same style, but this one has the stamp. The others ones don't have a stamp.
Q And does this also have different details in the handwriting portion?

A Yes. This, yes.
Q Looking at the handwriting portion, if you can read, who are the sister and brother handwritten there?
A Um Muhammad al-Ladiqani, the mother of brother Abu Ahmad al-Ladiqani.
Q And in Government Exhibit 3, do you see where it says "the mother of," was that handwritten as well?
A Yes, that's handwritten over "wife." So the original printed Arabic said "wife of" and then it was struck and written above it, "mother of" instead of "wife of."
Q So ISIS used this template but then modified it for the situation here, is that right?
A Yes, because -- yes.
Q And does this document have a signature?
A Yes.
Q Are you able to read who signed it?
A Illegible. There's a signature.
Q And you testified that this has a stamp on it. Is the stamp readable to you in Arabic?
A Yes. I can read it, yes.
Q In the top circle part, what does it say in English?
A It says the Islamic State.
Q And then underneath the circle, there's some scratched out. Are you able to see underneath the scratched out?
A Yes. I can, I can see it through the scratches, yes.

Q What are you able to read?
A It says, "Walaya al-Furat," the government of, Furat government. F-U-R-A-T.
Q And what is the significance of the -- sorry.
Is *"walaya"* another word for governor or province?
A Yes, province or governor.
Q And what is the significance of the al-Furat province or governor stamp here?
A So that province was established by ISIS to include parts of Iraq and Syria. So on the borders, in that corner, that's where I came from, and then they called it Euphrates province, essentially. That's what it means, yes.
Q And what is the significance of having the province or what does it signify that the province is listed on the stamp?
A Oh, it means whatever is happening here in the document is happening that area.
Q And --
A The person, the authority is, the local office is there, the *diwan*, you know, the officials and the member operated there.
Q And does this stamp, I guess in the second line, I'll just direct you, does it have the particular office identified?
A Yes. Yes.
Q What does it say there?

A It says the Center for Mujahideen Affairs.
Q And for that, it's M-U-J-A-H-I-D-E-E-N.
Are you familiar with the word "*mujahideen*" as part of your research?
A Of course.
Q What does that word mean?
A It just means jihadist but that's ISIS preference for jihadist, they call themselves *mujahideen*.
Q What is a jihadist?
A Jihadist? A person fighting for the cause of jihad which means war against others.
Q And then turning to Government Exhibit 4, compared to the previous documents at government 1 through 3, stylistically, what do you see here?
A Same template, same brigade, but with a stamp.
Q And are the handwritten details different?
A Yes, for the most part, different.
Q And is the stamp fully readable in Arabic?
A Yes, I can read it.
Q Are you able to determine what agency or office or bureau, if any, stamped this document?
A The Department of Health.
Q And can you see some numbers and some handwriting in Arabic on top of the stamp?
A In the document itself or --

Q Yes?
A -- or underneath it?
Q I guess on the first part, "Abu Saud," and then underneath that, do you see Arabic numerals?
A Yes.
Q -- or portion?
And what date do you see there?
A 14, 1439, and then 520.
Q Do you recognize that as a date?
A Yes. That's the reference to Islamic calendar that ISIS used. So they don't use the Gregorian calendar. They use the Islamic calendar. And this is the fifth month, day 20, the year 1439.
Q Does the date 5/20/1439 in the Islamic calendar roughly convert to February 6, 2018, in the Gregorian calendar?
A Yes, around there.
Q And then looking at Government Exhibit 5, what does this document appear to be as compared to government Exhibits 1 through 4?
A Same template, different details.
Q And if we were to turn to Government Exhibit 6, same question. How does Government 6 appear comparative to Government Exhibits 1 through 5?
A This is similar, same template stamped. Different names and details.

Q And going down to the signature, are you able to read the signature?

A Yes, I am.

Q What does the signature say?

A Um Yousef.

Q And turning back to Government Exhibit 1, who is the signature here again?

A Same, Um Yousef.

Q And then turning back to Government Exhibit 6, do you see multiple stamps?

A Yes.

Q Why would a document get multiple stamps?

A In this case, they have a general stamp, meaning the Islamic State, the Euphrates province, and underneath it, a very specific brigade.

Q And what is the specific brigade that is listed in that second stamp?

A Dawud, D-A-W-U-D, which is equivalent to David, brigade. And then underneath it says the second brigade or brigade two.

Q And then turning to Government Exhibit 7, how does this document appear to you as compared to Government Exhibits 1 through 6?

A The same template, different details.

Q And then focusing again on the signature, who signed this document?

A The same person, Um Yousef.

Q And then finally, turning to Government Exhibit 8, how does this document appear to you based on previous Government Exhibits 1 through 7?

A Same template, same brigade, stamped, different names and different details.

Q Having reviewed Government Exhibits 1 through Government Exhibit 8, what conclusions, if any, did you draw as to whether these appear to be genuine ISIS documents?

A The first one is they're consistent. They're the same template, terminology used, consistent with ISIS terminology. The departments check as well, like these are responsible for these details. And the name and scheme or system they use also consistent with ISIS documents. The stamps further reinforce that because it specifically tells you where these things were happening and who's in charge. And then the brigade in the area.

So all the data are consistent. Usually if there's any red flags, it would be something, like, the details don't check. But everything here tells me these are ISIS documents, mostly from that area between Iraq and Syria, the borderlands, and they relate to relatives or members, like, the name is included of ISIS members, and the weapons that should be, they're given or should be given.

Q Focusing on the templates in Government Exhibits 1

through 8, who would have access to these templates for this military authorization?

A So these are usually, they have to be issued by ISIS so only ISIS has them and only officials of ISIS have them.

Q And by officials, you mean senior members of ISIS?

A Senior members in charge of either the department or a bureau or people working with them.

Q Thank you.

MS. SHAMI: No further questions.

MR. JACOBSON: Your Honor, can we take a quick break to get set up?

THE COURT: Sure. Let's take a ten minute break.

MR. JACOBSON: Thank you.

(Recess taken.)

MS. SHAMI: Your Honor, before the defense starts their cross, we just want to note our objection to the defense's providing to us literally five minutes ago a binder of exhibits totaling at least 40 exhibits, some with translations.

The government made requests for disclosures for any materials that would be used and we only received it today. So we have just a standing objection to many of these materials being used.

THE COURT: What are you talking about? So you're saying that they produced to you exhibits they're going to

show this witness?

MS. SHAMI: Literally, five minutes ago, this giant binder even though the government requested disclosures from them in communications.

THE COURT: And they're exhibits that are not part of discovery, obviously, or that you've never seen?

MS. SHAMI: We don't know yet. I mean some of them, I recognize from the Arabic and what is in the translation, but, for example, the translations, who will be authenticating them, we review translations with linguists and with Mr. Hassan.

So whatever is in here has not been shared with the government, the government hasn't been able to review it for any objections, and we just have a standing objection to basically being provided this. It wasn't even provided to us this morning when we showed up to court. It was only provided five minutes before Your Honor walked in right now.

MS. EISNER-GRYNBERG: Thank you, Judge.

These are our exhibits for cross-examination. They are all objects received from the government in discovery or articles in the public record in the media. Any translations consistent with the government's practice have been done by a certified translator and they're also only draft translations.

The witness on the stand is fluent in Arabic. If we ask him to translate a term in realtime just as the government

did, we trust that he will translate it appropriately.

We're not moving this binder into evidence. It's only for reference. If there comes a time that we're going to move one of the pieces of proposed exhibits into evidence, we can discuss at that point if there's any issues with the translation, which I don't think there are, but I anticipate that, if at all, we'll be entering into evidence items from the government's discovery.

MS. SHAMI: I think, Your Honor, that multiple of these documents, that none of these documents appear to be, having flipped through it very quickly, appear to be the military document or the military document, other examples that the government provided. These seem to be dozens of documents from multiple other devices having nothing to do with the question of authenticity.

What the government has sought to do here is limit it and we understood Your Honor to be limiting this to the authenticity of a document.

So it is not clear what this is proposing to do other than expanding the scope significantly of what we are here today to accomplish which is the authenticity of Government Exhibit 1.

THE COURT: Okay.

MS. SHAMI: They have no reason for providing it to us so last minute. The fact that they were potentially for

cross still entitle the government to receive them certainly more than five minutes ago.

THE COURT: Why don't we move ahead and if you have objections to specific exhibits, we can deal with it then.

CROSS-EXAMINATION

BY MR. JACOBSON:

Q Good morning again, Mr. Hassan.

A Good morning.

Q We covered a lot of topics on direct examination. I want to zoom out for a second and start with your background. Okay?

A Sure.

Q You're a journalist?

A I am.

Q You don't have any formal training in document analysis, right?

A No.

Q And you have no law enforcement background?

A No law enforcement background, no.

Q You regularly publish in New Lines Magazine now, is that right?

A Now, yes.

Q And that's a magazine that you founded?

A Yes.

Q Now, you spent about 11 years as a journalist before you

started covering extremism, is that right?
A Not 11 years. It was -- when I was working from day one in UAE, I was covering stories related to extremism including terrorism cases in the UAE before, before ISIS, before the Syrian conflict.
Q That was initially -- I believe the groups you were covering in your early days as a reporter were Hay'at Tahrir al-Sham, is that right?
A That came much later.
Q Came later? Okay.
But the predecessor group to that was Jabhat al-Nusra?
A Correct.
Q And you were covering them in your earlier stages as a journalist?
A Yes.
Q Now, in 2014, you started covering ISIS during the formation of caliphate?
A Yes.
Q And you wrote a book about ISIS. We've talked about that already?
A Correct.
Q And the focus of book was on the origins and ideology of ISIS?
A Yes.

Q And I think you said you conducted interviews for that book?
A Yes.
Q Many of your interviews were via WhatsApp?
A They varied. Some of them, first, face to face.
Q Okay.
A On calls, over the phone, WhatsApp and other social media, Facebook.
Q And you were in the UAE at the time?
A I was, yes.
Q And you were using WhatsApp to contact people in Syria?
A Yes.
Q None of your interviews were in Syria?
A Not physically in -- I wasn't in Syria, but I talked to people in -- my family was there.
Q Yes.
A -- my contacts, and everything.
Q You were not in Syria?
A I wasn't in Syria, no.
Q Some of the interviews you conducted in Turkey, right?
A Yes.
Q And that was primarily in late 2014?
A Correct.
Q Your book was published in 2015?
A Correct.

Q And 2015 is before Nusaybah Katiba was founded, is that right?
A Yes.
Q Nusaybah Katiba is not mentioned in your book?
A No.
Q You testified in 2016 in a Senate committee on the ideology of ISIS?
A Yes, correct.
Q You didn't testify about Nusaybah Katiba?
A No, I didn't.
Q And in 2017, you testified before a house committee on defeating terrorism in Syria?
A Yes.
Q You didn't testify about Nusaybah Katiba in that hearing either?
A Not in name, no.
Q Before today, you've never testified about Nusaybah Katiba documents, right?
A No, not specifically.
Q And you've never testified about Nusaybah Katiba in any forum?
A No.
Q Not in Congress and not in a court?
A No.
Q You've never written about Nusaybah Katiba?

A Not public, no.
Q You haven't written about it at all in your New Lines articles?
A No.
Q And before your involvement in this case, you had never seen a Nusaybah Katiba document?
A Not a, not a document but I seen ISIS documents for other brigades.
Q Other brigades. You had never seen a Nusaybah Katiba document?
A I saw references to it but not a document, no.
Q Now, in your career as a journalist, you try to always be accurate, of course, right?
A Of course.
Q But you have published things that turned out to be wrong?
A As everyone does, yes.
Q I'll give you an example.
A Nobody is a prophet.
Q In 2021, for example, you published that Ayman al-Zawahiri died of asthma, right?
A I reported based on sources with caveat that qualified. I said this is not a hundred percent, but this is what I, I heard from a reliable source.
Q Your source was wrong?

A Yes, it turned out to be. The story that he heard was wrong.
Q He died in a drone strike in Kabul?
A That's right.
Q And in February of 2022, you published an article about who you believed to be the next caliph of ISIS?
A Yes.
Q And you had a source that told you it would be Bashar Khattab Ghazal, is that right?
A Yes.
Q And it wasn't?
A It's not confirmed because -- that was still debated because the Turks announced that they captured him, that person, as he was an ISIS member, and they announced, actually, that was after I published it. So the Turks actually confirmed my story.
Q Okay. But Bashar Khattab Ghazal did not become the next caliph of ISIS?
A We don't know because when that person was arrested by Turkey, ISIS, there's a -- you know, the Turks said he was the member, he was the leader of ISIS but ISIS denied it and then announced another person as the leader.
Q But you had backup potential caliphs as well; there were two other individuals that you thought might be the next caliph?

A Yes. I don't remember the specifics.
Q Okay. Mr. Hassan, when were you first contacted by the prosecutors about this case?
A Specifically, I don't know.
Q Was it January 2026?
A Like, I don't really remember but it was recently.
Q Around?
A Around then, yes.
Q And when did you start preparing with them for your testimony?
A After that.
Q Sometime after January?
A Yes.
Q Approximately how many prep sessions did you do with the government?
A I would say prep sessions, probably a couple.
Q A couple?
A Yes, probably.
Q Were those prep sessions by phone or in person?
A Phone, Zoom, and now, basically.
Q Did you prep with them in person yesterday?
A No.
Q Last week?
A No. In person?
Q Yes.

A Like, over virtually or in person?
Q In person?
A In person? No.
Q Only virtually?
A Yes. I did, you know, just before the court case.
Q And in any of those prep sessions, did you observe the prosecutors taking notes?
A No.
Q They took no notes at all?
A I don't remember if they did.
Q So, Mr. Hassan, today you've been qualified as an expert regarding the conflict in Syria and ISIS, is that right?
A ISIS, conflict in Syria and the Middle East, yes.
Q And you testified about ISIS's creation?
A Yes.
Q Right?
You testified about ISIS's bureaucracy and you testified a little bit about ISIS documents, right?
A Correct.
Q Now, you've previously testified in the Musabu case and in Musabu, you testified about ISIS generally, right?
A Generally about any relevant details about the case.
Q You testified about the origins of ISIS?
A Yes, sir. Yes, I did.
Q You also testified in the Imran Ali case?

A Yes.
Q And, again, you testified about the founding of ISIS in that case?
A I did, yes.
Q You also testified in the Mohamed Nasir case?
A I believe so.
Q And in that case, you testified about the rise of Islamist militancy, is that correct?
A Correct.
Q You also talked a little bit about Islamist propaganda?
A Yes.
Q So today was the first time you've been qualified as an expert in ISIS documents?
A Like I said, I testified before on ISIS documents, reviewed them, spoke about them.
Q Today is the first time you've been qualified as an expert in ISIS documents?
A If that's the -- I'm not sure about the technical terms but I think probably, yes.
Q Let's talk about the origins of Nusaybah Katiba and the timeline.
You were not in Syria in late 2016, right?
A No, I wasn't, no.
Q You were -- and you weren't in Turkey either?
A No, I wasn't.

Q Were you in Chatham House in the UK?
A 2016?
Q Yes.
A No, I was, I was in the U.S., here.
Q At the Tahrir Institute?
A Yes, exactly, yes.
Q You were not present in Raqqa in 2017 when the *katiba* was in training?
A No, I wasn't, no.
Q You were still in Washington,D.C.
A I was still in Washington.
Q Okay. Now, it's fair to say you've reviewed hundreds of ISIS propaganda videos, right?
A Yes, I would say.
Q You've never seen a Nusaybah Katiba propaganda video, have you?
A I saw female brigade like about women, propaganda related to women fighters.
Q But it wasn't specifically a Nusaybah Katiba propaganda video?
A No, I don't remember that, except for the video about ISIS, like, disseminated by a former leader, a former wife of the former leader of ISIS.
Q You have a binder of government exhibits in front of you, Mr. Hassan.

A Two, yes.
Q If you could turn -- the thinner binder of the government exhibits?
A Yes.
Q If you could turn to Government Exhibit 1, please.
You talked a lot about this document, correct?
A Yes.
Q You don't know who Um Khattab al-Muhajir was?
A No.
Q Did the prosecutors tell you who Um Khattab al-Muhajir was?
A I don't think so, no. At least I don't remember.
Q So you've obviously never met or spoken with Um Khattab al-Muhajir?
A No.
Q And looking at the bottom of the bottom of Government Exhibit 1, do you know who Um Yousef was?
A No.
Q You've never interviewed her, right? You've never spoken to her?
A No.
Q You have no idea who she is?
A I can glean from here.
Q But as a person?
A Not as a person, no.

Q And you've never interviewed any women who received training from Nusaybah Katiba?
A Not specifically from Nusaybah Katiba.
Q And just looking at Government Exhibits 1 through 8 more generally, you didn't personally collect any of these documents?
A No.
Q The first time you saw these document was sometime after January of 2026?
A These specific about Nusaybah, yes.
Q And you saw them because the prosecutor showed them to you?
A Correct.
Q You have no idea where they came from?
MS. SHAMI: Objection, Your Honor.
THE COURT: Overruled.
You can answer.
A I mean I can --
THE COURT: You don't have to speculate.
A Then I don't know.
Q Now, to receive training from Nusaybah Katiba, I believe you testified that you had to swear allegiance to ISIS, right?
A Correct.
Q But you're not actually swearing allegiance to ISIS; you're swearing allegiance to the caliph, right?

A Both.
Q You would swear allegiance to, at the time, al Baghdadi, is that right?
A Yes, Baghdadi and ISIS as, you swore allegiance to him as the leader of ISIS and to ISIS itself.
Q And I think you said that's called pledging *bayat?*
A Yes.
Q How would you pledge *bayat*? Physically, what would you do?
A So in person, you would just, it could be shaking hands with, shaking hands with someone delegated, authored to receive the *bayat*, and recite a certain long, basically, paragraph length allegiance that you basically say I swear allegiance to Abu Bakr al-Baghdadi in this case and I will not challenge him and I will not challenge this role, this office, essentially, and the reference to indefinitely, basically this is, and I will obey him in hardship and ease, so and so forth. So that kind of allegiance.
Q And you can either do that in person or in writing, right?
A In person, in writing, remotely as well, virtually.
Q And of the women mentioned in Government Exhibits 1 through 8, you haven't seen any evidence that any of them swore allegiance to Baghdadi?
A No.

Q Now, on direct, you talked a little bit about foreign women traveling to Syria starting in about 2014, right?
A There were some in 2013. There some already in Syria from before.
Q And that's called making *hijra*?
A Yes.
Q Basically, making a pilgrimage to the caliphate?
A Not a pilgrimage. Basically uprooting yourself and relocating to ISIS territory.
Q And I think you said that some women who made *hijra*, especially foreign women making *hijra*, wanted to take up arms and fight?
A Yes, some.
Q And you say the katiba was a battalion of female fighters, right?
A Correct.
Q And these women fighters were authorized to fight for the *walaya* of Raqqa?
A Authorized by the *walaya*, yes.
Q And the *walaya* is essentially the governor?
A The governor or the mayor, yes.
Q And the primary purpose of Nusaybah Katiba was to defend Raqqa during the 2017 seige, right?
A It was fighting so it could be for that and beyond. Not just Raqqa.

Q But it was founded as a means of defending Raqqa?
A Not specifically, no.
Q Women didn't just serve in Nusaybah Katiba. There were also women in the *hisbah*?
A Yes.
Q And the *hisbah* was essentially like a religious police authority?
A Correct.
Q And women also served in the Khansaa Brigade. Are you familiar with that?
A In which one, Khalid?
Q Khansa Brigade, K-H-A-N-S-A?
A K-H-A-N -- sorry?
Q K-H-A-N-S-A-A, Khansaa Brigade?
A Or "Hansaa."
Q Sorry.
A That's the original, that's the original all female brigade that was established also in Raqqa at the peak of ISIS and it was primarily for police and other women in the caliph.
Q So women served in the Khansaa Brigade?
A Exactly.
Q You've read -- I think you've said that you've read a lot of internal ISIS directives, right, while at GW and as part of your research?
A Yes.

Q So you're familiar with the Khansaa Brigade's manifesto about female fighters?
A Manifesto itself? The ethos, yes, like the --
Q Have you specifically read their manifesto as translated by Charlie Winter?
A Like, vaguely, I remember that, but I don't remember the wording.
Q Are you generally familiar that there was manifesto or a *fatwa* about women in ISIS, that they would be obligated to fight in a defensive war?
A Oh, yes, yes.
Q Okay. So you are familiar with that *fatwa*?
A I'm familiar with *fatwa*s, yes, relating to women fighting for ISIS.
Q And that *fatwa* essentially said that women could be obligated to fight, for example, to defend Raqqa?
A Yes.
Q There was also an article in Rumiyah magazine, right, that called women to arms for defensive operations?
A Yes.
Q The 100th issue of Naba magazine was also on that subject?
A I don't remember the specific issue but ISIS has, had to come out to justify use of women in battles.
Q And to your knowledge, did women fight to defend Raqqa?

A Women fight in Raqqa? Yes. I mean mostly Raqqa and elsewhere, they were involved in the welfare, whether by, like, moving, moving things. So they were involved in the war effort for sure.

Q Thank you.

A A fundamental part, like, as a critical part of ISIS operation to use women for either delivering correspondence or infiltrating enemies or suicide bombings.

Q Mr. Hassan, do you know with what a Kimlik is?

A Kimlik is the Turkish certificate for residency.

Q Yes. And it's an identification card that Turkey citizens and residents --

MS. SHAMI: Your Honor, objection. At this point, it's unclear what the connection is to this document.

THE COURT: What's the relevance for this witness?

MS. SHAMI: They're asking --

THE COURT: No, I'm asking --

MS. SHAMI: The --

THE COURT: I'm asking Mr. Jacobson.

MR. JACOBSON: I'll get there in two questions and I think it should be apparent.

THE COURT: Okay. Go ahead.

Q Now, Mr. Hassan, among people making *hijra* to the caliphate, there was a black market for counterfeit Kimliks, is that right?

A No idea about that.
Q If you were traveling to ISIS through Turkey, you needed a Kimlik to pass through Turkey, is that right?
A No. I mean as far as I know, they, people could travel to, say, Istanbul airport, take ground transportation all the way to the south and cross the borders from there. But if they wanted to stay in Turkey, legitimately -- I mean there are people who stay in turkey without. Turkey later on start imposing, you know, residency.
Q Let me use a different analogy.
If you're a teenager in the United States and you want to buy alcohol, you need a fake ID. Right?
A No idea.
MS. SHAMI: Objection, Your Honor. That's at this point far outside the scope.
THE CLERK: Please stand and use the microphone.
MS. SHAMI: Sorry.
Your Honor, at this point, it's far outside. We're actually at three questions and the clarity is not made apparent at all.
THE COURT: I think he's struggling with the witness a little bit.
Go ahead, Mr. Jacobson.
Q The purpose of a fake Kimlik or a fake ID is it's supposed to look like a Real ID, is that right?

A I really have no expertise, I'm not, on Turkish documents.
Q Any fake ID?
A Yes.
MS. SHAMI: Objection, Your Honor.
THE COURT: Overruled.
Q The point of a fake ID is for it to pass as a real one, is that right?
A I have to presume.
Q You can presume, yes. Okay. You're not familiar with fake IDs.
Now, there are ways, there are sometimes ways to tell a counterfeit document from a real document?
A Yes.
Q I think you were talking about that on direct even, right?
A Yes.
Q You are familiar with differentiating between documents?
A Yes.
Q And sometimes there's something off that's obvious, right?
A Yes.
Q I think you even mentioned a few examples.
The fake document might have the geography totally wrong, right?

A Correct.
Q Or the terminology might be completely off, correct?
A Yes, like, that's one red flag, but it could be like a matter -- yes, I mean, generally, that's a red flag, yes.
Q But sometimes it can be harder to tell the difference between a fake document and a real document?
A For most people, probably, yes.
Q Not for you?
A I mean I -- I'm immersed in ISIS, you know, details and stuff like that. And I've spotted a lot of, you know, forged ISIS documents that passed as legitimate ones.
Q Okay. When you're looking at an ISIS document, what method do you use to determine if it's real or counterfeit?
A So I read it and, you know, see the references in the document. If it's not stamped, for example, it would be the details, whether they also correspond or are consistent with other documents I've seen for that specific department.

Other things I can check is whether the names here are available online or mentioned somewhere, maybe someone who died. So this can't be -- so I look for like red flags within the documents and rule out, you know, documents that look inconsistent.
Q So if I can just summarize that, it sounds like one of the main things you do is cross reference the document with other materials that are in the ISIS known universe?

A And look as well as the data included in the documents.

Q Okay. And an example of that might be if there is an ISIS application form, you might want to cross reference that with a known ISIS roster to see if that person was, in fact, a member of ISIS?

A Yes.

Q Okay.

A If available, yes.

Q Now, if someone is making a fake ISIS document and wants it to look like the real thing and is familiar with ISIS terminology, what is your method for distinguishing the counterfeit document from the real document?

A So I look for -- like I said, if I don't see any red flags and I see consistency with what I know about ISIS, it tells me something about the, the content inside the documents, and I usually like, you know, you can check maybe there are other -- there were examples. For example, I find, like, this ID and I find it in a separate log for military, like Nusaybah, for example, names would be mentioned somewhere in another data. And if this ID matches that, then that's helpful.

In this case, if I may explain --

Q Let me --

A All the documents --

Q Let me ask you a question.

A Yes.
Q It sounds like if you don't see any -- if there are no red flags that are apparent to you, you determine that it's real?
A Well, first of all, I determine it's not real, and to me, if you look, I'm looking at multiple, right? Multiple documents. Not just one. So in isolation, you look at this and you say with high confidence this is a real document. And if you look at other documents --
Q Just to bring you back. I'm not asking you about this. I'm not asking you about these documents. Okay?
A Okay.
Q But let's talk about fake ISIS documents.
You did mention that there's sort of a robust literature on counterfeit ISIS documents, right?
You, in fact, have written about counterfeit ISIS documents?
A Yes. There were -- I mean, people forge, like, stuff I pointed out before online, ISIS documents, yes.
Q And you've tweeted about your opinion that a certain document is fake?
A Yes.
Q Are you familiar with Aymenn al-Tamimi's work on fake ISIS documents?
A Yes.

Q And Charlie Winter has also done work on fake ISIS documents, is that right?
A I'm more familiar with Aymenn's documents, yes.
Q He's sort of the fake ISIS document guy, right?
A He -- yes. He's self styled, yes.
Q Now, and you've read a lot of Tamimi's work on fake documents?
A Yes.
Q And some of the documents that he looks at are obviously fake?
A Yes, and I often agree with him.
Q Like the document uses the wrong term for ISIS?
A Exactly.
Q It uses a term for ISIS that ISIS doesn't use?
A Yes, stopped using or it's not using, yes.
Q So that's an example of an obviously fake ISIS document?
A Yes.
Q Have you read -- you've read his blog posts about a certain set of documents that U.S. intelligence agencies had said were genuine, right?
A I don't remember specifically.
Q Do you remember the 22,000 sign-up forms that U.S. intelligence agencies were relying on?
A Vaguely. It's been a while, I think, yes.
Q Would it refresh your recollection to see the article?

Why don't you -- if you don't mind, the bigger binder?

A Yes. The bigger one? Okay.

Q If you could turn to Exhibit BB. It's after Z. So A through Z and then you'll get to AA and BB. If you could turn to BB?

A Okay.

Okay. Yes.

Q I'll give you a moment to review it.

A Should I read the whole thing?

Q Yes.

MS. SHAMI: Objection, Your Honor. I think the first question is whether or not he's read it before. If he hasn't read it before, he's not opining on a document that he's reading right now or a document --

THE COURT: I thought the question was as to whether he was familiar with something, and Mr. Jacobson is using this to refresh his recollection.

Or are you asking him about the specific -- Mr. Jacobson, were you asking him if he knows of this document specifically?

Q I'm not asking you about this document, Mr. Hassan. I'm just asking you if this document refreshes your recollection about the situation with the 22,000 sign-up sheets.

THE COURT: Okay.

(Pause.)
A I mean I don't really remember.
Q You don't remember? Okay.
A I don't remember.
Q Do you remember, with a similar set of fake ISIS documents, the German police relying on them to initiate prosecutions?
A No, not familiar with that.
Q Okay. I know you do remember the Callimachi article. We talked about that earlier today.
A Yes, I remember the incident. Not the details.
Q And just to remind you of the incident, essentially Rukmini Callimachi published an article saying that al Baghdadi had paid tens of thousands of dollars through a rival group for safe harbor, is that right?
A I remember the incident, yes, it was about that.
Q And the article was based on the review of receipts for those payments?
A Yes, as far as I remember, yes.
Q And before publishing the article, Callimachi consulted with Aymenn al-Tamimi?
A Correct.
Q And Tamimi expressed an opinion to Callimachi that the documents were genuine?
A Yes. In the article itself, there was a reference that

he was vouching for them, yes.
Q Yes. And I think you alluded to this earlier, but the New York Times later published a retraction of the article, right?
A Yes, after I pointed out they were forged.
Q You pointed it out and Tamimi also pointed it out in a blog post, is that right?
A Yes. After that, he followed what I was saying and he said I wasn't actually vouching for everything. I was vouching for very specific documents that I saw. And the other -- as far as I remember, he said the other set, he said I'm not sure about.
Q Let's talk about weapons authorization forms.
When ISIS took over a region, they would often de-arm the civilians in the area?
A Correct.
Q So they would confiscate weapons from the local population?
A Correct.
Q And to carry a firearm in ISIS territory, you needed some form of authorization?
A If you're a member and you register with ISIS, yes.
Q I think you said you would need to carry that authorization on your person?
A Yes. I mean that's one way to do it.

Q You would need to have it with you, for example, if you got stopped by an ISIS police officer?
A As a cautionary thing, yes.
Q Because I think you even said it was a grave offense to carry a weapon without permission?
A Correct.
Q And these Nusaybah Katiba training documents that we've looked at, at least on their face appeared to function as a form of weapons authorization?
A Yes.
Q It says you've been trained on a Kalashnikov, right?
A Yes.
Q And that you're authorized to possess one?
A Correct.
Q If you were issued a weapon by ISIS, that would be recorded in other places?
A It would be recorded there in the document. That document could be part of folders somewhere.
Q Right. It might also be in your *katiba*'s weapons inventory?
A Yes.
Q So the weapon that they issued you would show up in the *katiba*'s inventory, right?
A Presumably, yes.
Q And your name would also be in *katiba*'s personnel roster?

A Presumably, yes.
Q So there are things to cross reference, to check, to check the veracity of training documents, right?
A Yes.
Q Did you cross-reference GX-1 through 8 with any other documents?
A No.
Q Men could also have weapons permits in ISIS territory?
A Yes, of course.
Q Not just women, of course.
A They have to.
Q And if you were an ISIS fighter, there are things that you could do that would get your weapon confiscated?
A If you're a member of ISIS?
Q In you're a *katiba* and you don't show up for duty, they might take your rifle away.
A It could be as a way of they call it reorientation. So if someone is suspected of having second thoughts about ISIS, they could reorient them and they set them aside and talk to them or even punish them. But if that involves taking away their weapons, that's, that's possible.
Q We've discussed a little bit about how people in *katibas* would get authorization to carry a firearm.
Civilians could, in certain circumstances, also be authorized to possess a firearm, is that right?

A Only if they are members of ISIS. That's the requirement, yes.
Q Only if they're members of ISIS, is that right?
A Yes. ISIS -- I mean it was clear, well known, ISIS does not allow other people to carry weapons unless they are ISIS members or loyal to ISIS or working secretly with ISIS.
Q If you could please turn to Exhibit Y in the big binder.
A Okay.

MS. SHAMI: Objection, Your Honor.

THE COURT: Basis?

MS. SHAMI: I think at this point, it is irrelevant to the question that we are talking about here which is the military authorizations that the government admitted at Government Exhibits 1 through 8. And now this is a document from the Islamic State archives that is dissimilar and the defendant -- excuse me -- the defendant is asking questions unrelated to the authenticity of the document that we are leer for.

MR. JACOBSON: I only have one question about this document, Judge. It's about civilians possessing firearms.

THE COURT: Okay. Go ahead.

Q Mr. Hassan, this is a manual for how a civilian can register a firearm?
A Yes.

MS. SHAMI: I also want to note an objection,

Your Honor. We have never seen this before. The defense has not produced this whether in reciprocal discovery and, again, we're only seeing this as they're identifying it right now.

THE COURT: What is this, Mr. Jacobson?

MR. JACOBSON: It's a manual for civilians to sign up to register their firearms with ISIS.

THE COURT: And it was in discovery?

MR. JACOBSON: It was not, but I believe that the witness has seen this document before.

THE COURT: But you didn't provide it to the government beforehand?

MR. JACOBSON: We did not. It just came up in cross-examination that we were going to use that.

MS. SHAMI: But, of course, you had it in the binder you prepared so it didn't just come up right now.

THE COURT: Just a moment, Ms. Shami.

Can I see the document? I don't have a copy.

(Pause.)

THE COURT: Are you just -- I'm assuming you're not impeaching him. You're just trying to refresh his memory that civilians could indeed have a weapon?

MR. JACOBSON: Yes.

Q You've seen this document?

THE COURT: All right. Go ahead.

A Yes. So not this document but I --

MS. SHAMI: He said that he's not seen the document.

THE COURT: Okay. Just a moment, Ms. Shami.

Q You've seen this document before?

THE COURT: I'm sorry. Mr. Jacobson, what is your question?

MR. JACOBSON: You know what? I'll move on, Judge.

THE COURT: Thank you.

Q Mr. Hassan, you testified on direct that there was a mechanism for documents to be stamped with an ISIS seal?

A Yes.

Q And whether a document was stamped or not was a function of how the ISIS bureaucracy operated?

A Right.

Q It might differ by I believe you called it a *diwan* department? It might differ by a *diwan*?

A Yes.

Q Different *diwans* had different procedures for stamping documents?

A Not procedures. Like, generally, they're similar, but meaning they could have different language inserted, different style, you know.

Q And it also might differ by the office within the *diwan*? They might have different language, different stamps?

A Yes, but it's not usual. It's possible.

Q Okay. Now, with respect to Nusaybah Katiba, you don't

know their particular process for stamping documents, right?
A I mean I know the general, like, how ISIS does things, like, how ISIS would do it and the Nusaybah Brigade, just like many brigades I reviewed, they followed similar procedures.
Q But you don't know if a training document was signed at the time of training versus signed back at the office, for example?
A I would know, for example, if there's authorization of guns, then it would be stamped right after the gun was given or, you know, during that time. It wouldn't be later. There's a risk.
Q Let's look at, in the other binder, back to the other binder, if we can look at Government Exhibit 3 for a moment.
A Yes.
Q Let me know when you get there. This document has a stamp on it.
A The document, which one?
Q Government Exhibit 3?
A Three, okay. Yes, it does.
Q And it has a date on it?
A It doesn't. I don't see a date on it, no.
Q It has a location though, right?
A Yes.
Q What is the location?
A One is scrapped. I can see it written over. It

basically says Euphrates province.
Q And just turning through Government Exhibits 4 through 8, those all have official seals on them, is that right?
A Yes.
Q And I think you testified that having a stamp is a strong indicator of authenticity?
A Yes. Yes.
Q I think you said a stamp is ideal, right?
A Ideal, yes.
Q Ideal.
You also testified that stamps were only in the big cities, is that right?
A No. They could exist elsewhere but I'm saying availability is more likely in big cities.
Q Okay. So that would be in a place like Raqqa or Mosul?
A Yes.
Q Stamps are less available in I think you described it as the hinterlands or the border regions, right?
A Yes. I say in certain cases, if they don't have stamp, it could be because of that. That's one reason.
Q Okay. Could you turn to Government Exhibit 6, please?
A Sure.
Q There are two stamps on this document?
A Yes.
Q One of the stamps is from Al Furat province?

A Yes.
Q And I think you said Al Furat was a border region, bordering both Iraq and Syria?
A Yes.
Q Along the Euphrates River?
A Yes.
Q Kind of far from Raqqa, relatively speaking?
A It's not far.
Q It's hundreds of miles from Raqqa?
A It's like half -- like a few hours' drive, yes.
Q The second stamp on Government Exhibit 6 is from the Dawud brigade, second battalion?
A Yes.
Q And it's signed by the emir of the brigade?
A Correct.
Q And I believe his name is Abu Al Ayna, is that right?
A Yes.
Q If you could turn briefly to Government Exhibit 8, please.
A Eight?
Q Yes.

THE COURT: Mr. Jacobson, just to let you know, I'm going to take a break in about five minutes.

MR. JACOBSON: Sure. I can wrap up this section.

Q I think when the prosecutors asked you about the stamp on

Government Exhibit 8, I think you said it was Furat province?
A Yes.
Q Do you see in pen where it actually says Al-Barakah province?
A Yes. Correct, I do.
Q Al-Barakah province was also a province that was founded by ISIS; it doesn't exist in Syria today, right?
A The name. It's basically -- yes, correct.
Q Sort of in the Northeast region of Syria?
A Yes, exactly.
Q Also not Raqqa, not Raqqa?
A Not Raqqa, no.

MR. JACOBSON: This might be a good breaking point, Judge.

THE COURT: All right. We'll take a break. We'll resume at 2:00 p.m.

(Luncheon recess.)

AFTERNOON SESSION

THE COURT: Good afternoon. Thank you for your patience. Please be seated.

Do we need to talk about the defendant's expert witness and whether he needs to go out of order or anything of that nature?

MS. SHAMI: I think, Your Honor, that we understand from the defense that this cross will not go for I think about 20 more minutes.

MS. EISNER-GRYNBERG: Less.

MS. SHAMI: Less than.

And then our next witness and our final witness, in fact, is less than 20 minutes on direct.

THE COURT: Okay.

MS. SHAMI: So I think barring the time that's needed for cross, I do think that we still expect to finish today. So there's no need to go out of turn and the government will prefer to be able to put on its case altogether.

MS. EISNER-GRYNBERG: I don't know what time, if the Court has a hard stop today, but I think if we get Dr. Barhoum on the stand by 4 o'clock, we shouldn't have any problems.

THE COURT: Okay. Let's try.

Continue cross-examination?

MR. JACOBSON: Yes. Thank you, Judge.

(The witness, HASSAN HASSAN, having been previously sworn, resumed the stand.)

CROSS-EXAMINATION (Continued)

BY MR. JACOBSON:

Q Good afternoon.
A Good afternoon.
Q Nusaybah Katiba was established in December of 2016, is that right?
A Yes, around that.
Q Now, you testified earlier that weapons permits may be checked on raids or at checkpoints, correct?
A Yes.
Q And you said the way to check that a weapons permit or document is real is to cross reference it with other rosters?
A For me, for experts?
Q Yes.
A Yes.
Q And there are many types of rosters in ISIS territory, right? There are *katiba* rosters, right?
A Yes.
Q There are personnel rosters?
A Yes.
Q There are weapons inventory rosters?
A Within probably military formations, yes.
Q ISIS did a lot of recordkeeping?

A Yes.
Q There are many different types of rosters in the society?
A Correct.
Q And with respect to Government Exhibits 1 to 8, you didn't do any that sort of cross-referencing?
A No.

MS. EISNER-GRYNBERG: That's all I have, Judge. Thank you.

THE COURT: Thank you.

Any redirect?

MS. SHAMI: No, Your Honor. No.

THE COURT: Thank you so much.

The witness is excused.

THE WITNESS: Thank you.

MS. SHAMI: You can leave.

THE WITNESS: Oh, okay.

(Witness excused.)

THE COURT: Does the government want to call its next witness?

MS. SHAMI: Yes, Your Honor. The government wants to call Saida Ismail.

THE CLERK: Approach the witness stand and raise your right hand.

(The witness, SAIDA ISMAIL, was duly sworn/affirmed by clerk.)

THE CLERK: Thank you. I'm going to ask you to keep your voice up.

State and spell your name for the record.

THE WITNESS: Saida Ismail, S-A-I-D-A, last name I-S-M-A-I-L.

MS. SHAMI: May I proceed?

THE COURT: Yes.

DIRECT EXAMINATION

BY MS. SHAMI:

Q Good afternoon, Ms. Ismail.

A Good afternoon.

Q Where do you live?

A Canada.

Q Did you grow up in Canada?

A Yes.

Q Directing your attention to summer of 2014, where, if anywhere, did you travel?

A Syria.

Q Where in Syria did you intend to go?

A To join the Islamic State in Raqqa.

Q And when you traveled to Syria, what was your understanding of the?

A That it was a Muslim state.

Q When you travelled to ISIS territory, what did you want to do for ISIS?

A To live under the caliphate.
Q And why did you want to live under the caliphate?
A To practice my religion freely.
Q Are you familiar with the Nusaybah Katiba?
A Yes.
Q What is it?
A It is a women's fighter's battalion under the Islamic state.
Q And how are you familiar with the Nusaybah Katiba?
A I visited their offices and my friends were signing up for it.
Q And just to clarify, Islamic State is also referred to as ISIS?
A Yes.
Q How did women including the friends that you just testified about sign up for the Nusaybah Katiba?
A Through forms and paperwork.
Q Did you join the Nusaybah Katiba?
A No.
Q Why not?
A I was not interested in being a fighter.
Q Why were you not interested in being a fighter?
A I had a child and I was raising my daughter.
Q When you testified just now about forms being filled out by your friend and going to Nusaybah Katiba, where, in

particular, did you go?
A The city center roundabout of Raqqa.
Q And when you went there, did you meet anyone?
A Yes.
Q Who did you meet?
A Um Muhammad al-Amriki.
Q And do you know Um Muhammad al-Amriki by any other name?
A Yes.
Q What name do you know her by?
A Allison and Um Yousef.
Q When you went to the Nusaybah Katiba in Raqqa with your friend to sign up, what did your friend sign up for?
A She signed up for the medical division.
Q And apart from the medical division, what other tasks were available for sign up?
A Suicide bombing and sniper and weapons training, as well as cooking and child care.
Q Are you familiar with the word "*kunya*"?
A Yes.
Q What is a *kunya*?
A An alias.
Q And is Um Muhammad al-Amriki *a kunya*?
A Yes.
Q Apart from the woman that you went to the Nusaybah Katiba who went to join ISIS for medical, did you know any other

women who joined the Nusaybah Katiba?
A Yes.
Q Approximately how many?
A More than 50.
Q Do you know what those women signed up for?
A Yes.
Q What did they sign up for?
A To be midwives and give emergency medical aid, to cook for the fighters and their families, to learn how to assemble and disassemble different types of weapons and other things.
Q When you were in Syria, did you know any women who had received training on weapons?
A Yes.
Q How did you know that they received weapons training?
A I saw them being trained when I was at the Nusaybah Katiba offices.
Q And that was in Raqqa?
A Yes.
Q Was there any other way that you knew that women received training?
A I'm not sure what you mean.
Q Were you shown any documentation at any point regarding training?
A Yes.
Q What kind of documentation were you shown?

A My friends who signed up for the *katiba* received Nusaybah Katiba ID cards and permission forms that they were allowed to stay in Raqqa during the seige.
Q And what did these authorization forms look like?
A They looked like Islamic State documents being given permission from other departments of the Islamic State.
Q You testified earlier that you live in Canada. Did you return from Syria to Canada?
A Yes.
Q How did you return to Canada from Syria?
A I was repatriated by the Canadian government.
Q When were you repatriated?
A November 2021.
Q Did you have any interactions with law enforcement in Canada upon your return?
A Yes.
Q Were you charged with any crime in Canada?
A No.
Q Do you expect to be charged with any crime in Canada?
A No.
Q Why not?
A I was given immunity by the Canadian government for cooperating.
Q When did you receive this immunity in Canada?
A The end of 2025.

Q Before coming to New York over this weekend for this hearing, were you questioned by the FBI about your time in Syria?
A Yes.
Q How many times?
A About five or six times over the years.
Q Why did you meet with the FBI?
A I was cooperating with the FBI and sharing information about my experiences.
Q Did the FBI make any promises to you when you talked to them?
A No.
Q When did you agree to testify at today's hearing in New York?
A Many years ago while I was in a Kurdish camp in Syria.
Q And when you say about testifying today, did you know about the specific hearing today or were you agreeing to testify generally?
A I was agreeing to testify generally.
Q And when did you learn about the hearing that is taking place today?
A Just the end of 2025 or recently.
Q And were you asked if you wanted to testify?
A Yes.
Q Did you receive a letter from the U.S. Attorney's Office

of this District?
A Yes.
Q What was that letter?
A An immunity letter.
Q When did you first learn about that letter?
A Just this week.
Q And what does the letter require you to do?
A To tell the truth about my experiences.
Q What do you get in exchange for that?
A Nothing, or the immunity, but ...
Q Before a few days ago, have you received any offer of immunity in the United States?
A No.
Q And I want to turn back briefly to your time in Raqqa and then we can talk more about Nusaybah Katiba.
Turning back to when you lived in Raqqa, who did you live with?
A My husband.
Q Where did you meet him?
A In Syria.
Q And where did you marry him?
A In Syria, in Raqqa.
Q When you first spoke to the FBI in Syria, were you completely honest with the FBI about your husband?
A No.

Q What did you tell the FBI about your husband when you first spoke to them in Syria?
A I told them that I married my husband and traveled to Syria with him.
Q Was that truthful?
A No.
Q Why did you tell the FBI that information about your husband, about meeting and then traveling to Syria?
A Because I was afraid of the Kurdish military whose control I was living under in the refugee camps.
Q And was Kurdish military personnel in the room with you during that hearing?
A Yes.
Q Or that interview?
And why were you afraid of the Kurdish military in the room?
A Because the Kurdish military previously imprisoned and tortured me and they were known for dealing much harshly with women who traveled to Syria alone instead of women who traveled to Syria with their families.
Q Did you later tell the FBI the truth about when and where you met your husband?
A Yes.
Q What made you tell the FBI the truth about your husband?
A I was no longer under the Kurdish military control in the

camps.

Q When you were in Syria, did you see any documents written by ISIS?

A Yes.

Q What kinds of documents did you see?

A Many different kinds of documents that were given to my husband and my friends by the Islamic State.

Q In what language were these documents?

A Arabic.

Q Do you read Arabic?

A Yes.

Q How do you know Arabic?

A I studied Arabic and became fluent when I lived in Syria.

Q During your time in Syria, did you see any documents related to the Nusaybah Katiba?

A Yes.

Q What kind of documents did you see?

A I saw Nusaybah Katiba ID cards, I saw Nusaybah Katiba permission forms for women to carry weapons, I saw Nusaybah Katiba forms giving women permission to stay in Raqqa and fight, and other documents from them.

Q Focusing on the weapon authorizations, do you know why your friends were receiving Nusaybah Katiba weapon authorization permits?

A Yes.

Q Why was that?

A The Islamic State banned women from having weapons and carrying them publicly and the Nusaybah Katiba was given special permission for women to have weapons and carry them publicly, but you needed to have a piece of paper with you to prove that.

Q And why did you need to have that permission with you to prove that?

A Because if you had a weapon publicly without the permission letter, you would be stopped by the ISIS religious police and punished.

Q And what kind of punishment could be meted out for not having your permission slip?

A Either having your weapon confiscated or your husband would be punished with receiving lashes.

Q During meetings with the government attorneys here before testifying today, were you shown some documents?

A Yes.

Q I'm going to show you what has been admitted as Government Exhibit 1 through Government Exhibit 8.

MS. SHAMI: If you could cycle through them please, Mr. Jennings.

Q Were these the documents shown to you?

A Yes.

Q Had you seen these specific eight documents before the

government showed them to you?
A No.
Q Had you seen documents like them?
A Yes.
Q What language are these documents in?
A Arabic.
Q Were you able to read these documents in Arabic?
A Yes.
Q Based on your time in Syria, what do you know about these weapon authorization documents?
A These look like authentic Islamic State documents to me because of the stamps and the headings and the Nusaybah Katiba logo at the bottom.
Q And we want to turn to Government Exhibit 3.
Had you seen ISIS stamps when you were in Syria?
A Yes.
Q Are you familiar with how documents get ISIS stamps?
A Yes.
Q How does a document get an ISIS stamp?
A Through the head of the specific offices. They were the only ones who had these stamps to approve the letters.
Q Had you seen ISIS documents in Syria that did not have stamps?
A Not that I remember.
Q When you were in Syria, did you see women carrying

weapons?
A Yes.
Q Can you estimate how many?
A In the first year before the Islamic State banned women from carrying weapons, the majority of women carried weapons.
Q And then after the ban, what happened?
A After the ban, it was very few women, specifically in the Nusaybah Katiba.
Q And turning back to Government Exhibit 1 through Government Exhibit 8, and we can zoom in on them, do you recognize any of the names in that first paragraph, in the first half of the document?
A Yes.
Q What name do you recognize?
A Um Khattab al-Muhajir.
Q How do you recognize that name?
A It was a common alias.
Q Do you recognize the name in Arabic in the blank next to it?
A Yes.
Q What does it say?
A Abu Ali al-Khorasani al-Almani.
Q How do you recognize it?
A Just as an alias.
Q I guess to clarify, do you recognize them to be aliases

or do you believe that you know the people who are in this document?
A I don't know the people who are in this document specifically but I recognize the aliases.
Q Is it because they follow a format for *kunyas* or you remember hearing about these people?
A The *kunya* format.
Q The *kunya* format. Okay.
And directing your attention to the signature line at the very bottom, can you please read who the signature is?
A Um Yousef.
Q Were you familiar with anyone in the Nusaybah Katiba that had the *kunya* Um Yousef?
A Yes.
Q Who are you familiar with?
A Um Muhammad Amriki who started the *katiba*. One of her aliases was Um Yousef.
Um Yousef Australi who was the wife of the doctor, Abu Yousef al-Australi, and Um Yousef Swedi.
Q And you testified about who Allison is.
Who was the Um Yousef al-Swedi?
A She was a friend of mine who was from Sweden.
Q And what do you know about her role in the Nusaybah Katiba?
A She was a part of the fighting battalion.

Q And you testified about Um Yousef al-Australi, the wife of Abu Yousef.

What was her role in the Nusaybah Katiba?

A She trained women in the medical department alongside her husband.

Q Did you personally know any of these Um Yousef's?

A Yes, I knew all of them.

Q Had you seen the signatures of any of these Um Yousef's?

A Yes.

Q Which one?

A Um Yousef Australi, the wife of the doctor.

Q How were you able to see her signature?

A She wrote prescriptions in Arabic when I took my daughter to see Abu Yousef al-Australi. He was a pediatrician.

Q Looking at Government Exhibit 1, does it look like the signature of Um Yousef al-Australi, the wife of Abu Yousef al-Australi?

A Yes.

Q Are you sure that it could be her signature?

A It might be but I'm not 100 percent sure.

Q Why is that?

A There's no way I can know for sure who signed it.

Q Are Government Exhibit 1 through Government Exhibit 8 consistent with other weapon authorizations that you saw while in ISIS territory?

A Yes.
Q What about these authorizations that you saw in Syria tells you that Government Exhibit 1 through Government Exhibit 8 were issued by ISIS?
A The -- at the top, the part that says, at the top, it says -- (Speaking in Arabic).
This says permission to be given a weapon. I've seen this. The format is the same as the ones that I've seen my friends have, as well as the "*raqem al-thateea*" which is the number that each person is given in the Islamic State. So it looks authentic to me.
Q And then directing you to the bottom --
A Yes.
Q -- does anything about the bottom of this page look familiar to you or consistent with your recollection of documents from Syria?
A Yes. The Nusaybah Katiba logo at the bottom says "Nusaybah bint Ka'ab" in bold Arabic letters. That was the local on many of the Nusaybah Katiba forms that I've seen.
MS. SHAMI: Thank you. No further questions.
THE COURT: Thank you.
Cross-examination?

CROSS-EXAMINATION

BY MS. EISNER-GRYNBERG:

Q Good afternoon Ms. Ismail.

A Good afternoon.

Q My name is Mia Eisner-Grynberg. I'm one of the lawyers for Halima Salman.

You left Canada in 2013 when were you 23 years old, right?

A Correct.

Q And were you in ISIS territory until 2019?

A Yes.

Q Fair to say over those five years, you saw unspeakable horrors, right?

A Yes.

Q Your house was struck by a bomb?

A Yes.

Q You lived in places with no food, no shelter, right?

A Yes.

Q You saw people get killed by air strikes?

A Yes.

Q You saw women, children die right in front of you, correct?

A Yes.

Q From 2019 until 2021, you and your daughter were detained by the Syrian Air Force?

MS. SHAMI: Objection, Your Honor. Outside the scope of the direct examination.

THE COURT: Overruled.

Q From 2019 to 2021, you and your daughter were detained by the Syrian Democratic Forces, right?

A Yes.

Q First in 2019, you and Fatima were in detention camp called al-Hawl, right?

A Yes.

Q You were living in a tent?

A Yes.

Q And the conditions were horrible, right?

A Yes.

Q You were desperate to get out of there, correct?

A Yes.

MS. SHAMI: Objection, Your Honor.

THE COURT: Overruled.

Q And so you spoke to anybody who you thought could help you get home, correct?

A No.

Q Well, in 2013, the reporter came from Vice News, the television program, correct?

A Sorry?

Q In 2019, August 2019, some reporters from the television program Vice News came onto the property of al-Hawl, correct?

MS. SHAMI: Objection, Your Honor.

THE COURT: Basis?

MS. SHAMI: It's outside the scope and it is unclear what the relevance is of reporters that came to the camp is.

MS. EISNER-GRYNBERG: All of these questions will go to credibility, Judge.

THE COURT: Overruled.

MS. SHAMI: Well, in the first place, has she established that she was in al-Hawl at the time of the Vice interview?

THE COURT: Well, let's find out. Overruled.

Q In August of 2019, you were detained in al-Hawl, correct?

A Yes.

Q And you saw some reporters come to where you were at al-Hawl from an entity called Vice News, is that right?

A Yes.

Q And the reason that they were there, what they said is that they were looking for American children whose father was looking for them, correct?

A Yes.

Q And you knew that if you could help them find these American children, that would be one way that you could get home, correct?

A No.

Q You agreed to speak to the reporter, right?

A Yes.
Q And you actually stopped the reporter outside by the tents and said that you wished to speak to him, correct?
A Yes.
Q And you went in with him to an office, right?
A Yes.
Q And you told him that you did know the missing American children, that you had seen them and met them?
A Yes.
Q You said that you met them in Raqqa, right?
A Yes.
Q Those were the Shikder children?
A Correct.
Q You're aware that those children are still not back home, right?
A Yes.
Q After you spoke to the Vice team, you received death threats, right?
A Yes.
Q And the Kurds came and they took you out of al-Hawl and they put you and your young daughter in prison, right?
A Not due to that, not related to that interview.
Q The thing that happened -- at some point, you were, with your three year old daughter, put into a prison, right?
A Yes.

Q And that was even more horrible?
A Yes.
Q It was worse than al-Hawl?
A Yes.
Q It was very traumatic?
MS. SHAMI: Objection, Your Honor.
THE COURT: Overruled.
A Yes.
Q After that, after several weeks, you were taken to the al-Roj detention camp, correct?
A Yes.
Q And when you were there, you were also still trying to get home, correct?
A Yes.
Q So in February of 2020, I think you told us on direct examination, that's the first time that you spoke to the United States FBI?
A No.
Q When was that?
A I was speaking to the FBI before the Vice News, before the prison from Camp Hawl and I was willingly providing information to help find many missing children including the Shikder children.
Q When you were speaking to the FBI from al-Hawl, did you speak to them at all about the Nusaybah Katiba battalion?

A I don't remember.
Q Did you speak to them about anything that you saw in ISIS other than the missing children?
A The main reason I was speaking to them was about finding missing children.
MS. EISNER-GRYNBERG: Judge, I'll just make a record that we've received no 3500 material for this witness prior to February of 2020. If the government possesses any notes from those meetings that is material, we would demand that at this time.
THE COURT: Okay.
Q There did come a time in February of 2020 that you spoke with the FBI when you were at Roj, correct?
A Yes.
Q And when you met with them that time, you asked them to bring you back home to Canada, right?
A Yes.
Q Or to the United States?
A I don't remember if I asked to come to the United States.
Q You certainly asked to come home, right?
A Yes.
Q And then you met with them that time in February of 2020 again about three days later, right?
A I don't remember but maybe.
Q Does it sound about right that you met with them on

February 17th and 20th of 2020? Those were the meetings that the Kurds were at?

A I did meet with them at Camp Roj. I don't remember the dates.

Q Do you remember -- is it fair to say that each time you met with them, you asked them to bring you back home to Canada?

A Yes.

Q But they didn't, right?

A Not immediately.

Q So then you got connected to a man named Peter Galbraith, right?

A No. I was connected to Peter Galbraith since I was in Camp Hawl before that.

Q Okay. And Peter Galbraith at that point was just a civilian, right?

A I'm not sure.

Q He didn't represent himself to be a current government official of the United States, correct?

A No, he didn't.

Q What he -- who he is is he used to be a diplomat, right?

A Yes.

Q And as now a former diplomat, he was helping some people get home, right?

A Yes.

Q And the reason you were speaking with Mr. Galbraith is that you were trying to get home, right?
A I was speaking to Mr. Galbraith initially to help find missing children.
Q And then you began to speak to him about getting yourself and your daughter home, right?
A Yes, because I was threatened for cooperating.
Q Right. And this man, Mr. Galbraith, actually personally came to Camp Roj on March 12, 2021, right?
A Yes.
Q And he came there with your sister?
A Yes.

MS. SHAMI: Objection, Your Honor. At this point, it's unclear. She's established that she had communications but going through each of these is not relevant to the topic of the direct examination.

THE COURT: Is this still getting to credibility somehow?

MS. EISNER-GRYNBERG: Judge, very shortly, I will go through the false statements that she told all of these people.

THE COURT: Okay. Overruled.

Q Mr. Galbraith and your sister came to bring your sister out of the camps, right? I mean your daughter out of the camps?

A Yes.
Q And that actually happened, right? They were able to take your daughter back to Canada?
A Yes.
Q So you kept talk to go Mr. Galbraith in order to try to get your cellphone, correct?
A No.
Q Well, you kept talking to him, right?
A Yes.
Q And then on June 28th of 2021, he came back to Roj again, right?
A Yes.
Q And this time, he took you out of al-Roj?
A Yes.
Q And he didn't take you to Canada, right?
A No.
Q He took you to Iraq?
A Yes.
Q This operation where Mr. Galbraith took you out of Roj to Iraq was, again, strictly private; this wasn't a government repatriation, right?
A Correct.
Q Canada did not help you get out and neither did the United States, right?
A Yes.

Q Now, you had spent five, six years at that point trying to get out of Syria and back home, correct?

A Yes.

Q And those last two years when you were in detention, you were desperate to get back home, right?

A Yes.

MS. SHAMI: Objection, Your Honor.

THE COURT: Overruled.

Q Of course, once your daughter left in March of 2021, you were very eager to get back to her, of course, right?

A Yes.

Q So you knew that to get home to Canada, you had to convince Peter Galbraith, for example, that were you not a radical, right?

MS. SHAMI: Objection, Your Honor.

THE COURT: Overruled.

A No.

Q Did you ever speak to Peter Galbraith about your ideology at the time you were in the camps?

A I mainly spoke to Peter Galbraith about missing children and one of which was Amina Bradley. When she was rescued, that's when Peter Galbraith helped me to be released from the camp with his connections to the Kurdish military.

Q So then what happened after he rescued you is you got trapped in Iraq, right? You were stuck?

A I went to a Canadian embassy in Iraq.
Q Right. And you ended up in Iraq for five months, right?
A Yes. I was waiting for emergency travel documents from the Canadian government.
Q But the emergency travel documents didn't come in any kind of urgent fashion, right?
A No.
Q You actually had to file a lawsuit in Canada to get yourself home, right?
A Yes.
Q And as part of that, you had to convince Canada that it was safe for them to bring you home, right?
A Yes.
Q That you were not a radical?
A Yes.
Q Okay. So let's talk about the stories that you told to Peter Galbraith and to the FBI.
Everybody that you've spoken to in this case, from the FBI to these prosecutors, the Canadian authorities, the first question everybody has or one question everybody has is how did you end up in Syria in the first place, right?
A Yes.
Q And everybody wants to know did you know where you were going when you left Canada?
A Yes.

Q They all want to know did you know that you were joining ISIS or did you get tricked, right?

A Yes.

Q So you mentioned on direct examination that when you first spoke to the FBI about your trip, you were -- you lied to them about your trip from Canada to Syria, right?

A I don't remember.

Q Well, I want you to think back to your direct examination a few minutes ago and also to when you were in the meeting with the FBI and they asked you how it came to be that you went from Canada to Syria. Okay?

A Okay.

Q You mentioned on direct examination that you told them something about you got married in Canada and you and your husband decided to move to the Middle East, right?

A Yes.

Q So it's fair to say that the story you told the FBI when you mentioned that you and your husband from Canada moved to the Middle East was a complete and total lie, right?

A Yes.

Q Nothing about it was true?

A Yes.

Q The first part of it was you told the FBI agent that you had married your husband --

Is it Nourredine? Is that how you say it?

A Yes.
Q -- when you were still in Canada in 2012?
A Yes.
Q That was a lie?
A Yes.
Q You told him that you met Nourredine at a mosque in Surrey, British Columbia, right?
A I don't remember.
Q Would it refresh your recollection to look at the notes from your meeting?

MS. SHAMI: Your Honor, objection. We've established that she, on direct, that she provided information that was inconsistent. Getting into the detail of providing her access to notes that she's never seen, that she did not author, would be inappropriate.

THE COURT: I'm sorry. You're saying it's inappropriate for her to see the 3500 material to refresh her recollection?

MS. SHAMI: These are not notes that she prepared. These are notes of agents.

In any event, she has not made any inconsistent statement or denied anything. What she has said is she admitted on direct and right now that she provided incorrect, untruthful information and the defense wants to get into the very details of all of those. The establishment of her

credibility has been made.

The fact that she provided a different story to the FBI agents about her husband has been established. Going into every single detail is cumulative, it's unduly harassing on the defendant to try to get her to remember six years ago what she said. She's already admitted she has made those statements and that they were false and that she had to provide revised statements.

MS. EISNER-GRYNBERG: May I respond, Judge.

THE COURT: Yes.

MS. EISNER-GRYNBERG: To the extent that the witness has provided a detailed account and each detail in it is false, that impairs this witness' credibility.

The witness has testified to significant material on her direct examination that we are calling into question so any questioning about her credibility and false statements to the FBI are relevant.

MS. SHAMI: If they're --

THE COURT: Just a moment.

I understand and I think you should be able to flesh out her credibility. I'm guessing now you're asking her where she said she got married, I believe. To a certain extent, some of it is going to get cumulative until, you know, you ask her if she said what was she wearing at her wedding and she doesn't remember.

At some point, it does get cumulative, so I will let you move forward with these questions, but please do keep in mind that to the extent we're getting into the minutia of every inaccuracy, I may cut that off at some point.

MS. EISNER-GRYNBERG: Understood.

THE COURT: But let me move back to Ms. Shami's point.

I just want to confirm to the extent you want to refresh this recollection with these notes, there's no reason that this witness cannot see these notes to refresh her recollection?

MS. SHAMI: No. We would consent to her seeing those notes.

THE COURT: Okay. You can refresh her recollection.

MS. EISNER-GRYNBERG: Okay. May I approach the witness?

THE COURT: Yes.

Q I'm handing you a binder that's marked 3500-SI-01. And I'm going to direct your attention to the last paragraph on that page.

Does that refresh your recollection of your conversation with the FBI on February 17th of 2020?

A Currently.

Q Do you remember telling the FBI that you met your husband at a mosque in Surrey, British Columbia?

A Again, I was having this conversation in a Kurdish detention camp with FBI agents and Kurdish armed military in the same room listening to everything I said. So I made certain statements under duress to protect myself.
Q I totally understand that. One of those was that you met your husband at a mosque in Surrey, British Columbia, right?
A Yes.
Q And that was not true?
A Correct.
Q You also told the agents that you and Nourredine decided together as a couple to move to the Middle East to live among other Muslim people, right?
A Yes.
Q And that was also not true?
A Yes, because I mentioned earlier that the Kurdish military dealt very harshly with women who traveled to that region alone as opposed to women who came with their husbands.
Q Right.
So you also told them that your husband is the one who arranged your travel to Turkey, correct?
A Yes.
Q And what you told them was that when your husband, who was not your husband, told you to come to Turkey, you did not know that from that point, you were going to be moving into the Islamic State, correct?

A Yes. I said that out of fear of the Kurdish military who were in the room when I was making these statements.
Q So you mentioned that between 2020 and 2021, you were speaking to Peter Galbraith, right?
A Yes.
Q And that was by phone?
A Yes.
Q So when you were speaking to Mr. Galbraith by phone, the Kurds were not present, correct?
A Yes, but Peter Galbraith had very close ties and connections to the Kurds and in my initial conversations, I was worried that the information I provided may be passed on to the Kurds.
Q Okay. On March 18th of 2021, you spoke to a CBC News reporter at al-Roj, right?
A Yes.
Q And CBC News is a Canadian news channel, right?
A Yes.
Q When you spoke to CBC News in March of 2021, you told the reporter correctly that you left Canada in 2014, right?
A Yes.
Q But what you said to the reporter back in 2021 is that when you left Canada, you were a housewife, not a militant, right?
A Yes. At the time I was speaking to these reporters, it

was in the Kurdish military detention camp and they were present when I was making these statements to the reporters.
Q So that was also a lie. You were not a housewife because you weren't a wife, right?
A I made these statements out of fear of the Kurdish military who were present with everything that I was saying.
Q And it wasn't true; you were not a housewife, right?
A No.
Q So let's talk about once you got to Iraq. Okay?
A Yes.
Q Once you got to Iraq, you were no longer in the custody of the Kurds, correct?
A That's not true. There were, there were still Iraqi and Kurdish military members around me, almost all the time.
Q Okay. You said you went to the embassy in -- the Canadian embassy for the travel documents to apply, yes?
A Yes.
Q And you mentioned earlier that they didn't give you them?
A Yes.
Q So you decided to file a lawsuit in federal court in Canada?
A My human rights lawyer decided that.
Q And you decided that that was a good idea, right?
A Yes.
Q So the lawsuit was filed in Canada, correct?

A Yes.
Q And it required a sworn affidavit from you, correct?
A I don't remember the process completely.
Q Do you remember having to give a statement in the lawsuit about what was happening with you?
A Not completely.
Q Do you remember at all writing anything down or saying anything to your human rights lawyer about your experiences in Syria?
A Yes.
Q In that affidavit, that was, that was filed in federal court in Canada, right?
A Yes.
Q Isn't it true that in the federal court affidavit that you filed in Canada, you also lied to the Judge about how you ended up in Syria?
A At the time I made those statements, I was in Iraq. I was not in Canada. So I was still making statements under duress of the Iraqi and Kurdish military members who were around me.
Q So you were in Iraq writing to a judge in federal court in Canada?
A No. No. I was in Iraq speaking to my lawyers over the phone and they made those documents in Canada.
Q And they told you that the things in the documents that

they were filing in the court in Canada had to be true, right?

MS. SHAMI: Your Honor, objection. At this point, it might be getting into attorney/client privileged information with her lawyers in Canada.

THE COURT: Doesn't she have a lawyer here?

MS. SHAMI: She does but he's a U.S. lawyer.

THE COURT: Okay, but I think he can represent his client's interests, if he wants to.

You're free to sit at the table if you think it's necessary, sir. I don't think we're there yet but if you think it's necessary to sit at the table, you can.

MR. GUADAGNINO: May I have a moment to speak to my client?

THE COURT: Yes. Go ahead.

(Pause.)

(Continued on next page.)

BY MS. EISNER-GRYNBERG: (Continued.)

THE COURT: I think you had a question on the record.

Q My question was, when you filed the lawsuit in Canada with the help of a human rights lawyer, you were aware that the contents of the affidavit you filed were supposed to be true, correct?

A I wasn't fully aware of the process. I don't remember all the details.

Q So the reason that the human rights lawyer and you decided to file a lawsuit in Canada was to try to get you back to Canada, right?

A To get the Canadian government to issue me emergency travel documents.

Q And part of that process required an affidavit from you, correct?

A Yes.

Q And you wrote that affidavit, correct?

A No, I didn't write it. I spoke to my lawyers over the phone.

Q And then they put into words what you had said to them over the phone, correct?

A Yes.

Q And then did they read it back to you?

A I don't remember.

Q Did they send you a copy for you to look at?
A I don't remember.
Q It's fair to say that you told the judge in your affidavit that you never intended to join the Islamic State when you left for Syria, right, when you left Canada?
A I don't remember.
MS. EISNER-GRYNBERG: Just a moment.
Q There's a binder in front of you. It's the big one. It's defense exhibits. It's to the left. Can you turn to the tab that's called Defendant's Exhibit KK. Let me know if you need help.
A Yes.
Q Let's turn to the third page of that book. Let's look at the front of it. This is an article from CBC News, correct?
A I don't see that.
MS. EISNER-GRYNBERG: Judge, may I approach the witness?
THE COURT: Yes.
MS. SHAMI: Your Honor, I think we would object to this coming into evidence. The document itself, it has not been authenticated. It's also a hearsay article. I understand what's happening here is she's trying to show her an excerpt from it, but this is, again, it is a secondhand hearsay, an article describing an affidavit that is not in front of the witness.

MS. EISNER-GRYNBERG: I'm not moving it into evidence. It's to refresh her recollection.

MS. SHAMI: It's not how a defendant or anyone would refresh a recollection. She first would have to ask and establish is there anything I could show you that would refresh your recollection, and provide for an opportunity to identify a document that would refresh her recollection, show it to her, take it away, and then ask her does that refresh you.

THE COURT: This is a very helpful evidence class. Do you want to set up your refreshing of recollection a little bit better, Ms. Eisner-Grynberg?

MS. EISNER-GRYNBERG: Sure.

BY MS. EISNER-GRYNBERG:

Q You were interviewed by CBC News, correct?

A Yes.

Q And that was in March of 2021, right?

A Yes.

Q And you spoke to them about the circumstances of you leaving Canada to come to the Islamic State, correct?

A Yes.

Q And you're aware that CBC News then reported on their interview of you, correct?

A Yes.

Q Would it refresh your recollection about your statements

to CBC News to look at CBC News' reporting on their interview of you?

A Yes. But all of the statements I made in that article were under duress because I was in the Kurdish military camp when they interviewed me, and there were Kurdish military present when I was giving this interview. So I couldn't make fully truthful statements about everything.

Q So then we're turning to the time when you were in Iraq working with your lawyer on the federal court affidavit, right? You also spoke to CBC News about that, didn't you?

A Yes.

Q So can you flip forward from where you are to the article right before it, Exhibit JJ?

MS. SHAMI: Objection, Your Honor. We don't have a question as to why this document is being shown to her. Same objection as before. This hasn't gone through the process for establishing that she needs to have her recollection refreshed.

MS. EISNER-GRYNBERG: I'm doing that, Judge.

THE COURT: Go ahead.

Q If you can go to page 4 of 4 of the exhibit.

THE COURT: I'm sorry. What do you think she does not remember right now?

MS. EISNER-GRYNBERG: I'll back it up.

Q Do you remember what you put in the affidavit that you

filed in federal court in Canada about your trip from Canada to the Middle East?

A Not everything.

Q Do you remember that you did file an affidavit in federal court in Canada where you gave a narrative of how you ended up in Syria from Canada?

A My lawyer filed that based on limited conversations we had while I was in Iraq, and also felt unsafe providing fully truthful statements.

Q Okay. So what you put in the affidavit was that you had traveled from Canada to Turkey, right?

A Yes.

Q And you put in the affidavit that when you went from Canada to Turkey you ended up in Turkey for several months, right?

A I don't remember.

Q Would it refresh your recollection to look at the news reporting of the contents of your affidavit?

A Yes.

Q Looking right in front of you, Exhibit JJ, page 4. Take a look at the first paragraph that begins "in an affidavit filed in federal court."

MS. SHAMI: Your Honor, we would renew our objection. This is hearsay. Without showing her the affidavit, it's a reporting on what is potentially an

affidavit without confirmation.

THE COURT: She can say it doesn't refresh her recollection. Overruled.

Q Have you read the paragraph that begins, "in an affidavit filed in federal court"?

A Yes.

Q Does that remind you of what you put in your affidavit?

A That doesn't say that I was in Turkey for months.

Q Okay. Isn't it true that you told the judge in the affidavit in Syria that you had been manipulated into going to Syria?

A I did the process in Iraq, not Syria.

Q Right.

A And I was manipulated into going to Syria not by my husband but my someone else that the Canadian government is familiar with.

Q And so that's what you told the judge in the affidavit, that you had been manipulated into going to Syria, right?

A Yes.

Q You testified on your direct examination that your intention when you left Canada was to go to Syria to join the Islamic State, correct?

A I was still manipulated and radicalized into the mentality by somebody.

Q After you filed the affidavit and the lawsuit in federal

court, five Canadian officers came to Iraq to interview you, right?
A Yes.
Q They called what they were doing a threat assessment?
A Yes.
Q Meaning they were assessing if it was safe for you to be repatriated to Canada, right?
A Yes.
Q So you knew that it was important to convince them that you were not a radical, right?
A Yes.
Q Isn't it true that when you spoke to those officers you told them that you traveled to Turkey in 2014? That's right, right?
A Yes.
Q And that you told them that after a few months in Turkey you were then convinced to cross into Syria?
A No, that's not correct.
Q Okay. So you spoke to CBC News once you returned as well, right, to Canada?
A Not that I remember.
Q Well, you mentioned that CBC News had reported on the contents of the affidavit that you filed in court, right?
A Can you repeat the question? I don't understand.
Q You remember I showed you before that there was news

reporting on the contents of your affidavit, right?
A Yes. I believe that happened while I was in Iraq, not Canada.
Q Okay. So take a look at Defendant's Exhibit LL. I'm on the second page where it says: SA tried to escape Syria. Do you see that?
A Yes.
Q Does that refresh your recollection about whether you ever said that you stayed in Turkey for a few months before you were convinced to cross into Syria?
A That's not correct. I never said that. That may have been a misunderstanding by the reporter, or whoever made that statement. I was in Turkey for a very short amount of time.
Q You were in Turkey only for several days, right?
A Yes.
Q After the threat assessment Canada did bring you home?
A Yes.
Q And when they brought you home you had an agreement with them that you were going to surrender to the Canadian police when you got home, correct?
A Yes.
Q And you did that?
A Yes.
Q And they released you on what they call in Canada a peace bond, right?

A Yes.
Q Which is basically some conditions on your freedom there, right?
A Yes.
Q And there were law enforcement officers in Canada who would come to make sure you were following their rules, correct?
A I guess. I'm not sure.
Q Well, you were in touch with law enforcement in Canada, right?
A Yes, I was.
Q And at some point you were informed that Canada was investigating you for war crimes and terrorism offenses, correct?
A Yes.
Q So you mentioned that from 2020 until 2025 you were communicating with the United States FBI, right?
A Yes.
Q We know that you spoke with the FBI when you were at Roj, right?
A Yes.
Q And you spoke with the FBI just last year in 2025, correct?
A Yes.
Q Did you ever speak to the FBI in between that time?

A In between what time?
Q 2020 and 2025.
A Maybe briefly. I don't recall.
Q You mentioned a person named Allison Fluke-Ekren on your direct examination, right?
A Yes.
Q You're aware that that person was prosecuted in the United States in 2022, right?
A Yes.
Q Were you a witness in that prosecution?
A No, I was not.
Q Did you ever speak to prosecutors back in 2021 or 2022 about Allison Fluke-Ekren about her case?
A I don't remember if I spoke about her case, but she did come up in relation to the Nusaybah Katiba briefly.
Q So you were not called as a witness in that case?
A No.
Q You didn't testify in the grand jury?
A No.
Q In May of 2025 you met with the FBI about this case on the Canadian border, right?
A I didn't meet with them about this case. I met with them about sharing information about my experiences.
Q Okay. And one of the questions that they asked you in that meeting was about Halima Salman, correct?

A Yes.
Q So that meeting was at the Sweetgrass Port of Entry; that's on the Montana, United States, Canadian border, right?
A Yes.
Q And the FBI paid for your round trip travel and hotel for yourself and your daughter to get to that location?
A Yes.
Q That was about three hours away from your home?
A Yes.
Q And they provided you with child care and beverages and snacks, right?
A No. They didn't provide me with child care. They just covered the travel related things.
Q Did you have your daughter with you that day?
A Yes. I had my daughter with me, and my sister was providing child care for my daughter.
Q That meeting lasted two days, right?
A It lasted a few days.
Q When you met with the FBI in Canada, that's when you came clean about your trip to Syria in the first place, right?
A Yes.
Q You told them you were not married when you left Canada?
A Yes.
Q And that the way you got to Canada was because of a friend who you had met online, right?

A The way I traveled to Syria, yes.
Q I'm sorry. The way you traveled to Syria was facilitated by a friend you met online, correct?
A Yes.
Q Who is that person?
A Ayan Jama.
Q That person had previously left Canada to join a terrorist organization in Somalia, correct?
A Yes.
Q And she had been caught and sent back to Canada?
A Yes.
Q So when she was back in Canada she had a new role facilitating other women's travels to join terrorist groups, right?
MS. SHAMI: Objection, Your Honor. At this point I think it's outside the scope. We've established that she had differing stories. Now getting into the details of how she traveled there is unnecessary to proving the authenticity.
THE COURT: What's the relevance of this?
MS. EISNER-GRYNBERG: Your Honor, if I could have a little bit of scope, I will very quickly establish that this is another different version than the story she told the FBI later about how she came to leave Canada.
THE COURT: That the testimony or that her conversation with the FBI in May of 2025 is a different story

than the one she previously gave?

MS. EISNER-GRYNBERG: Yes. This communication about her relationship with this woman, the ISIS recruiter is different than a statement I'm about to get to about how she came to get to Syria.

MS. SHAMI: We've already established that she was not truthful in her first interactions. Is Ms. Eisner-Grynberg saying there's an inconsistency between a 2025 statement and a more recent statement?

MS. EISNER-GRYNBERG: Yes.

THE COURT: Continue.

BY MS. EISNER-GRYNBERG:

Q So what you told the FBI is that you met this woman online who sent women to join terrorist groups in other places, right?

A Yes.

Q It turns out, actually, that this woman that you met was not just an online acquaintance, correct?

A Yes. I never said she was only an online acquaintance. I met her online but we were friends offline as well.

Q Okay. That's the person who arranged your trip to the Islamic State?

A Yes.

Q Your first piece of your journey was you flew to Spain?

A No. I flew within Canada first.

Q And then from Canada you flew to Spain?
A Yes.
Q And when you got to Spain you were supposed to connect to Istanbul and Turkey?
A Yes.
Q There was a problem with your ticket, right?
A Yes.
Q And that required that you ended up spending a week in the airport in Barcelona?
A Yes.
Q During that whole week in Barcelona you had the option to get back on the plane back home to Canada, right?

MS. SHAMI: Your Honor, this has nothing to do, again, with any inconsistency. At this point she's trying to establish that she could have returned and this is outside the scope.

MS. EISNER-GRYNBERG: Your Honor, the witness testified that she was manipulated into her trip into Syria. The fact that she was alone and decided to spend a week continuing on her voyage all by herself makes it unlikely that that first statement is true.

MS. SHAMI: I believe her testimony was that she was radicalized and manipulated into going.

THE COURT: Overruled.

BY MS. EISNER-GRYNBERG:

Q In that week in the airport in Barcelona you never got back on the plane back to Canada, right?
A Because I was afraid of going back to Canada and being arrested upon arrival. I was also in communication with Ayan Jama the entire time that I was traveling, and she directing me not to go back to Canada and wait for the next flight to Turkey.
Q Why were you afraid that you would be arrested in Canada for traveling to Spain?
A Because --
MS. SHAMI: Objection, Your Honor.
THE COURT: Overruled.
A Because I was being actively radicalized and manipulated, and somebody who had experience in these things was telling me that even while I was still in Canada, while I was in Spain, while I was in Turkey, that it was too late to go back and that I would be in a worse situation if I were to go back. So I was afraid.
Q So you decided to go on to Turkey, right?
A Yes, because I was afraid.
Q And you got on -- eventually you got on a plane to Turkey?
A Yes.
Q Then when you got to Turkey they tried to arrest you there?

A Yes.
Q Which is not what you wanted, right?
A I didn't want to be arrested anywhere. I was afraid to be sent back to Canada and imprisoned.
Q So you eventually were able to get out of the Istanbul airport, right?
A Yes.
Q You were afraid you said in Istanbul that you would be arrested if you went back to Canada?
A Yes.
Q Istanbul at that time, at any time, was not part of the Islamic state, right?
A Yes.
Q So now at this time you're in Turkey, correct?
A Yes.
Q And your friend wasn't there with you, right?
A She was in communication with me.
Q She wasn't there on the ground, right?
A Yes.
Q She was continents away from you?
A But she was also financially providing everything while I was there. So even if I wanted to go back, I didn't have the financial means to go back. So she was paying for everything.
Q So she was continents away from you, right?
A Yes.

Q While you were in the Middle East, and generally, you were in contact with your sister in Syria, right?
A While I was in Syria, not during my travel. Yes, I was in contact with my sister in Syria.
Q When you were in Istanbul, that's a major world city, right?
A Yes.
Q It has internet cafes, right?
A Yes.
Q It has phones?
A Yes.
Q It has people?

MS. SHAMI: Your Honor, objection at this point, again. This is far outside the scope of the direct, and it has not yet been established, despite dozens of questions and an affirmation from Ms. Eisner-Grynberg that we are getting to a point, we haven't reached a point yet.

THE COURT: Ms. Eisner-Grynberg, can we --

MS. EISNER-GRYNBERG: I will finish, yes.

Q The bottom line is, when you were in Istanbul you decided to go join the Islamic State, right?
A I think you're misrepresenting the mentality that I was in. Just because I was there doesn't mean that I wasn't mentally being manipulated and radicalized and afraid. So yes, I possibly could have made other choices, but I was in a

specific mental state at that time that made me follow the directives of Ayan Jama.

Q I understand. When you landed -- when you got out of the airport in Istanbul you did, in fact, go into Syria, right?

A Yes. After some time I went from Turkey to Syria.

Q Right. That was just several days, correct?

A Yes.

Q And that was by way of drivers that smuggled you across the border, right?

A ISIS facilitators, yes.

Q So fair to say when you left Canada you knew where you were going, to Syria, right?

A Not completely.

Q You knew that you were going to live in the Islamic State, right?

A Not completely.

Q You testified on direct examination that you chose to leave Canada to go live in the Islamic State so that you could practice your religion freely, right?

A Yes. But I was being directed by Ayan Jama, and there were options of places for me to go that she was directing me. One of them was the Islamic State in Syria.

Q And that is the one you went to, right?

A Yes.

Q You followed her directions?

A Yes.
Q When you got to Syria the first place that you ended up was a van let you out in a field, correct?
MS. SHAMI: Objection, Your Honor. Again, we have not established what credibility issue is at play here, apart from the defendant wanting to inquire about every single step of her travel through Canada to ISIS territory.
MS. EISNER-GRYNBERG: I'm two questions away from another false statement.
THE COURT: Okay.
Q When you got out of the van you were directed to run across a field to a house, right?
A Yes.
Q And fair to say when you got there it was not the paradise that you had heard about in the propaganda, right?
A Yes.
Q And this house, they told you, you were only allowed to leave this house if you are married, right?
A Yes.
Q So you lied to them, right?
A I was directed to do that by someone.
Q I'm not asking you who told you what to do. I'm asking you what you did. And what you did is you lied, right?
A There were reasons for me saying those things and doing those things, and that was to protect myself.

Q So to protect yourself when they said you could only leave this house if you're married, you said yes, I am married, right?
A Yes. I was told to do that. So that's what I did.
Q And that was not true, right?
A No, I wasn't married.
Q So since you lied to them and told them you were married they let you leave that house and go to what's called a Madafah, right?
A Yes.
Q What is that?
A That's a guest house.
Q And it's a house for women, right?

MS. SHAMI: Objection, Your Honor. She established that she lied when she went to the first house, and now this line of questioning is about her next stop in Syria. Again, it's outside the scope and unrelated to the authenticity issue.

We're about an hour in to what was a 20-minute direct. This is not at issue that she traveled to Syria. It's the question of her access and her availability to review these documents. That's the issue here.

THE COURT: Thank you. Ms. Eisner-Grynberg, can we maybe kind of start wrapping up, to the extent the questions are focused on the number of different stories that she told.

Short stream it a bit.

MS. EISNER-GRYNBERG: Yes.

BY MS. EISNER-GRYNBERG:

Q Let's fast forward to the time that you got married. Okay?

A Okay.

Q Eventually you came to the conclusion that to have any freedom, any even limited freedom, in the Islamic State you needed to get married?

A Yes.

Q And so you were introduced by a friend to the person that you would eventually marry, right?

A Yes.

Q And that was Nourredine Ghoumari. You just met him, it turns out, in Syria, right?

A Yes.

Q And you had a child?

A Yes.

Q Your daughter was born on May 14th of 2016?

A Yes.

Q You mentioned on direct examination that you came to learn about the entity called Nusaybah Katiba, right?

A Yes.

Q And you said that you learned about it because you met the founder of Nusaybah Katiba, correct?

A Yes.
Q That's a person that you knew then as Um Muhammad al-Amriki, right?
A Yes.
Q Who you now know whose name in the United States is Allison Fluke-Ekren?
A Yes.
Q When you spoke to the FBI all the way back in February of 2020, you identified her as um Muhammad al-Amriki, right?
A Yes.
Q That is the kunya that you knew her by, right?
A Yes.
Q When you spoke to the FBI in February of 2020 it was your understanding that um Muhammad al-Amriki was still alive, right?
A Yes.
Q And you did come to learn that she was brought to the United States to be prosecuted, right?
A Yes.
Q And you also learned that she was sentenced to 20 years in federal prison?
A Yes.
Q You continued speaking with the FBI about Allison Fluke-Ekren about five or six times, right?
A I don't remember how many times.

Q You spoke to the FBI, you said, about five or six times.
A Yes, but not about her every time we spoke.
Q One of the things that you told them, and that you just told the judge, is that you met her, right?
A Yes.
Q When you were telling that at first, the agents, they showed you a picture of someone, right? They showed you a picture of Allison?
A Yes, at some point. I believe so.
Q When they showed you the picture of this woman that you said you met you said did you not recognize her, right?
A That's because during the time I met her, it was my first year in the Islamic State. Some of the pictures that they had were taken of people at times where I didn't recognize them either before they came to Syria or after the collapse of the Islamic State. And there was many different people who looked completely different by the end. So I may not have recognized her.
Q And you didn't, right? You did not recognize her when they showed you the picture?
A Yes.
Q When you said that you met her, do you recall meeting her inside of her house, right?
A Yes.
Q So I want to try to narrow down when it was that you met

her. Do you remember when it was?

MS. SHAMI: Objection, Your Honor. At this point what is the scope or reason to discuss when she met Allison Fluke-Ekren. Again, it's about the document. The government established that she knew the Nusaybah Katiba and she knew the founder.

What is the purpose of going into every single detail of this meeting?

THE COURT: I think to the credibility of whether she really met her. Ms. Eisner-Grynberg?

MS. EISNER-GRYNBERG: Yes. That's right.

THE COURT: Overruled.

Q You remember meeting with Ms. Fluke-Ekren in her house, right?

A Yes.

Q Do you remember the house?

A Yes, I do.

Q Are you aware that Ms. Fluke-Ekren had at least four different homes while she lived in Raqqa?

A I'm not aware of how many homes she had.

Q How many of them were you in?

A I was in one.

Q And the one that you were in, it was in a five-story apartment building?

A I don't know how many stories, but it was in an apartment

building.
Q And it was the one that was on the Main Street by the market; is that right?
A It was in the roundabout in the city center of Raqqa.
Q Part of how you remember that when you met Allison it was in that house is because you remember her husband at that time, right?
A No. That's not why I remember.
Q Do you remember her husband at the time that you met her?
A Yes.
Q Her husband at the time that you met her was a Turkish man, right?
A From what she told me, yes.
Q And what she told you at the time you met her was that he was a Turkish sniper leader, right?
A Yes. That's what she told her.
Q Do you remember his name being Volkon Ekren?
A I don't remember his name. We went by aliases, so I didn't know anybody's real names.
Q Did you come to know her later husband's, later in the time, in the Islamic State?
A No.
Q At the time when you were speaking to her in her house she was telling you she is then currently married to the Turkish sniper leader. Do I have that right?

A She didn't tell me it was then or past or anything. She just told me her husband was Turkish and a sniper.
Q She told you her husband was Turkish?
A Yes.
Q You told the judge that when you were in this meeting in the house Allison told you and your friend about Nusaybah Katiba, right?
A Yes.
Q And told you about what they could do in terms of weapons training?
A Yes.
MS. SHAMI: Your Honor, this mischaracterizes the testimony earlier.
THE COURT: If it's not accurate, she can correct Ms. Eisner-Grynberg.
Q You said she told you about assembling and disassembling guns, right?
A Yes.
Q And what you remember, your recollection is, as you sit here, is she was telling you that stuff about Nusaybah Katiba in the house while she was married to the Turkish man, right?
A I don't know if it was while she was married. I don't know -- the reason why she brought up the fact that he was Turkish was because my friend, who I was there with, was also Turkish. So it came up. I don't remember if it was about

currently being married to someone Turkish or her children's father being Turkish. I don't remember the details.
Q Do you remember that when you were in this house, what you say was Allison's house, it was before your daughter was born, right?
A I'm not sure what year it was exactly or what month.
Q Do you have in front of you the binder that says 3500?
A Yes.
Q If you could go to tab number one. The pages, unfortunately, are not numbered but if you count it's seven pages, eight -- one second -- the ninth page. It says at the top: Female went to the Nusaybah Katiba orientation. Are you at the right place?
A Yes.
Q Take a look at the second paragraph and read the first three lines. Tell me if that helps refresh your recollection about the time period that we're talking about.
A Yes. It says my daughter had not been born yet.
Q So at the time when you were learning about Nusaybah Katiba your daughter had not yet been born yet, right?
A Yes.
Q As we said, that was in May of 2016, right?
A My daughter was born in May of 2016, yes.
Q Thank you. In addition to the meeting at Allison's house, you remember hearing about a Nusaybah Katiba

orientation meeting, right?
A Yes.
Q But you didn't go to that meeting, you just heard about it from other people. Right?
A I went to some and I didn't go to some.
Q You remember hearing from friends that went, right?
A Yes.
Q But you said you didn't want to go, right?
A No, I didn't say that. I said I didn't want to join the Katiba. I went with my friends to some of the offices where they filled out the forms, and I went to some of the meetings at the offices and Allison's house. But some of them I didn't attend.
Q All of that was before your daughter was born in May of 2016, right?
A Yes, I believe so.
Q You would agree with me that the purpose of Nusaybah Katiba, as you understood it, was to train women to stay behind in Raqqa and fight, correct?
A Yes.
Q But the time to stay behind in Raqqa and fight was once Raqqa was being surrounded and attacked, right?
A Yes.
Q And that wasn't happening around the time your daughter was born yet, right?

A It was approaching.
Q Right. So about a year later in May 2017, or April of 2017, is when the siege of Raqqa began, right?
A No. That's not when the siege of Raqqa began.
Q When was that?
A That was basically the finalization of being able to leave or stay.
Q Let me ask you about these trainings that you said were being held by Nusaybah Katiba. Your recollection is that those trainings by Nusaybah Katiba were held in Raqqa, right?
A Yes.
Q And your understanding is that those trainings were held in Raqqa during the siege, correct?
A Not during the siege, before the siege.
Q And then they were ongoing in Raqqa, right?
A Yes.
Q You do not know if there was ever a Nusaybah Katiba training that was not in Raqqa, right?
A I don't know.
Q You do know that after the fall of Raqqa you never heard about Nusaybah Katiba being formally referred to that way again?
A I did hear about it, but I wasn't a part of it. So I had friends who stayed behind in Raqqa and came out after the siege was over. They were still considered to be a part of

that, but it wasn't as ongoing as it was during the siege in Raqqa.

Q You mentioned a variety of types of documents connected to Nusaybah Katiba, right?

A Yes.

Q But you never had one issued in your name because you weren't in the Katiba, right?

A Yes.

Q And you never went to one of their trainings?

A I never participated in their trainings, but I witnessed other people being trained.

Q By the way, in the five or six times that you spoke to the FBI, did you ever mention to them that you witnessed the actual training taking place?

A I don't remember. I spoke about many things when I was speaking to the FBI based on their questions, not my own statements that I was just giving freely.

Q Do you have any specific recollection of having told any agents or any prosecutors ever when they asked you about the trainings that you actually saw the training happening?

A I don't remember.

Q You don't remember saying that, right?

A I don't remember if they asked or if I mentioned it. I don't recall.

MS. EISNER-GRYNBERG: Your Honor, I would ask the

government to stipulate that nowhere in any of the 3500 materials have they provided a statement to law enforcement that this witness witnessed the training directly.

THE COURT: I don't think the government is stipulating to anything. Go ahead.

MS. SHAMI: I think the government would need to re-review the 3500. I will not accept Ms. Eisner-Grynberg's assertion that there is nothing in these notes. As the defense knows, the government made redactions to these 3500 materials, in particular to shield the identification of women who are under active investigation. So I will not stipulate.

If there is information about her having attended a training that the government inadvertently redacted, we will make that information provided. But we also have no obligation to provide 3500. We have an obligation to memorialize every single statement. We take the best notes that we can and provide what we can without compromising an active law enforcement investigation.

THE COURT: Okay. So you said if there is 3500 material about her attending trainings or witnessing the trainings you will --

MS. SHAMI: We will provide that statement on its own.

THE COURT: Thank you.

MS. EISNER-GRYNBERG: Thank you.

BY MS. EISNER-GRYNBERG:

Q You mentioned that you went with one of your friends when she applied to join the Nusaybah Katiba, right?

A Yes.

Q And you mentioned that you saw her fill out an application form?

A Yes.

Q You'd say that you got a good look at the application form, right?

A Yes.

Q You said that you would agree that the form was available in English or Arabic, right?

MS. SHAMI: Objection, Your Honor. Again, we are here about the authenticity of one document. We used this on direct to establish that her knowledge was direct, was firsthand as to signing up but, again, we are here on one document and the sign-up sheet is not one of those documents.

THE COURT: Relevance?

MS. EISNER-GRYNBERG: Yes, Judge. The existence of the application form that precedes getting the training is extremely probative to our case because Ms. Salman did not have such an application form.

So this witness' verification of what the form looked like, and whether it is, in fact, the form that she saw, the non-existence of that form in Ms. Salman's case makes

it more likely that the document she is said to have received is not authentic.

MS. SHAMI: This is a trial issue. If she wants to talk about the missing items from the government's case that we don't have an application or a sign-up sheet or a roster is a trial issue. That has nothing to do with the authenticity of Government Exhibit 1 as pertains to the other government exhibits that have been put forth today and provided as exactly that, proof of authenticity of those documents.

MS. EISNER-GRYNBERG: Judge, I would strongly disagree. The fact that, as I think I can establish with this witness, that this completion certificate was one of a set of documents that she observed the process of, that required several different forms that ended with the training certificate, if Ms. Salman has only one piece of that set it makes it much more unlikely that her document is authentic.

THE COURT: Do we have or do you have in discovery the other sign-up sheets or these other forms you're asking her about?

MS. EISNER-GRYNBERG: Yes. That's my next question.

THE COURT: You have those?

MS. EISNER-GRYNBERG: Yes. I'm about to show her one.

MS. SHAMI: Your Honor, again, we're going to continue to object as to documents that were not provided to

us, including documents that would need translation that we haven't had a chance to review, including with our linguist.

MS. EISNER-GRYNBERG: These are the government's documents. They provided them.

THE COURT: Overruled.

BY MS. EISNER-GRYNBERG:

Q You saw your friend fill out the Nusaybah Katiba application form, right?

A Yes.

Q And you said you got a good look at it, right?

A I don't remember how it looked. I wasn't the one filling it out, but I glanced at the application that my friend was filling out while she was filling it out.

Q When you spoke to the FBI about that experience you told them that you remembered specific questions that were on the application, right?

A I don't remember.

Q Do you remember telling them that it said, for example, did your husband give you permission to join?

A Yes. That wasn't specific to the application. That was a rule in the Nusaybah Katiba that women had to receive permission from their husbands to apply and join.

Q Take a look at the large binder in front of you that says defense exhibits. Let's go to Exhibit N, just one N. Do you have in front of you on the top right it says Defendant's

Exhibit N?
A Yes, I believe so.
MS. EISNER-GRYNBERG: Judge, may I approach or the Court can?
THE COURT: Yes, go ahead.
Q Take a look at what's been marked for identification as Defendant's Exhibit N. Does that refresh your recollection about what the form, the application form, the format looked like that your friend filled out?
A I don't remember, but it could be.
Q Does it appear to ask the kinds of questions that your friend was asked?
A Yes.
Q But when you look at it right now you can't be sure this was the actual format?
A I can't be 100 percent sure.
Q After your friend filled out the application form, what you understood to happen next in the process is you saw that it was handed to a Syrian woman who was working for Nusaybah Katiba, right?
MS. SHAMI: Objection, Your Honor. Again, this is going to minutia of detail.
THE COURT: Could we have a sidebar?
(Sidebar; continued on next page.)

(Sidebar conference.)

THE COURT: I've been giving leeway in terms of questions. This is just a hearing. I feel like we're getting far afield, and I don't want to have objections every other question. So to the extent you can start to streamline your questions to focus on the document, I would appreciate that so we don't have as many objections, some of which it is starting to get far afield, which I don't fault you for but streamline it a bit.

(Sidebar concludes; continued on next page.)

Q Your recollection of the process is after your friend filled out the application she turned it in to a Syrian woman, who worked for Nusaybah Katiba, right?
A Yes, I believe so.
Q And then your friend had to wait to find out if she had gotten accepted, right?
A I believe so. I don't remember those very, very specific details. It's been many years. But yes, I went to the office with her, she filled out the application in front of me, and she handed it over to the women who worked at the Nusaybah Katiba office.
Q And then she showed you when she got it back that it had been stamped that she was accepted, right?
A I don't remember the specific details, but I do know that she was accepted into the medical department.
Q Had you ever seen one of your friends' Nusaybah Katiba application that came back with a stamp on it accepting them?
A I saw the stamp on the Nusaybah Katiba ID cards that they were given. I don't remember about the application.
Q That's my next question. You saw such a thing as a Nusaybah Katiba identification card, right?
A Yes.
Q And that was given to women after they applied and were accepted in the Katiba, right?
A Yes.

Q Going back to the same binder, if we could look at Defendant's Exhibit C. So it's in the very front of the binder. It's the third letter.

MS. SHAMI: Objection, Your Honor. Again, this is showing additional documents. The existence or non-existence of other documents as pertains to the defendant has no impact on the question of authenticity of the particular document that the government seeks to admit. This is a document that the government produced on Sunday.

It is a Nusaybah Katiba ID card. It is not in the name of the defendant. It's in the name of somebody else. And the government has and Your Honor has entertained numerous questions that are unrelated to the document itself.

MS. EISNER-GRYNBERG: Again, this is one of a set of documents that don't exist for Ms. Salman, which make it less likely that her document is authentic. That's the core question the Court is here to decide.

MS. SHAMI: There is no connection between the existence of other documents versus the authenticity of a single document. The fact that the government does not have other documents pertaining to Nusaybah Katiba for the defendant, does not undermine the one document that it does have simply because there aren't multiple indicators of someone's guilt, as the defense would prefer, does not mean that the item that the government does have is inauthentic.

We've put on two witnesses, both of whom were able to authenticate this document. The defense has done nothing to undercut that, apart from asking unrelated questions about travel and of unrelated documents.

These are questions, if they were to be appropriate, would be appropriate at trial where the true factfinder is the jury who will ultimately determine the veracity of the document, versus what we are doing here, which is establishing a very minimal bar for authenticity and is a prima facie case, which the government believes has been established.

The line of questions the defense has pursued at this point has no bearing on the authenticity bar that we're here for. To the extent that Your Honor wants to discuss hearsay, we can do that.

MS. EISNER-GRYNBERG: Judge, if I may, the question -- the Court is deciding two questions today. Is the document --

THE COURT: Maybe not today.

MS. EISNER-GRYNBERG: Is the document authentic? Is it what it purports to be? Is it a validly issued weapons training certification, and are the statements within it hearsay?

In deciding the first question of whether the document is authentic, it is certainly relevant that if other versions of this document come in a set that have an

application form, an acceptance form, an ID card, and then this document, but Ms. Salman is missing those first three pieces and only has the last page, it makes it less likely that it's authentic.

THE COURT: I don't think you need this witness to make that argument. I don't know that the witness knows it comes in a set. To the extent you want to argue that it does, in fact, come in a set and to the extent that you only have the last page of the set, I think you can argue that without getting into the detail of it with this witness.

MS. EISNER-GRYNBERG: The only thing I'm asking this witness is if this exhibit fairly depicts what a Nusaybah Katiba ID card looks like, as far as she knows.

THE COURT: You can ask her that and then let's move on.

BY MS. EISNER-GRYNBERG:

Q What's in front of you is Exhibit C. Does that look to you like a Nusaybah Katiba identification card?

A Yes, it does.

Q It looks how it looked, how Nusaybah Katiba identification cards looked, back in the Islamic State when you were there in 2016, '17, right?

A Yes.

MS. EISNER-GRYNBERG: Your Honor, at this point we move Exhibit C into evidence.

MS. SHAMI: Your Honor, the government objects. It has nothing to do with, again, the military training document.

MS. EISNER-GRYNBERG: And for the reasons that I just argued, it makes it less likely that Ms. Salman's document is true.

THE COURT: Overruled. It's admitted.

(Defendant's Exhibit C was received in evidence.)

Q We've gone over the application form, the acceptance, and the ID card. The last type of document that you mentioned from the Nusaybah Katiba is the certificate of completion; is that right?

A I don't remember which one you're speaking of.

Q Isn't it true that you never saw a certificate of completion that somebody had finished Nusaybah Katiba training?

MS. SHAMI: Your Honor, objection. At this point I think the defense -- could we have a sidebar, actually.

THE COURT: Sure.

(Sidebar; continued on next page.)

(Sidebar conference.)

MS. SHAMI: This document, Government Exhibit 1, has gone by many titles; military training document, certificate of completion. What it is, the title, as she testified to, as Mr. Hassan testified to, is an authorization to grant a weapon. It's a confusing line of questioning by introducing terminology that she's not used to.

What she's used to, the document in Arabic, at the title it says authorization to grant a weapon. So your question, I think, is misleading and I think it's meant to confuse the issues which, again, is whether or not this military training document, which the government refers to but is literally titled authorization to grant a weapon.

THE COURT: Just a moment. Are you trying to ask about Government Exhibit 1?

MS. EISNER-GRYNBERG: If I may proffer, the prior statements of this witness is I saw the form to join Nusaybah Katiba but not a certificate of completion.

THE COURT: The document, this document, this title, I don't speak Arabic, but it's titled something else. Do you want to ask her if she's seen this type of document?

MS. EISNER-GRYNBERG: I want to ask her if she's seen a certificate of completion.

THE COURT: Why do you think the certificate of completion is the same as this military training document?

MS. EISNER-GRYNBERG: The government has stated in all of its pleadings within the complaint that this document is the proof that Ms. Salman received military training.

THE COURT: But was it called -- I mean certificate of completion could be an informal thing or it could be a formal document. If the document has a formal name, is this a certificate of completion that you're referencing? Are you using that as a formal name?

MS. EISNER-GRYNBERG: I don't know. It's her words. I would like to know what she meant when she said that.

MS. SHAMI: Your Honor, it's the FBI's words in that note. But I will say this, which is in the second paragraph, which we extensively went through with Mr. Hassan and he translated on the spot and there's a translation, it literally says that the person completed military training and a test and is, therefore, authorized to carry.

So the document itself has a completion aspect to it. It's certified the completion but it's not entitled a certification of completion.

MS. EISNER-GRYNBERG: Exactly.

MS. SHAMI: Yes. But again --

THE COURT: I'm going to be honest, I'm not sure why we're getting into the weeds of this. If you want to ask her if she's seen this document, ask her that. Ask her what she meant by certification of completion she could say I never

used that term. She could say whatever. I'm confused that this seems to be a big deal to you all.

MS. EISNER-GRYNBERG: She said on the stand that she's seen these documents before.

THE COURT: She saw this military document.

MS. EISNER-GRYNBERG: She's never stated that previously to the FBI.

MS. SHAMI: That's not true.

THE COURT: Sorry. So you're saying that the -- in the 3500 material she never said she saw these military training documents?

MS. EISNER-GRYNBERG: Yes. She did not see a certificate of completion.

THE COURT: I thought I saw something different in the 3500 material.

MS. SHAMI: Yes, you did. On May 7, 2025 she was shown this document. It is called New York NK document in the notes, and it's handwritten. She says that yes, I have seen this document. This is the authorization that women had to carry. She described the van that she testified to on direct. I can find it for you.

MS. EISNER-GRYNBERG: It's right here.

MS. SHAMI: That's the handwritten note.

THE COURT: What is your objection exactly?

MS. SHAMI: It's a confusing use of the word

certificate of completion. Ms. Eisner-Grynberg wants to inquire about the specific document that she's already indicated she's seen that has been established. What is trying to be done here is to confuse and mislead the witness by using terminology that she was not familiar with because the document she testified to has a title in Arabic she recognizes.

THE COURT: I'm going to ask you to rephrase your question. Just a moment. I know you said you needed your witness by 4:00 p.m. What are we doing?

MS. EISNER-GRYNBERG: I have a little bit left.

THE COURT: With this witness? When you say a little bit, do you mean like a little bit or do you mean we've got a little bit? So your witness is not testifying today, then.

MS. EISNER-GRYNBERG: We might need to check with our witness.

THE COURT: Do you want to take a break now? We're not going to take a break in the middle of her testimony. Do you want to see if your witness is available if this witness goes over?

MS. EISNER-GRYNBERG: I mean, I have to finish with this witness.

THE COURT: So either way you want to finish with this witness.

MS. EISNER-GRYNBERG: Can we just speak with our other witness to see what our options are.

THE COURT: Yes. I'll take a break. Rephrase the question or move on. Either one.

(Sidebar concludes; continued on next page.)

THE COURT: Let's take a ten minute break. Come back at 4:20.

MS. EISNER-GRYNBERG: Does the Court -- what time can the Court remain until?

THE COURT: Preferably 5:00 p.m. but it's looking like it is going to go past 5:00.

How much more do you need?

MS. EISNER-GRYNBERG: I don't think we need more than 20 minutes. The direct examination of our witness is not long.

THE COURT: And then you likely have redirect?

MS. SHAMI: We don't have redirect at this point.

MR. REICH: We'll have cross of their expert.

THE COURT: I mean for this witness.

MR. REICH: No.

THE COURT: So let's come back at 4:15.

MS. EISNER-GRYNBERG: If the Court needs to take a break, that's fine, but if we can keep going, I think we can get it in.

THE COURT: Do you need a break?

MS. SHAMI: No, we're good.

THE COURT: Let's keep going, then.

BY MS. EISNER-GRYNBERG: (Continued)

Q I want to talk to you about Government Exhibit 1. Turn to the small binder to Government Exhibit 1.

Do you have it?
A Yes.
Q Government Exhibit 1 is what the prosecutor showed you on your direct examination, right?
A Yes.
Q And this is the document that says Um Khattab has completed military training, right?
A I have to read it quickly to see if that's what it says.
Q Sure. There's a translation that's in evidence in English behind it. I know you read Arabic. You can read whichever one you're more comfortable with.
(Pause.)
A This says that she has completed training and it gives her permission to carry weapons.
Q Thank you.
I want to talk to you about our client, Halima Salman. Okay?
A Okay.
Q To be clear, when you say that you were at Allison Fluke-Ekren's house, Halima Salman was not there, right?
A No.
Q You never saw Halima Salman in the Nusaybah Katiba office, right?
A No.
Q You never saw her filling out an application form for the

Nusaybah Katiba?
A No.
Q You never saw a stamped response form accepting her into Nusaybah Katiba, right?
A No.
Q You never saw a Nusaybah Katiba ID card in the name of Halima Salman?
A No.
Q Or in the name of Um Khattab, right?
A No.
Q You didn't see Halima Salman when you watched the train that you said that you saw, right?
A No. Everyone had covered their faces at that time so I wouldn't be able to recognize her either way.
Q And so you don't recognize her as having been at one of those trainings, right?
A No.
Q And you testified on direct examination that Government Exhibits 1 through 8, you did not see those specific certificates while you were in the Islamic State, right?
A Which specific certificates?
Q 1 through 8 that are in front of you, the ones that you discussed on direct examination.
A Not these ones specifically, no.
Q Right. You did not see Government Exhibit 1 until the

agents in this case showed it to you in 2025, right?
A Yes.
Q You mentioned that when you saw these certificates being given out to people, it was in Raqqa, correct?
A Yes.
Q After Raqqa, you left for Mayadin, right?
A Yes.
Q When you were in Mayadin, you did not see Halima Salman there, right?
A No.
Q And you did not see her in Al-Bukamal, right?
A I've never met this person. I don't recall ever seeing her.
Q Thank you.

Let's go back to the completion certificate then.

You said that you were not aware of these certificates ever being handed out other than in Raqqa, is that right?
A Yes.
Q Now, the government asked you to review this one, Government Exhibit 1, and to look at the signature on the bottom, right?
A Yes.
Q And that's what you've told us says Um Yousef?
A Yes.

Q I want you to be very clear on this answer.
You do not know who signed Government Exhibit 1, right?
A No.
Q "No," you do not know, correct?
A I don't know for sure who signed these documents.
Q And you'd agree that there were a number of Um Yousef's when you were in the Islamic State, right?
A Yes.
Q It just means mother of Joseph, right?
A Yes.
Q Or wife of Joseph is how it was often used with these "Um" *kunya*'s, right?
A Wife of mother, wife of father of Joseph, yes.
Q Or sometimes people just picked whatever name they wanted if they could get it approved, right?
A Yes.
Q So you do not know which Um Yousef is this one, right?
A Correct.
Q Take a look at Government Exhibit 1.
It doesn't have a stamp on it, right, from the Islamic State?
A Yes.
Q "Yes," it does not have a stamp, correct?
A Yes, it does not have a stamp.

Q And it doesn't have a signature where the stamp would be on the other documents of the person stamping it, correct?
A Correct.
Q It doesn't have a date on it, right?
A Correct.
Q It doesn't have a location on it, right?
A Yes.
Q Let's look at Government Exhibit 6.
That document also is signed by the name Um Yousef, right?
A Yes.
Q It does have a stamp, correct?
A Yes, it does.
Q It has two stamps?
A Yes.
Q And it has a signature in pen over the stamp, right?
A Yes.
Q And it has a date on it?
It's to the right of the lower stamp, right?
A Yes.
Q And I don't know if you can see within the stamp, it has a location on it as well in Arabic.
A Yes.
Q Let's turn to Government Exhibit 7. That one is also signed with the name Um Yousef, correct?

Case 1:24-cr-00206-NCM Document 158 Filed 04/27/26 Page 189 of 261 PageID #: 1585



A Yes.
Q And that one also has two stamps?
A Yes.
Q It also has handwritten signatures over the stamps?
A Yes.
Q And it also has a date?
A Yes.
Q And those stamps also have a location?
A Yes.
Q You testified on direct examination that one of the Um Yousef's that you knew in the Islamic State was Allison Fluke-Ekren.
A Yes.
Q Isn't it true that every single time you have ever spoken to the FBI or these prosecutors before you landed in New York, you always and only referred to that person's *kunya* as Um Muhammad al-Amriki?
A Yes.
Q Right now in this court, you're under oath, right?
A Yes.
Q And it was explained to you that if you make a false statement on purpose in this courtroom, you can be charged with perjury, right?
A Yes.
Q You mentioned on direct examination that you're here

testifying in this court because of a deal that you made with the United States Government, right?
A What deal?
Q A deal to receive immunity in exchange for your testimony.
A Yes.
Q And that you also received immunity from the Canadian government?
A Yes.
Q So let's talk about Canada first.
When Canada first brought you home in November 2021, you were not charged with a crime, right?
A Yes.
Q But then you said you came to learn that they were investigating you, correct?
A They have always been investigating me since I left Canada, but I was never charged with a crime.
Q Eventually, they notified you that they were not going to be prosecuting you, that they were giving you immunity, right?
A Can you ask that question again?
Q Yes.
At some point, Canada told you they were providing you with immunity from prosecution in Canada?
A Yes.
Q And they told you that the reason that you were getting

immunity from prosecution in Canada is because of the helpful testimony you had given them as a cooperator?

A No.

Q They told you that because you cooperated with them, you were getting immunity in Canada, right?

A Yes, that I -- it wasn't necessarily testimony. It was immunity to protect me to share my experiences truthfully.

Q And was that based on the information you're providing in this case or a different case?

A All the information I provided to the Canadian government, not specific to this.

Q Well, let me ask you this. You've also met with the Canadian authorities?

A Yes.

Q Many times?

A No, not many times, but ...

Q More than once?

A Yes.

Q Have you ever spoken to the Canadian authorities about Nusaybah Katiba?

A Yes, I have.

Q Have you ever spoken to the Canadian authorities about Allison Fluke-Ekren?

A I don't remember if it specifically came up but I did speak to them about the *katiba*.

Q You began -- you reconnected with the FBI in this case in May of 2025, is that right?

A Yes.

Q That was in the Montana Canadian border office that we spoke about, right?

A Yes.

Q And since that date, for the nine months or so that had followed, that's when you've been speaking to them in preparation for testifying in this case, correct?

A Yes.

Q On March 12th of 2026, last week, you received a call or you spoke on the phone with these prosecutors, correct, Ms. Shami and Mr. Reich?

A Yes.

Q And what they told you is that they wanted you to come to the United States?

A Yes.

Q And that if you came to the United States and testified at this hearing, they were intending to give you immunity, right?

MS. SHAMI: Objection, Your Honor.

Can we have a sidebar?

THE COURT: Sure.

(The following occurred at sidebar.)

MS. SHAMI: On March 12, '26, there was no phone

call between Andrew Reich, AUSA Reich and myself. There was a phone call notifying Ms. Ismail that she has been appointed a lawyer and that the lawyer will be in contact with her about the offer.

THE COURT: Who made the call?

MS. SHAMI: An FBI agent.

THE COURT: So she was just an inaccurate just now?

MS. SHAMI: Exactly, and that she discussed with her that you should expect a phone call from the lawyer that was appointed for you, and Your Honor signed that appointment letter, and all of our communications with Ms. Ismail about the letter have been directed through counsel.

So it wasn't the government was giving her representations about what was being provided. It was her lawyer providing a representation of what the letter draft would be.

THE COURT: Do you care about the inaccuracy? Is the inaccuracy important to your questions?

MS. EISNER-GRYNBERG: I'll just note that maybe it was a misstatement but Ms. Shami e-mailed us when I asked if the witness had received immunity, that the government had told the witness on March 12th that they intended to offer her immunity but that it hadn't been finalized yet.

MS. SHAMI: Right.

MS. EISNER-GRYNBERG: If that was true, it was

various people, that's not what you wrote so I didn't know that at the present time but it doesn't matter. I can move on.

THE COURT: Okay. Move on. Thank you.

(In open court; sidebar ends.)

BY MS. EISNER-GRYNBERG:

Q While you were still in Canada, you learned that if you came to the United States and you testified in this proceeding, that you would receive immunity from prosecution in a United States court, is that right?

A Only related to what I've spoken about in this case.

Q Yes.

A Yes.

Q And what they told you was that you will not be -- what you've spoken about in this case will not be used against you in a prosecution for material support of ISIS, right?

A Yes.

Q And you're familiar with the charge of material support of ISIS in a United States court, right?

A Somewhat.

Q You have a lawyer here in New York who's here in court right now, right?

A Yes.

Q And he explained to you or you came to learn that there's a crime in the United States of material support of ISIS,

right?
A We did not discuss that. We discussed what is written --
THE COURT: You don't have to explain. You don't have to go into detail about what you discussed with your attorney.
THE WITNESS: Okay.
Q You are aware that there's such a crime as material support of a foreign terrorist organization in the United States, right?
A Yes.
Q That's what you know what Allison Fluke-Ekren was convicted of, right?
A I don't know what she was convicted of.
Q You know that the charge of material support of ISIS in the United States carries a penalty of up to 20 years, right?
A I didn't know that but, yes, I know now.
Q And you know that it's a serious charge, right?
A Yes.
Q When you said that when you were all the way back in the airport in Barcelona, you were afraid to question back to Canada because you didn't want to be arrested, right?
A Yes.
Q And that's the same fear that you have had testifying in a U.S. court, that you could be arrested, right?
A No, I didn't have that fear.

Q When you came to New York and stated to a Assistant United States Attorney that you left Canada with the intention of joining the Islamic State, you were not concerned about being prosecuted in the United States?
A No, because I'm not an American citizen. I'm a Canadian citizen.
Q Did anybody explain to you that foreign citizens can and are prosecuted in the United States for material support of terrorism?
A No.
Q When you came to the United States, you met with these prosecutors, right?
A Yes.
Q And that was when you actually got a letter saying we are granting you immunity in the United States, right?
A Yes.
Q And the letter said on it the statements that you give at this hearing will not be used against you in a prosecution for material support of terrorism?
A Yes.
Q And you signed the letter, right?
A Yes.
Q The way you came to New York is the United States Government paid for your trip, right?
A Yes.

Q They paid for you and your daughter to get on a plane in Canada and fly to New York, right?
A Yes.
Q They paid for round trip tickets?
A Yes.
Q They assisted you with your travel?
A Yes.
Q They -- you ordinarily are not able to travel into the United States as a tourist, right?
A I haven't tried to since I've returned to Canada.
Q Well, when you tried to come to the United States through the Sweetgrass port of entry, you were not admitted into the United States, right?
A I wasn't attempting to enter the United States. I was meeting with FBI agents at the border.
Q Right. And you met with them at the border rather than in the United States, right?
A Yes.
Q You're aware that the prosecutors arranged with the immigration authorities in the United States to let you come in to testify in this hearing, right?
A Yes.
Q On March 15th, you met with the prosecutors in person, right?
A Yes.

Q That was when they gave you the letter and you signed it?
A Yes.
Q And that was when for the first time, after talking to the FBI for six years about Um Muhammad, you've told them for the very first time that she also used the name Um Yousef, right?
A Because they never asked me about those details previously.
Q Well, that's not true, right?
A To what I remember, it is true. They didn't ask me about all of the aliases she went by.
Q Many, many times, you told them that the person who started Nusaybah Katiba who you say you met was Um Muhammad al-Amriki, right?
A Yes, that was one of her aliases.
Q And you did not offer up to them any other aliases than Um Muhammad al-Amriki?
A No, because it didn't come up in the conversations.
Q What did come up in conversations was they asked you who is Um Yousef, right?
A That just came up in the conversations recently.
Q Really? Because in May of 2025 is when they first showed you Government Exhibit 1, right?
A Yes, maybe, but --
Q Well, I mean this is very important so I need you to

really try to remember.
A Yes. They showed me many documents when I met with them in May.
Q Right. And one of them was this document that's in play in this case about Um Khattab completing military training, right?
A I believe so, yes. They may have showed me this one.
Q And it's signed by Um Yousef, right?
A Yes.
Q And they asked you do you know an Um Yousef, right?
A Yes. They asked me and at the time, I told them what, who I have remembered off the top of my head as being Um Yousef and that was the one from Sweden who I was very close to.
Q Right. So when you were in the meeting with them in May, on May 7, 2025, you spoke to them about Um Muhammad al-Amriki, right?
A Uh-huh.
Q And in the same meeting, you spoke to them about Um Yousef, right?
A Yes.
Q And you said, the Um Yousef that I remember is the Swedish woman, right?
MS. SHAMI: Your Honor, can we have a sidebar?
THE COURT: Sure. Just a moment.

(The following occurred at sidebar.)

MS. SHAMI: This is, again, a mischaracterization of 3500.

During the May 7th meeting, she was shown the document and she was asked about it and she provided general information. It was not until the November 21, 2025 interview, and that's reflected in the notes, that she was asked who was Um Yousef and she provided the information about Um Yousef al-Swedi, the Swedish woman.

MS. EISNER-GRYNBERG: I'm sorry. My mistake. I can correct it.

THE COURT: Okay.

(In open court; sidebar ends.)

BY MS. EISNER-GRYNBERG:

Q Do you remember having a videoconference meeting in November of 2025 with these prosecutors and an FBI agent?

A Yes.

Q And it was Ms. Shami and Mr. Reich were there, right?

A Yes.

Q And a number of FBI agents as well, right?

A Yes.

Q And they specifically drew your attention to Allison is what you called her, right?

A Yes.

Q They asked you about your experiences with this person,

correct?

A Yes.

Q And the name that you called that person was Allison, right?

A Yes. She had many different names that I've referred to her by.

Q Right. But the only one that you referred to her by on November 21st was Allison, right?

A Yes.

Q And then in that exact same videoconference meeting in November of 2025, what is that, five months ago, they asked you to look at Government Exhibit 1, right?

A Yes.

Q And they asked you who is Um Yousef, right?

A Yes.

Q That same conversation where you were talking about Allison and Um Yousef, you said the Um Yousef I know is a Swedish woman, right?

MS. SHAMI: Objection, Your Honor.

During this interview, she was not shown this document. It was referred. We just asked her plainly if she knew an Um Yousef.

THE COURT: Okay. Can you reframe your question?

Q They asked you if you knew a Um Yousef, right? And you said I knew a Swedish Um Yousef, right?

A I knew many Um Yousef's over the years and my, I was referring to my immediate memory of the person that I was closest to which was Um Yousef Swedi.

When I have conversations with the FBI about things that happened over the span of more than ten years, sometimes the memories come and go about people and I will remember after the conversation and then let them know after.

Q Okay. So for the entirety of 2020 until March 14, 2026, it never occurred to you to tell them that one of the Um Yousef's you knew was Allison Fluke-Ekren, right?

A Allison had many children and many aliases that she went by so I didn't think it was necessary to list every single alias and every single child's name and all of that information. I just went with what she was commonly referred to, her legal name, Allison, and her, you know, widely known *kunya* "Um Hammad Amriki."

Q Right. So all of those times before this weekend when they asked you about Um Yousef --

MS. SHAMI: Objection. I think the point has been made.

THE COURT: Overruled.

Q All of those other times that they asked you about Um Yousef and about Allison until this weekend in New York, you never said another name Allison Um Muhammad used was Um Yousef, right?

A Because it was not relevant.
Q I'm not asking you why. I'm asking you if.
A No.
Q Did you ever, over six years until this weekend, this Sunday in New York, tell these prosecutors or these agents one of the names Allison Fluke-Ekren used was Um Yousef? Yes or no.
A No.
Q Thank you.
On March 16th, that's yesterday, you met with the prosecutors again, right?
A Yes.
Q And they asked you let's go back to this Um Yousef thing, do you know which Um Yousef signed the document.
That's what they said, right?
A Yes.
Q And what you said to them is actually I do not know who specifically signed the document, right?
A No. I told them the people I knew who went by the name "Um Yousef" and that I couldn't know for sure who signed this document.
Q Right. You told them you did not specifically know who had signed the document, right?
A Yes.
Q And you told them that whoever did sign the document you

thought was a native Arabic writer, right?
A Yes.
Q Yesterday, you told these prosecutors that it could have been the Um Yousef who's Syrian, right?
A Yes, that was one of the people that I mentioned to them who I knew was named Um Yousef.
Q Allison is not Syrian, right? She's American?
A Yes.
Q It's fair to say that you have been through quite a lot in the last 12 years, right?
A Yes.
Q You spent five years in the Islamic State and then two years in detention camps and prisons, right?
A Yes.
Q You spent five months trapped in Iraq?
A Yes.
Q You've spent five years under investigation in Canada at least, right?
A Yes.
Q You don't want to go to prison, right?
A No.
Q You don't want to go to prison in the United States?
A No.
Q Or in Canada?
A No.

Q Your daughter now is ten years old, right?
A Yes.
Q And you are inseparable with your daughter, right?
A Yes.
Q You brought her with you on this trip from Canada to New York, right?
A Yes.
Q You are never going to risk being separated from your daughter again, fair?
A Correct.

MS. EISNER-GRYNBERG: Thank you. That's all.

THE COURT: Any redirect?

MS. SHAMI: No, Your Honor.

THE COURT: Thank you.

The witness is excused. Thank you.

(Witness excused.)

THE COURT: Any additional witnesses from the government?

MS. SHAMI: No, Your Honor. No further witnesses from the government.

THE COURT: And the defense has one witness?

MR. JACOBSON: We do, Your Honor.

The defense calls Dr. Khalil Barhoum.

MR. REICH: Actually, briefly, Your Honor, before they call their witness.

I understand that we're ending at 5:00 today. It's 4:30 now. I'm not sure. They haven't relayed how long this testimony is going to take, but obviously the government does feel the need to cross-examine their witness.

THE COURT: I said my preference was to end at 5:00 but it seems like we're not going to do that. I think you said the direct is about 20 minutes?

MR. JACOBSON: No longer than 20 minutes.

THE COURT: Actually, we're going to take a short break. Come back at 4:40 and then we'll try to get through everything.

MS. EISNER-GRYNBERG: Thank you.

MR. REICH: Thank you, Your Honor.

(Recess taken.)

THE COURT: Please be seated.

Please call your next witness.

MR. JACOBSON: Thank you, Your Honor.

The defense calls Dr. Khalil Barhoum.

THE CLERK: Please remain standing. Raise your right hand.

(The witness, KHALIL BARHOUM, was duly sworn/affirmed by the clerk.)

THE CLERK: Thank you. Have a seat. The chair does not move, only the microphone. Speak directly into the microphone.

Please state and spell your name for the record.

THE WITNESS: Khalil Barhoum.

THE CLERK: Spell your name.

THE WITNESS: Khalil is spelled K-H-A-L-I-L. Barhoum, B-A-R-H-O-U-M.

THE COURT: Go ahead.

MR. JACOBSON: Thank you, Judge.

(Continued on next page.)

DIRECT EXAMINATION

BY MR. JACOBSON:

Q Good afternoon, Dr. Barhoum.

A Good afternoon.

Q What do you do for a living?

A I teach. I'm a professor at Stanford University.

Q What is your title at Stanford University?

A Senior lecturer in linguistics and coordinator of African and Middle Eastern language cultures.

Q How long have you been a professor at Stanford University?

A 40 years.

Q Are you in a specific department?

A We are housed in the division of literature and language, language center.

Q What is your educational background?

A I have a bachelor's degree in English, a master's degree in English literature, and a master's degree and PhD in linguistics.

Q When did you start teaching Arabic?

A At Stanford in 1985. I graduated from Georgetown in 1985 and ended up at Stanford right after. But before that, while I'm at Georgetown University, I was teaching at the Foreign Service Institute with the state department and at Georgetown and at Johns Hopkins.

Q Have you ever worked with the Department of Defense?
A No.
Q What levels of Arabic do you teach?
A Mostly advanced level, fourth year and sometimes third year.
Q Have you worked at the Defense Language Institute?
A I did review their Arabic program at their own request, but I did not teach there, no.
Q In addition to the Arabic language, do you teach any other Arabic related courses at Stanford?
A Yes. I teach a course on Arabic calligraphy. And also, I taught literature courses, like Arab woman writers and issues, Arab world travel literature, Arab literature and culture.
Q What is Arabic calligraphy?
A Arabic calligraphy is the part of the Islamic world and other arts, including architecture, metal work, glass, all actually draw on calligraphy as their source of inspiration and embellishment.
Q In addition to teaching calligraphy, do you practice it as well?
A I do.
Q How long have you been practicing calligraphy?
A Since childhood.
Q Are there different styles of Arabic calligraphy?

A Yes, there are. There are eight main types of or styles of Arabic calligraphy.
Q Are any of those styles of calligraphy particularly relevant today?
A There are a couple, yes.
Q What are those?
A Nasekh and Ruqa.
Q Can you differentiate between those two styles for us?
A It will be easier to do that if it's projected on the screen. I definitely can.
Q What do your calligraphy courses at Stanford consist of?
A I'm sorry. I didn't hear that.
Q What do your calligraphy courses at Stanford consist of?
A I teach a course on Arabic calligraphy. Usually it's full capacity and there's a waiting list. We introduce the art of Arabic calligraphy to students through the calligraphers, main calligraphers, and the evolution of art. And students are required to do two presentations each, one on the calligraphers and the other on the art itself.
Q Thank you. I'd like to show you what's marked as Defense Exhibit B on the screen, please. Dr. Barhoum, do you recognize this?
A Yes. That's actually my handwriting in Arabic. It says what it says in English, and that is Arabic calligraphy styles.

Q And what is this document?
A This style is Thuluth, which is not involved in the question you asked earlier. This style actually decorates most of the outside and inside buildings and mosques because it's the most decorative and probably the hardest to master by the calligraphers.
Q Is this one of the introductory PowerPoints that you use for your class?
A Yes.
MR. JACOBSON: Mr. Leito, if we could turn to page 14, please.
Q Dr. Barhoum, does this depict different styles of Arabic calligraphy?
A Yes. I did this to actually illustrate the different styles. The top part says Arabic calligraphic styles, and then these are the numbers in Arabic. And each line exhibits a style of calligraphy written in its own style. So the top one is the al-Ruqa, the Ruqa style, and number two is Nasekh. These are the two that were actually the subject of your question.
Q And how would you describe the difference between Nasekh and Ruqa?
A Khat-e-Ruqa is very much angular and straight lines. This an alif for the A sound in English. This one is pretty cursive. Number two, Khat-e-Naskh and Khat-e-Thuluth, this

one are very much related. This one and this one. Khat-e-Ruqa you can tell is straight and angular lines mostly.

Q Thank you. Have you lectured on Arabic calligraphy outside of Stanford?

A I have. I lectured at Princeton University, at Middlebury College, and UMass at Amherst, among others.

Q Are you involved in any relevant professional organizations?

A I am. I am involved with the Mason Studies Association and with the African Studies Association, with ACTFL.

Q Before this case, have you ever consulted on Arabic calligraphy?

A I have. I actually reviewed programs at other universities, and I also got -- I had consulted with mostly high tech companies in the Silicone Valley.

MR. JACOBSON: Your Honor, we'd move to qualify Dr. Barhoum as an expert in the written Arabic language, Arabic handwriting, and Arabic calligraphy.

MR. REICH: We renew our objection, Your Honor. We understand that you want to hear from the witness today, and that's fine. But we object to him being qualified as an expert in as broad a range as Mr. Jacobson has just presented.

THE COURT: Okay. I'll qualify him as an expert for the purposes of this hearing.

Q Dr. Barhoum, are you being paid to be here today?

A Sorry?
Q Are you being paid to be here today?
A I am.
Q What is your understanding of how much you're being paid?
A My budget is $10,000. I might say that I usually charge a lot more per the hour when I do consultations in the Silicone Valley.
Q How do you feel about testifying here today?
A I feel fine because I was told that you guys are a non-profit, and my motive was not tax relief financial.
Q I'd like to ask you about some of the documents in this case. Do you have a binder in front of you, Dr. Barhoum?
A I do.
Q It's labeled government exhibits. If you could take a look at Government Exhibit 1, Government Exhibit 6, and Government Exhibit 7. Have you seen these documents before?
A I have. You shared them with me on Zoom.
Q Have you had a sufficient chance to review those documents?
A Yes, I have.
Q Did we also send you these documents?
A Have I --
Q Did we also email you these documents?
A Yes.
Q I'd like to focus on the signatures in Government's

Exhibits 1, 6, and 7. Mr. Leito, if we could show defense Exhibit A, please.

MR. REICH: Objection, Your Honor. There's a series of defense exhibits that were just provided to us today that contain Dr. Barhoum's analysis about a number of aspects of these signatures. We asked them multiple times, for the defense, to provide disclosures in this case, not the least of which would have been an expert disclosure about what his testimony would be.

There's one, two, three, four, five pages of his analysis that we just have never received before, and we got it literally this morning.

MR. JACOBSON: Your Honor, we did provide an expert disclosure for Dr. Barhoum. Not only did we provide a disclosure, but in response to the government's motion to preclude we provided more information than we were required to about exactly what his testimony would entail.

As to this exhibit, it's a demonstrative. These are government exhibits that were admitted through their prior witnesses today just cropped with boxes around them. There is no analysis here. It's just a demonstrative.

THE COURT: Overruled.

MR. REICH: Your Honor, we'd be happy to show you the remaining documents. That's just one of five.

THE COURT: We can address them when they come up.

MR. REICH: Thank you, Your Honor.

BY MR. JACOBSON:

Q Dr. Barhoum, are these the signatures from Government Exhibits 1, 6, and 7?

A Yes. These are the ones I've seen before.

Q Are these fair and accurate depictions of those signatures?

A Yes, they are.

Q What is the name in the signature lines of this exhibit?

A It says um Yousef, which translating to the mother of Yousef.

Q Is it the same name signed on each document?

A It is.

Q I'd like to ask you a little bit about some of the similarities and differences in the signatures. I'd like to start by going letter by letter. What is the first letter in the um Yousef signatures?

A Let me use the pointer. This one is alif. And the long part is that A or A sound, and the squiggly part on top is called hamza. In linguistics we call it glottal. What it does is make the alif shorter. So instead of A sound, you produce an eh.

Q In looking at the alif and the hamza, does anything stand out to you stylistically?

A Yes. The alif in the last one looks more straight to me

than the top one. The hamza in the last one is placed to the right of the alif, whereas that's not the case with the other two.

Q When you say the last one, are you referring to Government Exhibit 1?

A Correct.

Q Let's walk through the other letters. Directing your attention to the second letter now. What is that?

A This letter is called meem, or M in English.

Q Does anything stand out to you stylistically?

A Yes. Again, you see this meem slanted to the right a lot more than this one. And the top, the loop also looks different. It's not visible on this screen, but it is quite different for me.

MR. REICH: Your Honor, the government will just renew its objection.

THE COURT: Can you stand?

MR. REICH: I'm sorry, Your Honor. We would just renew our objection. This is now one of the documents that we didn't receive that is certainly not a government exhibit as indicating.

THE COURT: I think this is just a blow-up of the signature.

MR. REICH: It is, Your Honor. There's the three signatures. So the first page was the three signatures from

three separate government exhibits. Then there's a series of documents, this is one of them, in which they put squares around certain letters and identify the letter. None of this was identified to us beforehand.

THE COURT: I see. Overruled.

MR. REICH: Thank you, Your Honor.

THE COURT: Thank you.

BY MR. JACOBSON:

Q Let's turn to the third and fourth letters now. What letters are these, Dr. Barhoum?

A There are two letters actually displayed here. The first one is a yeh and the second one is a waaw. And the yeh requires two dots. They're not visible here because they're merged into the line, whereas they're more visible on the other two exhibits.

Q Between these three signatures, does anything stand out to you about the yeh and the waaw?

A This waaw I can see is more triangular, whereas these are more round. The ending in this one is kind of truncated and these are more complete.

Q I'm just going to ask you to refer to the government exhibits. When you say this one, I believe you were referring to --

A Number one looks to me different from these two.

Q Let's turn to the next letter. What are these letters,

Dr. Barhoum?
A This letter is the seen, or the equivalent in English is S, as in Sam. And you notice that this is written one way, whereas these two are written an entirely different way. This one has three loops or three teeth. These are a long dash, each one of them. So this one is very distinct from the other two.
Q Just to back up for a moment. Are there different ways to write the letter seen in Arabic?
A Yes. With the seen you have the option of writing it with three loops or a long dash.
Q And are those two styles of seen, do they correspond to any particular style of calligraphy?
A Yes. My knowledge in Arabic calligraphy leads me to believe that this whole signature is based on the Naskh style, whereas these two are based on the Ruqa style. So when we're growing up we're usually handed a handbook to improve our penmanship, and it's either this style, Ruqa, or this style, Naskh.
So whoever wrote this one must have been basically educated to do the writing in the Naskh style by looking at the seen, waaw, yeh, meem, and alif. So this seen is only done in Naskh style with three teeth, whereas this one is done in the Ruqa style.
Q Thank you. And just to back up for a moment, is one way

of writing the seen more correct than the other?
A Not really, no.
Q Are there regional differences?
A Not really.
Q But when learning Arabic are there different ways -- do you learn one way as opposed to the other?
A Right. It's stylistic. So whatever handbook you're given to improve your penmanship, you basically follow it. So the top two are based on the Ruqa style. Number one down there below is based on the Naskh style because the seen is only done in Naskh style.
And in Naskh style you cannot do it like these, with a big dash. It's not allowed in Ruqa. Whereas in Naskh, you can do the three loops or you can do the big dash.
Q Now, when writing a seen are Arabic speakers typically consistent or do they change up the way they write the letter?
A My judgment is that if you're doing a signature you've done it many, many, many times. So it tends to come out naturally. And whatever style you learn to begin with, you're going to stick with. So it just doesn't seem to be natural that whoever did these would do the Naskh style all of a sudden.
Q And just to clarify, how is the seen written in Government Exhibit 1 at the bottom?
A The meem or the seen?

Q The seen.
A The seen is, like I said, it's a long dash.
Q In which exhibit?
A In this one and this one. The only one that features the seen with three loops is this one.
Q For the record, the bottom seen is Government Exhibit 1 that you're referring to; is that right?
A Correct.
Q Turning to the final letter in the signatures, what letter is that?
A This letter is feh, or F as in Frank. And it hangs right there. And this loop at the end is what we refer to in Arabic calligraphy as a flourish. It's really not needed, but when you're doing a signature especially, you try to embellish on it. You see it right here. So the feh should end right there but it goes all the way up and down. Same thing here.
Q Between the three signatures, are there similarities or differences in the feh?
A The feh here is more round. These are smaller. And the flourish at the end, to me, does not look natural. It looks forced. If I may, I think the whole signature doesn't look actually naturally done. It looks more drawn, as if someone was mimicking the signatures above. It's too deliberate for a signature, especially the last letter, the feh, looks like it's been drawn.

MR. REICH: Objection, Your Honor. Foundation.

THE COURTROOM DEPUTY: Please stand.

MR. REICH: I'm sorry. Objection, Your Honor.

THE COURT: You want to lay a foundation, Mr. Jacobson.

MR. JACOBSON: Sure, Judge. Thank you.

BY MR. JACOBSON:

Q Dr. Barhoum, as a professor of calligraphy, how many students have you trained over the years?

A Sorry. Say that again.

Q How many students have you trained over the years?

A In each class I have the number is capped at 25, but I usually end up with a waiting list. And sometimes I let people in because they have to wait for a whole year. I teach it in spring, and some students may be graduating in June and they don't have a chance to take it.

Q As part of the calligraphy courses you teach, do you observe your students writing in different calligraphic styles?

A Yes, I do. It's a workshop. So besides introducing the calligraphy and its evolution, the theoretical, as well as the practical aspects of it, I go through each one of these styles with the students and train them how to do it. And many students, in fact, after graduating, they continue practicing calligraphy. They send me samples.

Q Is it fair to say that you've looked at a lot of Arabic handwriting in your career?
A I have.
Q Let's look at just Government Exhibit 1 at the bottom. What is your -- based on your analysis of the letters, what is your overall conclusion about the um Yousef signature in Government Exhibit 1?
A I mean, if I were to look at this for the first time, I would judge it as it's done by different people. As I mentioned earlier, the alif here is more straight than this alif and this alif. These lean to the right more radically.
On top of that, the hamza, which shortens the alif, is placed to the right of the alif here, whereas here it's placed to the left. If you were doing signatures for years and years, you tend to do it basically kind of consistently the same way. So this doesn't look to me as consistent.
The meem, same thing. The loop here doesn't look normal. It's like it's been done to look like the other meems, but it's obvious this meem and this meem are more triangular than this one. This one is more round and then it loops down, whereas here there is no loop. It's straight.
So this one and this one look more similar than this. To go back to that yeh and waaw again, the yeh and waaw don't look to me like a natural signature. No one writes this. This is more deliberate, like if I was writing Naskh

teaching my students, I would do it patiently and slowly to show them how to do it. But that's not --

MR. REICH: Your Honor, we renew our objection.

THE COURT: Thank you. Overruled.

(Continued on next page.)

BY MR. JACOBSON: (Continuing)

Q So, Dr. Barhoum, that's your analysis of the signature in Government Exhibit 1.

Do you have any conclusions about the signatures in Government Exhibits 6 and 7?

A My only conclusion is number 1 looks pretty different from these two. And if I were given this the first time, I look at the *seen* and the *feh*, the way the flourish of the *feh* is done, it's being drawn. It's not done actually naturally.

MR. REICH: Objection, Your Honor.

THE COURT: Overruled.

Q And in comparing Government Exhibit 6 with Government Exhibit 7, do you have any conclusions?

A There are minor conclusions but -- I mean minor differences, but nothing to warrant making them actually distinct the way these two are pretty distinct from this one.

I mean no one does the *seen* in *nasekh* style if you're doing a signature. If I may, the signature tends toward simplicity, so why would you be drawing three loops for the scene when you can have just a dash.

MR. REICH: Objection, Your Honor.

THE COURT: Overruled.

MR. JACOBSON: If I can have just one moment, Judge.

(Pause.)

MR. JACOBSON: That's all I have.

Thank you, Dr. Barhoum.

THE COURT: I actually have a question for the witness before the government, just so I can better understand what we're talking about here.

I understand that you have studied calligraphy.

Can you help me, does everyone who learns to write in Arabic, do you learn calligraphy? Is that how it works? You learn a style of calligraphy if you know how to write in Arabic?

THE WITNESS: Only to improve your penmanship but not to become a calligrapher.

Calligraphy is an art and you have to have the talent for it and then tons and tons and tons and years of practice. So when you're in, say, grade 5 or 6 and they give a handbook, the handbook is either in *nasekh* or in *ruqa*, simply to improve your writing, and not to teach you calligraphy. But if you have the knack for calligraphy which I did even before I started, you know, learning the alphabet, then I find that fascinating and then I can try and improve and learn more about the other styles, but not everybody does that.

THE COURT: But the signatures, they would be considered to be different styles of calligraphy; the person who wrote it learned to write Arabic and they learned calligraphy and those signatures are in a style?

THE WITNESS: That -- definitely, the way I see it, yes.

THE COURT: And does everyone learn multiple styles of calligraphy?

THE WITNESS: No. That's why I offer the course at Stanford actually to introduce the students to the different styles.

This may be self-serving but not everybody can teach the different styles either. And there are styles, professional calligraphers who maybe do one style or two but not eight.

THE COURT: Okay.

THE WITNESS: So the course I teach at Stanford, as far as I know, is the only course in Arabic calligraphy offered at the college level.

THE COURT: Okay. Thank you. That was it.

MR. REICH: Thank you, Your Honor.

I would just ask that if the defense can put their first exhibit back up. Since they didn't provide these to the government, we don't have an electronic version of it.

THE COURT: Okay.

MR. REICH: Thank you.

CROSS-EXAMINATION

BY MR. REICH:

Q Good afternoon, Dr. Barhoum.

A Good afternoon.
Q My name is Andrew Reich. I'm an attorney for the government. We have not met before, have we?
A No, we haven't.
Q But you've spoken with defense counsel in this case a number of times, right?
A I have, only on Zoom.
Q Only on Zoom. Okay.
A Yes.
Q About how many times did you have a Zoom conversation with them?
A I actually did not write it down but probably six times, maybe seven times. I'm not sure so don't quote me on that.
Q I won't. Thank you.
You testified that you're being paid for your services today more than $10,000, is that fair to say?
A $10,000, yes.
Q Yes?
A Yes.
Q Okay. Dr. Barhoum, you're not a forensic document examiner, correct?
A I am not.
Q Okay. And you've never been trained as a forensic document examiner?
A No, I'm not.

Q And you've never been certified as a forensic document examiner by the American Board of Forensic Document Examiners or by any other board?
A No. No, I'm not.
Q Okay. You don't complete periodic trainings to maintain any sort of ongoing certification in forensic document examination, right?
A Correct, yes.
Q Okay.
A That's really not my, my area of expertise.
Q Not your area of expertise. Okay. Thank you. Understood.

And Mr. Jacobson asked you about some professional organizations that you were involved in, but you're not involved in any organizations that relate to forensic document examination or handwriting analysis or anything like that?
A No.
Q Right?

Okay. Or any other forensic sciences like the American Academy of Forensic Sciences or the American Society of Questioned Document Examiners, none of those, right?
A Right. None.
Q And you've never written any publications about forensic document examination, right?
A Correct.

Q Or about handwriting analysis?
A Correct.
Q Have you ever read any publications about forensic document examination?
A Not really. I'm not, I'm not that curious about it, to be honest.
Q That's okay. So I assume you haven't read the Journal of Forensic Sciences or any of those publications that relate to this field?
A I have not.
Q Okay. Thank you.
You've also never written any articles or publications in the last ten years at least about Arabic calligraphy, have you?
A My areas of expertise is writing calligraphy and I, on request, actually, I do, I get commission to do certain calligraphy.
Q Of course.
A Yes.
Q And my question was a slightly different one which was that you haven't written any scholarly articles about Arabic calligraphy in the last ten years?
A No.
Q You've never been qualified as an expert in forensic document examination or handwriting analysis or anything like

that by any court?
A No.
Q Okay. And you've never been qualified as an ISIS expert either, is that right?
A That's not my area of expertise, no.
Q Okay. So you would say you're not an ISIS expert and you're not an expert in the Nusaybah Katiba or any of those things, is that right?
A That's correct.
Q Okay. You don't teach about ISIS or write about ISIS or anything like that?
A I don't.
Q Okay. And you've never been qualified as an expert of any sort in any court, is that right? Today is your first time?
A Not in any court, no.
Q Okay.
A I've been consulted on Arabic and Arabic calligraphy.
Q Sure.
A But not in court.
Q Understood. Understood.
A No.
Q Thank you.
And before today, you've never been hired to conduct a handwriting comparison between two samples of handwriting,

have you?
A I'd rather not say. I mean I sign NDAs with, let's say, Apple computer. So I, I can't actually divulge that.
Q You can't answer the question --
A No.
Q -- whether you've been hired before --
A I did, I did these things but I can't tell you the particulars.
Q I see. So you've conducted handwriting analyses?
A Right, yes.
Q Within the last ten years?
A Probably.
Q But you didn't provide those to your lawyer -- excuse me -- to defense counsel in this case?
A No.
Q Did you tell them that you had done that before?
A Yeah, I did tell them that I got consulted --
Q So they knew about that?
A -- on many occasions.
Not that I know of, no.
Q Oh, they didn't know about that?
A Not that I remember.
Q So you didn't tell them about that?
A No.
Q Okay. You have never conducted an analysis of a document

to determine if there was a fabrication or an alteration, have you?

A That's a tough question. I probably did.

Q You probably did?

A Yes.

Q Is that one of the ones that you didn't tell the lawyers about?

A I did tell them that we, I signed NDAs with people I consulted with and, no, we did not talk about the particulars.

Q Okay. So if I were to ask you questions about how you did those analyses, is it fair to say you would refuse to answer them?

A About what analyses?

Q About how you conducted those handwriting analyses you're referring to now?

A If it gets into the actual details of what I did, probably not.

Q You can't discuss it?

A Correct.

Q Is there any -- have you ever done any sort of handwriting analysis other than today that you can discuss in the last ten years?

A No.

Q You haven't?

A No.

Q So there's the secret ones and there's the one you're doing today?

A You can say that.

Q Okay. Okay.

You testified that you are, in fact, an expert in Arabic calligraphy, right?

A Correct.

Q Okay. And calligraphy is an artistic sort of stylized type of lettering; it's an art form, is that right?

A Correct.

Q You've studied and you've received training in Arabic calligraphy art form, right?

A Correct.

Q And you've practiced making Arabic calligraphy for many years?

A Correct.

Q And I think you testified that you teach a class about Arabic calligraphy, is that right?

A Say that again, please?

Q You teach a class about Arabic calligraphy?

A I do.

Q Would you agree it's a fairly intricate art form?

A I think so.

Q And is it safe to say that you perform calligraphy better than someone else who has never practiced that art form?

A I hope so.
Q So calligraphy is different than handwriting then, isn't it?
A Definitely, except for the area we discussed, where we discussed.
Q Oh, okay. So they're two different things except for where you say they are not?
A Correct.
Q Understood.
Most people's everyday handwriting is not calligraphy, right?
A It may try to emulate calligraphy but it's not, no.
Q It's not.
A Calligraphy, if I may --
Q That's okay. I'll give you an opportunity.
A All right.
Q Thank you.
Most people don't sign their name using calligraphy, do they?
A Some try.
Q Some try?
A Yes.
Q Okay. But you would agree that most people do not sign their name using the type of calligraphy that you write in teaching your students?

A It could go either way.
Q It could go either way?
A Yes.
Q So you think there are probably some people --
A Yes.
Q -- that write in handwriting and some people that sign their name using the art form of calligraphy?
A To make the signature more distinctive, yeah.
Q Of course. But I guess what I'm saying is some people do, some people don't?
A Correct.
Q And the signatures you analyzed, you wouldn't call those works of art, would you?
A No. No. No.
Q Those are not calligraphy artwork, the type that you teach?
A Not at all.
Q They're written in a person's handwriting as far as you know, right?
A In a what handwriting?
Q Somebody wrote those in their own handwriting as far as you're aware?
A Yes. They're not typed. It's obvious. They're not printed.
Q Okay. In connection with your handwriting analysis, you

examined photographs of physical documents, right?
A Correct.
Q So you didn't examine the actual physical documents themselves, right?
A I examined what I was actually shown. So I'm not sure if that's the authentic one or not.
Q Okay. But the attorneys provided you photographs of documents?
A I'm sure you shared these with them. These are the ones that, yes, are on exhibit. These are the ones I looked at.
Q Understood.
And these are the only ones you looked at?
A Yes.
Q So you were not able to, for example, compare the indentations that were made by each signature on a piece of paper, is that right?
A Can you say that again?
Q Sure.
So because these were photographs and you didn't have the physical document, you weren't able to actually feel the document and examine the indentation made on the document?
A Right, but I don't need -- sorry.
Q I'm just asking you that question for now.
A Yes, but I will need to see the original to be able to tell what style this is --

Q That's okay.
A -- and the distinctions between one and the other.
Q I understand.
A Just to be clear.
Q No, I totally understand and I appreciate your clarifying that.

But to be clear, you were not able to actually touch a physical document and see the indentations that were made on the paper?
A No. No.
Q Okay. And you didn't use any special tools or equipment to examine the various signatures, is that right?
A I'm not sure what you're referring to. I mean what kind of tools do you have in mind?
Q Sure.

So forensic document examiners, when they're examining documents and they're comparing two signatures, they would use various tools. So, for example, there are things call macroscopies and microscopes, projectors, electrostatic detection apparatus.

Any of those things, have you ever used any of those?
A No. No.
Q You haven't?
A My only tool is my knowledge in Arabic calligraphy and

the different styles.
Q Understood.
A So I can tell the difference between the different styles right away.
Q Okay. So you were able to make your determinations right away?
A Correct.
Q Okay. So you didn't draft a report of your analysis, right?
A I didn't do what?
Q You didn't draft a report of your analysis? You didn't write a report about what you determined here?
A No. No.
Q Okay. And these exhibits that Mr. Jacobson showed you, who made those? Did you make those?
A No.
Q You didn't make -- so they were given to you looking that way already?
A Correct.
Q So when you say that you were able to tell from the beginning, you looked at these documents that had the square around the letters and that highlighted the different letters, that's what you were looking at?
A Right.
Q Okay.

A Yes.
Q Okay.
A That was my --
Q That's okay. I'll give you an opportunity to explain.
You didn't create any sort of document memorializing what methodology you were going to use to conduct a handwriting analysis before you conducted it, right?
A No.
Q Okay. Or even after for that matter, right?
A No.
Q And you didn't draft a document memorializing what standards you would rely upon to make your final determination, right?
A What do you mean by "memorializing"? Sorry.
Q Oh, I just mean writing down.
Did you write down what standards you had used?
A No, I don't need to.
Q Did you know that there are standards for comparing signatures in forensic document examination? Have you ever heard about those?
A Again, that's really not my area. I don't do documents scrutinizing --
Q That's not your area?
A Yes. I am an expert in Arabic calligraphy and that's it.
Q Of course. Okay.

A Yes.
Q You didn't write down the conclusions that you came to in any sort of way; you just sort of relayed them to counsel --
A Correct.
Q -- after looking at the documents they gave you?
A Yes.
Q Okay. And you didn't make a list of what are called limiting factors in your analysis, did you?
Have you ever heard that term before?
A Not really. You can explain it to me though.
Q Okay. Well, sometimes when people are examining signatures and they make a determination about whether they think two signatures are the same, they make a list of factors that are actually differences in what their ultimate conclusion would be. So there are sometimes, there are factors that can support their conclusion and there are other factors that may not support their conclusion.
A Yes, the only factors are the one that I referred to here.
Q You are only focused on the ones that support you?
A Yes.
Q Okay. So you weren't focused on any factors that didn't support your conclusion?
A Not really, no.
Q Okay. Understood.

A No.
Q To be clear, you don't know who signed these three signatures that you testified about, right?
A No, I don't.
Q Okay. So you compared one signature, the one at the bottom, with two others at the top and the middle, but you don't know who signed the one at the bottom, you don't know who signed the one in the middle, and you don't know who signed the one at the top?
A No, I don't.
Q Okay. For that matter, you don't know if this was all one person, two people, three people?
Your analysis was that you thought that perhaps --
A I mean --
Q -- the one was signed with different people --
A Unless I'm present there, how would I know? No.
Q Okay. So you have no way of knowing?
A Yes.
Q Okay. Thank you.
Setting aside whether the top two look alike or don't look alike, you don't know if those were signed by the same person, right?
A To me, they look like they could be from the same person.
Q Okay. They could be but you don't know if they are or not?

A I think with a high degree of certainty, I'd say the upper two are done by the same person and the third one is completely different. That's all I know.
Q That's all you know? Okay. So that's what I'm just trying to learn.
I understand what your opinion was, but I'm just saying in reality, you don't know for sure who --
A No, I don't.
Q Okay. Understood.
Did you review any other samples of handwriting other than these three signatures?
A I'm not aware that I did.
Q Okay. So, for example, you didn't look at another document that counsel said was written by the same person as number one, number two, number three, in order to get additional samples in order to have more of a dataset to compare them?
A Not that I remember, no.
Q Okay. So really what you were doing was comparing the one at the bottom with the top two and no other samples?
A That was the question posed to me, yes.
Q Did you ask to see other samples?
A Not really.
Q Okay. And you don't have any opinion on the rest of the text on these documents, do you?

Did you see the full documents?

A I have no interest in opinions about the document. All I'm looking at is the calligraphy part of the document.

Q I'm sorry. Okay. So just to be clear, you didn't see a document that was marked Government Exhibit 1, Government Exhibit 6 and Government Exhibit 7?

A I -- these are the ones we were looking at.

Q Sure. Sure.

So you saw the one that says "A" at the top and then has these three rectangles?

A Right.

Q But you didn't see a document -- and these are just signatures, right?

A Correct.

Q Do you know what this person was signing?

A Yes, I looked at the overall document.

Q You did look at the overall document?

A Yes.

Q For all three of these?

A Right.

Q Did you look at any other documents that look like that or just the overall document for just these three?

A I think just these three.

Q Okay. And what analysis did you conduct of the rest of the handwriting on those documents?

A The rest of the handwriting looks consistent to me. I mean the top part, it could have been filled out by the same person. The signatures are different.
Q Understood.
Okay. I want to take a quick look now at the three signatures here. So if we're looking at the first letter, just so I'm understanding this, you're saying the difference in the first letter was that the slants are at different angles, is that right?
A Let me --
Q Let me ask it this way.
Your testimony was that the slants are at different angles in the first letter of these three examples, right?
A If I may, this is slanted to the right. This and this. (Indicating.)
Q I understand. If you can answer my --
A This one is more straight.
Q Dr. Barhoum, I'd appreciate it if you can just answer my questions and counsel will have plenty of time to let you elaborate.
A Okay.
Q Is the one on the bottom not slanted at all? Is it your opinion that the one on the bottom --
A It's almost straight.
Q It's almost straight?

A Correct.
Q Did you measure it with a protractor?
A No.
Q So you were just eyeballing it?
A If I may, I've been doing this all my life, and part of what I teach in calligraphy is the slant of each letter. We have over 200 letters in Arabic. Each style has a different way of writing each letter.
Q So you could write --
A So I know them by heart.
Q Sir --
A This is slanted. This one is not slanted.
Q Dr. Barhoum, I appreciate that you want to elaborate. If you can just for now answer my questions and I'm sure defense counsel will give you plenty of time to elaborate. I do appreciate what you're saying.
A Okay. Sorry.
Q I'm just asking you more particular questions than that.
A All right.
Q So with the second letter, the top one, the middle one and the bottom one, you testified the tope two look different to you?
A Let's make sure we're talking about the same thing. Which one, are you talking about this?
Q Yes, sir. Yes, sir.

A The *meem*. Okay. What's your question?
Q How would you say that the middle one is different from the bottom one?
A Well, middle one, if you see is like triangular.
This one is like a round loop and it comes down.
This, from the triangle, it goes straight.
Do you want me to repeat that?
Q No. That's fine. Thank you.
A I mean I'll be happy to.
Q And to be clear, the one at the bottom, you say, you're saying is not shaped like a triangle?
A Does not seem what?
Q Is not shaped like a triangle, the one at the bottom?
A Like a what?
Q You used the phrase "triangle."
A That top part is not shaped like a triangle.
Q Understood.
A This part resembles the *alif*.
Q But if you look at the *meem* directly above?
A Yes.
Q That? (Indicating.)
A This one is more trying already.
Q I'm sorry. Please let me ask the question first.
A Sure.
Q That one you believe is a triangle but you believe the

one on the bottom is not a triangle?
A Correct.
Q Okay. Thank you.
Moving to the next letter over to the left, you testified that --
A This one? (Indicating.)
Q Yes.
A Okay.
Q You testified that one of the differences between the top two and the bottom one is that on the bottom one, the line beneath it is sort of intersecting upon which the signature is written?
A Right. This line --
Q Sir, if can you please answer my questions.
A All right.
Q You testified that the differences, one of the differences here was that the line beneath the letter in the bottom one intersected somewhat with the line upon which the signature is written?
A That's not what I said.
Q Okay. Go ahead.
A Okay.
Q What is different about that bottom line?
A Okay. This line is like a straight dash. This one is slanted. It goes down. This one slanted, it goes down.

These, if I may, these in lieu of two dots under the *yeh*. The *yeh* has two dots underneath it.

Q Okay.

A If I may, if I may, you can write the two dots or you can do the dash.

Q Okay. So just to be clear though, you're saying that some people write two dots and some people do it with a dash, but all three of these have dashes, correct?

A Correct.

Q Okay. That's my only question.

Moving on, I want to ask you about the *seen* now.

You mentioned that the *seen* can be drawn with sort of three teeth or loops or it can also be drawn with just a line. Is that right?

A Correct.

Q Okay. And you testified that both of those are proper ways of writing that letter, correct?

A Correct.

Q Okay. And I'm not sure I understood your testimony on this point, but is it possible that one person can write it both ways?

Is it your testimony -- is it possible that one person can write that letter in two different ways? Just a yes or no.

A This is written in *nasekh* style.

Q Sir, I'd just like to know.
A Yes.
Q Okay. It is possible.
A Right.
Q You testified, in your experience, that you believe that someone picked one way and would always write it that way, is that right?
A Correct.
Q Am I saying that correctly?
A Correct.
Q Is it based on your experience in calligraphy or your experience in looking at signatures?
A Both, actually.
Q Both?
A Yes.
Q But you agree it's possible that a person can write it different ways?
A Yes, but then they become consistent in what they do.
Q I understand.
The last question I want to ask is about the flourish.
A About the what?
Q The flourish.
A Yes.
Q You described this big loop as a flourish?

A It is, yes.

Q But you would agree all three of these signatures have a flourish, right?

A Yes.

Q And the flourish is not a letter itself; it's just a feature of somebody's handwriting?

A Yes.

Q And then you made a comment at the bottom, you said that it was written in a way that "no one does this."

What's your basis for saying that?

A This is the *feh* and it ends right there.

If you notice, there's a tail starting there to start the flourish and it goes back this way. This tail does not exist here or there and that's the basis why I said that.

Someone was basically drawing and not writing, because if I do the *feh* myself, I'll go like this and continue. I don't stop right there and then start with a tail over there.

Q Okay. But you didn't write this yourself, right?

A Of course not.

Q Okay. And are you a professional calligraphy artist, aren't you?

A Correct.

Q And the first two -- let me direct your attention back to the first two.

In the first one, the tail sort of ends and touches the line and, in the second one, it doesn't end down at the line, is that right?
A Let's make sure we're talking about the same thing.
Q Sure.
So the very left-hand side of the signature?
A Right here? (Indicating.)
Q Yes. I'm looking at the top two boxes now.
A Yes.
Q So the top one, it touches the line, right?
A Yes.
Q And the second one, it doesn't touch the line, right?
A Actually, it does.
Q I'm talking about the line upon which the signature is written.
A Yes.
Q The flourish does not go down and touch the line?
A It does. Here's the line. (Indicating.)
Q Which is the line? Which one do you think is the line upon which the signature is written?
A I'm pointing you. You see the line right here. (Indicating.)
Okay? So the flourish goes underneath.
Q To be clear, where you're putting your laser, you believe that's the line upon the paper on which the signature is

written?

A Right here. (Indicating.)

MR. REICH: Let the record reflect that the laser pointer at this point is bifurcating the signature.

Q That's what you believe is the line upon which this signature was written?

A Yes, I think so.

Q Okay. So let me ask you this.

Are the top two signatures the same? Like in every sense, are they identical?

A I think you asked me this before and I said it's possible.

Q Sorry. Let me rephrase this.

Are the top two signatures written identically to one other?

A I can argue that they are.

Q What I mean is that if you lay them on top of one another, will they look exactly the same?

A Not necessarily, no.

Q So let me move on from this.

You would agree, wouldn't you, that some people have neater handwriting than other people?

A Of course.

Q And some people have sloppier handwriting than other people?

A Right.
Q And you would agree that some people are more consistent in their handwriting and some people are less consistent in their handwriting?
A Right, but not in their signatures.
Q It is your view today that no one is inconsistent in their signatures?
A That's not what I said.
Q Okay.
A Yes.
Q So let me rephrase the question.
A Yes.
Q You agree that some people are more consistent in their signatures and some people are less consistent in their signatures?
A Correct.
Q Okay. But, again, you don't know anything about the actual person or people behind these signatures that you analyze, correct?
A I don't.
Q Okay. You would agree that sometimes people write more quickly if they're in a hurry, for example, right?
A Right.
Q Okay. But you don't know if the person who wrote any of these signatures was in hurry when they were written, right?

A There's no way to know.

Q There's no way for you to know?

A No.

Q You would agree that sometimes people write more sloppily if they don't have a surface to write on, would you agree?

A Yes. I don't know where you leading.

Q Sir, please, please, we're almost done. I promise. If you could please just answer the question.

A Okay.

Q Okay. Some people write more sloppily if they don't have a surface to write on, is that right?

A Yes.

Q You have no information about what surface these were written upon, right?

A No.

Q And a person's signature can vary from one document to another, could it not?

A It could.

Q So just because a signature might vary from one document to another does not always mean that it was signed by different people, is that right?

A Correct.

Q Okay. And it doesn't always mean that it was necessarily written by someone trying to copy another signature, is that correct?

A What you --
Q Yes or no.
A What you're ignoring is that these are two different styles. It doesn't have -- in English, you don't have style. You have Gothic styles. New York Times and Gothic style. You can tell. Washington Post. And then you have other styles, but you don't have the same styles as in Arabic. I'm sorry.
Q I understand.
A These are two different styles.
Q Dr. Barhoum, I appreciate that. Thank you for clarifying that. I completely understand.
But, again, just to be clear, you agree there's a difference between calligraphy and handwriting, don't you?
A That's correct.
Q And you made -- you testified about people using the handbook to learn how to write.
Do you remember that?
A That's correct.
Q But not everyone uses a handbook.
A In grade school, just about everybody is handed the handbook by the teacher to improve their penmanship.
Q Okay. The same one?
A It could be nasekh. It could be *ruqa*. And that accounts for the difference in styles.
Q But those are two different styles you're referring to.

A Correct.
Q You kept referring to a handbook that people would learn from and I'm asking you is it possible that there are multiple handbooks that people learn from?
A And what I said, there's -- in grade school, you're handed only either *nasekh* or *ruqa* because they're the same list.
Q Understood.
A No one teaches you *thuluth* or *kufic*. That's too hard.
Q Dr. Barhoum, I appreciate that, but I think you're referring again to the style.

I'm asking you are there more than one handbook that people can learn how to write Arabic from?
A For penmanship, mostly *nasekh* and *ruqa*.
Q Once again, are those names of books or are those names of styles of calligraphy?
A Styles of calligraphy.
Q Okay. Thank you, sir.

And, again, calligraphy, you believe calligraphy is different from handwriting, correct?
A Correct.
Q Okay. Thank you.

MR. REICH: No further questions.

(Continued on next page.)

REDIRECT EXAMINATION

BY MR. JACOBSON: (Continuing.)

Q I just wanted to clarify something briefly with you. Could you look at the exhibit binder in front of you?

A Sure.

Q And take a look at Government Exhibits 1, 6, and 7. Is that the original form that we sent you these documents in?

A Yes. Yes, because it's all printed.

MR. JACOBSON: No further questions.

THE COURT: Any other witnesses? I'm sorry. Any other questions for this witness?

MR. REICH: Not from the government, Your Honor. Thank you.

THE COURT: Thank you, Doctor. You're excused.

THE WITNESS: Thank you.

THE COURT: Any additional witnesses?

MS. EISNER-GRYNBERG: Not for Ms. Salman.

THE COURT: Anything additional for the government?

MS. SHAMI: No additional witnesses, Your Honor.

THE COURT: Would the parties like an opportunity to make argument, not tonight, tomorrow morning?

MS. EISNER-GRYNBERG: Judge, we are going to ask for an opportunity to write on the hearing. We're happy, as well, to make oral argument either tomorrow or following briefing, whatever is preferred by the Court.

MR. REICH: Your Honor, we think that we briefed this at length. Your Honor wanted to hear from witnesses today, and that's what's happened. We understand that there may be a question about a particular issue, like the hearsay discussion we've been having. We'd be happy to brief that if it would help the Court.

We think on the question of authenticity there can be absolutely no question here. The case law that the government provided Your Honor clearly says that there's just a prima facia showing that needs to be made. Your Honor does not need to determine authenticity.

There is no reason to brief this any further because Your Honor does not even need to make that determination. It is simply a prima facia showing. Anything after that is definitionally rebuttal, and anything after that goes to the jury, Your Honor.

THE COURT: Okay. Did you want to make argument today or tomorrow?

MR. REICH: We're happy to make argument, if Your Honor would find it helpful. If Your Honor is inclined to grant the defendant's request for briefing, we don't need argument on top of that, of course.

THE COURT: Why don't we have additional argument and I'll let you know if I need additional briefing. So tomorrow at 10:00 a.m.

MS. EISNER-GRYNBERG: That's fine. I'm sorry. Just one second.

Is the Court available tomorrow afternoon? We have a personal conflict. I believe the Court is aware of it. It's a conflict with the Court's schedule.

THE COURT: It's a conflict with what?

MR. JACOBSON: Your Honor, I believe I have another case in front of Your Honor tomorrow morning.

THE COURT: Let's see. The status conference. So you're not going to ask to adjourn that?

MR. JACOBSON: No, I'm not.

THE COURT: I've been waiting with bated breath.

MR. JACOBSON: I have a personal matter at noon tomorrow. So I could do first thing in the morning or later in the afternoon.

THE COURT: How long were you all expecting for argument?

MR. REICH: Your Honor, we don't have much argument to make. I mainly just made it to Your Honor. I don't know if defense counsel has much more. We think this is not something that needs to be belabored.

The point of the hearing was to see if a threshold showing was made, and I think it is a very, very high bar for the defense to be able to prove -- to be able to argue to Your Honor that an initial prima facia showing was not even made.

MS. EISNER-GRYNBERG: Judge, of course we completely disagree. I don't think it will be a long argument.

THE COURT: Can we do 11:00 to 12:00? Does that conflict with your schedule, Mr. Jacobson?

MR. JACOBSON: I have to leave at about 11:30.

MS. EISNER-GRYNBERG: Is the afternoon possible?

THE COURT: Is the afternoon possible for the government?

MR. REICH: We understood we set aside two days for the hearing. So the government is available whenever Your Honor would like.

THE COURT: Okay. You're sure you're not canceling this 10:30? In that case, let's do 1:00 p.m. tomorrow. Does that work?

MR. JACOBSON: That's fine, Judge.

THE COURT: 1:00 p.m. tomorrow for argument.

MR. REICH: That's fine for the government. Thank you very much.

THE COURT: Anything additional?

MS. EISNER-GRYNBERG: No. Thank you.

THE COURT: We're adjourned.

(Proceedings adjourned until March 24, 2026 at 1:00 p.m.)

# I N D E X

WITNESSES:


HASSAN HASSAN

| | |
|---|---|
| DIRECT EXAMINATION BY MS. SHAMI | 5 |
| VOIR DIRE EXAMINATION BY MR. JACOBSON | 20 |
| VOIR DIRE EXAMINATION BY MS. SHAMI | 23 |
| FURTHER VOIR DIRE EXAMINATION BY MR. JACOBSON | 25 |
| DIRECT EXAMINATION BY MS. SHAMI (Continued) | 26 |
| CROSS-EXAMINATION BY MR. JACOBSON | 64 |

SAIDA ISMAIL

| | |
|---|---|
| DIRECT EXAMINATION BY MS. SHAMI | 102 |
| CROSS-EXAMINATION BY MS. EISNER-GRYNBERG | 116 |

KHALIL BARHOUM

| | |
|---|---|
| DIRECT EXAMINATION BY MR. JACOBSON: | 208 |
| CROSS-EXAMINATION BY MR. REICH | 226 |


## EXHIBITS:


| | |
|---|---|
| Government Exhibits 1 through 8 | 42 |
| Defendant's Exhibit C | 177 |


* * * *