# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

July 1, 2026

**By ECF and Email**
The Honorable Natasha C. Merle
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> **Re:**   **United States v. Halima Salman, 24-CR-206 (NCM)**
> Reply to Government's Opposition to Supplemental Motion to Dismiss the
> Indictment, and in Further Support of Motion for Authorized Recipients

Dear Judge Merle,

We write to reply to the government's publicly filed opposition (ECF No. 176) to our sealed supplemental motion to dismiss the indictment. ECF No. 171. With the government's consent, we move to unseal ECF No. 171,[1] and to withdraw our motion to seal the government's opposition. ECF No. 177. Rather, the government's public filing of protected discovery illustrates the government's misuse of the operative protective order, and provides support for Salman's still-pending motion requesting designation of authorized recipients. *See* ECF Nos. 161-167.

## I.   Background

On March 15, 2026, Salman moved, under seal, to dismiss the indictment, or for alternative remedies, following the government's suppression of certain Nusaybah Katiba documents in the government's possession. ECF No. 147. The government responded in opposition on March 30, 2026. ECF No. 152. Salman's motion remains pending.

Separately, on May 13, 2026, Salman moved to designate certain individuals authorized recipients of specific protected discovery material, so that she may prepare them as trial witnesses. ECF No. 161, 162. She narrowed her request on May 22, 2026. ECF No. 167. Salman sought to discuss with the witnesses portions of a disclosure made by the government on March 27, 2026 (the "March 2026 Disclosures"), a disclosure made by the government on October 1, 2025, and reports of interviews of those witnesses, Bates-stamped HSALMAN_74-550. The government

---

[1] The government maintains that Exhibit A to the motion should remain under seal, despite quoting or referencing most of its contents. *Compare* ECF No. 171, Ex. A *with* ECF No. 171. While Salman has no objection to Exhibit A remaining under seal, the government has provided no explanation, and has made no showing of good cause, as to why the remaining contents of the disclosure "will result in a clearly defined and serious injury." *See* Fed. R. Crim. P. 16(d)(1); *United States v. Smith*, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013).

opposed, arguing that discussing any of the contents of the March 2026 Disclosures, the October 1, 2025 Disclosures, or HSALMAN_74-550 with potential trial witnesses "present[s] a serious risk to the integrity of this proceeding." ECF No. 164 at 1. Salman's motion remains pending.

On June 15, 2026, Salman moved, under seal, to supplement her pending motion to dismiss, following the government's suppression of exculpatory witness statements of Nadim Mujcinovic until he was moved outside of the United States's control. ECF No. 171. On June 26, 2026, the government publicly filed its response to Salman's supplemental motion to dismiss. ECF No. 176. In its response, the government, without permission from the Court, quotes and cites heavily from Salman's sealed motion to dismiss. *Id*. at 2, 4, 5, 6, 7. Further, the government relies on numerous quotations from both the March 2026 disclosures and protected discovery Bates-stamped HSALMAN_111, HSALMAN_121, HSALMAN_213, HSALMAN_285, HSALMAN_291, HSALMAN_309, and HSALMAN_398, each of which the government had argued could not be discussed with Salman's potential witnesses due to an alleged security, obstruction, and collusion risks. *See id*., ECF. No. 164.

## II.    The Government's Opposition Continues its Pattern of Suppressing and Misrepresenting Information, and then Relying on that Information to Seek a Litigation Advantage

Salman's supplemental motion to dismiss is based on the March 2026 Disclosures: a bullet-pointed list the government claims to summarize three interviews of Nadim Mujcinovic by the FBI. Prior to the filing of the motion, and continuing to today, the government has refused to disclose the actual interview notes or reports. *See* ECF No. 171 at 8. Yet the government's opposition relies on numerous new claims supposedly contained within those notes, which Salman has no ability to confirm, challenge, or contradict without the source material. The government's opposition also makes claims as to the defendant's actions that are demonstrably false. We will discuss each of these new and misrepresented claims in the order in which they appear.

(1) "Nadim Mujcinovic . . . did not live in the same city as the defendant in Syria during the charged conduct." *Id*. at 1, 4.

This claim—and either Mujcinovic's or Salman's alleged city of residence—is not contained within the March 2026 Disclosures, and is critical. The government has consistently maintained that it does not know where Salman was trained during the charged conduct, which was the basis for Salman's successful litigation for a bill of particulars. On October 27, 2025, this Court granted Salman's "request for particulars regarding the approximate location and date of alleged military-type training." ECF No. 121 at 13. The Court held that "informing defendant that the crime allegedly occurred somewhere in Syria is also inadequate to allow for a pretrial investigation here." *Id*. at 14. As of August 2025, the government "had not identified the location of the military training that it believes it can link to the defendant." *Id*. at 15-16. Responding to the Court's Order, on November 26, 2025, the government alleged that Salman received training by the Nusaybah Katiba in either "Mayadin, al-Barakah Province [or] al-Furat Province," the latter two comprising tens of thousands of square miles in Northeast Syria. ECF No. 130. Regarding the location of the charged conduct, the government has stated that "it's certainly not something that the Government is hiding from defense counsel." ECF No. 117 at 117. This is belied by the government's new

assertion that implies it knows where Salman lived during the charged conduct, and that her residence was in a different city than Mujcinovic's.

(2) "The government in fact provided the interview dates to the defendant at her request immediately following the disclosure." *Id*. at 2, n.2.

The March 2026 Disclosures do not contain any dates of the interviews, stating only that the statements were made by Mujcinovic to FBI agents "while in Hasakah Prison in Syria." In response to defense counsel's email requesting the dates of the interviews, the government stated, "Nadim Mujcinovic was interviewed on September 10, 2024; September 23, 2024; and October 7, 2025." The government did not delineate on which dates the witness made any of the statements contained in the March 2026 Disclosures. But in its opposition, the government quarrels that it provided his statements "just a few months after they were made," ECF No. 171 at 5, 7, despite two of the interviews occurring, by the government's admissions, in September 2024—a year-and-a-half before the March 2026 Disclosures.

(3) "Mujcinovic subsequently asserted, in response to questioning by law enforcement about Rabia during an October 7, 2025 interview, that nobody in the defendant's family was involved in the Nusaybah Katiba." ECF No. 171 at 1-2."

The March 2026 Disclosures do not list any questions by law enforcement, do not provide any of Mujcinovic's answers to those questions, and do not limit the scope of his statements to being about Salman's sister Rabia.

(4) "On May 14, 2026, nearly two months after the March 2026 Disclosures, the defendant asked the government <u>for the first time</u> since the defendant's arrest to identify the facilities in which Mujcinovic and Nurzad were detained." *Id*. at 2 (emphasis added).

This claim is false. Salman requested this information on March 27, 2026, minutes after receiving the March 2026 Disclosures:

| From: | Samuel Jacobson |
|---|---|
| To: | Shami, Amanda (USANYE); Mia Eisner-Grynberg |
| Cc: | Reich, Andrew (USANYE) |
| Subject: | RE: United States v. Halima Salman, No. 24-CR-206 (NCM) - Disclosures |
| Date: | Friday, March 27, 2026 6:30:05 PM |

Amanda and Andrew,

Please let us know the dates of any interviews with Nadim Mujcinovic, along with his current location. Please also let us know whether the government has interviewed Matiullah Nurzad, and where he is currently detained.

Thanks and have a good weekend,
Sam

The government responded, "We understand both are in custody abroad."

(5) "Mujcinovic stated that he had never met the defendant." ECF No. 171 at 4 (three times).

The March 2026 Disclosure averred that Mujcinovic "did not interact" with Halima Salman, not that he had never met her—a significant difference. The government then uses this new claim to argue that Mujcinovic "was not a 'percipient witness,' to any of the defendant's conduct." *Id*. Salman's investigation has produced evidence that this claim is untrue, which may be produced to the Court *ex parte*.

The government relies on all these new and distorted claims to argue that Mujcinovic's statements are neither favorable to Salman nor material to her defense, and were not suppressed by the government. *Id*. at 4-6. Because the government continues to refuse to produce these statements, Salman cannot meaningfully respond. The Court should order the government to turn over the interview notes and reports to Salman, or in the alternative, to the Court for in camera review, so that Salman is not deprived of exculpatory evidence.

## III.     The Government's Arguments Go to the Weight of the Exculpatory Evidence, Not its Favorability or Materiality to the Defense

The government continues to demonstrate that it fundamentally misunderstands its disclosure obligations. It has charged Salman with receiving military-type training from ISIS. ECF No. 13 at 1. Though the government now obfuscates that "The defendant has been charged with receiving military-type training from ISIS, and there is no reference anywhere in the indictment to the Nusaybah Katiba," ECF No. 171 at 4, n.4, its Bill of Particulars specifically alleges that the training was associated with that particular ISIS subgroup, as it has consistently maintained. ECF No. 130 at 1-2. Pursuant to *Brady v. Maryland*, as well as the operative Rule 5(f) Order in this case, the government is obligated to disclose to Salman "all information 'favorable to an accused' that is 'material either to guilt or to punishment' and that is known to the Government." ECF No. 7 at 1 (quoting *Brady*, 373 U.S. 83, 87 (1963)). Accordingly, the government is, and has been, required to disclose to Salman any evidence that makes it less likely that she received ISIS military training through the Nusaybah Katiba.

Mujcinovic's statements plainly fit that bill, even if the government has arguments it would make to a jury to downplay their importance. According to the disclosure, the government learned from a witness that Halima Salman was not an ISIS member. ECF No. 171, Ex. A at 1. And the witness also told the government that Salman was not "involved" in Nusaybah Katiba, nor was any other Salman family member. *Id*. at 2. Certainly, Mujcinovic's statements that Salman was not a member of ISIS, nor involved in its alleged women's training group, makes it less likely that she received military-type training from that group. Put another way, if the government possessed evidence that Salman <u>was</u> a member of ISIS—that she had an ISIS identification number, or identification card, for example—they would surely seek to introduce that evidence at trial to argue that these identifiers make it more likely that she received the charged training. Indeed, the government has argued just that regarding Salman's photographs in front of ISIS flags. A witness's disavowal that she was so affiliated correspondingly makes it less likely that she attended the training, even if not conclusively so.

The same is true for Mujcinovic's assertion that Salman was not "involved" in Nusaybah

4

Katiba. Naturally, attending a group's training class would "involve" a person with that group, whether or not she was a member of it. If the government possessed evidence that Salman was involved with the Katiba—through a witness who saw her at one of their meetings, for example— they would seek to introduce that evidence to argue that it is more likely that she attended their training. So, the opposite must also be true: if Salman was not involved with the group, she is less likely to have attended their events.

The government's arguments evince their own assessment of the reliability or importance of Mujcinovic's claims, which is not the government's role, but the jury's, or at a minimum, this Court's. According to the government, his statements about Salman aren't favorable or material, because his exposure to her was purportedly limited: he didn't live in the same city as her, he didn't interact with her (and maybe never met her), and his "generalized denials" were "asserted broadly" "in response to questioning about his wife." ECF No. 176 at 4. Putting to the side that none of these claims are even contained within the March 2026 Disclosures, *see ante* Part II, all of them go to the weight of the evidence, not its relevance.

## IV.     The Government Suppressed Mujcinovic's Statements Until He Was No Longer Available, Depriving Salman of Any Effective Use of the Information

Pursuant to the operative Rule 5(f) Order in this case, the government has been ordered that it "shall disclose [*Brady*] information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case." ECF No. 7 at 1. "If the Government fails to comply with this Order, the Court, in addition to ordering production of the information, may:

> (1) specify the terms and conditions of such production;
> (2) grant a continuance;
> (3) impose evidentiary sanctions;
> (4) impose contempt or other sanctions on any lawyer responsible for violations of the Government's disclosure obligations, or refer the matter to disciplinary authorities;
> (5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or
> (6) enter any other order that is just under the circumstances.

*Id*. at 2. Here, by its own admission, the government learned of exculpatory evidence between September 2024 and October 2025. Rather than "promptly" disclosing the evidence once it became known, the government intentionally suppressed the evidence, even from the Court, during the pendency of relevant motion practice and an evidentiary hearing. The government chose not to disclose it until the witness was no longer within the government's control, or within Salman's ability to access him. That decision—for which the government offers no explanation or justification whatsoever—has irrevocably prejudiced Salman's defense.

First, the government faults Salman for failing to divine, from 2019 until the March 2026 Disclosures, that Mujcinovic (1) was alive, (2) possessed exculpatory evidence, and (3) was available to be interviewed or deposed by her counsel, none of which absolves the government of its delayed disclosure. Per the government's opposition and discovery productions, the last time any Salman family member saw Mujcinovic was in 2019, when he and Rabia were separated by

5

SDF and he was taken to an unknown prison. From this, the government avers that during her 2024-2026 prosecution, Salman should have, and had the ability to, seek a deposition under Federal Rule of Criminal Procedure 15. That rule requires the Court to make case-specific findings of "all" of a wide range of factors that were unknowable to Salman, including that his "testimony could provide substantial proof of a material fact in a felony prosecution." Fed. R. Crim. P. 15(c)(3)(A).

This is nonsensical. Unlike the United States government, who worked in tandem with the SDF to run the prison in which Mujcinovic was apparently detained, Salman (a private citizen) and her United States attorneys had no access whatsoever to these foreign facilities or their rosters. The government acts as though the SDF prisons had a BOP.gov-type look-up tool, such that Salman should have known where Mujcinovic was housed and sought to interview him. On the contrary, Salman did not even know if Mujcinovic was alive until she received the March 2026 Disclosures. It has been well documented that mass torture and death ruled the day inside of the SDF prisons, and specifically in the Hasakah prisons where Mujcinovic was apparently detained. *See*, *e.g.*, Amnesty International, *Aftermath: Injustice, Torture and Death in Detention in North-East Syria* at 12-14 (Apr. 17, 2024), https://www.amnesty.org/en/documents/mde24/7752/2024/en/.

The same is true for Salman's actions between the March 2026 Disclosures and Salman's renewed motion to dismiss, during which the government, on the one hand, chides Salman for "rais[ing] no issues at all for more than two and a half months" and on the other, asserts that "the government is not required to conduct the defendant's investigation for her." ECF No. 176 at 2, 5. What was Salman to do with this belated information? Within minutes of receiving it, Salman asked the government where Mujcinovic was located. It responded that he "is in custody abroad." That having narrowed down his location to the entire world absent the United States, Salman endeavored unsuccessfully to find him. Unlike the United States and its law enforcement partners, Salman's Federal Defenders attorneys reached out for months to informal contacts developed domestically and abroad to attempt to find him. When those efforts predictably failed, on May 14, 2026, we filed a formal letter request with the government seeking its assistance in finding him. That went unanswered. When we followed up on May 27, 2026, the government responded that it did not have that information, and provided a partial list of Iraqi prisons where it guessed that Mujcinovic might be among the thousands of inmates. Our efforts to locate Mujcinovic within the Iraqi prison system have thus far failed.

None of this was necessary, and all of it was intentionally designed to block Salman from access to Mujcinovic's exculpatory evidence. The government defends its delayed disclosure by insisting that it was provided six months before the scheduled trial date. That's true, but irrelevant: the Rule 5(f) Order required the government to turn over the evidence "promptly after its existence becomes known to the Government," not six months (from the October 5, 2025 interview) or a year-and-a-half (from the September 10 and 23, 2024 interviews) later. ECF No. 7.

The government's suppression of the evidence in this particular way vitiated Salman's ability to "make effective use of the information in the preparation of its case." *Id*. The government argues that it "had no control over, or advance knowledge of, the transfer of ISIS prisoners from custody in one foreign country to another." ECF No. 176 at 5. Again, that's beside the point. The prisoners were transferred over a well-publicized period from January 21 to February 12, 2026. *See*

6

ECF No. 171 at 2. Incredibly, the government argues that "at the time the prosecution team provided the March 2026 Disclosures,"—March 27, 2026—it had not yet received information that Mujcinovic had been transferred to Iraqi custody." ECF No. 176 at 7. But any reader of the New York Times, and so surely the prosecutors and agents conducting this terrorism investigation, was aware of these ongoing, and completed, transfers. *See* Euan Ward, Eric Schmitt, and Erika Solomon, The New York Times, *U.S. Starts Moving ISIS Detainees From Syria to Iraq* (Jan. 21, 2026), https://www.nytimes.com/2026/01/21/world/middleeast/isis-syria-prisons-iraq.html; Eric Schmitt, The New York Times, *U.S. Transfers Thousands of ISIS Prisoners to Iraq From Syria* (Feb. 13, 2026), https://www.nytimes.com/2026/02/13/us/politics/us-isis-prisoners.html. Had the government complied with the Rule 5(f) Order and "promptly" turned over the material when its agents obtained it—October 5, 2025, at the latest—Salman could have endeavored to make use of it months before the transfers took place, when the FBI still had access to the inmates in Hasakah Prison, and when this Court could have granted a foreign deposition. The Court could have required the government to assist Salman in accessing his testimony,[2] which could have been preserved for trial by video. By instead sitting on the information—without justification—Salman lost that chance, and now it is too late. The only sufficient remedy is dismissal of the indictment.

**V.     The Government's Misuse of the Protective Order as a Sword and a Shield Supports Salman's Pending Motion Requesting Designation of Authorized Recipients**

The government required Salman to agree to a protective order governing all discovery in this case, limiting her ability to "disclose, disseminate or discuss discovery material to or with any other individual . . . unless such further disclosure is authorized in advance by this Protective Order, by the government in writing, or by Order of the Court." ECF No. 22 at ¶ 3. This provision has severely limited Salman's ability to prepare defense witnesses for trial. Accordingly, on January 13, 2026, we sought permission from the government to show certain potential witnesses their own prior statements. The government did not respond until February 24, 2026, denying the request. Following receipt of the March 2026 Disclosures, we likewise requested to show them to certain potential witnesses, which the government again refused, saying only that we could ask questions about the topics. In line with the protective order's constraints, we then applied to the Court, which the government opposed, citing severe security, obstruction, and collusion risks.

The government's refusal to authorize any discussion of a potential witness's own statement with that witness, combined with the Court's outstanding ruling, has had a significant impact on Salman's ability to be ready for trial. By way of one example, while the motion has been pending, counsel travelled seven hours to interview one of the proposed witnesses about these events, which occurred eight-to-ten years ago, amidst undeniable trauma. When the witness did not recall the event, undersigned counsel were unable to refresh her recollection, despite possessing on a laptop the notes of her own prior statement about the event. Imagine our surprise, then, when the

---

[2] The government quarrels that it has no authority to "require foreign authorities to produce an individual detained by them for an interview by third parties." ECF No. 176 at 7. Again, Salman would not be in this position but for the government's suppression of Mujcinovic's information since September of 2024, or October of 2025. The limited information in the disclosure, consistent with the Salman's experience in detention, is that the United States—by way of the FBI—had full access to question inmates while they were in SDF custody.

government filed on the public docket quotations from those exact witness statements that we have been hamstrung from using in witness preparation, any discussion of which the government had argued "present a serious risk to the integrity of this proceeding." ECF No. 164 at 1.

The government's public discussion of the vast majority of the March 2026 Disclosures, as well as direct quotations from HSALMAN_ 111, 121, 213, 285, 291, 309, and 398, severely diminish the veracity of their hyperbolic claims. Whereas the government argued last month that revealing the contents of the March 2026 Disclosures with certain potential witnesses "risks collusion" of the witnesses, the government has clearly abandoned that claim by now quoting wholesale from the disclosure. But the government did not alert Salman to its change of heart, so she has remained hamstrung from discussing the disclosure with the witnesses. So too regarding the witnesses' own statements. The government has made no showing, and provides no explanation, as to why the public is entitled to statements made by Brandy, Rabia, and Bilal Salman, ECF No. 176 at 2, but defense counsel must be banned from reviewing the reports containing those same statements with those witnesses. These actions impair Salman's right to present a defense, and upend her rights to a fair trial, by giving the public and the press distorted access to known potential trial witnesses' prior statements.

The government's conduct has required Salman to prepare for trial with one hand tied behind her back, while it, conversely, makes free and ready use of the same material in its effort to defeat her motion to dismiss. As a result, the Court should grant Salman's motion to discuss "with each family member only the contents of their respective interviews, not each other's," ECF No. 167, as well as the March 2026 and October 2025 disclosures. Those documents are as follows:

| Bette Ann Coy | HSALMAN_74-101 [specifically 74-78, 87] |
| Bilal Salman | HSALMAN_102-120 [specifically 102-108, 111-114] |
| Brandy Salman | HSALMAN_121-287 [specifically 121-131, 184-187, 213-221, 229-231, 234, 285-287] |
| Marwa Salman | HSALMAN_288-290 |
| Rabia Salman | HSALMAN_291-401 [specifically 291-299, 308-316, 398-399, 401] |
| Umar Salman | HSALMAN_402-550 [specifically 402-412, 436-439, 449-455, 549-550] |

Thank you for your consideration.

Respectfully Submitted,

_____/s/_____
Mia Eisner-Grynberg
Deputy Attorney-in-Charge
(718) 330-1257

Samuel Jacobson
Assistant Federal Defender
(718) 407-7429

cc: all counsel of record (by ECF)

8