UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

– against –

HALIMA SALMAN,

*Defendant.*

**MEMORANDUM & ORDER**
24-cr-00206 (NCM)

---

**NATASHA C. MERLE**, United States District Judge:

Defendant Halima Salman is charged in an indictment with receiving military-type training from a foreign terrorist organization. *See* Indictment, ECF No. 13. Before the Court are defendant's motion to dismiss the indictment due to the alleged nondisclosure of *Brady* material, *see generally* Mot., and two memorandums in further support of that motion, *see generally* Mem; Reply.[1] In the alternative, defendant seeks several forms of relief, including: (1) an order compelling the government to affirmatively seek out and produce additional Nusaybah Katiba documents; (2) making an adverse inference at the March 17, 2026, evidentiary hearing in favor of Ms. Salman; (3) reopening the CIPA 4 proceedings, ordering the government to obtain all classified information held by the intelligence community that is relevant to Nusaybah Katiba and Ms. Salman's case, and reconsidering the Court's ruling denying disclosure to the defense, (4) an order directing the government to locate Nadim Mujcinovic ("Nadim") and make him available for the

---

[1]     The Court hereinafter refers to defendant's Motion to Dismiss, ECF No. 147, as the "Motion"; the government's Response in Opposition, ECF No. 152, as the "Opposition"; defendant's Memorandum in Further Support of its Motion to Dismiss, ECF No. 171, as the "Memorandum"; the government's Response to defendant's Memorandum, ECF No. 176, as the "Supplemental Response"; and defendant's Reply to the government's Supplemental Response, ECF No. 178, as the "Reply."

defense to interview; and (5) an order compelling full disclosure of the materials related to the FBI's 2024 and 2025 interviews with Nadim, or, in the alternative, an order compelling disclosure of the Nadim interview notes to the Court for in camera review. Mot. 1; Mem. 5; Reply 4. The government opposes. *See generally* Opp'n; Supp. Resp.[2]

Defendant again moves to dismiss the indictment. *See* ECF No. 121 (denying previous motion to dismiss premised on alleged pre-indictment delay). This time defendant's motion is based on the government's alleged failure to disclose a Nusaybah Katiba ID card, the location of Nadim and Matiullah Nurzad ("Matiullah"), and statements made by Nadim to FBI agents. This evidence is, according to defendant, *Brady* material that was not disclosed in a timely fashion. Defendant says these untimely disclosures are part of a wider pattern of "head-in-the-sand *Brady* violations" for which there is no cure other than dismissal of the indictment. Even assuming that the evidence here is materially exculpatory, defendant's argument fails for the simple reason that the government *did* disclose this evidence, and did so in time for its effective use at trial. Accordingly, there was no *Brady* violation, much less a widespread and flagrant pattern of misconduct that would support dismissal of the indictment. For these reasons, explained more fully below, defendant's motion to dismiss the indictment is DENIED, as are defendant's first, second, third, and fourth requests for alternative relief. Defendant's fifth request for relief is GRANTED in part and DENIED in part.

---

[2]    In the Reply, defendant moves, with the government's consent, to unseal the Memorandum. Reply 1. Defendant's motion to unseal is GRANTED. Additionally, defendant moves to withdraw her motion to seal the Opposition, ECF No. 177. Reply 1. Defendant's motion to withdraw is GRANTED.

## DISCUSSION

The Court assumes the parties' familiarity with the facts and procedural history of the case. First, defendant moves to dismiss the indictment based on the government's failure to disclose a Nusaybah Katiba ID card that FBI agents used to question witness Saida Ismail on May 7, 2025. Mot. 1, 8; Mot. Ex. A at 14–15, ECF No. 147-1. Defendant argues that this document is exculpatory because "[t]he existence of [a] type of Nusaybah Katiba document . . . which Ms. Salman does not have . . . makes it less likely that [she] attended Katiba training." Mot 1. Defendant states that she has "repeatedly requested all Nusaybah Katiba documents in the government's possession." Mot. 1. Because the government represented that it had produced "all responsive documents" in its August 18, 2025, status report and again at the November 5, 2025 status conference, yet had the Nusaybah Katiba ID card in its possession at that time, Mot. 3, defendant concludes that the government suppressed the ID card in violation of its obligations under *Brady*.

That is not all. Defendant further argues that the government's "repeated[] and flagrant[] violat[ions] [o]f its [*Brady*] obligations"—of which the delayed disclosure of the ID card is just a recent example—also warrant dismissal of the indictment. Mot. 5, 7.

The government counters that it had no obligation to produce the ID card because it is not exculpatory, let alone materially so. Opp'n 2. According to the government, the ID card pertains to an unrelated individual's membership in Nusaybah Katiba, an ISIS battalion with which "hundreds of individuals [are] associated," and therefore "simply does not bear on any element of the charged offense." Opp'n 2. The government further argues that the document was not suppressed because it was not in the case team's possession and, more importantly, because the document was obtained and provided to defendant upon her request. Opp'n 2.

Second, defendant contends that the government intentionally withheld information regarding the location of Nadim and Matiullah, as well as exculpatory statements Nadim made to FBI agents about defendant at that location (the "March 2026 Disclosures"), until the two men were relocated to a prison outside of U.S. control. Mem. 2–3; *see* Reply 5–7. Specifically, defendant asserts Nadim's statements that "[n]o Salman family member was involved in the Nusaybah Katiba"; that—other than Cihat Salman— "the rest of the Salman family stayed at home, were unemployed, or otherwise stayed away from ISIS" and did not "subscribe[] to ISIS ideology"; and that "[t]he Salmans discussed their previous life often and wanted to leave Syria" make it "materially less likely that [defendant] received training from the Nusaybah Katiba battalion of ISIS." Mem. 1–2. And since these statements were made during interviews conducted "on September 10, 2024; September 23, 2024; and October 7, 2025," defendant asserts that information about the interviews was subject to her requests for exculpatory evidence. Mem. 2 (citing ECF Nos. 69, 85, 90, 101, 103). Finally, because Nadim and Matiullah were a part of a "transfer mission" in which United States Central Command moved approximately 5,700 alleged ISIS fighters from detention facilities in Syria, which are controlled by a U.S.-led coalition, to detention facilities in Iraq, which are not, defendant concludes that the government "intentionally with[eld] the exculpatory information until such time that it could no longer be used by the defense." Mem. 2; *see* Reply 7 ("[A]ny reader of the New York Times, and so surely the prosecutors and agents conducting this terrorism investigation, was aware of these ongoing, and completed, transfers.").

The government's arguments are familiar—the mens' locations and Nadim's statements are neither exculpatory nor material, and, in any case, were not suppressed. The government contends that Nadim's statements are not exculpatory because they are

"generalized denials" that are "asserted broadly" in response to questions about defendant's sister. Supp. Resp. 4. The government also notes that Nadim "did not live in the same city as defendant" and indeed "stated that he had never met" defendant. Supp. Resp. 4. And Nadim's statements are not material, the government claims, because being a "member of the Nusaybah Katiba" is neither alleged in the indictment nor an element of the charged offense. Supp. Resp. 4. Finally, the government argues that neither Nadim and Matiullah's locations nor Nadim's statements were suppressed because those facts "were voluntarily disclosed to [] defendant more than six months ahead of the scheduled trial . . . and within a reasonable period after the government became aware of them and received authorization to share them." Supp. Resp. 4.

Defendant contends that the government's arguments on these points only further illustrate its "pattern of suppressing and misrepresenting information" because the arguments rely on information underlying, but not contained in, the March 2026 Disclosures. Reply 2. Defendant says she has no way to "confirm, challenge, or contradict" the government's claims without the "actual interview notes or reports" associated with Nadim's interviews. Reply 2.

## I. Legal Standard

"The basic rule of *Brady* [*v. Maryland*] is that the [g]overnment has a constitutional duty to disclose favorable evidence to the accused where such evidence is material either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[3] The government has a *Brady* obligation "where non-disclosure of a particular piece of evidence would deprive a

---

[3]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

defendant of a fair trial." *Id.* at 140. The *Brady* obligation is violated where (1) the government suppresses evidence; (2) the evidence at issue is favorable to the defendant; and (3) the evidence is material to the defendant's guilt or innocence. *Id.* at 139–40. Evidence is material, and thus its suppression is prejudicial, where it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995). Accordingly, "as long as a defendant possesses *Brady* evidence in time for its effective use, there can be no *Brady* violation." *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016).

"[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence . . . as well as the particular circumstances of the case." *Coppa*, 267 F.3d at 146. Given the difficulty in determining materiality prior to trial, the Second Circuit has declined to specify a precise meaning for the phrase "in time for effective use." *See United States v. Rodriguez,* 496 F.3d 221, 226–28 (2d Cir. 2007) (collecting cases and declining to "express [any] definitive views on the [g]overnment's argument" that eliciting potentially exculpatory evidence from a witness on direct examination was sufficiently timely disclosure). But "the closer to trial the disclosure is made, the less opportunity there is for use." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001).

If it appears that the government has failed to timely disclose *Brady* material, the typical remedy is an "adjournment [to provide the] [d]efendant[] sufficient time to investigate potential leads." *United States v. Pizarro*, Nos. 19-2391, 19-2419, 2023 WL 3332539, at *1 (2d Cir. May 10, 2023) (summary order). Indeed, "[d]ismissal of the indictment is an extreme sanction and a drastic remedy, appropriate only when it is otherwise impossible to restore a criminal defendant to the position that he would have

occupied vis-a-vis the prosecutor, or when there is a widespread or continuous pattern of prosecutorial misconduct." *Id.*

## II.    Application

Here, what defendant frames as "delayed disclosure" of the ID cards and March 2026 Disclosures occurred six months before trial. Put simply, defendant received the evidence with time to investigate and use it at trial. That means "there is no *Brady* violation." *Coppa*, 267 F.3d at 144. Moreover, defendant has adduced no evidence of a "widespread or continuous pattern of prosecutorial misconduct." *Pizarro*, 2023 WL 3332539, at *1. In sum, there is no basis for defendant's motion to dismiss the indictment.

Moreover, as to the summary of Nadim's interview with the FBI, where the government has disclosed "the essential facts which would enable [the defendant] to call [a] witness and thus take advantage of any exculpatory testimony that [they] might furnish," *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975), it is not "required to produce primary materials containing exculpatory statements in order to meet its *Brady* obligation," *United States v. Collins*, 409 F. Supp. 3d 228, 244–45 (S.D.N.Y. 2019). Accordingly, the government appears to have met its *Brady* obligation by producing the summary of the Nadim's interview sufficiently ahead of trial and there is no basis for the vast majority of defendant's requested alternative relief.

Nonetheless, in an abundance of caution the Court will grant defendant's request for an order directing the government to produce, for the Court's in camera review, the interview notes and FBI 302 reports related to the interviews with Nadim that occurred on September 10, 2024; September 23, 2024; and October 7, 2025. *See Collins*, 409 F. Supp. 3d at 245 (denying motion for production of interview notes and FBI interview

7

reports after "independently review[ing] the summaries of the exculpatory statements provided by the government, and the notes and FBI 302s of the witnesses' interviews").

### A.  Nusaybah Katiba ID cards

The government did not suppress the Nusaybah Katiba ID card within the meaning of *Brady*. To begin, the Second Circuit has rejected the notion that such *Brady* material must be disclosed "immediate[ly] . . . upon request by a defendant." *Coppa*, 267 F.3d at 146. Instead, and while declining to articulate a specific timeline for disclosure, the Second Circuit has held that such evidence must be disclosed at a time "sufficien[t], under the circumstances, [to give] the defense[] [an] opportunity to use the evidence when disclosure is made." *Leka*, 257 F.3d at 100 ("It is not feasible or desirable to specify the extent or timing of [the] disclosure *Brady* and its progeny require . . ."); *see Coppa*, 267 F.3d at 142 (collecting cases and observing that due process of law requires "*Brady* material [to] be disclosed in time for its effective use at trial").

Here, the government produced the Nusaybah Katiba ID card to defendant prior to the March 17, 2026, evidentiary hearing and more than six months ahead of trial. *See* Hr'g Tr. 173:20–177:05 (questioning Saida Ismail on the Nusaybah Katiba ID card), ECF No. 158; *see also* Mot. Ex. B ("[The government] reached out to obtain [the ID card] for you and will provide it."). Thus, defendant had time to make "effective use" of the ID card "as shown by the fact that [defendant]'s counsel was able to question witnesses about the subject-matter of the [document]" at the March 17 evidentiary hearing. *Halloran*, 821 F.3d at 342; *see id.* at 342 n.14 (finding no prejudice where court's week-long continuance gave defendant time to make effective use of newly disclosed evidence and observing that even if there had been prejudice "dismissal of the indictment would not have been an appropriate remedy"). Because defendant possessed the ID card in time to use it at the

March 17 hearing, it is unclear how she would be prevented from effectively using it at the trial currently scheduled to begin in October 2026. *Pizarro*, 2023 WL 3332539, at *1 (declining to dismiss indictment where the government disclosed new *Brady* material days before trial, reasoning that "the district court's four-month adjournment gave [d]efendants sufficient time to investigate potential leads"); *see United States v. Persico*, 645 F.3d 85, 98, 111 (2d Cir. 2011) ("The [district] court noted that the facts were disclosed on the fourth day of a[n] [eight week] trial . . . and it concluded that the [d]efendants had more than ample time to assimilate the evidence and to effectively use it at trial. We agree."). The ID card was not suppressed within the meaning of *Brady* and dismissal on this ground is unwarranted.

Defendant's review of circumstances under which various courts have either dismissed indictments or upheld the dismissal of indictments, Mot. 5–6, is unavailing because none of those circumstances are present here. First, there is no evidence that the government withheld the ID card "deliberate[ly] or in bad faith." Mot. 5. Indeed, the government produced the ID card upon defendant's request. *See* Opp'n 2. ("[The document] was obtained for the defendant and provided to her upon her request."). Second, there was no prejudice to defendant, much less prejudice that "cannot be cured." Mot. 5. Third, and related to point one, the government produced the ID card, so there is no "delay and [] new trial [that] would unduly advantage the government." Mot. 5–6. Finally, the government's "unwilling[ness] to accept responsibility for the *Brady* violation," Mot. 6, is understandable given that it maintains, and the Court agrees, no *Brady* violation occurred. Accordingly, dismissal of the indictment on the basis of the Nusaybah Katiba ID card is unwarranted.

B. <u>Interviews with Nadim</u>

To start, the Court agrees with defendant that Nadim's statements appear to be at least somewhat exculpatory. Reply 4–5. If credited by a juror, a family member's statements that "[n]o Salman family member was involved in the Nusaybah Katiba" and that, aside from Cihat, "the rest of the Salman family stayed at home, were unemployed, or otherwise stayed away from ISIS," Mem. 1–2, make it less likely that defendant—a member of the Salman family who is not Cihat—was involved with, much less received training from, the Nusaybah Katiba.

The government's argument that Nadim's statements are immaterial because being a "member of Nusaybah Katiba" is neither alleged in the indictment nor an element of the charged offense, Supp. Resp. 4, is not persuasive. In fact, that argument is difficult to square with the government's heavy reliance on a Nusaybah Katiba training document which, according to the government, strongly supports that defendant received military training and was authorized to carry or receive guns and ammunition from ISIS. *See generally* Opp'n to Mot. to Exclude Evid., ECF No. 80; Supp. Opp'n to Mot. to Exclude Evid., ECF No. 157. First, the fact that the government's witness testified that the ISIS Department of Soldiers kept records of "[a]nything related to military matters" including "numbers and names [of those] who joined them" and "details about weapons and which soldier has what," Mar. 17 Hr'g Tr. 36:13–24, ECF No. 158, undermines the notion that ISIS was providing training to individuals unaffiliated with the organization. *See also* Opp'n to Mot. to Exclude Evid. 91 ("ISIS, unlike other terrorist organizations, . . . attempted to establish a fully functioning, centrally controlled, and organized hierarchical government with various subcomponents."). Second, the government asserts that the Nusaybah Katiba training document is admissible as "a non-hearsay co-conspirator

10

statement of Um Yousuf," who is a member of ISIS. Opp'n to Mot. to Exclude Evid. 91. Thus, the government attempts to bolster its case through allegations that defendant is in a "conspiracy to materially support ISIS," *id* at 93, while simultaneously narrowing the scope of its *Brady* obligations based on a hypertechnical read of the indictment, Supp. Resp. 4. The Court declines to engage in such an uncritical elevation of form over substance.

Here, Nadim's statements appear to directly support defendant's theory of the case: that "[a]side from Cihat, no one in the Salman family"—including defendant—subscribed to ISIS ideology" but rather "discussed their previous life [in the U.S.] often and wanted to leave Syria." Mem. 2. Put another way, it contradicts the allegations supporting the sole count of the indictment, tending to disprove the government's case. *See* Indictment 1.

Nevertheless, as with the Nusaybah Katiba ID cards, this evidence was not suppressed within the meaning of *Brady*. Again, for evidence to be suppressed in a way that constitutes a *Brady* violation a defendant must be prevented from meaningfully investigating and using it at trial. *Coppa*, 267 F.3d at 144 ("[W]e reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.").

Here, the government disclosed the mens' locations and Nadim's statements "shortly upon learning of them and receiving authorization to share the information," Supp. Resp. 5, and—again—more than six months before trial. Opp'n. 1. While it is true that "the closer to trial the disclosure is made, the less opportunity there is for [its] use," *Leka*, 257 F.3d at 100, courts in this Circuit have declined to find *Brady* violations in

much more exteme circumstances. *See, e.g., Pizarro*, 2023 WL 3332539, at *1 (concluding that a four-month adjournment was sufficient to cure any possible prejudice resulting from disclosure made "[d]ays before [d]efendants' original trial date"); *United States v. Douglas*, 525 F.3d 225, 245–46 (2d Cir. 2008) (explaining that "documents given to [defendant] on the Friday before trial" were not "suppressed" because the relevant information within them was "easily found and fathomed"); *United States v. Rittweger*, 524 F.3d 171, 180–82 (2d Cir. 2008) (finding no *Brady* violation where the government disclosed exculpatory grand jury testimony a week before trial and exculpatory FBI agent notes just prior to the agent's direct testimony at trial because "[t]he exculpatory information was . . . put before the jury and [defendant] was able to assimilate the materials into his case for its effective use at trial.").

Moreover, "the time required for the effective use of a particular item of evidence will depend on . . . the particular circumstances of the case." *Coppa*, 267 F.3d at 146. Here, defendant cannot claim that the timing of the government's disclosure *prevented* her from "undertak[ing] efforts to travel to Syria to interview" Nadim and Matiullah, Mem. 3, because by at least August 2024 she knew that members of her own family had told investigators the men were being detained in a prison in Syria. Supp. Resp. 2 ("[Defendant's mother] separately told the defendant and her sister Rabia that, according to their brother Umar, 'both ur [sic] husbands in shadadi' (a prison in Hasakah, Syria that housed ISIS fighters)."); *see also* Gov't Ltr. dated August 12, 2024, ECF No. 27 (confirming Rule 16 disclosures). It is difficult to conclude that earlier disclosure of Nadim and Matiullah's locations, "would have produced a different result at trial," *Coppa*, 267 F.3d at 144, given that defendant had access to this information over a year before the "delayed" disclosures of which she complains.

12

To the extent defendant contends that she did not have a reason to travel to Syria and interview Nadim prior to learning of these statements, Reply 5–6, that is not true. Nadim was a member of defendant's family who was known to be involved with ISIS. Supp. Resp. 2 (citing interviews, "produced to [] defendant in August 2024," in which Salman family members discuss Nadim's location and the fact that he is in "shadadi," a prison in Syria); *see* Gov't Ltr. dated August 12, 2024. Defendant may have had a stronger incentive to develop Nadim as a witness after learning about the statements he made, but she also had ample reason to investigate him prior to the March 2026 Disclosures.

Defendant's unsupported speculation about the timing of the March 2026 Disclosures is unavailing. The government represents that "[it] had no control over, or advance knowledge of, the transfer of ISIS prisoners from custody in one foreign country to another." Supp. Resp. 5. And defendant has pointed to no evidence supporting the conclusion that the government was aware that Nadim and Matiullah—two of 5,700 individuals who were moved from Syrian prisons to Iraqi prisons—would be relocated. Mere speculation about the incentives of the prosecution team based on the actions of the United States Central Command cannot justify the "extreme sanction" and "drastic remedy" of dismissal, *Halloran*, 821 F.3d at 342 n.14, absent some pattern of misconduct from which the Court could infer bad faith. And as discussed *infra*, defendant has established no such pattern. Accordingly, dismissal of the indictment based on the timing of the March 2026 Disclosures is unwarranted.

### C. Pattern of Prosecutorial Misconduct

Finally, defendant has not identified a widespread and continuous pattern of prosecutorial misconduct. To the extent defendant's argument is grounded in the exculpatory value of the Nusaybah Katiba ID card or the timing of the March 2026

13

Disclosures, as discussed above, that evidence was disclosed sufficiently far ahead of trial for defendant to investigate and make effective use of it.[4]

And the fact that the Court has ultimately disagreed with some of the positions the government has taken in various discovery disputes, *see* Text Order dated Jan. 27, 2026, or questioned its positions on the scope of its *Brady* obligations, *see* Mot. 4 n.1, 9 n.2, does not establish that the government engaged in prosecutorial misconduct by taking those positions.

Nor does the government's reliance on materials underlying the FBI's interviews with Nadim in its opposition to defendant's motion to dismiss establish a "pattern of suppressing and misrepresenting information." Reply 2. Defendant points out five "new claims" raised in the government's opposition that contain information other than what was provided in the the March 2026 Disclosures. Reply 2–4. Be that as it may, defendant's arguments regarding this "new information" are either irrelevant or fail to move the needle in her favor. Nonetheless, the Court briefly addresses each.

First, defendant says that the government's claim that Nadim "did not live in the same city as the defendant in Syria during the charged conduct," Supp. Resp. 4, "implies that the [government] knows where [defendant] lived during the charged conduct," despite its repeated representations that it did not. Reply 2–3.

---

4    Defendant's repeated invocations of *United States v. Bundy*, Mot. 6; Mem. 4–5, are unavailing because there the district court dismissed the indictment after holding several hearings regarding "important evidence [that] had been withheld" by the government and which only "trickled out during trial." 968 F.3d 1019, 1026 (9th Cir. 2020). The district court in *Bundy* dismissed the indictment with prejudice because "retrying the case would only advantage the government by allowing it to strengthen its [case]" based on the knowledge gained from the trial. *Id.* at 1029. Those considerations are not present here. Even assuming the evidence is materially exculpatory, it has been disclosed well before trial.

That implication is tenuous at best. On November 26, 2025, and in response to the Court's order on defendant's motion for a Bill of Particulars, the government said that defendant received Katiba training in either "Mayadin, al-Barakah Province [or] al-Furat Province." Gov't Ltr. dated Nov. 26, 2025, ECF No. 130. It is therefore plausible that Nadim was living outside of those provinces at the time of the charged conduct, which would also place him in a different city than defendant. The government need not know the particular city in which defendant was living to deduce that fact.

Second, defendant points out that the government did not "delineate on which dates [Nadim] made any of the statements contained in the March 2026 Disclosures" but represented that it "provided his statements just a few months after they were made." Reply 3. Defendant insinuates this was a misrepresentation given that two interviews happened in September 2024—"a year and a half before the March 2026 Disclosures." Reply 3. But this quibble is largely irrelevant given the fact that this information was disclosed roughly six months prior to trial.

Third, defendant takes issue with the lack of contextual material provided with the March 2026 Disclosures. Reply 3. But as discussed above, the government is not required to provide that material to satisfy its *Brady* obligations.

Fourth, defendant faults the government for stating that defendant asked the government to identify the facility in which Nadim was detained "for the first time" on May 14, 2026, given that she requested information about Nadim's location on March 27, 2026. Reply 3. Defendant is referring to an email, sent on March 27, 2026, in which she asked generally where the Nadim was located. Reply 3 ("Please let us know . . . [Nadim's] current location."). The government responded, "[w]e understand [he is] in custody abroad." Reply 3. Two months later, on May 14, defendant emailed the government

15

requesting information about the specific facilities in which Nadim was located. Mem. 3. The government responded that it did not have that specific information. Mem. 3. Thus, the government's assertion that May 14 was the first time defendant asked the government "to identify the facilities in which [Nadim] w[as] detained" is not inaccurate.

Finally, defendant argues that the government's representation that Nadim said he that "never met" defendant is materially different than what is in the March 2026 Disclosures, which say that Nadim "did not interact" with her. Reply 4. Further defendant says that her investigation "has produced evidence that this claim is untrue." Reply 4. First, the distinction between "never met" and "did not interact" seems to be one without a meaningful difference. Second, and more importantly, defendant will have ample opportunity to present evidence relevant to the veracity of Nadim's (or any other witness's statements) in support of any forthcoming motions in limine and, if admissible, at trial.

At bottom, many of these alleged "misrepresent[ations]" and "demonstrabl[e] false[hoods]" are unsupported by the record and largely irrelevant. Reply 2. Defendant has "not pointed to any evidence indicating that the disclosure failure was based on bad faith . . . or was otherwise part of a larger pattern," *Pizarro*, 2023 WL 3332539, at *1, and therefore dismissal is not warranted.

### D.  Defendant's Alternative Requests for Relief

Because the Court finds no *Brady* violation, it largely denies defendant's requests for alternative relief.[5] However, given the exculpatory nature of Nadim's statements and

---

5    Given the government's representation that it "is aware of its discovery obligations and has complied with them," Gov't Ltr. dated June 22, 2026 at 2, ECF No. 174, and the fact that the government did in fact disclose the ID card and interview information, the Court declines to "compel the government to affirmatively seek out and produce additional Nusayba[h] Katiba documents" or "reopen the CIPA 4 proceedings, order the government to obtain all classified information held by the intelligence community that

the government's arguments to the contrary—including a generally narrow view of what constitutes material evidence, Supp. Resp. 4, the government is directed to provide the underlying interview notes and FBI reports to the Court for in camera review on or before July 29, 2026. *See Collins*, 409 F. Supp. 3d at 244–45 (conducting an independent review of interview notes and FBI 302 Reports even though defendant's motion "could [have] be[en] denied" on the basis that the government had "provided abbreviated descriptions . . . of limited, unquestionably exculpatory statements by these two witnesses.").

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss the indictment is DENIED. Defendant's first, second, third, and fourth requests for alternative relief are

---

is relevant to Nusaybah Katiba and [defendant]'s case, and reconsider the Court's ruling denying disclosure to the defense." Mot. 1. Indeed, "[d]istrict courts in this Circuit commonly accept such representations from the [g]overnment as sufficient." *United States v. Hernandez*, No. 99-cr-00073, 2001 WL 674133, at *3 (S.D.N.Y. June 15, 2001). (collecting cases). Simply "hypothesiz[ing] that the [g]overnment is failing to meet its discovery obligations because of its allegedly narrow view of what . . . [is] discoverable" is "not a persuasive basis to compel disclosure" in light of such a representation. *United States v. Grinin*, 734 F. Supp. 3d 219, 224 (E.D.N.Y. 2024). And because the government produced the ID card in time for its use at the March 17, 2026, evidentiary hearing, defendant's request for an "adverse inference," Mot. 1, is moot. Finally, given that defendant knew Nadim had been apprehended in 2024 and could have attempted to locate and interview him at that time, the Court declines to compel the government to locate Nadim and make him available for the defense to interview. Defendant does not cite any authority holding that she is entitled to such relief, nor, more importantly, any basis upon which this Court could grant it. *See United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962) ("The Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it. Otherwise any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor."); *see also United States v. McLellan*, 959 F.3d 442, 473 & n.13 (1st Cir. 2020) ("Despite our search, we could find no decision contrary to th[e] proposition" that "[t]he Constitution may protect individuals in the United States from [foreign] subpoenas . . ., but it generally does not vest criminal defendants with the power to compel the government to lodge diplomatic requests on their behalf.").

17

DENIED. Defendant's fifth request for alternative relief is GRANTED in part and DENIED in part. The government is directed to provide the interview notes and FBI reports underlying the FBI's 2024 and 2025 interviews with Nadim to the Court for in camera review on or before July 29, 2026.

**SO ORDERED.**

*Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated:    July 22, 2026
          Brooklyn, New York

18